1

|  |  |
|---|---|
| 1 | IN THE UNITED STATES DISTRICT COURT |
|  | FOR THE NORTHERN DISTRICT OF ILLINOIS |
| 2 | EASTERN DIVISION |

```
DONALD HENNEBERG,                    )  No. 19 C 7380
                                     )
          Plaintiff,                 )
                                     )
          vs.                        )  Chicago, Illinois
                                     )
TOM DART, SUSAN SHEBEL, R.N., JOHN   )
DOE MEDICAL DEFENDANTS, JOHN DOE     )
CORRECTIONAL OFFICER NO. 1, and      )
COOK COUNTY, ILLINOIS, et al.,       )
                                     )  January 4, 2023
          Defendants.                )  9:45 a.m.
```

              TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HON. SARA L. ELLIS

APPEARANCES:

For the Plaintiff:     MR. PHILIP A. MISCIMARRA
                       MS. MARIA E. DOUKAS
                       Morgan, Lewis & Bockius LLP,
                       110 North Wacker Drive, Suite 2800,
                       Chicago, Illinois  60606

                       MS. LIZA B. FLEMING
                       Morgan, Lewis & Bockius LLP,
                       1701 Market Street,
                       Philadelphia, Pennsylvania  19103

For the Defendants:    MR. JASON E. DeVORE
                       MR. TROY S. RADUNSKY
                       DeVore Radunsky LLC,
                       27 North Wacker Drive, Suite 431,
                       Chicago, Illinois  60606

ALSO PRESENT:          Mr. John Power
                       Ms. Khara Coleman
                       Ms. Sandra Navarro

                       PATRICK J. MULLEN
                       Official Court Reporter
                   United States District Court
                219 South Dearborn Street, Room 1412
                       Chicago, Illinois  60604
                          (312) 435-5565

Exhibit B

1          (Proceedings in open court on the record.)

2               THE CLERK:  2019 CV 7380, Henneberg versus Dart.

3               THE COURT:  All right.  If everybody could state their

4     names and who they represent on the record, please.

5               MR. MISCIMARRA:  Your Honor, Philip Miscimarra with

6     Morgan, Lewis & Bockius for plaintiff Donald Henneberg.  With

7     me today is also the plaintiff, Mr. Henneberg, and my

8     co-counsel, Liza Fleming and Maria Doukas.

9               MR. RADUNSKY:  Good morning, Your Honor.  Troy

10    Radunsky for the defendants today with my partner, Jason

11    DeVore, John Power with the state's attorney's office, Khara

12    Coleman, general counsel with Sheriff Dart's office.  We're

13    also here with Josh Rafinski to testify or to talk about the

14    issues on the Cermak side, as you wanted, Your Honor, and we

15    also have Director John Mueller here to discuss the issues, as

16    the Court wanted, with respect to the jail side of it.

17               THE COURT:  Okay.  Great.

18               MR. RADUNSKY:  If I missed anybody, I apologize.

19               THE COURT:  Okay.  All right.  You can all be seated.

20    So --

21               MR. RADUNSKY:  Oh, I'm sorry.  And Sandy Navarro, who

22    is general counsel with Cermak.

23               THE COURT:  Okay.  All right.  So we've got

24    essentially two issues.  One is with grievances related to

25    assaults that are related or connected to the use of the

3

1    telephones at the jail, and then grievances on the medical side

2    relating to PTSD and vision care.  So for the benefit of the

3    jail and Cermak personnel who weren't here the last time, what

4    I want to understand is how does the jail and how does Cermak

5    keep these grievances, how are they organized, how can you pull

6    them, and what it would take.

7           So my initial understanding is that both Cermak and

8    the jail keep grievances in paper format and that they are not

9    organized necessarily by type of grievance.  So I basically

10   want just a better understanding of what would it take if we

11   were to say, for example, just with the assaults, you know, are

12   grievances categorized by assaults, are they categorized by

13   what kind of assault it was or by what caused the assault

14   allegedly, or is it, you know, that there's no categorization

15   at all?  So why don't we start on the jail side of things.

16          MR. MISCIMARRA:  Your Honor, just a point of

17   clarification, and I mentioned this in our last hearing.  The

18   discovery that's in dispute is not limited to grievances.

19   Consistent with the scope of the Monell claims that the

20   plaintiff is pursuing in this case, our discovery requests also

21   encompass communications between various people in the

22   hierarchy that deal with either inmate assaults or assaults by

23   gang members or control of the phones or medical care as well

24   as training and evaluations that are conducted for correctional

25   officers, policies and procedures that may bear on these

4

1   issues, incident reports.

2            We have one example of an incident report dealing with

3   Mr. Henneberg's assault, but there are obviously other written

4   incident reports as well.  There's additional documentation

5   that includes a 2010 agreed order that was entered in a lawsuit

6   by the Department of Justice and the Cook County Jail and

7   Sheriff Tom --

8            THE COURT:  All right.  Let me stop you.

9            MR. MISCIMARRA:  Sure.

10           THE COURT:  The reason that we're here, though, is

11  that the defendants are saying -- they're not saying we can't

12  pull policies, right?  They're not saying that.  What they are

13  saying is that at this point some of the things that you want

14  to prove your Monell claim we cannot pull, and that's why I

15  have them here.  So I want to deal with that first, and then we

16  can get through these other things.

17           MR. MISCIMARRA:  Thank you, Your Honor.

18           THE COURT:  All right.  Okay.

19           MR. RADUNSKY:  John, do you want to step up?

20           Judge, do you want him to come to the podium?

21           THE COURT:  Yes, that's fine.

22           MR. RADUNSKY:  Okay, wherever you'd like to him to go.

23           Go ahead, John.  Go to the podium.

24           THE COURT:  All right.

25           MR. MUELLER:  Good morning, Your Honor.

5

1    THE COURT:  Good morning.  Why don't we state your
2  name again for the record.
3    MR. MUELLER:  I apologize.  What?
4    THE COURT:  State your name again just for the record.
5    MR. MUELLER:  Okay.  John Mueller, J-o-h-n,
6  M-u-e-l-l-e-r.
7    THE COURT:  Okay.  So, Mr. Mueller, when the jail --
8  when someone at the jail files a grievance, just walk me
9  through the process of where it goes and how it's kept.
10    MR. MUELLER:  Sure.  So the CRW is their recipient of
11  the grievance form when the inmate turns it in.  They review
12  the content of the grievance form and then make a determination
13  whether it's a compliant grievance or non-compliant grievance
14  with the process.  If it's compliant, they then read through
15  the subject matter and categorize it in a general manner.  For
16  example, if a detainee would say "I missed my medical
17  appointment," then the CRW would categorize that as a medical
18  grievance.
19    There are approximately five categories in the medical
20  area:  dental, medical, psyche, medical diets, and medical
21  prescriptions.  So whatever issue it is related to the health
22  care side, it would subcategorize it into one of those fields.
23  It would enter it into a database.  So they would just extract
24  certain information from the grievance form itself.  The date
25  he submitted it, the date of incident, the name of the CRW

6

1   who's handling it, the number of the responder, all of these

2   things are in there.  There's no content of the grievance form

3   put into the database, just the general subject matter.

4           THE COURT:  And so with the database, for example, if

5   somebody was claiming, you know, they didn't get their glasses,

6   for example, would they be able then to -- would they put that

7   in the database?

8           MR. MUELLER:  No, it would just be categorized as a

9   200 medical grievance.

10          THE COURT:  Okay.

11          MR. MUELLER:  200 is like the code.  It would be like

12  the code for medical.

13          THE COURT:  Okay.

14          MR. MUELLER:  We do not have any specified categories,

15  such as optometry, in our fields for the grievance database.

16          THE COURT:  Okay.  And then where -- then the paper is

17  kept?

18          MR. MUELLER:  Sure.  So when the grievance form itself

19  is done, responded to and answered, the image of it is scanned

20  into -- well, the proper name is inVize database.  It's a

21  retention document storage thing where they can pull up an

22  image of the grievance, a particular grievance, and then export

23  it to PDF.

24          THE COURT:  And are the images searchable?

25          MR. MUELLER:  They are based on the general subject

Exhibit B

7

1  matter of a grievance, for example, to all 200 medicals and

2  like that, or by the specific inmate number.

3          THE COURT:  And so, you know, I know like with a PDF,

4  if something is converted to a PDF, you could, for example, run

5  searches on the PDF.  Is that possible in this system as the

6  images are captured or no?

7          MR. MUELLER:  Unfortunately, I apologize, but I

8  wouldn't be able to answer that.  We have never done that

9  through the history of working with the grievance forms.  I

10  also wanted to mention that when we -- on the inVize database

11  side when we pull up an image, we cannot do a date search, like

12  a time period search.  It would literally be from 2013.  I

13  think we applied inVize in 2013.  So if we go into inVize and

14  we want all the 200 medical grievances, the database is going

15  to populate from 2013 to present all of the medical grievances.

16          THE COURT:  Medical grievances, okay.  All right.

17          Then on the jail side, how are the grievances kept?

18          MR. MUELLER:  So after the inVize scan, basically we

19  have the alphabet, the full file folders, and we store them

20  according to the first letter of the inmate's last name.

21  They're just stuffed into folders and then sent to the

22  storeroom or warehouse.  For example, in the letter S will be

23  all the Smiths, Stanislovs.  They're not in any alphabetical

24  order and they're not in any numerical order within the

25  folders.

Exhibit B

1      THE COURT:  Okay.  So this is just an aside and not

2 necessarily relevant here, but the jail does need to come into

3 the 21st century in terms of how it keeps its records.

4      MR. MUELLER:  We are currently working on a new

5 database platform that will allow better search abilities.

6 It's current.  We expect to go live probably in March.

7      THE COURT:  Oh, all right.  So tell me about that.

8      MR. MUELLER:  That's for data moving forward, not

9 for --

10      THE COURT:  Not for historical data.

11      MR. MUELLER:  Right.

12      THE COURT:  Okay.  All right.  So that would be the

13 same then with any grievances regarding like assaults, for

14 example.

15      MR. MUELLER:  Correct.  So again, it's a general

16 subject matter.  I think there's like three of them.  There's a

17 failure to protect subject matter.  There is a

18 misconduct-physical by staff subject matter.

19      THE COURT:  Okay.  Okay.  So if we -- so if I wanted

20 to find in terms of the grievances all grievances related to

21 use of the phones, you know, if somebody was assaulted because

22 they went to use the phone, from what you're telling me,

23 there's no way to do that unless you manually went through

24 them.

25      MR. MUELLER:  You'd have to manually go through those

9

1  folders from A to Z and read each one.

2  THE COURT:  Okay.  All right.

3  Do the plaintiffs have any questions for Mr. Mueller?

4  MR. MISCIMARRA:  Your Honor, just a few things.

5  THE COURT:  Sure.

6  MR. MISCIMARRA:  Mr. Mueller, so all of the grievance

7  forms themselves are scanned in and they're made into a

8  PDF-imaged document, correct?

9  MR. MUELLER:  The images of the grievance forms are

10  scanned into a retention database.

11  MR. MISCIMARRA:  And those formats, to the extent they

12  contained texts, they can be the subject of word searches for

13  particular text, correct?

14  THE COURT:  Well, that's where he's saying that he

15  doesn't -- he's not sure and he doesn't think so.  So they are

16  scanned as images that could then be turned into a PDF, but

17  from what I understand you're telling me, Mr. Mueller, those

18  initial scans are basically image scans --

19  MR. MUELLER:  Yes.

20  THE COURT:  -- that have not yet been turned into a

21  PDF.  Is that right?

22  MR. MUELLER:  That's correct.

23  MR. MISCIMARRA:  Okay.  So they're not scanned into a

24  PDF form that can itself be searched for text.  When you said

25  before that they can be searchable, you were referring to the

10

1   fact that the imaged documents have to then be manipulated in

2   some way to permit a text search, is that right?

3           MR. MUELLER:  Correct.

4           MR. MISCIMARRA:  And it is possible if we take, for

5   example, the category 200 searches for medical records under

6   your current system, you could do or take a particular

7   category, for example, medical --

8       (Unidentified voice speaking over the phone.)

9           MR. MISCIMARRA:  I apologize.  You said it would be

10  possible to look within a particular category, and then you

11  would immediately be able to pull up all grievances in a

12  particular category from 2013 to the present.

13          MR. MUELLER:  Yes, but you wouldn't be able to --

14  again, you wouldn't be able to do a date period search.  That

15  would pull up from 2013 to present.

16          MR. MISCIMARRA:  But if we were looking at a period

17  from 2013 to present --

18          THE COURT:  Yes, but all you're going to get is the

19  category 200, which would be all medical grievances, right?  So

20  I can imagine that's in the hundreds of thousands of

21  grievances.

22          MR. MISCIMARRA:  But we haven't even gotten that kind

23  of data in terms of the claim of burdensomeness in this case.

24          The same thing in terms of assaults, what category did

25  you say would relate to assaults?

Exhibit B

1         MR. MUELLER:  Again, I apologize.  I don't have the
2   number of subject matter codes committed to memory.
3   Approximately four as well as four or five subject matter codes
4   on the medical side.  You're roughly looking at approximately
5   two to 3,000 medical grievances a year.  I did not -- I can't
6   recall specifically.  Now that's for 2018-'19.
7         MR. MISCIMARRA:  My question relates to assaults.
8         MR. MUELLER:  Okay.
9         MR. MISCIMARRA:  So with respect to assaults, there is
10  a number that relates to assaults, including a subcategory,
11  failure to protect, is that right?
12        MR. MUELLER:  That's correct, yes.
13        MR. MISCIMARRA:  It would be possible and not be
14  burdensome at least to do a search of all of the failure to
15  protect grievances in your records, and that would produce the
16  outcome of all of the grievances pertaining to failure to
17  protect from 2013 to the present.  I understand there could be
18  a very large number of those, but it wouldn't be burdensome at
19  least to find out how many grievances there were that dealt
20  with failure to protect.  Is that a correct statement?
21        MR. MUELLER:  It would be an extremely large number of
22  grievances to pull, but it is possible to pull those.
23        MR. MISCIMARRA:  Well, my question is that it wouldn't
24  be burdensome just to do the search and to find out how many
25  there were.

12

1         THE COURT:  Well, but here's where it breaks down.
2    It's that -- say you do this search for failure to protect.
3    You're going to get however many thousands of grievances over
4    this ten-year time span, and the ones that are relevant,
5    they're going to have to -- someone would have to go through
6    all of those, right?

7         MR. MUELLER:  That's correct.

8         THE COURT:  Because it is not relevant to a Monell
9    claim generally in a failure to protect, given the claims that
10   Mr. Henneberg is bringing here.  So what I don't want to do is
11   send the defendants off to do an initial part of a search if we
12   know that to really get to what is relevant, it's the tail
13   wagging the dog on a Monell claim.

14        MR. MISCIMARRA:  Understood, Your Honor, and the
15   relevant period that encompasses our discovery requests started
16   out being October 1, 2015, to the present.  In the course of
17   trying to resolve these issues, we limited it to October 1,
18   2015, to 12/31 of 2019.  The assault on Mr. Henneberg occurred
19   on June 17, 2019.

20        I understand that there's a voluminous number of
21   records if you're just talking about the grievance process but,
22   nonetheless, as you indicated in your order denying the motion
23   to dismiss, our burden in trying to pursue this claim is to get
24   relevant documentation that relates to the treatment of other
25   inmates in addition to Mr. Henneberg.

1      As I said before, certainly these grievance forms are

2  relevant in the fact that there are large numbers of these

3  grievance forms that may relate to failure to protect.  Well,

4  that's relevant.  If those instances are relevant to

5  Mr. Henneberg's treatment in some way, well, then for us to

6  pursue these claims there must be some burden on the defendants

7  separate from saying it's too burdensome for them to produce

8  anything.

9      THE COURT:  There's some burden, right?  There's

10  always some burden in discovery.  It's whether it is an

11  unreasonable burden which, you know, as they're describing how

12  they're keeping these records, it is seeming to me that it is a

13  bit unreasonable and that there has to be a different way to go

14  about getting similar information.

15      All right.  So, Mr. Mueller, why don't you have a

16  seat.

17      MR. MUELLER:  Okay.

18      THE COURT:  Ms. Johnson, we're just going to switch

19  over to the criminal cases really quickly, and then we'll pick

20  up where we left off.

21    (Recess.)

22      THE COURT:  Okay.  So we'll get back to 19 C 7380,

23  Henneberg versus Dart.

24      MR. RADUNSKY:  Judge, can I illuminate an issue that

25  we're talking about before we go to the Cermak side of this?

14

1          THE COURT:  Sure.

2          MR. RADUNSKY:  So a few things.  We understand the

3     plaintiff's frustration in wanting, you know, some of these

4     records.  The jail has incident reports that are written by

5     officers if there's an incident.  So let's say there's a riot

6     or a fight or something, an assault that is a big deal.

7     Officers will write up an incident report.  That's put in the

8     system typewritten, so that can be searched.

9          An inmate, let's say, who's involved in that situation

10    may file a grievance which is independent from the incident

11    report.  So the incident report isn't going to be a recitation

12    of the grievance.  It's not going to be a verbatim recitation

13    of anything that's in the grievance.  There may be similarities

14    between what the inmate is grieving about and what the officer

15    wrote in the incident report, but incident reports can be

16    searched.

17         So, for instance, I mean, if they were asking for, you

18    know, fights over the phone, if there's incident reports on

19    those between 2015 and 2019, we could probably -- we could

20    definitely do a search of those, but we can't search the

21    handwritten documents.  In other words, when you take a static

22    picture and create it to a PDF of a handwritten document, you

23    can't OCR search the PDF because it's handwritten.  All right?

24         THE COURT:  Right.

25         MR. RADUNSKY:  So that's where the problem just

1  continually comes in, and you'll hear the same thing with

2  Cermak.  It's not that we're not willing to cooperate or we

3  don't want to or we're trying to stonewall.  We're trying to

4  find a way to give them what they want in a reasonable fashion,

5  as the Court has pointed out.  So if it's incident reports,

6  which hasn't been brought up in court today, that is searchable

7  but we just can't do the grievances.

8          THE COURT:  Well, so there might be a way to get to

9  the grievances from the incident reports.  So would the

10 defendants be willing to do a search, if we're talking about on

11 the jail side of things the issue relating to the telephone, to

12 do a search for incident reports that involve assaults where

13 the underlying issue is use of the telephones, to pull those up

14 from that time period?  At that point then looking at the

15 incident reports, the plaintiffs, once you review those

16 incident reports, you'll know who was involved, and the person

17 who was assaulted presumably would file a grievance.  I think

18 from what I heard from Mr. Mueller, you can search the

19 grievances by inmate number.

20         MR. RADUNSKY:  That's correct.

21         THE COURT:  So you can at least pull the grievances

22 for that particular inmate and be able to, you know, match them

23 up.

24         MR. RADUNSKY:  And I'm assuming --

25         THE COURT:  So you're not going to necessarily end up

Exhibit B

1   with -- you know, what I don't want is you getting tens of

2   thousands of grievances that somebody has to look at, right?

3   That's just an utter waste of time.  But if it is grievances

4   for this particular inmate under this inmate's number

5   cross-referenced by the assault code, then at least it's going

6   to cut down on, you know, the grievances filed.

7           MR. RADUNSKY:  I mean, assuming there's a grievance

8   associated with the incident report, which is -- you know, we

9   have countless incident reports where inmates don't file

10  grievances.

11          THE COURT:  Right.

12          MR. RADUNSKY:  But you're right, Your Honor.  It's

13  possible theoretically to potentially work backwards.  You

14  know, if there's an incident report related to an inmate who

15  complains about a fight at the phone, to see if that inmate

16  then filed a grievance, a handwritten grievance, that can be --

17  I mean, I imagine that that can be done.  It would again be

18  time consuming, but those types of searches I think are

19  feasible.

20          THE COURT:  Mr. Mueller, does that seem like it would

21  -- Mr. Mueller, does it seem like that would make sense?

22          MR. MUELLER:  Yes.

23          THE COURT:  Is that possible?

24          MR. MUELLER:  So if I'm hearing everyone correctly, we

25  do the incident reports, identify a date of an incident and

1    specific inmates and their numbers, and we can then take those

2    numbers, inmate numbers, and search them for the 15-day period

3    beginning at the date of the incident.  All right?  There's

4    only 15 days allowed to submit a grievance under the rules, so

5    I believe that's doable.

6            THE COURT:  All right.  So that would at least get us

7    the universe of grievances that are filed relating to incidents

8    that are relevant, right?  That will at least get us there.

9            In terms of the Cermak side of things, is there a way

10   to -- you know, nobody is going to be filing incident reports

11   for a lack of appointment or anything like that, so I'm not

12   sure how we would get to the grievances on the Cermak side of

13   things.

14           MR. RADUNSKY:  I mean, it's a little different on the

15   Cermak side because you're filling out what's known as a health

16   services request form, also handwritten.  Okay?  So similar to

17   the grievances, those are then -- a picture is taken, PDF,

18   can't search them OCR because they're handwritten.

19           There is a separate component of the chart where

20   health services request forms, there's a section for that where

21   they're not the handwritten component.  It's just -- you know,

22   the handwritten records are there and then there's some

23   typewritten records, but there are differences between the two.

24   The handwritten ones which they're really talking about to

25   search, there's even more, I believe, and Josh could explain

18

1   this.  I think there's even more HSRFs at the jail for, you

2   know, medical issues than there are grievances.

3           THE COURT:  Right.

4           MR. RADUNSKY:  And now you're talking about an eye

5   condition.  On this particular form that we have, this health

6   services request form that was signed by the plaintiff, there's

7   actually a checkbox for eye issues.  I brought an example if

8   the Court wanted to see it, but it's just a box and you can

9   check like:  I'd like to see an eye doctor.

10          I think it says or the box is:

11          "I would like to be seen by an eye doctor for

12  eyeglasses."

13          Then you can check that, that box.  All right?  That's

14  on the handwritten form.  So there's no way.  Again, because

15  it's checked, it's handwritten, and it's on every form, you

16  can't -- unless you search every form, you can't see who

17  checked what or didn't check the box without looking by hand on

18  this issue specifically related to eyeglasses.  This has

19  nothing to do with the assault.  So the searches are going to

20  be even broader, I think.

21          Again, I brought Mr. Rafinski in here to explain all

22  of that if the Court wants to speak to him in more detail.

23          THE COURT:  All right.  So on the Cermak side of

24  things, what exactly is Mr. Henneberg looking for?

25          MR. MISCIMARRA:  Your Honor, we were looking for

Exhibit B

19

1    documents that relate in particular to vision care during the

2    relevant period of time, more specifically eyeglasses, but some

3    of our requests are more general than that.

4              THE COURT:  All right.  But what exactly are you

5    looking for, though?

6              MR. MISCIMARRA:  We would be looking for documents,

7    and I think the approach, Judge Ellis, that you've identified

8    in relation to incident forms and working backwards from the

9    incident forms to get the grievance forms should also be

10   feasible to use in connection with vision care issues, because

11   it's possible to take a look at for a particular period of time

12   the actual medical records or the things that happened when a

13   particular inmate requests eyeglasses, and that entire document

14   trail has been completely unexplored.

15             I'd note with respect to the incident report issue

16   we're more than a year into this litigation.  In fact, we're

17   more than a year into this discovery dispute, and we've

18   received one incident report, which is the incident report that

19   pertains to Mr. Henneberg.

20             Everyone has known from the beginning of this

21   litigation in connection with the Monell claim that our

22   requests would encompass all kinds of documentation, including

23   communications, internal reports, standard operating

24   procedures, et cetera, that relate to the range of inmates

25   within Cook County Jail.

1    I could be more specific than I am right now, but it's

2  very frustrating, not to mention burdensome, to be a year into

3  a discovery dispute and for the first time the defendants are

4  talking about producing incident reports when that's what we've

5  been seeking, among other things, for more than a year.

6    THE COURT:  Okay.  But the point is we're here now.

7  So I'm trying to get to a way to get the information that you

8  need.

9    MR. MISCIMARRA:  I appreciate that.

10    THE COURT:  So my understanding on the health care

11  side of things, I understand that if you scan a handwritten

12  document and turn it into a PDF it's not searchable.  Cermak

13  receives, you know, thousands upon thousands of requests for

14  health care every month, so there's no way to really search

15  those, right?  So there has to be something that is -- you

16  know, I'm not sure.  You can't really work backwards.

17    The incident reports will identify specific

18  individuals, which then you can go back and pull those

19  grievances.  The problem here is that from what I understand

20  Mr. Henneberg asked or made a request for vision care, made a

21  request for glasses, and then didn't get them.

22    So even if, for example, you went to the records of

23  the optometrist who comes to Cermak and you were to say, you

24  know, show me everybody you saw, that doesn't necessarily help

25  Mr. Henneberg because those are people who actually got seen,

21

1    not the people that made the request but didn't get seen.  So

2    that's -- we're looking for a negative, which you can't do from

3    searching, you know, the people that the optometrist saw.

4    Because the optometrist has no record of people who had asked

5    to be seen but then were never seen, so you can't get there

6    from that.

7             So, you know, does anybody have any ideas?

8             MR. RADUNSKY:  I mean, we have told counsel, I mean,

9    you know, if his client is trying to bring a Monell claim on

10   this, I mean, if you're bringing a Monell claim and trying to

11   show widespread policy or practice, then if you can identify

12   any other inmates, anybody that had a similar issue or problem,

13   we could search by inmate booking number, you know.

14            THE COURT:  But here's the deal, right?  Not to

15   discount the work that is done at Cermak, however, you're

16   not -- I think it is generally understood that it is difficult

17   to get health care when you are in custody.  You have to jump

18   through a number of hoops.  Having done this job for nine

19   years, I can tell you that if you show up with an issue, you

20   know, you get arrested and you don't have your glasses with

21   you, it will take a long time for you to get your glasses

22   because they won't allow you to send them in from the outside.

23   You have to request them, and you have to request them multiple

24   times.

25            So the problem for Mr. Henneberg is that this is

1  fairly common.  He knows that his experience is not unique.

2  However, he does not have access to the information to prove

3  that it's not unique.  The party with the information is the

4  jail, but the jail does not keep its records in a way that will

5  provide him with that information.

6       So it's not his burden necessarily and it's not

7  reasonable for him to track down everybody that he was with

8  over that time period and ask them how long did it take you to

9  get your glasses when you needed them, right?  He has no way of

10  tracking any of those people down.

11       The jail, however, knows exactly who was there, knows

12  who requested glasses, and knows how many times they needed to

13  request glasses before they actually got them.  However,

14  because it's kept in a form that -- in this day and age, no one

15  should keep forms in that way.

16       Every other system, at the MCC, at Kankakee County

17  Jail, all the outlying jails that the federal criminal system

18  uses, all of those grievances are done at a kiosk.  You go over

19  and you type it in and make your request, and it is sent

20  electronically to the people that need it.  It is saved in a

21  database, and the database is searchable.  It's not rocket

22  science, nor is it more expensive than it is to have outside

23  counsel sitting in a court hearing where the jail is paying for

24  it because they don't keep records in a searchable format.

25       So Mr. Henneberg is entitled to this information.  We

23

1   have to figure how he's able to get that information without
2   having somebody spend countless hours looking at handwritten
3   requests where they've checked a box.  So I am open to any and
4   all ideas.
5           MR. RADUNSKY:  Every inmate, when they're initially
6   brought in the jail, goes through intake and are asked about
7   eyeglasses, you know, every single one.  So even if you were to
8   do a search, I mean, for eyeglasses, it's every inmate.  I
9   mean, there's no way to do a narrower record search because, as
10  the Court pointed out, it's just the system that they use,
11  unfortunately.  I wasn't even aware of what you just said, I
12  mean, of the kiosk issue, but this is how they keep records.
13          We have searched our brains to try to come up with
14  even creative ways to try to comply and be as transparent as we
15  can.  We'd welcome any suggestions because we just cannot
16  figure out a way to do this where it wouldn't be, as you said,
17  inefficient, extremely costly, highly burdensome.  I don't
18  know.  We've talked about it internally, and we just can't
19  figure out a way to do it within the system that we have.
20          THE COURT:  All right.  So has Cermak been audited in
21  any way?
22      (Discussion off the record.)
23          MR. RADUNSKY:  I want to bring up Josh.
24          THE COURT:  Sure.
25          MR. RADUNSKY:  He might be able to answer those

24

1    questions, Your Honor, Josh Rafinski.

2             THE COURT:  All right.  Good morning.

3             MR. RAFINSKI:  Good morning to you.  My name --

4             THE COURT:  Go ahead.

5             MR. RAFINSKI:  My name is Joshua Rafinski,

6    J-o-s-h-u-a.  Rafinski is R-a-f-i-n-s-k-i, and I work for

7    Cermak Health Services.

8             THE COURT:  All right.  So has Cermak been audited by

9    any institution that's looking at the timeliness of the health

10   care that's provided or responsiveness?

11            MR. RAFINSKI:  Yeah.  So the accrediting body over at

12   the jail would be the NCCHC, which is the National Commission

13   for Correctional Health Care.  We're in the process of being

14   accredited now.  We just completed a mock survey a few months

15   ago, and so we passed that mock survey.

16            Additionally, prior to that we were under a Department

17   of Justice agreed order, and we had monitors coming in every

18   six months for about ten years or so, roughly 2008 to 2018.  So

19   we regularly had federally appointed medical monitors coming in

20   and auditing all of our processes.

21            THE COURT:  Okay.

22            MR. RAFINSKI:  So we're no stranger to audits.

23            THE COURT:  Okay.  So how accessible would the audits

24   be from 2016 to 2018, the federal audits?

25            MR. RAFINSKI:  Good question.  I would have to do some

1  research.  They were -- a lot of the audits are typed up in

2  just summary documents, so you won't find individual patient

3  information or anything like that.

4        THE COURT:  No, I'm not looking or I wouldn't

5  necessarily be looking for individual patient information, but

6  more issues that were identified in the audit in terms of

7  responsiveness or timeliness broken down by particular types of

8  care, whether it's dental care or vision care.

9        MR. RAFINSKI:  Yeah, I'm not quite sure on that.  I do

10  know in order to fulfill the consent decree we needed to be

11  compliant on all components, which would include each of those

12  different categories.  We had to be compliant for two years.

13  So from 2016 through to 2018, we would have passed and been

14  compliant with community standards for those final years.

15        MR. RADUNSKY:  Excuse me, Your Honor.  I was just told

16  in 10 CV 2946 the audits are on the docket.

17        THE COURT:  Oh, okay.  All right.  So that may be a

18  start at least.

19        MR. MISCIMARRA:  Your Honor, I think -- well, two or

20  three things.  One is, you know, we have the agreed order that

21  dates back to May 13, 2010, and there were successive monitor

22  reports.  I have one, for example, that is report number 12,

23  and it was filed in 2016.  Those audits and those reports

24  relate in part to assault issues as well as to some degree

25  health care issues.  So they provide a starting point.

1        One thing that we would request from where we are

2    right now is a reasonable opportunity to supplement our

3    discovery requests so there's no question about the other types

4    of documents, separate and apart from grievance forms.  We can

5    certainly exhaust efforts on our side to identify information

6    that may relate to vision care and medical care issues and try

7    to address that through supplemental discovery requests.

8        However, we do have in relation to the assault part of

9    our claims a method that you've identified that can be used,

10   working from incident reports, internal communications, other

11   types of other investigation reports to identify particular

12   people, then work backwards into the grievance forms.

13       Unfortunately, the grievance forms pertaining to

14   medical care, in particular vision care, have unique relevance

15   in connection with the Monell claims because that's the

16   information that specifically goes to deliberate indifference.

17   When someone has filed a grievance, it reflects the fact that

18   they haven't emerged as a case for treatment in any other way.

19       THE COURT:  Well, yes and no.  I mean, the findings

20   from the audits over the years can also go to the deliberate

21   indifference issue, and it may be if you dig into those audits

22   and perhaps communications around the audits, which I want to

23   get to next, you can get there without necessarily the

24   grievances.  So, you know, there are different ways to build a

25   deliberate indifference case.  Grievances obviously are an

27

1   easier way to do it, but you can get there another way.

2           MR. MISCIMARRA:  Of course, we will exhaust every

3   other possible opportunity to do that.  The challenge here is

4   Mr. Henneberg, like most people incarcerated in Cook County

5   Jail, was there for a limited slice of time, and one of the

6   things that's also important about the original agreed order

7   that dates back to 2010 and intervening monitor reports is they

8   found deficiencies and insufficiency with respect to the Cook

9   County correctional institution's recordkeeping.

10          So when we get back into this courtroom, if necessary,

11  for a trial, the inadequacy of the recordkeeping, we will put

12  in evidence with argument that it directly bears on the merits

13  of the Monell claim because the type of recordkeeping that

14  makes it predictably difficult or impossible to pursue a Monell

15  claim itself is relevant to the issue of deliberate

16  indifference.

17          You know, nonetheless, we're going to try to do what

18  we can through other means to get into this area, but because

19  as we have a limited timeframe that we've already made more

20  narrow I think it's still reasonable to expect the Cook County

21  Jail and the defendants to do some manual searching of these

22  grievance forms, at least in relation to the medical care

23  issue.

24          THE COURT:  Well, the problem as I understand it is

25  that, you know, even if you were looking at a two-year time

1  span, they're not kept in -- it's just medical care grievances,

2  and they are not kept anywhere.  And it's going to be thousands

3  and thousands and thousands and thousands of records that need

4  to be searched manually to determine if they relate to vision

5  care.

6         MR. MISCIMARRA:  You know, I thought from some of the

7  testimony that there was some designation of particular

8  grievances that relate to medical care.  One possibility could

9  be for a particular period of time -- and the period of time

10 that we have narrowed our request to was October 1, 2015, to

11 the end of the year 2019 -- one possibility would be to take

12 the available grievance forms pertaining to medical care or

13 vision care, have them scanned, go through the process of just

14 doing a PDF conversion so that the PDFs can themselves be

15 searched, and then have an agreed number of search terms that

16 could be used to go through those documents.

17        THE COURT:  So that's not how it works.  The

18 technology doesn't work like that.  So when you convert an

19 image into a PDF, PDFs that are created organically as PDFs can

20 be searchable by terms.  When something is created as an image

21 and then turned into a PDF, that PDF is not searchable by

22 terms.  There's something in the conversion process that

23 prevents it from being searchable, so you can't look for

24 "eyeglasses," for example.  It's just -- it's like you turned a

25 picture into a PDF.  So the text doesn't mean anything.

29

1      MR. MISCIMARRA:  I am aware, Your Honor -- and we do

2   this all the time -- to have PDFs that start out as images, and

3   various programs that I think are off-the-shelf programs have

4   an optical character capability and they convert the image PDFs

5   into text-searchable PDFs.  It takes a matter of seconds for

6   that to be done on a per-document basis.

7      THE COURT:  Go ahead.

8      MR. RAFINSKI:  Yeah.  What you said, Your Honor, is

9   true.  It all depends on whether or not you have structured

10   data.  When it's organically produced, say you're in Microsoft

11   Word, you have a structured document with structured text, and

12   that gets converted to a PDF.  It's structured data that could

13   be extracted.

14      Images are not.  They're not structured.  If you took

15   a white board and handwrote on it and took a picture of it on

16   your camera, I don't know any off-the-shelf apps that would let

17   you search through that picture of the white board you just

18   took.  So that would be unstructured data.

19      So depending on how that PDF was generated determines

20   if it's searchable, and based on what we're hearing today on

21   the jail for both Cermak and the jail side, we're scanning

22   images like pictures of handwritten documents.  It's the same

23   as if you took a picture on your cellphone.

24      MR. MISCIMARRA:  I agree that handwriting is

25   different.  But to the extent that there are the grievance

Exhibit B

30

1  forms that reflect text, for example, in the response to the
2  grievance, if that were typewritten, then that could be, that
3  could be the subject of word searches.

4         MR. RAFINSKI:  And for every handwritten document,
5  someone would have to do a full transcription into an
6  electronic structured format.  So you'd have a full team
7  of transcriptionists.

8         MR. MISCIMARRA:  I'm not suggesting that.

9         MR. RAFINSKI:  Yeah.

10        THE COURT:  All right.  So why don't we start with at
11  least the audit reports.  So what I want the defendants to do
12  is provide the audit reports and attachments to the
13  plaintiffs -- to the plaintiff.  How far do you want to go
14  back?  I mean, it starts in 2010.

15        MR. MISCIMARRA:  It would be -- if we're talking about
16  the audit reports, I would request that we go back to the
17  agreed order in 2010 and all of the monitor reports since then.

18        MR. RAFINSKI:  Just to clarify one last thing, for the
19  agreed order, there was two separate agreed orders, one for the
20  jail side and one for the health side.  So if you're looking
21  for the health information, you've got to read through the
22  health version, so Cermak.

23        MR. MISCIMARRA:  Well, we would request both because
24  the assault -- you know, both claims, especially the assault
25  claim relates principally to the jail, and the medical claim

31

1  relates to both.

2          THE COURT:  All right.

3          MR. RADUNSKY:  And just so we're clear, I mean, these

4  audit reports, I think they're called medical monitoring

5  reports.  You know, they're separated for medical and

6  correctional conditions.  I mean, I know that we're calling

7  them, you know, audit reports.  You know, there's also been, I

8  think, some crisscross between, you know, grievances and the

9  health services request forms, and I just want to make it clear

10 that they're separate.  They're completely separate things.

11         THE COURT:  I understand that.

12         MR. RADUNSKY:  And I think the Court understands that.

13 Okay.

14         THE COURT:  But what I'm asking for and telling you to

15 provide is essentially the audit reports, the monitor reports

16 going back to 2010 for both the jail and for Cermak, and then

17 we can start from there.  You can review all the reports at

18 that point and then do supplemental discovery requests

19 identifying, you know, whatever specific issues that you'd be

20 able to get that at least the monitor had reviewed in terms of

21 making the report.  Then we can go from there, because at least

22 that information has been pulled.

23         MR. MISCIMARRA:  And, Your Honor, we would also

24 request, to the extent that it's available, the communications

25 that exist that went back and forth between the original

1   investigators and Cermak or the jail or the underlying data, to

2   the extent that it exists, that was provided to the

3   investigators and/or the monitors.

4           THE COURT:  Yes.  So I don't know how far back, you

5   know, the emails are going to go or any correspondence, but I

6   would suspect that because this isn't -- 2018 was when the

7   consent decree was up.

8           MR. RAFINSKI:  I believe so.

9           THE COURT:  So, you know, to the extent that you have

10  it, go ahead and provide those.  Then what I would want also

11  are any email communications that the jail has regarding the

12  type of assault that Mr. Henneberg is complaining about as it

13  relates to the telephones, use of the telephones and control of

14  the telephones from 2015 to 2019.  So let's start there and see

15  where we get.

16          Thank you.  You can be seated.

17          MR. RAFINSKI:  Thank you.

18          THE COURT:  So we'll start there and see where we go.

19  I will say that, you know, this process could have happened

20  without me and should have happened without me.  You didn't

21  need me for this.  Just because something is a little harder

22  than it looks on the first go doesn't mean that you give the

23  plaintiff one incident report and call it a day.

24          So, you know, fact discovery is supposed to close, I

25  think, on January 24th, and obviously you're not going to get

Exhibit B

33

1   done before then.  Yes?

2        MR. DeVORE:  Your Honor, one thing we wanted to add

3   was the docket for the case we had referenced before, the 2010

4   case, has a protective order for the Department of Justice, and

5   we cannot produce DOJ communications.

6        THE COURT:  Well, who's the judge in that case?

7        MR. RADUNSKY:  That was the one that was 10 CV 2946.

8        THE COURT:  Judge Kendall?

9        MR. DeVORE:  Yes.

10       THE COURT:  Well, I think what you can do --

11       MR. MISCIMARRA:  I think it's Virginia Kendall, Your

12  Honor.

13       THE COURT:  Yes, we just said that.

14       MR. MISCIMARRA:  Yeah.

15       THE COURT:  What you can do is talk to the lawyer

16  representing the Department of Justice.  If the county is fine

17  with producing this information and the Department of Justice

18  agrees, then it can be produced in this case.  So, you know,

19  the protective order will, I'm sure, allow the parties to the

20  protective order to produce information if they agree, and it

21  could be produced pursuant to the protective order here because

22  we've got one entered.

23       MR. DeVORE:  And, Your Honor, one more thing that I

24  wanted to add, the sheriff's office was not subject to the

25  terms of the consent decree after June of 2017.

34

1      THE COURT:  Okay.

2      MR. RADUNSKY:  That's docket number 361, Your Honor,

3  on 10 CV 2946.

4      THE COURT:  All right.  Have the parties discussed

5  settlement at all?

6      MR. RADUNSKY:  I don't believe we have -- I don't want

7  to speak for -- I mean, I don't recall us receiving a

8  settlement demand.  I know we were discussing among us doing an

9  OJ.  I don't think that's happened yet, either, but I don't

10  think you made a settlement demand.

11      MR. MISCIMARRA:  Well, we haven't had enough

12  information in order to even have an intelligent discussion

13  with our client.

14      THE COURT:  All right.  Well, I mean, here's the

15  thing, right?  It's that a Monell claim can at first blush seem

16  to add value to a case, and there are different, certainly

17  different reasons for bringing a Monell claim.  So sometimes

18  people bring these claims to attempt to change a system.

19  There's value to that, but it doesn't translate into monetary

20  value.

21      So in order to be successful on a Monell claim, a

22  plaintiff has to show that the underlying constitutional

23  violation applied to him, right?  So you cannot get to a Monell

24  claim without some underlying constitutional violation, and in

25  the end the Monell claim doesn't add any more to the damages.

1      So, Mr. Henneberg, you're only going to get damages

2   for what happened to you, not because this was resulting from a

3   policy or a procedure or a custom or a practice that the jail

4   or Cermak had, right?  So your damages are only from what

5   happened to you.  It doesn't matter that this was a one-off

6   thing that applied to you or that this was the result of a

7   policy or a practice or a custom.

8          So there should be or you should have sufficient

9   information at this point to make a demand based on the damages

10  that you suffered.  The Monell aspect of it is sort of like

11  icing on the cake, but it doesn't necessarily go to the

12  damages.  So it may be worthwhile to come up with a demand.  As

13  the defendants at this point know, the discovery aspect on the

14  Monell claim is going to take some time and going to cost some

15  money.  So that may be worthwhile.

16        MR. DeVORE:  Your Honor, just a point of

17  clarification.

18        THE COURT:  Yes.

19        MR. DeVORE:  Plaintiff's counsel indicated that they

20  had either some or all of the monitoring reports from 10 C

21  02946.  I just want to be clear.  Are you requiring defendants

22  to download those documents which plaintiff apparently has and

23  then produce them?

24        THE COURT:  Well, talk to each other.  All right?  I

25  don't know that it makes sense.  You know, the first question

1  would be:  Well, what do you have?  All right?  Do you want me

2  to give it to you again?

3         I would suspect the answer would be no, and the

4  response would be:  I may have these reports, but I don't have

5  the underlying data and I need the underlying data.

6         MR. DeVORE:  Understood.  We just want to make sure

7  we're clear in terms of whether we're being required to produce

8  publicly available documents.

9         THE COURT:  No, I'm just asking you to open your

10  mouth, pick up the phone, and talk to him.

11         MR. DeVORE:  Understood.

12         THE COURT:  Clearly, none of that has happened before

13  today, or very little of it.

14         MR. RADUNSKY:  Actually, Judge, I mean, we have had a

15  lot of communication with counsel.  I mean, you know, we're

16  trying to have, you know, meet-and-confers.  We've always been

17  available.  They know that.  We've had a great professional

18  cordial relationship with them.  I think the Court is bringing

19  up a good point about, you know, maybe we need a motion to

20  bifurcate, you know, the Monell issues from the underlying

21  claims.

22         MR. MISCIMARRA:  We would oppose that.

23         MR. RADUNSKY:  We can deal with those before the

24  Monell issues.  You know, in listening to you talk, I mean,

25  it's something that I'm going to consider.

1     MR. MISCIMARRA:  Your Honor, we would oppose that.

2     THE COURT:  I understand, but this is where we are

3  right now, right?

4     MR. RADUNSKY:  Sure.  We'll do everything, you know,

5  Judge.  We'll make those phone calls, and we're happy to work

6  and continue to work with counsel and cooperate in discovery.

7     MR. MISCIMARRA:  Your Honor, we would also --

8     THE COURT:  Hold on.

9     MR. MISCIMARRA:  -- just ask that you set deadlines

10  for when these further steps should be conducted and completed.

11     THE COURT:  So what's defendants' position on going to

12  see the magistrate judge for a settlement conference?

13     MR. RADUNSKY:  That's predicated on the demand usually

14  for us.  I mean, they like to -- you know, the county likes to

15  see the demand first and then, you know, decide if it's

16  worthwhile and, you know, something that we would even want to

17  involve a magistrate in.  But, you know, usually, Judge, we're

18  always willing to participate.  Not always, but we're willing

19  to participate in settlement conferences if the demand is

20  reasonable, of course.

21     THE COURT:  All right.  So I'm going to enter a

22  referral, Ms. Johnson, to the magistrate judge for a settlement

23  conference.

24     Mr. Miscimarra, how long do you think it would take

25  you to put a demand together?

38

1      MR. MISCIMARRA:  You know, I would suggest, Your
2  Honor, that you give us 20 to 30 days just because of where we
3  are at the beginning of the year, but I think that would be
4  sufficient.
5      THE COURT:  All right.  So I'm going to enter the
6  referral.  You're going to see Judge Cole, I would suspect, you
7  know, within a few weeks.  So try to, you know, get a demand
8  over certainly before you have your first status with him, and
9  then he's going to set the date for a settlement conference.
10     I would like -- how long do the defendants need to do
11 the search of the incident reports, provide the underlying data
12 to these monitor reports, and then do the search of the
13 grievances?
14     MR. RADUNSKY:  Do you mind if we get a couple minutes,
15 Your Honor, to talk about this in the hall?
16     THE COURT:  Go ahead.
17     MR. RADUNSKY:  I appreciate it.  Thanks.
18   (Recess.)
19     THE COURT:  Okay.
20     MR. DeVORE:  Thank you, Your Honor.  We conferred, and
21 we can get the incident reports to plaintiff within 21 days.
22 What we would propose is once those incident reports are
23 provided that the plaintiff identify detainees within those
24 reports, and at that point we can provide all grievances
25 associated with those particular detainees.  We don't know what

39

1   the time period is because it depends on if they give us 20 or

2   they give us 200.  But as Your Honor suggested, you know, we

3   think we can work this out with counsel in terms of timing and

4   move along in that manner.

5           And then secondarily, with respect to the underlying

6   data, you know, when we go to the DOJ and Judge Kendall, you

7   know, obviously we need to have some particular things that

8   we're looking for, and our suggestion would be for plaintiff to

9   identify sections of these reports.  There are, I believe,

10  20-plus reports, voluminous, 80, 100 pages, depending on the

11  report.  So if they could identify certain sections of the

12  reports, then we can then go to the DOJ and Judge Kendall with

13  that and kind of have a narrowed scope of relief.

14          THE COURT:  All right.

15          MR. MISCIMARRA:  Your Honor, the timeframe of 21 days

16  is acceptable to us.  I just think it would be helpful to the

17  process if you set some additional times for us to provide a

18  response and then at least put in a timeframe, even if it may

19  be subject to change, for the additional stage of producing

20  the -- doing the search and producing the actual grievance

21  forms that relate to what comes from working backwards.  Our

22  only request after all of this time is that we be working from

23  a timetable that's in writing, even if it might be subject to

24  change.

25          THE COURT:  So --

1          MR. MISCIMARRA:  With respect --

2          THE COURT:  All right.  So I'm going to order that the

3    parties sit down because I have spent more than enough time on

4    this doing things that clearly you could have and should have

5    done on your own.  So sit down with each other.  You are to

6    meet in person within a week and come up with a proposed

7    discovery plan going forward, how much more time you need for

8    fact discovery, and then send it to my proposed order email.

9    At this point, you should know how long it's going to take to

10   get things on both sides done.  You can sit down and go through

11   it and then you can propose it to me, and then I will enter it.

12         But again -- and I'm not looking to the plaintiffs --

13   a lot of this could have been short-circuited.  It's not enough

14   to say you can't do it and then get up and walk away.  That

15   doesn't work.

16         MR. DeVORE:  Understood, Your Honor.  We did offer,

17   and it's mentioned in paragraph 18 of the joint discovery

18   motion regarding incident reports.  So it was something that

19   was discussed, just to be clear on that particular area.

20         THE COURT:  Right, but I'm not -- I don't consider

21   myself a genius.  I'm not particularly brilliant.  What I came

22   up with, you could have come up with and worked backwards,

23   right?  But if you come at it thinking I'm not going to give

24   you anything, then you're not going to think up a way to get

25   them information.  If I'm coming at it saying that they're

Exhibit B

1  going to get something, that it may not be everything they want

2  but they will get something and we will figure out a way to

3  make this work, then you're going to come up with something.

4      So I expect going that forward.  I don't want to get

5  any more:  Well, we just don't keep documents that way, so you

6  can't have anything.

7      That's not going to fly, and the fact that every other

8  correctional institution within the greater Chicagoland area

9  that is not associated with the county or the state is able to

10 keep documents in an electronic format, is able to keep medical

11 records in an electronic format, is able to keep requests for

12 medical care in an electronic format that is easily searchable

13 and that can be held for years and years and years, and yet the

14 county is not capable of doing that, that makes no sense to me

15 whatsoever.  All right?  It's not an excuse as to why you can't

16 produce things.

17     So what you don't want is for me to get frustrated and

18 say that somebody is going to spend hours and hours and hours

19 looking at paper forms, because that's an option.  It's always

20 an option.

21     So do the proposed order.  I'm going to see you back

22 in 90 days for status.  It doesn't need to be in person unless

23 there's an issue.  So we'll set it for -- the next status date

24 for April 5th at 9:30.  I'd like a status report by April 29th

25 -- I'm sorry -- by March 29th.

Exhibit B

42

1          All right.  Anything else we need to take up at this

2   point?

3          MR. MISCIMARRA:  Your Honor, the only thing is I would

4   request that we have the opportunity within the next week to

5   meet by video conference rather than in person just because two

6   of the three counsel actually work out of offices outside of

7   Chicago.

8          THE COURT:  Okay.  That's fine.

9          All right.  Anything else?

10          MR. DeVORE:  I think we're good.

11          THE COURT:  Okay.

12          MR. MISCIMARRA:  Thank you, Your Honor.

13          MR. RADUNSKY:  Thank you, Your Honor.

14          MR. DeVORE:  Thank you.

15       (Proceedings concluded.)

16                   C E R T I F I C A T E

17          I, Patrick J. Mullen, do hereby certify that the
     foregoing is a complete, true, and accurate transcript of the
18   proceedings had in the above-entitled case before the Honorable
     SARA L. ELLIS, one of the judges of said Court, at Chicago,
19   Illinois, on January 4, 2023.

20                         /s/ Patrick J. Mullen
                           Official Court Reporter
21                         United States District Court
                           Northern District of Illinois
22                         Eastern Division

23

24

25

Exhibit B