## __Exhibit 3__

30(b)(6) Deposition Transcript of Kimberly Hosteadter
(Feb. 24, 2025)

Page 1

1

2      UNITED STATES DISTRICT COURT

3      FOR THE NORTHERN DISTRICT OF NEW YORK

4      Case No. 1:19-cv-07380

5      -------------------------------------x

6      DONALD HENNEBERG,

7                         Plaintiff,

8             - against -

9      TOM DART, SUSAN SHEBEL, R.N., JOHN DOE

10     MEDICAL DEFENDANTS, CORRECTIONAL OFFICER

11     JORGE ARIAS, and COOK COUNTY, ILLINOIS, et

12     al,

13                         Defendants.

14     -------------------------------------x

15                         February 24, 2025

                           2:13 p.m.

16

17     Videotaped Deposition of 30(b)(6) Witness

18     KIMBERLY HOSTEADTER, taken by the

19     Plaintiff, pursuant to Notice, held via

20     Zoom, before Tammy O'Berg, a Shorthand

21     Reporter and Notary Public of the State of

22     New York.

23

24

25

Page 2

```
1
2    A P P E A R A N C E S :
3
4        MORGAN, LEWIS & BOCKIUS LLP
5    Attorneys for Plaintiff
6            77 West Wacker Dr., Suite 500
7            Chicago, Illinois 60601
8    BY: TIMOTHY GORDON, ESQ.
9            BRENT HAWKINS, ESQ.
10
11   DeVORE RADUNSKY LLC
12   Attorneys for Defendants
13           230 Monroe Street, Suite 230
14           Chicago, Illinois
15   BY:  JASON DeVORE, ESQ.
16           TROY RADUNSKY, ESQ.
17
18
19       AMOS EFRAT, Videographer
20
21               *    *    *
22
23
24
25
```

Page 3

```
1
2        S T I P U L A T I O N S
3
4        IT IS HEREBY STIPULATED AND
5    AGREED, by and between the Attorneys for
6    the respective parties hereto, that filing
7    and sealing be and the same are hereby
8    waived;
9        IT IS FURTHER STIPULATED AND
10   AGREED that all objections, except as to
11   the form of the question, shall be
12   reserved to the time of the trial;
13       IT IS FURTHER STIPULATED AND
14   AGREED that the within deposition may be
15   signed and sworn to before any notary
16   public with the same force and effect as
17   though signed and sworn to before the
18   Court.
19
20
21
22
23
24
25
```

Page 4

```
1
2        THE VIDEOGRAPHER:  Good
3    afternoon, everyone.  We're going on
4    the record at 1:13 p.m. CST on
5    February 24th, 2025.
6        Please note that -- please note
7    that this deposition is being
8    conducted virtually.  Quality of
9    recording depends on the quality of
10   camera and Internet connection of
11   participants.  What is seen from the
12   witness and heard on screen is what
13   will be recorded.
14       Audio and video recording will
15   continue to take place unless all
16   parties agree to go off the record.
17       This is Media Unit 1 of the
18   video-recorded deposition of Kim
19   Hosteadter taken by counsel for the
20   plaintiff in the matter of Henneberg,
21   Donald, versus Dart, Tom, et al.,
22   filed in the United States District
23   Court of the Northern District of
24   Illinois, Case number 19-cv-07380.
25       My name is Amos Efrat
```

Page 5

```
1
2    representing Veritext, and I'm the
3    videographer.  The court reporter is
4    Tammy O'Berg from the firm Veritext.
5        I'm not authorized to administer
6    an oath.  I'm not related to any party
7    in this action nor am I financially
8    interested in the outcome.
9        If there are any objections to
10   proceeding, please state them at the
11   time of your appearance.
12       Counsel and all present,
13   including remotely, will now state
14   their appearances and affiliations for
15   the record, beginning with the
16   noticing attorney.
17       MR. GORDON:  Thank you.  My name
18   is Tim Gordon.  I'm counsel for
19   plaintiff Don Henneberg, and I'm also
20   accompanied by my colleague Brent
21   Hawkins who's also -- we're both at
22   Morgan, Lewis & Bockius LLP.
23       MR. DeVORE:  Good afternoon.
24   Jason DeVore, D as in David, E,
25   capital V as in Victor, O-R-E,
```

2 (Pages 2 - 5)

Page 6

K. HOSTEADTER

1          K. HOSTEADTER
2    representing the defendants and
3    defending the witness this afternoon.
4    I'm here with Troy Radunsky, and we're
5    both from DeVore Radunsky LLC.
6          THE VIDEOGRAPHER:  Will the
7    court reporter please swear in the
8    witness and then counsel may proceed.
9    KIMBERLY HOSTEADTER, stating her business
10   address as 3026 South California Avenue,
11   Chicago, Illinois 60806, having first
12   been duly sworn by a Notary Public of the
13   State of New York, was examined and
14   testified as follows:
15   EXAMINATION BY
16   MR. GORDON:
17   Q.   Hi, Miss Hosteadter.  My name's
18   Tim Gordon.  You call me by Tim.
19         Is it okay if you call by Kim
20   throughout this --
21   A.   Yes.
22   Q.   Great.  Thank you, Kim.
23         Thank you for being here, first
24   of all.  I appreciate you taking the time
25   out of your day to be here and -- for this

Page 7

K. HOSTEADTER

1          K. HOSTEADTER
2    deposition and provide testimony.
3          I just want to go through some
4    ground rules first if you don't mind.
5          Is this your first time being
6    deposed?
7    A.   No.
8    Q.   Okay.  Have you been deposed in
9    an individual capacity as your own person
10   in a private capacity?
11   A.   I'm not sure.
12   Q.   Okay.  Have you been deposed as
13   a 30(b)(6) corporate witness before?
14   A.   Yes.
15   Q.   Okay.  Thank you.  I'm just
16   going to go over some ground rules.  You
17   probably went over this before.
18         If you do not hear or understand
19   a question, especially since we're virtual
20   right now, please say so, and I will
21   repeat or rephrase it; but if you answer a
22   question, I will assume you understood
23   did.
24         The court reporter will be
25   transcribing the deposition and can only

Page 8

K. HOSTEADTER

1          K. HOSTEADTER
2    record one person at a time.  To make
3    things easier, let's agree not to
4    interrupt each other.  So please wait for
5    me to finish before responding to a
6    question.  And you have to respond
7    verbally because the court reporter can't
8    transcribe gestures such as head nods.
9          And then there anyone else in
10   the room with you?
11   A.   No, not at this time.
12   Q.   Great.  It's important that you
13   answer your questions without input from
14   external parties.  So please let me know
15   if anyone else enters the room so that we
16   can take a break if needed.
17         I know you had said you were
18   different room than your office, I
19   believe.  Which room are you in right now?
20   A.   I am actually at my desk in my
21   office.
22   Q.   Okay.  Okay.  Just on the phone.
23   A.   Yes, because I could not get the
24   deposition computer to work correctly.
25   Q.   No worries.  I appreciate you

Page 9

K. HOSTEADTER

1          K. HOSTEADTER
2    using your phone.  It's crazy how
3    technology can do that these days.
4          I will be.  Just going forward,
5    I will sharing my screen to show you some
6    documents.  Let me know if you can't see
7    it, and we'll try to get a workaround; but
8    hopefully you can see those on your phone.
9    A.   Okay.
10   Q.   Okay.  And then do you have any
11   other device other than your phone which
12   you can communicate with external parties
13   other than your cellphone that you're
14   holding?  So do you have a phone on the
15   desk?
16   A.   Yes, I do.
17   Q.   If so, I ask you to keep them
18   off or to the side to ensure that you are
19   not communicating people outside of
20   this deposition while questions are
21   pending.
22         And you can take a break if you
23   need to.  So I will probably be taking a
24   break every 45 minutes just to use the
25   restroom and whatnot.  The only time you

3 (Pages 6 - 9)

Page 10

K. HOSTEADTER

1 can't take a break is if there's a
2 question pending. So if I ask a question,
3 you have to answer before we take a break.
4
5 And then you're under oath,
6 which means you have to tell the truth
7 just like you would in court, and your
8 oath is also continuing.
9 And there will be times today
10 when your attorney objects to certain
11 questions I ask. If you understand my
12 questions, you can still answer unless
13 your attorney instructs you not to do so.
14 Is that all understood?
15 A. Yes.
16 Q. Great. Thank you.
17 And a few more just preliminary
18 questions. This isn't to get too
19 personal, but are you on any medication,
20 controlled substance or drug that would
21 possibly interfere with your ability to
22 understand questions or impair your
23 memory?
24 A. No.
25 Q. Is there any other reason why

Page 11

K. HOSTEADTER

1 your memory would be impaired today?
2
3 A. No.
4 Q. Is there any other reason you
5 can think of that would prevent you from
6 testifying truthfully today?
7 A. No.
8 Q. Great. Thank you.
9 So in terms of today's
10 deposition, you are representing the Cook
11 County Sheriff's Department as a 30(b)(6)
12 witness, correct?
13 A. Yes.
14 Q. What did you do to prepare for
15 today's deposition?
16 A. Met with counsel.
17 Q. Okay. Just Jason or -- or Jason
18 and Troy or both Jason and Troy?
19 A. Both.
20 Q. Okay. Did you speak with anyone
21 other than your attorney?
22 A. Khara Coleman.
23 Q. Okay. Khara Coleman. And who's
24 Khara Coleman?
25 A. General counsel for the

Page 12

K. HOSTEADTER

1 Sheriff's Department.
2
3 Q. Okay. When did you meet -- did
4 you meet with Troy, Jason and Khara
5 Coleman in the same meeting, or were they
6 separate meetings?
7 A. Same meeting.
8 Q. Same meeting. When was that?
9 A. On Friday.
10 Q. Okay. And how long?
11 A. It was about an hour.
12 Q. And that was the only -- that
13 was the only meeting you had?
14 A. Yes.
15 Q. And aside from those three,
16 Troy, Jason and Khara Coleman, was anyone
17 else present?
18 A. No.
19 Q. And have you had any other
20 discussions with anyone else regarding
21 this deposition?
22 A. No.
23 Q. Did you review documents to
24 prepared for today's deposition?
25 A. Yes.

Page 13

K. HOSTEADTER

1 Q. Which ones?
2
3 A. They were provided by counsel.
4 Q. Okay. Do you know, were they
5 policies?
6 A. Yes.
7 Q. Great. Did you do anything else
8 to prepare for today's deposition?
9 A. No.
10 Q. Thank you. I just want to go
11 into other prior litigations.
12 You said before that you had --
13 you said before that you've been in a
14 lawsuit in your capacity as a 30(b)(6)
15 witness, correct?
16 A. Yes.
17 Q. And those were all for Sheriff
18 Dart, or were they for other parties?
19 A. One was for Sheriff Dart, but
20 generally I am involved in criminal cases
21 with the state's attorney's office.
22 Q. Okay. Can you just explain
23 those involvements? What type of cases
24 are those --
25 MR. DeVORE: Objection. Form.

4 (Pages 10 - 13)

K. HOSTEADTER

1
2    Q.   Are those criminal cases or
3    civil cases?
4    A.   Criminal cases.
5    Q.   Okay.  Do you know the general
6    nature of those cases?
7    A.   They're various.  I lay the
8    foundation for those cases.
9    Q.   Okay.  Did they involve inmates?
10   A.   Telephone records for inmates.
11   Q.   Telephone.  Okay.
12        So your involvement with that is
13   to procure the telephone records to the
14   State Department for specific inmates?
15        MR. DeVORE:  Objection.  Form.
16        You can answer.
17   A.   Yes.
18   Q.   Okay.
19        MR. DeVORE:  State Department or
20        state's attorney?  I'm sorry.
21        MR. GORDON:  Both.
22        MR. DeVORE:  Thank you.
23   BY MR. GORDON:
24   Q.   Okay.  So one of them has been
25   for Sheriff Dart?

K. HOSTEADTER

1
2    A.   Yes.
3    Q.   How long ago was that one?
4    A.   Pre-COVID.
5    Q.   So around 20 -- do you have a
6    roundabout year?
7    A.   Possibly 2019, 2020.
8    Q.   Okay.  And do you know what --
9    do you know what the claims were for that
10   case?
11   A.   I do not recall that.
12   Q.   And what was your role as a
13   30(b)(6) witness in that case?
14   A.   To also lay the foundation for
15   telephone records.
16   Q.   Okay.  And when you say "lay the
17   foundation for telephone records," what do
18   you mean by that?
19   A.   I explain on how the phone
20   system works and how the individuals
21   incarcerated in our facility are able to
22   use the phones.
23   Q.   Okay.  Thank you.
24        So I just want to go to your
25   employment background.

K. HOSTEADTER

1
2        How long have you been working
3    at the Cook County Sheriff's Department?
4    A.   Almost 25 years.
5    Q.   Great.  Sorry, I jumped the gun
6    there.  Who is your current employer?
7    A.   Cook County Sheriff's
8    Department.
9    Q.   Cook County Sheriff's
10   Department.
11        And how does that relate to the
12   Cook County Department of Correction?
13        MR. DeVORE:  Objection.  Form.
14        You can answer.
15   A.   They're all blanketed under one
16   department.
17   Q.   Okay.  So it would be the same
18   policies throughout?
19        MR. DeVORE:  Objection.  Form.
20        Speculation.
21        You can answer if you can.
22   A.   In -- regarding inmate
23   telephones, yes.
24   Q.   Okay.  Thank you.  And thank for
25   that.  Thank you for helping me with that,

K. HOSTEADTER

1
2    Kim.
3        So you've been there for 25
4    years.  When did you start working there?
5    That would be --
6    A.   '99.
7    Q.   And what's your current role?
8    A.   Investigator.
9    Q.   Investigator.  What are the
10   responsibilities related to the role of
11   investigator?
12   A.   My role is to fulfill the
13   state's attorney's office, outside
14   agencies and requesters for jail records.
15   Q.   And these jail -- what type of
16   jail records?
17   A.   It would be telephone calls,
18   telephone records or videos.
19   Q.   What type of videos?
20   A.   Requested videos that occurred
21   within our facility, or depending on the
22   request, any courthouse.
23   Q.   Okay.  And how long have you
24   been an investigator for?
25   A.   2012.

5 (Pages 14 - 17)

K. HOSTEADTER

1
2    Q.   What was your role before that?
3    A.   A correctional officer.
4    Q.   And how many years were you a
5    correctional officer?
6    A.   About 12 years.
7    Q.   And what was your
8    responsibilities as a correctional
9    officer?
10   A.   There were various, depending on
11   my assignment for the day.
12   Q.   Okay.  Can you just tell me a
13   few various positions or various roles or
14   responsibilities that you can remember?
15   A.   A tier officer.  I would escort
16   individuals to and from visits or medical
17   depending on the need.  Security officer.
18   Q.   Any others?
19   A.   I did maintenance for a while.
20   Q.   And what would that entail?
21   A.   Having a group of workers with
22   me to pick up garbage, serve food, clean
23   the areas where others are living to make
24   sure their areas were clean, laundry,
25   changing of clothes and linens.

K. HOSTEADTER

1
2    Q.   Okay.  And what roles did you
3    have to do for security officer?
4    A.   Take in the counts, do
5    attendance sheets, answer the needs of the
6    brass if they had reports that had to be
7    handed over to another division.
8         It's been a while since I've
9    done that.  I'm sorry, I don't remember
10   everything I've done.
11   Q.   That's fine.  I'm just kind of
12   doing this for my own curiosity, but it is
13   relevant.
14        So security officer, does that
15   have anything to do with, I guess, like,
16   securing inmate safety within the
17   division?
18   A.   No.  A security officer
19   basically handles everything for the
20   brass.  We take the counts.  We ensure all
21   the keys and handcuffs are turned in.  We
22   make sure that everybody has arrived on
23   their assignments.  We put in payroll.
24   Different things like that.
25   Q.   Okay.  And I think you said "the

K. HOSTEADTER

1
2    brass."  What does that mean?
3    A.   Sergeants -- the supervisors,
4    sergeants, lieutenants.  At the time there
5    was a commander.
6    Q.   Okay.  That makes sense.  Okay.
7         And then before being a -- was
8    that your first position at Cook County, a
9    correctional officer?
10   A.   No.
11   Q.   What was the role before that?
12   A.   I was an administrative
13   assistant for the state's attorney's
14   office, Branch 66.
15   Q.   And what did you do in that
16   role?
17   A.   Administrative needs for the
18   state's attorneys.
19   Q.   Okay.  All right.  I think we'll
20   just go into -- so you've been produced as
21   a witness to discuss the general
22   regulation of the inmate telephone system
23   and any monitoring or recording of inmate
24   telephone calls by Cook County and the
25   Cook County Sheriff's Department for the

K. HOSTEADTER

1
2    purpose of discovering improper telephone
3    usage.
4         Does that sound about right?
5    A.   Yes.
6    Q.   How long have you been working
7    with inmate telephone records?
8    A.   Almost 13 years.
9    Q.   Thirteen years.  And can you
10   just tell me generally -- you can go on a
11   monologue about this -- just how do
12   inmates use the telephone?
13   A.   Depends on which system we have
14   during the timeframe when you're inquiring
15   about the telephone system.
16   Q.   That's fair.  So from my
17   knowledge, I know there's a -- I know that
18   inmates can use the telephone during the
19   initial intake, and then I know they can
20   use it while they're incarcerated.  Is
21   that correct?
22   A.   Yes.
23   Q.   Are there any other -- you said
24   "systems."  Are those some of the systems
25   you were describing there?

Page 22

K. HOSTEADTER

1          K. HOSTEADTER
2      A.   Vaguely.  I would need year.
3   Like, if you want calls from 2019, I would
4   need to know the timeframe.  If you wanted
5   calls from last week, then I would know a
6   timeframe and how to let you know how each
7   person was able to use the phone for that
8   particular system.
9      Q.   Okay.  So it sounds like there's
10  different -- is that based off policy?
11  Like, did the policy change throughout the
12  years, and so you would have to know -- in
13  order to gain access to those records, you
14  would have to know the years because
15  there's different ways that the inmates
16  gained access to the telephones?
17         I'm just -- why is it that you
18  need to know the year to know which --
19  which records to -- to locate?
20     A.   I would need to know the year
21  because the vendors have changed over the
22  last 10 years with our phone system.
23     Q.   Okay.  Let's go back to the
24  intake.
25         So there's two ways that inmates

Page 23

K. HOSTEADTER

1          K. HOSTEADTER
2   can use the -- not two ways, but there's
3   two times where inmates can use the phone.
4   The first one is the intake, and then the
5   next one is in the division that they're
6   housed in, correct?
7      A.   Yes.
8      Q.   Are there any other places where
9   they can use the telephones; like at the
10  courthouse or...
11     A.   No.
12     Q.   Are they the same area?
13     A.   I'm not sure what you're asking.
14     Q.   So if I was an inmate and I was
15  using the telephone during intake, would
16  it be the same telephones that I would be
17  using if I was incarcerated in a division?
18     A.   Physically, no, but it's the
19  same type of phone.
20     Q.   Okay.  They're just located in
21  different areas, I imagine?
22     A.   Correct.
23     Q.   Okay.  Can you describe to me --
24  is the policy for -- sorry.  Is the policy
25  for inmates to use the telephone during

Page 24

K. HOSTEADTER

1          K. HOSTEADTER
2   intake different than the policy for
3   inmates who use the phone -- currently
4   incarcerated inmates that are in the
5   division?  Are those two separate
6   policies?
7      A.   No.
8      Q.   Okay.  How can inmates use the
9   telephones during the intake process?
10     A.   There's a designated where
11  they're allowed to make phone calls.
12     Q.   And they're allowed to make one
13  phone call, two phone calls, many phone
14  calls?
15     A.   They're allotted one free phone
16  call when they come into our facility.
17     Q.   How long is that phone call?
18     A.   Fifteen minutes.
19     Q.   And they can call anyone?
20     A.   Yes.
21     Q.   Is there ever an issue with not
22  enough phones during the intake process
23  that inmates can use?
24     A.   That I'm not sure of.
25         (Discussion off the record.)

Page 25

K. HOSTEADTER

1          K. HOSTEADTER
2          THE VIDEOGRAPHER:  I'll take us
3   off the record.  We're going off the
4   record at 1:36 CST.
5          (Brief recess taken.)
6          THE VIDEOGRAPHER:  We're going
7   back on the record at 1:40 p.m. CST.
8   BY MR. GORDON:
9      Q.   Thank you, Kim.
10         MR. GORDON:  Jason, can you
11  speak real quick so we can --
12         MR. DeVORE:  Yeah.  Are we good?
13         MR. GORDON:  Yeah.
14  BY MR. GORDON:
15     Q.   Let's continue.  I just asked
16  you, Kim, whether or not, you know, if
17  there was ever an issue with too many
18  people going through the inmate intake
19  process and not enough phones, and you
20  said --
21         MR. DeVORE:  Objection to form.
22     Q.   -- and you said you didn't know
23  about whether there was an issue with
24  that, correct?
25     A.   Correct.

7 (Pages 22 - 25)

K. HOSTEADTER

2  Q. How do you choose which inmate
3  gets to use the phone during the intake
4  process at what time?
5      MR. DeVORE: Objection as to
6  form.
7      You can answer.
8  A. I don't. I'm not there.
9  Q. Do you know of any policies that
10  allow inmates to use the phones in an
11  orderly fashion?
12      MR. DeVORE: Objection to form.
13      You could answer if you can.
14  A. Not to my knowledge.
15      MR. GORDON: I want to put up
16  Exhibit 1. Let me just share my
17  screen.
18  Q. And, again, Kim, let me see
19  if -- let me know if you're unable to see
20  this.
21      (Plaintiff's Exhibit 1, Cook
22      County Department of Corrections
23      Inmate Information Handbook, marked
24      for identification, as of this date.)
25      (Discussion off the record.)

K. HOSTEADTER

2  BY MR. GORDON:
3  Q. Can you see that, Kim?
4  A. Yes.
5  Q. Perfect. So this is the Cook
6  County Department of Corrections Inmate
7  Information Handbook as it reads on the
8  first page. It was produced by
9  defendants. The Bates number is CCSAO
10  HENNEBERG 001721.
11      Kim, throughout this deposition,
12  I'll be referring to the Bates number.
13  That's just the number at the bottom right
14  here for your reference.
15      So do you know what this policy
16  is? Have you seen this before?
17      MR. DeVORE: Tim, can we make it
18  bigger so she can see the whole
19  document?
20      MR. GORDON: Can you not?
21      MR. DeVORE: It's just one part
22  of one page. I didn't know how long
23  it was -- I didn't know -- I'm just
24  seeing, like, a little half sheet.
25      MR. GORDON: Really?

K. HOSTEADTER

2      MR. DeVORE: Yeah. I don't
3  know.
4      MR. GORDON: Oh, whoops -- that
5  is not -- I'm so sorry. I'm sharing
6  the wrong screen. Let's do this.
7      There we go. Is that better?
8      MR. DeVORE: Yes. And it's 41
9  pages?
10      MR. GORDON: Yes, yes, of
11  course. Sorry about that. We'll get
12  to the other one later. That was a
13  little sneak peek, so thank you.
14  BY MR. GORDON:
15  Q. So do you see this, Kim?
16  A. Yes.
17  Q. Are you familiar with this
18  document?
19  A. Yes.
20  Q. And what is it?
21  A. It's the inmate handout book.
22  Q. Great. Do you know who created
23  this?
24  A. No.
25  Q. It says 3rd Edition Effective

K. HOSTEADTER

2  June 2018; is that correct?
3  A. As far as I know.
4  Q. Do you know of any other -- is
5  this the most recent edition?
6  A. I do not have any knowledge of
7  that. I do not hand the books out.
8  Q. Okay. Let's go -- but you have
9  seen this before?
10  A. Yes.
11  Q. Okay. How have you seen this?
12  A. Through working security and
13  being a tier officer.
14  Q. And what would you do with it
15  during those positions?
16      MR. DeVORE: Objection. Form.
17      You can answer.
18  A. If someone requested a handout
19  book back when I was a tier officer, we
20  would give it to them, and in security we
21  would make copies to make sure there was
22  enough to be handed out on intake when
23  they came to our division.
24  Q. Okay. Is this the same edition
25  you were handing out during that time?

Page 30

K. HOSTEADTER

1
2    A.   No.
3    Q.   Which edition were you handing
4    out?
5    A.   Something prior to 2018.
6    Q.   Okay.  So it would be prior to
7    2012, as well, because that's when you
8    were a security or a tier officer?
9    A.   It would have been anywhere
10   between 2001 and 2008 is when I was on a
11   tier.
12   Q.   Okay.  So there are previous --
13   2001 to 2008.  So there are previous
14   editions to this?
15       MR. DeVORE:  Objection.  Form.
16       But you can answer.
17   A.   Yes.
18   Q.   Thank you.  So when would --
19   sorry.  Would you give these to inmates
20   just during the intake process, or would
21   you give it to them while they were also
22   housed in a division?
23   A.   When they were housed in a
24   division if they requested one.  If they
25   were available.

Page 31

K. HOSTEADTER

1
2    Q.   Okay.  Let's go down to chapter
3    eight, Outside Communication, page four.
4    It says Telephone here.  This is Bates
5    number 001754.  And I'll zoom in, and let
6    me know if doesn't look good.
7        Can you read this, Kim?
8    A.   Unfortunately, I cannot see it
9    on my phone no longer.
10       Oh, wait.  I found it.
11   Q.   You got it?
12   A.   Yes.
13   Q.   Great.
14   A.   Which parts would you like me to
15   read?
16   Q.   You can scan through this part.
17   It says, How do I stay in touch with
18   people outside of the CCDOC, and there's a
19   section for telephone.  So if you can scan
20   through real quick, and then I'll start
21   asking questions.
22   A.   Okay.
23   Q.   So is this policy for intake, or
24   is this policy for inmates who are
25   currently in a division?

Page 32

K. HOSTEADTER

1
2        MR. DeVORE:  Objection.  Form.
3        But you can answer.
4    A.   The policy is for anyone inside
5    the jail.
6    Q.   Okay.  So anyone inside the
7    jail.  Would that also include anyone who
8    is inside the jail for intake?
9    A.   Yes.
10   Q.   Okay.  And I see here it says,
11   Inmates share telephones in the living
12   units.
13       How many telephones are there
14   that the inmates share?
15       MR. DeVORE:  Objection as to
16   form.
17       You can answer if you can.
18   A.   Depends on the population for
19   the tier.
20   Q.   Okay.  So if it's a higher
21   population, there would be more
22   telephones?
23   A.   Correct.
24   Q.   For the highest-population
25   division, about how many telephones would

Page 33

K. HOSTEADTER

1
2    there be?
3        MR. DeVORE:  Objection.  Form.
4        You can answer if you can.
5    A.   I do not have recollection of
6    how many phones there are for each living
7    unit, but I do know that the dorm setting
8    has more phones than a cell setting.
9    Q.   What's the difference between a
10   dorm setting and a cell setting?
11   A.   A dorm setting is where they
12   have a great big room.  Everybody shares
13   their sleeping space.  There's a bunch of
14   bunk beds together.
15       In a cell setting they're two
16   housed to a cell, and they have a day
17   room.
18   Q.   Okay.  Perfect.  Thank you.
19       So what's the ratio of
20   telephones to inmates in a particular
21   division, would you say?  Like, if there
22   were a hundred inmates, how many
23   telephones would that be?
24       MR. DeVORE:  Objection.
25       Objection as to form.  Sorry.

9 (Pages 30 - 33)

Page 34

K. HOSTEADTER

1
2     You can go ahead and answer.
3     A.   I do not know the ratio.
4     Q.   Do you know just about -- I
5   mean, if there are, like, a thousand
6   inmates, are there 10 phones?  Is there a
7   policy -- if there's, like, a thousand
8   inmates, are there 10 phones, 25 phones?
9   Just a roundabout -- or just a guess of
10  how many phones there could be in one of
11  the highest-populated divisions.
12        MR. DeVORE:  Objection to form.
13        Don't guess.  You can answer if
14  you can.
15    A.   I do not know that answer.
16    Q.   Okay.  Is there a policy on that
17  ratio of telephones to inmates?
18    A.   I do not know that answer.
19    Q.   Okay.  So you said during intake
20  inmates are allowed one free telephone
21  call for 15 minutes.
22        How often can inmates in a
23  division use the telephone?
24    A.   They can use the phone as many
25  times as the phone is available during

Page 35

K. HOSTEADTER

1
2   their time out of their cell or are
3   allowed in their dayroom time.
4     Q.   Okay.  How often are they
5   allowed out of their cell and during their
6   dayroom time?
7         MR. DeVORE:  Objection to form,
8   but go ahead.
9     A.   It depends.
10    Q.   On what factors?
11    A.   Lockup time, shift change.  It
12  depends if it's their time to be out or
13  not, because they rotate on some living
14  units because the PC, those protective
15  custody individuals.
16    Q.   So any time they're out of their
17  cells, they could potentially use the
18  telephones?
19    A.   Correct.
20    Q.   So long as one is available?
21    A.   Yes.
22    Q.   What if one's not available?
23    A.   They would wait their turn.
24    Q.   How long would they need to
25  wait?

Page 36

K. HOSTEADTER

1
2     A.   An average phone call is between
3   15 and 30 minutes.
4     Q.   Is there a maximum amount of
5   time a telephone call can be?
6     A.   Thirty minutes.
7     Q.   Thirty minutes.  So inmates in a
8   division can only use the telephone 30
9   minutes at a time?
10    A.   Correct.
11    Q.   How do you know they've used it
12  for 30 minutes?
13    A.   I do not personally know that
14  they use it for 30 minutes.  The phone
15  system will hang up their call after a
16  two-minute minute warning and say, You've
17  exceeded your time, and the call is ended.
18    Q.   So it's an automated process?
19  Someone is on the phone, they're talking.
20  At 28 minutes there will be an automated
21  message saying you have two more minutes
22  left, and then at 30 minutes, regardless
23  of how much time they have -- regardless,
24  the phone is hung up?
25    A.   Yes.

Page 37

K. HOSTEADTER

1
2     Q.   What happens -- is anything
3   stopping them from picking up that phone
4   and redialing and taking another telephone
5   call?
6     A.   No.  Unless it's lockup time.
7     Q.   So theoretically, I could be an
8   inmate, I could take a call.  At 30
9   minutes it could be hung up on me
10  automatically, and then I could pick up
11  the telephone again and then dial the same
12  number and have another conversation, have
13  it hung up on me again, and I would be
14  there for an hour?
15        MR. DeVORE:  Objection as to
16  form.
17        You can answer if you can.
18    A.   Correct.
19    Q.   Okay.  So there's really nothing
20  restricting an inmate from using a
21  telephone past the allotted 30 minutes?
22        MR. DeVORE:  Objection.  Form.
23  Mischaracterizes testimony.
24        You can answer.
25    A.   The call is ended at 30 minutes.

10 (Pages 34 - 37)

Page 38

K. HOSTEADTER
1 K. HOSTEADTER
2 They would have to reissue the call, and
3 it would show through the phone system
4 that the call has been ended and that the
5 call has been reinstated a few minutes
6 later.
7 Q. Okay. But in the scenario I
8 just said, that single inmate can have a
9 conversation on the same telephone for an
10 hour?
11 MR. DeVORE: Same objection.
12 You can answer if you can.
13 A. I stand to say the same. The
14 call has to be regenerated after the other
15 call has been ended.
16 Q. Do you know the average amount
17 of telephones that are in each division?
18 I know we tried to go for the ratios, but
19 do you have any idea how many telephones
20 are in Division 10?
21 MR. DeVORE: Objection. Form.
22 I think you asked that before.
23 Q. Do you know how many telephones
24 are in Division 10?
25 A. No, I do not.

Page 39

1 K. HOSTEADTER
2 Q. Going back to my scenario where
3 the inmate is at the same telephone,
4 they've been hung up on at the 30-minute
5 mark, they pick up the phone again.
6 What happens if the same number
7 is reinitiated? What happens if they call
8 the same number?
9 MR. DeVORE: Objection. Form.
10 Asked and answered.
11 But you can go ahead and answer
12 again.
13 A. If the person on the other end
14 decides to accept the second call, the
15 phone call would go through.
16 Q. Do you see here -- I'm going
17 back to Exhibit 1. It says Telephone,
18 number one, General Access to Telephone
19 Calls. Telephone calls may be monitored
20 unless prior special arrangements allow
21 for confidential telephone calls to your
22 attorney.
23 Do you see that?
24 A. Yes.
25 Q. How are telephone calls

Page 40

1 K. HOSTEADTER
2 monitored?
3 A. It depends on the circumstances.
4 A telephone call could be monitored if it
5 is a high-profile case, if an investigator
6 from another unit would like to listen in
7 on calls on his specific unit to see if
8 there's anything going on, or they can
9 just be monitored at a random request of a
10 supervisor.
11 Q. Why would a supervisor request
12 to monitor a phone call?
13 MR. DeVORE: Objection. Form.
14 You can answer if you can.
15 A. There could be multiple
16 circumstances. There could have been a
17 fight on the tier. There could have been
18 a PC request, and they want to know why.
19 There could be unrest on the tier, and the
20 supervisor will listen -- have somebody
21 listen to calls to see if they can find
22 out any information to resolve the issue
23 on the tier.
24 Q. Is that a normal occurrence?
25 MR. DeVORE: Objection. Form.

Page 41

1 K. HOSTEADTER
2 Objection as to form.
3 You can go ahead.
4 Sorry for interrupting.
5 A. It can be, depending on the
6 circumstances.
7 Q. Now I'm going to go into the
8 actual specifics of how to monitor it.
9 How are they monitoring --
10 technically, how are they monitoring these
11 phone calls?
12 A. That's vague for me. I need
13 something a little bit more specific.
14 Q. That's fair enough. I'm a
15 supervisor. I want to monitor inmate
16 number two's phone call at a specific
17 telephone. How do I do that? Do I pick
18 up a phone on the other end myself? Do I
19 go to that telephone and listen in? How
20 do I listen, as a supervisor, on that
21 inmate's telephone call?
22 MR. DeVORE: Objection as to
23 form, but you can answer if you can.
24 A. If you have access to the phone
25 system and know the particular person that

11 (Pages 38 - 41)

Page 42

K. HOSTEADTER

1 you would like to listen to their phone
2 calls, you would log in to the phone
3 system, enter that inmate's information
4 into the phone system for the time that
5 you're requesting, and the phone system
6 will provide you with that telephone call
7 and you will listen to it.
8     Q.   Is it a recording of the phone
9 call, or is it a live feed of the phone
10 call?
11         MR. DeVORE:  Objection as to
12 form as to timeframe.
13         But you can answer.
14     A.   For your question, it would be a
15 recorded phone call.
16     Q.   So is every phone call recorded?
17     A.   Yes.
18     Q.   And how are they stored?
19         MR. DeVORE:  Objection as to
20 form.  Timeframe.
21         You can answer go ahead.
22     A.   Depends on the timeframe that
23 you're requesting.
24     Q.   Are there different policies for

Page 43

K. HOSTEADTER

1 recording and storing based on the
2 timeframe?
3     A.   There is not different policies.
4 There are different vendors.
5     Q.   Do you need to attend to
6 something?
7     A.   One second, please.
8     Q.   Go ahead.
9         (Pause.)
10     A.   Thank you.  I'm back.
11     Q.   No worries.  Okay.
12         So different vendors -- explain
13 that to me.
14     A.   So over the course of me being
15 here in my position, we've had three
16 separate vendors.
17     Q.   And can you elaborate further?
18     A.   The vendors each store the phone
19 calls in the same fashion but in different
20 areas.
21     Q.   What fashion would they store
22 these phone calls?
23     A.   They would be in a cloud, but
24 depending on the vendor, it depends on the

Page 44

K. HOSTEADTER

1 location of where the phone calls were
2 stored.
3     Q.   And there were three different
4 vendors?
5     A.   Correct.
6     Q.   Do you remember the names of the
7 vendors?
8     A.   There was Securus,
9 S-E-C-U-R-U-S, EDVO, E-D-V-O, and now we
10 have Global Tel Link.
11     Q.   What was the last -- second
12 word?
13     A.   Global Tel Link, GTL.
14     Q.   When was Securus the vendor?
15     A.   Securus was the vendor from the
16 latter part of 2011 until June 12th of
17 2019.
18     Q.   When was EDVO -- is it EDVO? --
19 when was --
20     A.   EDVO.
21     Q.   EDVO.  Sorry.
22     A.   It was from June 12th, 2019
23 through September 21, 2021.
24     Q.   And then Global Tel has been in

Page 45

K. HOSTEADTER

1 since September 2021 until now?
2     A.   Correct.
3     Q.   They would record these
4 telephone calls, but they were just stored
5 in different areas?
6     A.   Correct.
7     Q.   How long would they hold the
8 recordings?
9         MR. DeVORE:  Objection.  Form.
10         You can answer.
11     A.   I have access to all three
12 systems until 2014 in Securus.
13     Q.   Is that, like, a 10-year
14 retention policy or --
15     A.   I don't believe it's a policy.
16 I believe it's part of a contract.
17     Q.   Okay.  Great.
18         And these recordings, do they
19 have all of the -- does it have both the
20 inmate and the other person on the other
21 line's conversations?  It has the entirety
22 of the conversation in them?
23     A.   Yes.
24     Q.   Can the prison -- can the prison

12 (Pages 42 - 45)

K. HOSTEADTER

1    K. HOSTEADTER
2 listen to a live call?
3    A.   We can, but you have to be
4 delegated to listen to a live call.
5    Q.   Can you explain that process?
6    A.   There's certain steps or phases
7 that each individual has been granted to
8 access to the phone system.
9         So you can only listen to calls,
10 you can download calls, you can listen to
11 live calls, or one of the three.
12   Q.   Is there a policy that states
13 that, a written policy that states that?
14        MR. DeVORE:  Objection as to
15   form.
16        You can answer if you can.
17   A.   That is up to the head of each
18 department requesting the phone calls on
19 the access for each person that they're
20 giving access to.
21   Q.   How do they determine who to
22 give access to, the live phone calls?
23   A.   It would be up to their
24 department head for their daily tasks.
25   Q.   Do you know of any tasks --

1    K. HOSTEADTER
2 like, who -- so it would be up to the
3 department head.
4         Is that a specific job position,
5 or who is the department head?
6    A.   There are multiple departments
7 that access the phone.  We have intel,
8 sheriff's police, regular jail intel that
9 would have access to the phone system.
10        Their superiors would be the
11 ones that would say, we need this person
12 to be able to download.  We need this
13 person to be able to have access to listen
14 to live calls, recorded calls and to
15 download.
16   Q.   Who are their superiors?
17        MR. DeVORE:  Objection.  Form.
18        But you can answer if you can.
19   A.   I would not know that.
20 Depending on the department.  Each
21 department has a different -- each
22 department has a different superior.  My
23 superior is not the same as somebody that
24 works intel, and that is subject to
25 change.

1    K. HOSTEADTER
2    Q.   Who's the -- who would make the
3 decision for the sheriff's police
4 department?
5    A.   That would depend on each unit
6 that wants access to the phones.  There's
7 multiple units.  There's multiple
8 departments within our larger department.
9 Each department has its own entity.  Each
10 department has its own needs.  It would be
11 on a need basis.
12   Q.   Okay.  Is there ever a request
13 to monitor live phone calls based -- to
14 see if they're using the telephone in an
15 improper way?
16   A.   Not to my knowledge.
17   Q.   And those superiors that you
18 were discussing that made the decision of
19 who can record, who can listen in to live
20 telephone calls, is there a list of
21 decision makers that is documented?
22   A.   Not to my knowledge.
23   Q.   Could you name one of the
24 superiors who has the ability to grant
25 access to someone to listen to a live

1    K. HOSTEADTER
2 telephone call?
3        MR. DeVORE:  Objection as to
4   form.
5        You can answer.
6    A.   The superiors change.
7    Q.   Who is the current superior that
8 can -- sorry.  Go ahead.
9    A.   Superiors change.  It's usually
10 an e-mail that comes to an administrator
11 that would be able to give them the access
12 to the phone system.
13        The superiors -- the supervisors
14 that have the request in don't actually
15 give them the access.  They would put the
16 request in to have the access granted to
17 them for their needs or their tasks for
18 whatever job they're performing.
19   Q.   But someone has to write that
20 off, right?  Someone has to say, okay, I
21 will grant you the access, correct?
22   A.   Yes.
23   Q.   Do you know anyone in that
24 position?
25   A.   That can grant access to the

13 (Pages 46 - 49)

Page 50

K. HOSTEADTER

1      K. HOSTEADTER
2  phone system once the request has been
3  submitted?
4     Q.   Yes.
5     A.   Me.
6     Q.   Thank you.  Perfect.
7        MR. RADUNSKY:  Let's take a
8  break in a little bit?
9        MR. GORDON:  Yeah.  I'm sorry.
10 Okay.  Let's -- let's take a break
11 there.
12       THE VIDEOGRAPHER:  Let me just
13 take us off the record before we
14 discuss that.  We're going off the
15 record at 2:07 CST.
16       (Brief recess taken.)
17       THE VIDEOGRAPHER:  We are going
18 back on the record at 2:17 p.m. CST.
19 BY MR. GORDON:
20    Q.   So, Kim, before the record --
21 before the record.  Before the break, we
22 were discussing how someone could be
23 granted permission to monitor live
24 telephone recordings, and you had stated
25 that you are someone in the position -- a

Page 51

1      K. HOSTEADTER
2  superior who grants those requests,
3  correct?
4     A.   I am not a superior.  I am an
5  investigator with administrative rights.
6  But, yes, I can grant that once the e-mail
7  has been generated.
8     Q.   What's the difference between a
9  superior and your position?
10    A.   A superior is a ranking officer;
11 sergeant, lieutenant, commander, captain.
12 I'm an investigator.
13    Q.   So how does the process work?
14 Do you directly receive the request to
15 access live telephone calls, and then you
16 go to the superior, and then you grant the
17 access; or how does the procedure work?
18    A.   The superior or the designated
19 unit head would have to send in a request
20 asking for them to be granted this
21 specific type of clearance for the phone
22 system.
23    Q.   Okay.  I'll share my screen real
24 quick.  Sorry about that.  Just go back to
25 the...

Page 52

1      K. HOSTEADTER
2        Here's the right one.  Okay.
3  Can you see this, Kim?
4     A.   Yes.
5     Q.   Great.  So when it says,
6  Telephone calls may be monitored, is that
7  one way -- or is that the only way
8  telephone calls may be monitored?
9        MR. DeVORE:  Objection.  Form.
10       You can answer, though.
11    A.   So I am not sure about your
12 question for monitoring.
13    Q.   Okay.  Telephone calls may be
14 monitored.  Is the only way a telephone --
15 does that mean live monitoring?  Does that
16 mean monitoring recordings?  What does
17 that mean?
18    A.   Any phone call that is either
19 live or recorded can be monitored.  If a
20 person or an investigator is monitoring a
21 recorded call, they're backtracking the
22 phone calls.
23       I don't know how else to explain
24 it.  It's a phone call that's already been
25 recorded.  They can go back and listen to

Page 53

1      K. HOSTEADTER
2  that at any time.
3        The live phone call is for
4  specific needs to listen to a live phone
5  call.  That phone call, once it has been
6  completed, will also go into the database
7  and can be monitored at a later time
8  because it has been recorded.
9     Q.   Okay.  Thank you.
10       You said you're with Global Tel
11 Link right now that has the recordings.
12       They have them in a cloud?
13    A.   Yes.
14    Q.   Is who has access to that cloud
15 of recordings?
16       MR. DeVORE:  Objection.  Form.
17 Calls for speculation.
18       But you can answer if you know.
19    A.   Anyone that's been designated
20 access to the phone system has access to
21 those recordings.
22    Q.   Are there any other third
23 parties that has access or can gain access
24 to those recordings?
25       MR. DeVORE:  Objection.  Form.

14 (Pages 50 - 53)

Page 54

K. HOSTEADTER

1    Speculation.
2        You can answer.
3    A.   I'm not sure what you mean by a
4    third party.
5    Q.   Can an individual, private
6    citizen, request those recordings?
7        MR. DeVORE:  Same objection.
8    Form.  Speculation.
9        MR. RADUNSKY:  You can answer,
10   Kim.
11   A.   I'm -- if a citizen asks -- do
12   they have -- are they law enforcement?
13   Are they part of an outside agency working
14   for specific things for the jail?  I need
15   to know a more designated answer -- or
16   question to answer that.
17   Q.   I'm just wondering who can gain
18   access to these recordings.
19   A.   So I'll generally answer in this
20   type -- or form:  No one outside the
21   Sheriff's Department without designated
22   rights by their unit head can actually
23   access the calls through the system.
24       An outside person or entity, via

Page 55

K. HOSTEADTER

1    the state's attorney's office, a public
2    defender, somebody working pro se for a
3    certain individual, can subpoena or FOIA a
4    recorded call.  They cannot have a live
5    call.
6    Q.   That's what I was looking for.
7    Thank you.
8        Do you have a list of
9    individuals that have access to those
10   recordings or that have been granted
11   access to monitor live telephone calls?
12       MR. DeVORE:  Objection.  Form.
13   Scope.
14       You can answer if you can.
15   A.   No, I do not.
16   Q.   There's no documented list of
17   people who have access to listen to live
18   telephone calls?
19   A.   There is a document, but I do
20   not have it handy.  It would have to be
21   generated because it's stored within the
22   phone system, and depending on which phone
23   system you're inquiring about, that
24   information could be gone.

Page 56

K. HOSTEADTER

1    Q.   And you're referring to the
2    three phone systems we discussed; Securus,
3    EDVO, and Global Tel Link?
4    A.   Yes.
5    Q.   So I want to go here -- I'm
6    still on Exhibit 1.  It says number four,
7    Prohibited Telephone Use, A, Three-way
8    calls, fraudulent calls and harassing
9    calls are prohibited and will result in a
10   loss of telephone privileges, a
11   disciplinary report, disciplinary action,
12   disciplinary sanctions and/or criminal
13   charges.
14       Do you see that, Kim?
15   A.   Yes.
16   Q.   How do you know if an inmate is
17   making a three-way telephone call?
18   A.   I do not know because I don't
19   listen to every phone call that goes
20   through the system.  It would be
21   impossible.
22       A three-way phone call is
23   generally detected through the phone
24   system.  If it can't be detected --

Page 57

K. HOSTEADTER

1    because our phones now are too smart for
2    the phone system to catch all of them.  So
3    it would depend on the phone system that
4    we're working with to answer that
5    efficiently.  There's no way for me to
6    know unless I'm actually listening to the
7    phone call.
8    Q.   What do you mean by the
9    telephones are too smart to capture that,
10   if there's a three-way phone call being
11   done?
12   A.   Smart phones these days, when
13   they click over to connect a third party
14   to the two original people talking is done
15   quite efficiently, and it's not always
16   detected.
17       The phone system would generally
18   pick it up and end the phone call.
19   Sometimes it gets ended, sometimes it does
20   not.
21       I don't have a specific answer
22   for that.  I am not savvy on the tech end
23   of how those are connected.
24   Q.   Yeah.  I'm just trying -- so it

15 (Pages 54 - 57)

Page 58

K. HOSTEADTER

1      K. HOSTEADTER
2  would be -- it's because -- it's not
3  because the telephone system within the
4  jail is unable to detect it; it's that the
5  telephones outside of the jail that the
6  inmate is calling, you know, those smart
7  phones, that are too quick with connecting
8  the telephone system within the jail cell
9  wouldn't be able to detect that?
10     MR. DeVORE: Objection. Form.
11     That was a little confusing for
12  me anyway, but if you understood, you
13  can answer it. I just want to make
14  sure it's a clear question.
15     A. The best way to explain it is
16  the caller inside the facility calls
17  caller B. They call caller C. Like you
18  said, the smart phones on the outside of
19  our facility are smart.
20     Normally, there would be a click
21  or a passage to that outside line that,
22  because the smart phone does it
23  discreetly, is the only way to say it --
24  maybe that's the wrong term, but it's how
25  it was explained to me, that it doesn't

Page 59

1      K. HOSTEADTER
2  always pick up the third-party calls. But
3  then again, it depends on the phone system
4  that you're inquiring on.
5     Back when we had Securus, smart
6  phones were not as smart as they are now,
7  and the system would generally grasp those
8  phone calls and end them.
9     Q. Okay. And I guess this is a
10  good time to ask what type -- what are the
11  telephones -- what type of telephones are
12  in the jail that inmates can access? Are
13  they kind of like the pay phones, or are
14  they analog, I guess, pickup desk phones?
15  What type of telephones are they?
16     A. They're similar to a pay phone.
17     Q. Okay. That makes sense.
18     And has it been that way ever
19  since you've been at CCDOC?
20     A. Yes.
21     Q. They haven't changed
22  substantially?
23     MR. DeVORE: Object to form as
24  to "substantially," but you can answer
25  if you know.

Page 60

1      K. HOSTEADTER
2     A. Not to my knowledge, but it's
3  been a while since I've been inside the
4  jail.
5     MR. GORDON: Okay. Let us go
6  to -- I will mark Exhibit 2.
7     (Plaintiff's Exhibit 2, Illinois
8  Department of Corrections Inspection
9  Report of the Cook County Jail, marked
10  for identification, as of this date.)
11     MR. GORDON: This is -- sorry.
12     MR. DeVORE: Can you show the
13  whole thing of it while you're going
14  through?
15     MR. GORDON: What's that?
16     MR. DeVORE: Can we see the
17  whole document?
18     MR. GORDON: Oh, yes. Sorry.
19     MR. DeVORE: Thanks.
20     MR. GORDON: So I'll just scroll
21  through. I kind of want to give a
22  description first if I can.
23     MR. DeVORE: Sure, sure.
24     MR. GORDON: So this looks like
25  it's the Illinois Department of

Page 61

1      K. HOSTEADTER
2  Corrections Inspection Report of the
3  Cook County Jail. Looks like it was
4  signed by Edwin R. "Bob" Bowen,
5  Manager of Jail and Detention
6  Standards Unit.
7  BY MR. GORDON:
8     Q. Have you seen this document,
9  Kim?
10     MR. DeVORE: Has this been
11  produced, this document?
12     MR. GORDON: I don't believe so.
13     MR. DeVORE: Okay. Did you
14  tender this to us before the
15  deposition as an exhibit? I'm just
16  trying to see if we've seen this
17  document before at all, and if not,
18  I'd like to take a look at it.
19     MR. GORDON: Okay. No, I don't
20  believe so. It doesn't look like
21  there's Bates numberings on the
22  bottom.
23     MR. RADUNSKY: Can you scroll
24  down, Tim, just so we can take a look
25  at it?

16 (Pages 58 - 61)

Page 62

K. HOSTEADTER

1
2    MR. GORDON:  Yeah.  Sorry.  I
3  would hoping that I could just drop it
4  in the chat, but I guess that feature
5  has been taken from Zoom, which is
6  unfortunate.
7    MR. DeVORE:  Does this document
8  have a date on it?
9    MR. RADUNSKY:  It does.  And
10 we're getting there, Jason.  I was
11 thinking the same thing.  Let's just
12 let him scroll.  I just want to see
13 this.
14   MR. DeVORE:  Okay.  Does that
15 say turkey, baloney on there?  Okay.
16   MR. GORDON:  It continues, so --
17   MR. RADUNSKY:  Yeah, yeah,
18 exactly.  Just go to the end.  I just
19 want to see when it's dated.
20   MR. GORDON:  I can go to the
21 beginning.
22   MR. RADUNSKY:  February 1st,
23 2023 is when the letter was sent by
24 Mr. Bowen with -- there it is.  Date
25 of Inspection, December 13 and 14,

Page 63

K. HOSTEADTER

1
2  2022.  Okay.  That's helpful.
3    Go ahead, Tim.
4    Kim, did you get a good look at
5  it?  Are you good to go?
6    THE WITNESS:  I did look at it,
7  but okay.
8    MR. RADUNSKY:  Yeah.  Obviously
9  we're not going to have you spend an
10 hour and a half looking at the all the
11 pages, but I wanted to get a general
12 lay of the land.
13   MR. GORDON:  Yeah.  It's just
14 going to be pretty targeted.  Nothing
15 too crazy, I promise.
16   MR. RADUNSKY:  Okay.  Go ahead.
17 BY MR. GORDON:
18   Q.  Kim, have you seen something
19 like this document?
20   A.  Not until today.
21   Q.  It looks like, again, Illinois
22 Department of Corrections Inspection
23 Report of Cook County Jail.  On the second
24 page it says Cook County -- sorry.  County
25 Jail Inspection Checklist, and it looks

Page 64

K. HOSTEADTER

1
2  like it's -- it's Superintendent, Dr. Jane
3  Gubser, G-U-B-S-E-R, and then Dom Beachem,
4  B-E-A-C-H-E-M.  Then it says, Officials
5  and titles interviewed other than above,
6  and then it has a list of other people.
7  Not saying your name is on this list.  I
8  just wanted to show you for transparency.
9    And it shows -- so I'm just
10 going to go down to where it says
11 Telephone.
12   Do you see that section,
13 701.190; it says Telephone, Kim?
14   A.  Yes.
15   Q.  I'll give you a second to just
16 look it over.  Just a couple questions.
17   And I'll zoom out and just show
18 you that it says Yes, Not Available, No in
19 the columns with each box, and in the
20 Telephone section, the Yes box is marked
21 for all the questions.  Just -- so I can
22 zoom back in.  These all indicate Yes.
23   So I just want to go one by one.
24   Are detainees permitted to place
25 at least one five-minute telephone call

Page 65

K. HOSTEADTER

1
2  per week?
3    A.  Yes.
4    Q.  And then are telephone calls
5  subject to monitoring?
6    A.  Yes.
7    Q.  Can violations of telephone
8  rules result in the suspension of the
9  detainees' use of the telephone --
10   MR. DeVORE:  Objection.  I'm
11   sorry.  Objection as to form and the
12   scope in terms of the topics.  She's
13   talking about the general use of
14   telephones.
15 BY MR. GORDON:
16   Q.  Can violations of telephone
17 rules result in the suspension of the
18 detainees' use of the telephone for a
19 designated period of time?
20   MR. RADUNSKY:  Objection.
21   Q.  You can answer.
22   MR. GORDON:  Are you instructing
23   her not to answer?
24   MR. RADUNSKY:  No.  We're just
25   saying it's outside the scope.  You

17 (Pages 62 - 65)

K. HOSTEADTER

1    know we have another witness, I mean,
2    who's going to come in and testify as
3    to this is exact issue. We just feel
4    it's outside Tim's scope.
5        So if you're asking her just to
6    simply say was that box checked, go
7    ahead, Kim, you can answer.
8    A. Yes.
9        MR. GORDON: You don't need to
10   speak, Troy. There's no speaking
11   objections.
12   Q. Is a notice stating telephone
13   calls may be monitored or recorded posted
14   by each telephone from which detainees may
15   place calls?
16   A. Yes.
17   Q. Are rules governing the use of
18   telephones established?
19       MR. DeVORE: Objection as to
20   form in terms of speculation, but you
21   can answer.
22   A. Can you ask me the question one
23   more time, please?
24   Q. Of course. Are rules governing

K. HOSTEADTER

1    the use of telephones established?
2    A. If you're referring to the
3    handbook, then yes.
4    Q. Is the inmate handbook that
5    we've just looked over in Exhibit 1, is
6    that the only rule you're aware of?
7        MR. DeVORE: Objection. Form.
8    Q. With regard to telephones?
9        MR. DeVORE: Objection. Form.
10   Mischaracterizes prior testimony.
11       But you can answer.
12   A. As far as I know, the handout is
13   the only rule there is for the phones.
14   Q. Okay. You don't know of any
15   other rules or policies governing the use
16   of telephones for inmates?
17       MR. DeVORE: Objection. Form,
18   as to written or oral.
19       But you can answer.
20   A. Not to my knowledge.
21   Q. Okay.
22       MR. GORDON: I'm going to mark
23   as Exhibit 3 -- I'm sorry. It does
24   say Exhibit 4. This is not Exhibit 4,

K. HOSTEADTER

1    this is Exhibit 3.
2        (Plaintiff's Exhibit 3, 2024
3    Illinois Department of Corrections
4    County Jail Inspection Checklist,
5    marked for identification, as of this
6    date.)
7    BY MR. GORDON:
8    Q. Do you see this, Kim?
9        MR. DeVORE: Is this another one
10   of those?
11       MR. GORDON: Yeah.
12       MR. DeVORE: Can we take a look
13   at it, as well? Obviously we haven't
14   seen it.
15       MR. GORDON: It's a similar
16   thing, I promise you. I just want to
17   throw it in here for the record, but
18   I'll go through it again. Date of
19   inspection is 12/12/2023, and
20   scrolling through it again, it's
21   substantially the same --
22       MR. DeVORE: 1220 -- 1209 --
23   wait. No, this isn't 1209. This is a
24   checklist, right?

K. HOSTEADTER

1        MR. GORDON: Yes.
2        (Crosstalk.)
3        MR. DeVORE: Not the policy.
4    Okay. Is it 1209 -- no. Is one of
5    them Policy 1209? No. Exhibit 1.
6        MR. GORDON: This is Exhibit 3.
7    It's on the 2024 Illinois Department
8    of Corrections County Jail Inspection
9    Checklist.
10       MR. DeVORE: Got it. Okay.
11   Thank you.
12       MR. GORDON: Again,
13   substantially the same document. It's
14   34 pages instead of 33.
15       I'll go through it again. It
16   has there three columns; Yes, Not
17   Available and No. Scrolling through
18   to show it's the same type of
19   document. Going to the Telephone
20   section again.
21   BY MR. GORDON:
22   Q. And have you seen this document,
23   Kim?
24   A. Not until today.

Page 70

K. HOSTEADTER

1
2 Q. Okay. I wish I had paper
3 versions of these, but I'm not going to go
4 through each question again; but I just
5 wanted to show you that these are the same
6 questions that we just spoke into the
7 record with the same boxes checked.
8      MR. GORDON: I can go through it
9 again if you prefer, Jason.
10      MR. DeVORE: I mean, I'm just
11 going to have the same objection as to
12 form and in terms of it being outside
13 the scope of the topics for which you
14 designated, but I see that --
15      (Crosstalk.)
16      MR. GORDON: Okay.
17      MR. DeVORE: And also objection
18 as to subsequent remedial measures, to
19 the extent it applies.
20      MR. GORDON: Let's go to Exhibit
21 4. Exhibit 4 is a large document.
22 It's been produced to us by
23 defendants --
24      MR. RADUNSKY: Tim, I thought
25 the last one -- wasn't the last one

Page 71

K. HOSTEADTER

1
2 Exhibit 3 and 4, the jail inspection
3 checklists, or am I totally wrong?
4 I'm sorry, I just want to get this
5 right.
6      MR. GORDON: Yes. So the first
7 one was the inmate handbook.
8      MR. RADUNSKY: Yeah.
9      MR. GORDON: The second one is
10 the checklist from --
11      MR. RADUNSKY: Oh, even though
12 it says Exhibit 3 up there?
13      MR. GORDON: I know, I know.
14      MR. RADUNSKY: I'm sorry, that's
15 why I got confused. My bad.
16      MR. GORDON: I made a play
17 action.
18      (Crosstalk.)
19      THE VIDEOGRAPHER: Would you
20 guys like to stay on the record for
21 all this?
22      MR. RADUNSKY: We're fine. It
23 doesn't matter. We straightened it
24 out.
25      Go ahead, Tim. I'm sorry.

Page 72

K. HOSTEADTER

1
2      MR. GORDON: No worries.
3      So Exhibit 4, it's a large
4 document that was produced by
5 defendants with Bates number CCSAO
6 HENNEBERG 000132. That's the first
7 page. And the last page is 000332.
8 It looks to be, you know -- the first
9 page is a Daily Roster Division Ten.
10      (Plaintiff's Exhibit 4,
11 documents Bates stamped CCSAO
12 HENNEBERG 000132 through 000332,
13 marked for identification, as of this
14 date.)
15 BY MR. GORDON:
16 Q. Have you seen anything like
17 this, Kim, or have you seen this before?
18 A. I have seen a document like this
19 before, yes.
20 Q. Can you explain what this is?
21 A. It's a daily roster.
22 Q. And what is a daily roster?
23 A. It is the divisional shift
24 assignments for staff.
25 Q. And is this daily?

Page 73

K. HOSTEADTER

1
2 A. Yes.
3 Q. It says Day, Month, Date, June
4 17th, 2019.
5      Can you explain what this column
6 is, the Staffing Number column on the
7 very, very left?
8      MR. DeVORE: Objection as to
9 form and as to scope relative to the
10 purpose of her deposition, which is
11 general use of the phone systems.
12      You can go ahead to the extent
13 you can respond to it.
14 A. That would be up to a supervisor
15 to respond to. I do not know all of the
16 ins and outs of that assignment for
17 staffing members.
18 Q. Okay. Is there someone who
19 would be assigned in a division to monitor
20 telephones or be near them physically?
21 A. Are you asking for, like, an
22 assignment?
23 Q. Yeah. Is there an officer who's
24 standing near and, like, looking at the
25 telephones and making -- you know, and

19 (Pages 70 - 73)

Page 74

K. HOSTEADTER

1    K. HOSTEADTER
2  monitoring them in that capacity
3  physically?
4        MR. DeVORE:  Object as to form
5   as to monitoring, but with that
6   clarification, you can answer if you
7   can.
8    A.   Not to my knowledge.  I'm not
9  the supervisor of the division to say
10 that, and the phones are in the tier.  I
11 don't have an answer for that.
12       There's no monitoring that's
13 physically done.  It's done via through
14 listening through the system.
15   Q.   So there's no correctional
16 officer that has their eyes set on -- that
17 is within eyesight of the telephones?
18       MR. DeVORE:  Objection.  I'm
19   sorry.  Objection.  Form.  Calls for
20   speculation.
21       MR. GORDON:  I'm not talking
22   about division, Tim.  I'm just talking
23   about -- in the jail, is there a
24   correctional officer who, on a daily
25   basis, is near -- within eyesight of

Page 75

K. HOSTEADTER

1    K. HOSTEADTER
2  the telephones.
3        MR. DeVORE:  Objection.  Form.
4   Speculation.
5        You can answer to the extent you
6   can.
7    A.   A tier officer has visual of the
8  dayroom.  It doesn't necessarily mean that
9  he's constantly watching the phone.  There's
10 things that are going on.  There's
11 a TV, there's a washroom, there's feed.
12 There's people coming in and out of the
13 tier.
14       Are the phones eyesight the
15 whole entire time?  Not necessarily.
16   Q.   So at any given point there
17 could be an inmate on the telephone that
18 is not being physically watched by an
19 officer?
20       MR. DeVORE:  Objection.  Form.
21   Incomplete hypothetical.
22       You can answer.
23    A.   I can't speak for a tier
24 officer.
25   Q.   You were a correctional officer

Page 76

K. HOSTEADTER

1    K. HOSTEADTER
2  from 2010 to 2012; is that correct?
3    A.   2001 till about 2008, I was a
4  tier officer.
5    Q.   And then from 2008 to 2012, what
6  was your position?
7    A.   I worked maintenance and
8  administrative.
9    Q.   I had that you were an
10 investigator -- I'm sorry, I'm just trying
11 to get this cleared up then.  I have that
12 you started becoming an investigator in
13 2012, and then before that you were a
14 correctional officer, and then before that
15 you were administrative assistant.
16       Is that not correct?
17    A.   Yes.
18    Q.   That's not correct?
19    A.   It is correct.
20    Q.   So you were correctional officer
21 up until 2008, or were you a correctional
22 officer up until 2012?
23    A.   Up until 2012 I received a title
24 of investigator.  I am still a
25 correctional officer.  It's just that my

Page 77

K. HOSTEADTER

1    K. HOSTEADTER
2  title has changed.
3    Q.   Okay.  What were your
4  responsibilities from 2010 to 2012?
5    A.   To clean and help maintain my
6  division with workers, to feed, to do odd
7  jobs that were requested of my daily
8  duties.
9    Q.   During that time, did you ever
10 see inmates argue about telephone usage?
11       MR. DeVORE:  Objection.  Form.
12   Scope.
13       You can respond if you can.
14    A.   I do not recall.
15    Q.   So you've never -- you can't
16 remember if you've ever seen inmates argue
17 over telephone usage?
18       MR. DeVORE:  Same objection.
19   Asked and answered.  30(b)(6) witness.
20   I mean, we're not talking about 2001
21   to 2008 when she was a tier officer.
22       MR. GORDON:  There doesn't need
23   to be speaking objections.
24 BY MR. GORDON:
25    Q.   Okay.  Let's go down to Bates

20 (Pages 74 - 77)

Page 78

K. HOSTEADTER

1  number 000210.
2
3       Sorry.  Before I get off that
4  topic, so you've been working at Cook
5  County Jail, and you've been working in
6  the division for, you know -- you've been
7  working at Cook County Jail for 25 years.
8  You've been working in the division as a
9  correctional officer from 2000 to 2012,
10  whether it be, you know, through
11  maintenance, cleaning and whatnot, but
12  you've never experienced or never
13  witnessed inmates having an argument over
14  using the telephone?
15      MR. DeVORE:  Objection.
16  Mischaracterizing prior testimony
17  regarding how long she's worked for
18  the Cook County Sheriff's Office.
19  Asked and answered.  Argumentative.
20  Asking for, also, personal opinions as
21  opposed to those for which she has
22  been brought here as a 30(b)(6) --
23      MR. GORDON:  Speaking
24  objections --
25      MR. DeVORE:  I'll just put them

Page 79

K. HOSTEADTER

1
2  all out there.
3  BY MR. GORDON:
4      Q.   So you can answer, Kim.
5      A.   I don't recall.
6      Q.   You don't recall.  Have you ever
7  heard of inmates arguing over using the
8  telephone?
9      MR. DeVORE:  Same objections.
10  Form.
11      You can answer if you can.
12      A.   I don't recall.
13      Q.   So you are unaware of any type
14  of inmate arguments resulting from the use
15  of the telephones?
16      MR. DeVORE:  Objection.  Form.
17      You can answer.
18      A.   There have been several
19  arguments between inmates, several things
20  have happened.  I do not know or can
21  remember each -- every detail that takes
22  place between two inmates throughout the
23  course of my career.
24      Q.   I'm not asking for specifics.
25  I'm just wondering if you just know

Page 80

K. HOSTEADTER

1
2  generally, like, whether or not inmates do
3  fight over the use of telephones.
4      MR. DeVORE:  Objection.  Scope
5  and form.
6      You can answer if you can.
7      A.   That could possibly happen.
8  Like I said, I don't recall.
9      Q.   But it's possible?
10      A.   It is possible.
11      Q.   But it's never something that
12  was brought to your attention as a
13  correction officer or in your current
14  capacity?
15      MR. DeVORE:  Objection.
16  Mischaracterizing her prior testimony.
17  Asked and answered.
18      But you can answer it one more
19  time.
20      A.   I don't recall.
21      Q.   Let's go to -- sorry.  I said
22  000210 before.  I actually want to go to
23  Bates number 000201.
24      Are you able to see this, Kim?
25      A.   Yes.

Page 81

K. HOSTEADTER

1
2      Q.   Have you seen this before?
3      A.   Yes.
4      Q.   When have you seen this
5  document?
6      A.   Prior to today, on Friday.
7      Q.   And what is it?
8      A.   It's an inmate handout, I
9  believe.
10      MR. RADUNSKY:  Tim, can you go
11  to the top so she can see it?  I
12  appreciate it.  No, to the top --
13  you're on page seven.  Can you go to
14  the first page?  There you go.  Past
15  it.
16      MR. DeVORE:  You can read any
17  part of it you'd like, if you need,
18  Kim.
19      Q.   Yeah.  I wish could give you
20  this document, but --
21      MR. DeVORE:  She is on a phone,
22  so it's difficult.
23      (Crosstalk.)
24      THE WITNESS:  I'm struggling.
25  I'm sorry.

21 (Pages 78 - 81)

Page 82

K. HOSTEADTER

1
2         MR. GORDON: It's not your
3    fault. It's fine.
4         A.   So this particular part is a
5    policy.
6         Q.   Policy -- it says Cook County
7    Department of Corrections Custody Manual
8    at the top, and then this policy, 702,
9    Inmate Reception and Intake, and you're
10   familiar with this policy.
11        Have you seen it any other time
12   prior to Friday?
13        A.   Yes.
14        Q.   What other times have you seen
15   this document?
16        A.   As part of my duties. You have
17   to go over the policy, you have to read
18   things. It's part of keeping up with
19   policy and procedures within our
20   department and within the jail.
21        Q.   Okay. Do inmates receive this
22   policy?
23        MR. DeVORE: Objection. Form.
24   Calls for speculation.
25        You can answer.

Page 83

K. HOSTEADTER

1
2         A.   They receive an inmate handout.
3         Q.   Okay. But they don't receive
4    this actual document?
5         A.   No.
6         MR. RADUNSKY: Tim, was this
7    marked? Did I miss it? Is this 5.
8         MR. GORDON: No, this is 4.
9         MR. RADUNSKY: Four, okay.
10        MR. GORDON: It's a large
11   packet. Sorry.
12   BY MR. GORDON:
13        Q.   Okay. So here we go. Inmate
14   Reception and Intake. Let's go down to
15   702.8, Bates number 000201.
16        Do you see this right here where
17   it says Inmate Telephone Calls?
18        A.   Yes.
19        Q.   I'll give you a second to scan
20   it.
21        A.   Okay.
22        Q.   So is this consistent with the
23   he -- is this the same policy that's in
24   the inmate handbook, the same intake
25   policy?

Page 84

K. HOSTEADTER

1
2         MR. DeVORE: Objection. Form.
3         You can answer.
4         A.   I would have to see the inmate
5    policy to reference them back and forth.
6         They're similar.
7         Q.   When inmates are going through
8    intake, they're allowed one free phone
9    call, correct?
10        A.   Yes.
11        Q.   And this is the Inmate Reception
12   and Intake policy. Why at 702.8.1,
13   Telephone Call Procedures, does it say,
14   Local and long-distance calls will be paid
15   by the inmate using calling cards or by
16   calling collect if they're allowed one
17   free phone call?
18        I'm just confused -- I don't
19   understand -- so does the inmate, during
20   the intake process, are they using a
21   calling card or calling collect, or are
22   they given one free phone call?
23        A.   During the intake process,
24   they're given one free phone call.
25        Q.   But it says here Inmate

Page 85

K. HOSTEADTER

1
2    Reception and Intake, the telephone policy
3    is that it would have to be paid by the
4    inmate using calling cards or calling
5    collect.
6         A.   That's after they get to their
7    units.
8         Q.   So this telephone policy
9    dictates both the Inmate Reception and
10   Intake -- the inmate intake and while
11   they're living in the living quarters?
12        MR. DeVORE: Objection. Form.
13        But you can answer if you can.
14        A.   The inmate, once they come in,
15   to notify their family of where they are,
16   they're given a free call. Once they've
17   made it to their living unit, they're
18   given another free call.
19        But after that they have to
20   register within the system, whether it be
21   a calling card, collect -- if they want to
22   call their family and friends, after that,
23   then they have to pay for the phone calls.
24        Q.   Okay. My confusion just comes
25   with it says Inmate -- Inmate Reception

22 (Pages 82 - 85)

1          K. HOSTEADTER
2   and Intake policy.  It says a Telephone
3   Call Procedures.  It doesn't say anything
4   about a free phone call here.
5          And then down here it says
6   Ongoing Telephone Access, Ongoing
7   telephone access for inmates who are
8   housed at this facility will be in
9   accordance with the Inmate Telephone
10  Access policy.
11         MR. RADUNSKY:  Why does this
12  matter, if it's a free phone call or
13  not?  I mean, the inmate handbook says
14  it.
15         (Crosstalk.)
16         MR. RADUNSKY:  I know you're
17  making a big deal --
18         MR. HAWKINS:  Troy, Troy, we get
19  to ask the questions we want of the
20  witness --
21         MR. RADUNSKY:  It's outside the
22  scope.
23         MR. HAWKINS:  Two things:  There
24  should be no double-teaming on
25  objections.  That's first and

1          K. HOSTEADTER
2   foremost.
3          And this is Brent Hawkins for
4   the record, Miss O'Berg.
5          There should be one person
6   objecting, and there certainly should
7   not be a discussion about why our
8   questioner asks questions that they
9   want to ask.  Thank you.
10         MR. DeVORE:  The objection is
11  outside the scope in terms of a free
12  phone call.
13         MR. GORDON:  Telephone policy.
14  We're talking telephone access and
15  policies.  Thank you.
16  BY MR. GORDON:
17     Q.   So that's just my confusion.
18  Here it says -- you're saying that they
19  receive a free phone call, but then the
20  policy is that -- it says that they don't
21  receive a free phone call.
22         So I don't how to reconcile
23  those two, but --
24     A.   At intake they're given a free
25  phone call to notify their family.  When

1          K. HOSTEADTER
2   they get to the their living unit, they
3   are also given a free phone call to let
4   their family know where they're at within
5   our facility, when their visiting days --
6   whatever they want to discuss during that
7   free phone call.
8          After that they have to set up
9   with their family and friends in order to
10  make phone calls from our facility,
11  whether it be a phone call that's made
12  collect, the family had put money on their
13  books, or they get a calling card.  Is
14  that --
15     Q.   Well, that's helpful.  The only
16  thing that's not helpful is that's not the
17  written policy in front of me.  The
18  written policy in front of me is that
19  local and long distance --
20         MR. RADUNSKY:  Tim, you've made
21  your point.  We know.  We understand.
22  You've made your record that you don't
23  understand the discrepancy.  We don't
24  know why you don't understand --
25         MR. GORDON:  Please stop

1          K. HOSTEADTER
2   interrupting.
3          MR. RADUNSKY:  Let's just move
4   on.
5          MR. GORDON:  We're not arguing.
6   Let me just ask my question.  Why are
7   you so upset about this?
8          (Crosstalk.)
9          MR. RADUNSKY:  I'm not upset.
10  What's bothering me is that she
11  doesn't know, and she said -- and
12  she's agreed with you there's a
13  discrepancy; and you keep saying that
14  you don't understand why, and she's
15  saying to you, I don't either but
16  there's a free phone call, and you
17  just keep going in the same direction.
18         Jason has tried to get you to
19  move off of it.  Kim has answered it
20  three times.  I tried to redirect you.
21  And Brent's right, I shouldn't be
22  saying anything --
23         MR. GORDON:  You shouldn't.
24         MR. RADUNSKY:  -- about the
25  inmate handbook, but I just want to

Page 90

K. HOSTEADTER

1
2  move on, because I think Kim has given
3  you an answer.
4      So why don't we just take a
5  break, and if you have the same
6  question when you come back, that's
7  fine, but, I mean, our objection
8  stands.
9      MR. GORDON:  I don't like that
10 you do this every time, Troy.  I
11 can't.  Please stop talking and
12 interrupting me.  Let me ask my
13 questions.  We would be done with this
14 and have moved on by now had you not
15 interrupted me and just said -- who
16 cares?  Please.  It's really annoying.
17 You did it at the last deposition and
18 you're doing it this last deposition,
19 too.  Okay.  This is my second
20 deposition I've ever taken, by the
21 way.  The last one was the first one
22 ever, so, please...
23     MR. RADUNSKY:  You're doing a
24 really good job --
25     THE COURT STENOGRAPHER:  Do you

Page 91

K. HOSTEADTER

1
2  want to go off the record?
3      MR. GORDON:  We'll go off the
4  record, and we'll take a nine-minute
5  break.  We'll get back here at 3:10 --
6      THE VIDEOGRAPHER:  Let me just
7  take us off the record.  We're going
8  off the record at 3:01 CST.
9      (Brief recess taken.)
10     THE VIDEOGRAPHER:  We're going
11 back on the record at 3:11 p.m. CST.
12 BY MR. GORDON:
13 Q.  Hi, Kim.  Welcome back.
14     (Witness inaudible.)
15     THE COURT STENOGRAPHER:  Off the
16 record.
17     (Discussion off the record.)
18 BY MR. GORDON:
19 Q.  Hi, Kim.  Thank you.  I'll try
20 to keep this quick.  We'll try to wrap
21 this up as soon as we can.
22     So I just want to go back to
23 telephone call procedures in 702.8.1.
24     We were discussing and you had
25 said they receive a free phone call at

Page 92

K. HOSTEADTER

1
2  intake and then again once they're, you
3  know, admitted into their division, right?
4  And here I'm just saying we can't
5  reconcile the distinction here.
6      So there are discrepancies
7  between the phone policies; is that
8  correct?
9      MR. DeVORE:  Objection.  Form.
10 Mischaracterizes prior evidence -- or
11 prior testimony.
12     Go ahead.
13 A.   This is reception and intake.
14 Now, my -- I don't know how else to get it
15 across that they're receiving these calls.
16     Do you have another question
17 other than about intake?
18 Q.  So 702.8.1 isn't about intake?
19 A.  Let me go back to that.  Hold on
20 one second.
21 Q.  Sorry.  Are you seeing -- I'm
22 sharing my screen.  I'm sorry about that.
23 A.  You are sharing your screen, but
24 I'm working on a phone.
25     MR. DeVORE:  And objection as to

Page 93

K. HOSTEADTER

1
2  form.  Asked and answered.
3  A.  So I still stand with what I
4  said before.  They're allowed free phone
5  calls and...
6  Q.  And I'm just saying it's not
7  saying that here.
8      So it's safe to the say that
9  there are discrepancies between the phone
10 policies, correct?
11     MR. DeVORE:  Objection.  Form.
12 Mischaracterizes her testimony.
13     You can answer.
14 A.  Are you referring to the inmate
15 handout or the policy?
16 Q.  I'm referring to this policy,
17 the Cook County Department of Corrections
18 Custody Manual.
19     MR. DeVORE:  Is there a
20 question?
21 Q.  I'm just saying, specifically
22 702.8.1, it says Telephone Call
23 Procedures.  Long and -- local and
24 long-distance calls will be paid by the
25 inmate using calling cards or by calling

24 (Pages 90 - 93)

Page 94

K. HOSTEADTER

1   K. HOSTEADTER
2   collect.  And this is for the Inmate
3   Reception and Intake Process.
4       It says that they will be using
5   calling cards or by calling collect;
6   however, you're stating that they will --
7   they are able to make a phone call free.
8       A.   Yes.
9       Q.   I'm --
10      (Reporter clarification.)
11      Q.   So there's a discrepancy between
12  the phone policies, the inmate handbook
13  says that they would receive a free phone
14  call, and you're saying that they would
15  receive a free phone call; however, this
16  Cook County Department of Corrections
17  Custody Manual, it says at 702.8.1 that it
18  would be paid by the inmate using calling
19  cards or by calling collect, correct?
20      MR. DeVORE:  Objection.  Form.
21  Asked and answered several times.
22      You can give it one more shot.
23      Q.   Yes or no?
24      A.   Yes.
25      Q.   Okay.  Thank you.

Page 95

1   K. HOSTEADTER
2       MR. GORDON:  All right.  So
3   let's move on to -- sorry.  This will
4   be Bates 000210, and it will be Policy
5   1209.
6   BY MR. GORDON:
7       Q.   Are you familiar with this
8   policy, Kim?
9       A.   Yes.
10      MR. RADUNSKY:  I'm sorry, this
11  is Exhibit 4 still?
12      MR. GORDON:  Yes.
13  BY MR. GORDON:
14      Q.   And what is this policy?
15      A.   This is about the inmate phone
16  access.
17      Q.   And is this during intake or is
18  this -- sorry.  Is this during intake?
19      A.   It's about their whole time with
20  us, intake and on their tier for the phone
21  policy, the use of the phones.
22      Q.   So this is about both.  So
23  Policy 1209 is about both intake and --
24  inmate intake and while they're currently
25  incarcerated?  It covers both of those?

Page 96

1   K. HOSTEADTER
2       A.   Yes.
3       Q.   Okay.
4       MR. RADUNSKY:  Can we get the
5   Bates stamp on that, Tim, just for the
6   record?
7       MR. GORDON:  Yes.  I already
8   said it was 000210.
9   BY MR. GORDON:
10      Q.   It says here at 1209.2 of the
11  policy, The executive director or the
12  authorized designee shall develop written
13  procedures establishing the guidelines for
14  access and usage.
15      What does that mean?
16      MR. DeVORE:  Objection.  Form.
17      You can answer.
18      A.   That is where the inmate is
19  housed.  An inmate can use the phone at
20  any time on their tier unless they're in
21  disciplinary; then their time on the
22  phones is restricted.
23      Q.   How are the times on the phones
24  restricted when they're in disciplinary?
25      MR. DeVORE:  Objection.  Scope.

Page 97

1   K. HOSTEADTER
2       She's not here to testify --
3       MR. GORDON:  Well, this is a
4   policy --
5       (Crosstalk.)
6       MR. DeVORE:  The objection was
7   just as to the discipline component of
8   it, but you can answer.
9       Q.   How is their phone use
10  restricted?
11      A.   It can be limited to a certain
12  time.
13      Q.   How would it be limited?  By how
14  much time?
15      MR. DeVORE:  Objection.  Form.
16      You can answer.
17      A.   It depends on the circumstances.
18  I do not have control over that.  That's
19  done by other entities in the jail.
20      Q.   But are you aware of the policy?
21      A.   The policy on discipline or the
22  policy for phones?
23      Q.   The policy for which they can
24  access the phones.
25      So you said they're limited in

25 (Pages 94 - 97)

Page 98

K. HOSTEADTER
1
2    time.  Why are they limited in time?  How
3    much time are they limited to?  Who sets
4    the -- like, how do you determine how much
5    time they have access to the telephones?
6          MR. DeVORE:  Objection.  Form.
7    Multiple questions.
8          But you can answer one of them.
9      A.   They're allotted to use the
10   phone any time they have access to a
11   phone, unless they're in disciplinary.
12         When they're in disciplinary,
13   that is not under my control.  That is up
14   to the unit heads to decide on how much
15   time they are allotted for disciplinary;
16   otherwise, like I said before, any time
17   they're in the dayroom, they're allowed to
18   use the phones.
19     Q.   Who enforces that policy that
20   limits people who have been discipline's
21   use of the phone?
22         MR. DeVORE:  Objection.  Form.
23   Outside the scope.
24         You can answer if you can.
25     A.   I do not know.

Page 99

K. HOSTEADTER
1
2      Q.   This is the current policy
3    enacted; is that correct?
4      A.   Yes.
5      Q.   It says down here 2018/12/31.
6    Is that when it was enacted or...
7          MR. DeVORE:  Objection.  Form.
8          You can answer if you can.
9      A.   I do not know.
10     Q.   Do you know if the policy has
11   changed since this policy was enacted?
12         MR. DeVORE:  Objection.  Calls
13   for speculation.
14         You can answer if you can.
15     A.   I do not know.
16     Q.   Was there a policy prior to in
17   that was different?
18         MR. DeVORE:  Objection.  Form.
19         You can answer if you can.
20     A.   I do not know.
21     Q.   So you're the corporate witness
22   on policies regarding inmate telephone
23   usage and their inmate access to telephone
24   usage, and you don't know if this is the
25   current policy that's enacted right now,

Page 100

K. HOSTEADTER
1
2    and you don't know if there are any
3    policies enacted prior to this, and you
4    can't even tell me if this is -- was
5    enacted in 2018?
6          MR. DeVORE:  Objection.  Form.
7          You can answer if you can.
8      A.   This is the policy that was
9    presented to me, and that's the policy
10   that I have seen and reviewed.
11         It has possibly changed over the
12   course of my career in subtle ways that
13   probably did not make a difference in
14   what -- in how I utilize the phone system
15   or use it from day to day.
16     Q.   So there have been no
17   substantial changes that you can remember
18   throughout your tenure at Cook County to
19   this telephone access policy?
20         MR. DeVORE:  Objection.  Form.
21         You can answer.
22     A.   Yes.
23     Q.   Is this the current policy that
24   is enacted right now?
25         MR. DeVORE:  Objection.  Scope.

Page 101

K. HOSTEADTER
1
2          You can answer.
3          MR. GORDON:  Scope?  This is
4    about telephone usage policies.  She's
5    the corporate witness.
6      A.   Yes.
7          MR. GORDON:  She's the corporate
8    witness.
9      Q.   So this is the one that's
10   enacted right now, Kim?
11     A.   Yes.
12     Q.   Thank you.
13         MR. DeVORE:  The scope was 2011
14   to 2021, no?  Am I correct?
15         MR. GORDON:  Corporate witness
16   for telephone inmate usage.
17         MR. DeVORE:  When you say
18   current, we're in 2025.  We're talking
19   about the timeframe -- you had from
20   2011 to 2021, and we talked about 2017
21   to '21.  So you're talking about
22   current.
23         MR. GORDON:  So -- I just want
24   to wrap this up, Jason.  Thank you.
25   BY MR. GORDON:

26 (Pages 98 - 101)

Page 102

K. HOSTEADTER

1
2    Q.   Next question.  The minimum time
3  allowed per call should be five minutes,
4  except where there are substantial reasons
5  to justify such limitations.
6        Do you see that, Kim?
7    A.   Yes, I do see that.
8    Q.   Do you remember earlier in this
9  testimony where you testified that an
10  inmate can be on the phone for up to 30
11  minutes until they're kicked off?
12    A.   Correct.
13    Q.   Why does it say here -- can you
14  explain to me the discrepancy -- so I'm
15  confused because the minimum time allowed
16  per call shall be five minutes.  So
17  they're allowed -- are they allowed to
18  make calls below five minutes?
19        MR. DeVORE:  Objection.  Form.
20        But you can answer if you can.
21    A.   A phone call has to have certain
22  things to go through.  They have to put in
23  their phone number.  They have to say
24  their name or a phrase.  They have to wait
25  and see if the other person on the other

Page 103

K. HOSTEADTER

1
2  end will accept, decline or block the
3  phone.  So that takes away from the phone
4  call.  Five minutes is generally, I'm
5  okay, I'm here.  That's a minimal phone
6  call up to 30 minutes.
7    Q.   Okay.  But it doesn't -- I
8  mean -- I'm not reading here anything that
9  says it can be up to 30 minutes.  Is that
10  correct?
11        MR. DeVORE:  Objection as to
12    form.
13        You can answer.
14    A.   No, I don't see 30 minutes
15  there.
16    Q.   So how is it determined that
17  they're only allowed 30 minutes?  Is there
18  a written policy on that?
19    A.   That, I believe, is done through
20  the vendor, which is nothing that I have
21  anything to do with.
22    Q.   So the vendor determines how
23  long an inmate can use the telephone?
24        MR. DeVORE:  Objection.
25    Mischaracterizes her prior testimony.

Page 104

K. HOSTEADTER

1
2    Asked and answered.
3        You can answer.
4        MR. GORDON:  I don't think that
5    was already asked and answered.  I
6    never asked if the vendor determines
7    how long the telephone call is.  I
8    don't think I've ever asked that,
9    Jason.  I just asked right now.
10  BY MR. GORDON:
11    Q.   Does the vendor determine how
12  long an inmate can use the telephone for?
13    A.   That is discussed between the
14  vendor and the Cook County treasurer or
15  the board to determine the guidelines for
16  the length of a phone call.  I do not have
17  anything to do with that.
18    Q.   So there's no written policy by
19  Cook County as to how long an inmate can
20  stay on the telephone for?
21        MR. DeVORE:  Objection.  Form.
22    Calls for speculation.
23    Q.   Is there a written policy that
24  says that an inmate can stay on the phone
25  for a certain amount of time, that there's

Page 105

K. HOSTEADTER

1
2  a maximum amount of time that an inmate
3  can stay on the phone?  Is there a written
4  Cook County policy about that?
5    A.   Off the top of my head I do not
6    know.
7        MR. DeVORE:  And objection as to
8    speculation.
9        You asked for Cook County.
10    Q.   So there's no written policy
11  that bars an inmate from using the
12  telephone for a certain amount of time?
13        MR. DeVORE:  Objection.  Calls
14    for speculation.
15        You can go ahead.
16    A.   I do not know.
17    Q.   Wow.
18        MR. RADUNSKY:  Keep your
19    commentary off the record, Tim,
20    honestly.
21        MR. GORDON:  Keep yours off the
22    record, Troy.
23        (Crosstalk.)
24        MR. DeVORE:  If you want to
25    speak to a witness that way and act

27 (Pages 102 - 105)

Page 106

K. HOSTEADTER

1    K. HOSTEADTER
2    like you're in disbelief --
3        (Crosstalk.)
4        MR. DeVORE: Thanks. Got going
5    to ask again. Because she's not
6    saying wow to your questions which are
7    completely ridiculous sometimes.
8        MR. HAWKINS: Excuse me. Again,
9    Troy, I ask if you can stay off the
10   record, please.
11       MR. RADUNSKY: Not when he says
12   that --
13       (Crosstalk.)
14       MR. GORDON: You are not here
15   to --
16       (Crosstalk.)
17       MR. RADUNSKY: -- so
18   disrespectfully. I mean, you want to
19   take it to the judge, Brent? I hope
20   that you do so that he can see Tim's
21   reaction to her questions. Okay?
22   Because I'll be there to also say to
23   the judge and so will Jason -- all I'm
24   asking is simple respect for the
25   witness, not to say wow when she's

Page 107

1    K. HOSTEADTER
2    gives an answer, like she's not
3    telling the truth or he's
4    disappointed. She's here to tell the
5    truth, not to tell Tim what he wants
6    to the hear.
7        MR. HAWKINS: Mr. Radunsky, can
8    you please stay off the record? You
9    are not to instruct the questioner how
10   to ask her questions. I would
11   appreciate it if you would allow Mr.
12   Gordon to take his questions and ask
13   and respond as he would.
14       MR. RADUNSKY: And I would ask
15   him to be civil and professional when
16   he's doing it, Brent. That's it. All
17   right. Otherwise we can talk to the
18   judge about his behavior in the face
19   of my witness's answers.
20       MR. DeVORE: We just don't need
21   colloquy from anyone, frankly.
22       MR. GORDON: Thank you, Jason.
23   Okay. Where was I? I'm trying
24   to wrap this up, and I this keeps
25   getting off the rails. I don't know

Page 108

1    K. HOSTEADTER
2    if you're doing it on purpose, Troy --
3    I don't know if it's a tactic because
4    you heard there's a hard stop at 5:15
5    and you're trying to cause some chaos
6    so I don't have enough time to
7    question the witness, but it's not
8    good. It's just really not good.
9        MR. RADUNSKY: You know what,
10   Tim, I've been a lawyer for 26 years,
11   so I don't need to be lectured by you.
12   And since you brought up my name
13   personally, if you have an issue with
14   what I'm doing, take it to the judge.
15       (Reporter clarification.)
16       MR. RADUNSKY: Stop with the
17   commentary. Stop the colloquy. I
18   don't need to be lectured by you.
19   Start acting like a professional and
20   somebody who's civil and behaves like
21   somebody who knows what they're doing
22   when they've got a witness in front of
23   them. All right? That's what I'm
24   asking. Don't talk to me about
25   personal issues.

Page 109

1    K. HOSTEADTER
2        THE VIDEOGRAPHER: Excuse me.
3    Would you like to stay on the record
4    right now?
5        MR. DeVORE: No.
6        MR. GORDON: Yes, I would.
7        MR. DeVORE: Now we're back --
8    oh, oh.
9        MR. GORDON: I would like to
10   stay on the record.
11       (Crosstalk.)
12       MR. DeVORE: I'm sorry. I
13   misunderstood.
14       MR. GORDON: Gosh.
15       MR. DeVORE: Sorry.
16   BY MR. GORDON:
17   Q.   So back to Policy 1209, I'm
18   seeing -- so we discussed how -- it says
19   here, A notice stating that telephone
20   calls that telephone calls may be
21   monitored or recorded shall be posted by
22   each telephone from which inmates may
23   place calls.
24       Is that correct, Kim?
25   A.   Yes.

28 (Pages 106 - 109)

Page 110

K. HOSTEADTER

1
2     Q.   Thank you.  And it says that
3  they may be monitored.  And I know we
4  discussed that they could be monitored and
5  how they could be monitored earlier, but
6  scrolling through this policy -- it's only
7  about two pages, I believe -- I'm not
8  seeing anything stating how they're
9  monitored.
10       Is there a written policy about
11  how these telephone calls are monitored?
12       MR. DeVORE:  Objection.  Asked
13    and answered.
14       You can answer again to the
15    extent you recall.
16     A.   The calls are monitored through
17  the individual units.  I'm not sure if the
18  individual units have their own policy
19  regarding how the phone calls are
20  monitored, but -- that is also to give the
21  person making the phone call from our
22  facility a warning that it could be
23  monitored and that they are being recorded
24  for their own risk factors, I guess.
25     Q.   But to your knowledge, there's

Page 111

K. HOSTEADTER

1
2  not a written policy stating how they're
3  monitored, just that they could be
4  monitored?
5       MR. DeVORE:  Objection.
6       I think it mischaracterizes her
7     prior testimony.  There were several
8     pages of it.
9       But you can answer it if you
10    can.
11     A.   It's up to the designated unit
12  that's utilizes the phone system.
13     Q.   Do those designated units have
14  written policies?  Do you know that?
15       MR. DeVORE:  Objection.  Calls
16    for speculation.
17       But you can answer if you can.
18     A.   No, I do not know.
19     Q.   Okay.  You see here it says, A
20  sworn member should monitor the use of
21  public telephones to ensure inmates have
22  reasonable and equitable access and that
23  the rules of use are observed?  Who are
24  the sworn members that are discussed here?
25       MR. DeVORE:  Objection.  Form.

Page 112

K. HOSTEADTER

1
2       But you can go ahead.
3     A.   The sworn members could be the
4  tier officers.  They could be an
5  investigator.  They could be anybody that
6  is part of the sworn staff.
7     Q.   Okay.  And how do any of those
8  parties -- or how do each of those parties
9  monitor the use of public telephones to
10  ensure inmates have reasonable and
11  equitable access and that the rules of use
12  are observed?
13     A.   That would vary between the
14  units and the tier officer themselves.
15     Q.   Can you give an example of a
16  tier officer monitoring the use of public
17  telephones to ensure inmates have
18  reasonable and equitable access and that
19  the rules of use are observed?
20     A.   The tier officer can make sure
21  that the phones are working, that there's
22  no work orders on the unit for the phones.
23  If there's a broken phone, they can allow
24  the inmates the use of another phone
25  except for the broken one.  There's other

Page 113

K. HOSTEADTER

1
2  phones on the unit.  If the phone is
3  broken, they can make sure that the work
4  order is submitted and that the phone is
5  fixed in a timely fashion.
6       As for violating or not abiding
7  by the rules, that would be up to somebody
8  that is listening to the phone calls to
9  see if there's a three-way call or
10  something that's been done.
11     Q.   How about -- is there any
12  officer or sworn member who would monitor
13  the use of public telephones to ensure
14  that -- it says equitable access here.
15       Is there any sworn member that
16  would monitor the use of public telephones
17  to ensure that they're allowing equal time
18  for use of the telephones?
19       MR. DeVORE:  Objection.  Form.
20       You can answer.
21     A.   Not to my knowledge.
22     Q.   So they don't monitor to say,
23  you've been -- you've been using the phone
24  for too long; like, please get off if you
25  can so others could use it?

29 (Pages 110 - 113)

Page 114

K. HOSTEADTER

1    MR. DeVORE: Objection. Form.
2    Asked and answered.
3        You can answer again.
4    A.   Not to my knowledge.
5    Q.   Is there a sign-up sheet inmates
6    use -- or that inmates use to determine
7    when they can use the telephones?
8    A.   Not to my knowledge.
9    Q.   How do inmates determine who's
10   next on the telephone?
11       MR. DeVORE: Objection. Form.
12   Speculation.
13       You can answer it if you can.
14   A.   I do not know.  It's first come,
15   first served.
16   Q.   So there's no written policy as
17   to an order that inmates --
18       MR. GORDON: Scratch that.
19   Q.   There's no written policy that
20   inmates follow a procedure to determine
21   who's next to use the phone?
22       MR. DeVORE: Objection. Form.
23       You can answer if you can.
24   A.   Not to my knowledge.

Page 114

K. HOSTEADTER

1        K. HOSTEADTER
2        MR. DeVORE: Objection. Form.
3    Asked and answered.
4        You can answer again.
5    A.   Not to my knowledge.
6    Q.   Is there a sign-up sheet inmates
7    use -- or that inmates use to determine
8    when they can use the telephones?
9    A.   Not to my knowledge.
10   Q.   How do inmates determine who's
11   next on the telephone?
12       MR. DeVORE: Objection. Form.
13   Speculation.
14       You can answer it if you can.
15   A.   I do not know.  It's first come,
16   first served.
17   Q.   So there's no written policy as
18   to an order that inmates --
19       MR. GORDON: Scratch that.
20   Q.   There's no written policy that
21   inmates follow a procedure to determine
22   who's next to use the phone?
23       MR. DeVORE: Objection. Form.
24       You can answer if you can.
25   A.   Not to my knowledge.

Page 115

K. HOSTEADTER

1        K. HOSTEADTER
2    Q.   So the reasonable and equitable
3    access that is being discussed here in
4    this sentence is just whether or not
5    there's a telephone working that an inmate
6    has access to?
7    A.   Yes, on the tier.
8    Q.   Is there anywhere else -- you
9    said "on the tier," so I'm assuming -- is
10   there another place they can use
11   telephones?
12   A.   If they're in Cermak Hospital,
13   they have a phone in their room because
14   they're being -- I lost the word I was
15   trying to think of.  Somebody who has
16   COVID, they're put into isolation -- if
17   they're in isolation in the hospital, then
18   the phone is in their room.  Sorry about
19   that.
20   Q.   That makes sense.
21       So on the tiers, it's the sworn
22   members would make sure reasonable and
23   equitable access is -- that the telephones
24   are working and that inmates have access
25   to use them because they're working?

Page 116

K. HOSTEADTER

1        K. HOSTEADTER
2    A.   Yes.
3    Q.   But they don't -- the sworn
4    members don't monitor the use of public
5    telephones to ensure that each one is
6    having -- each one is having a fair turn
7    at using the telephones?
8        MR. DeVORE: Objection. Form.
9        You can answer.
10   A.   Not to my knowledge.
11   Q.   So there's really, I mean,
12   nothing determining -- there's really
13   nothing determining when an inmate can use
14   the telephone?
15       MR. DeVORE: Objection. Form.
16   Asked and answered.
17       You can answer again.
18   A.   If they're in the dayroom and if
19   there's time, the phone is available, they
20   can use the phone.
21   Q.   I guess what's worrisome about
22   that is there could be inmates -- there's
23   no maximum of time that an inmate can use
24   the phone.  They could use it in
25   perpetuity.  So if there are 10 telephones

Page 117

K. HOSTEADTER

1        K. HOSTEADTER
2    and there's 10 inmates and they're all
3    using the telephones, there could be 20
4    inmates waiting in line, and they could
5    not be able to use the telephones; is that
6    correct?
7        MR. DeVORE: Objection. Asked
8    and answered multiple times.
9    Foundation.
10       Go ahead, if you want to explain
11   it again.
12       That also mischaracterizes her
13   testimony.
14   Q.   There's no maximum time which
15   they can't use the telephones, right?
16       MR. DeVORE: Objection. There's
17   a minimum --
18   Q.   There's a minimum time per call,
19   and it should be five minutes.  We stated
20   that it's 30 minutes.  I'm not seeing 30
21   minutes here of maximum time allowed to
22   use the telephones, right?
23       MR. DeVORE: Objection, asked
24   and answered.
25       Don't answer it again.  You

Page 118

K. HOSTEADTER
1
2    already answered it several times.
3        Q.   I'm guessing there's just a
4    scenario where all the telephones could be
5    used up by all the inmates, and they could
6    be because there's no policy to kick them
7    off the telephones at a certain amount of
8    time.
9        They wouldn't be able -- there
10   could be inmates waiting in line that
11   wouldn't be able to go up and use the
12   telephones for the entirety they're in the
13   dayroom? Is that possible, Kim?
14       MR. DeVORE: Objection. Assumes
15   facts not in evidence. Incomplete
16   hypothetical. No foundation. Asked
17   and answered.
18   Q.   You can answer.
19       MR. DeVORE: Not going to answer
20   again. She already answered it.
21       MR. GORDON: She didn't answer
22   my hypothetical.
23       MR. DeVORE: Ask a better
24   question. You're being redundant.
25   It's abusive to the witness.

Page 119

K. HOSTEADTER
1
2    BY MR. GORDON:
3        Q.   Are you taking counsel's
4    instruction, Kim, not to answer?
5        MR. DeVORE: She's taking it.
6    Move on.
7        Q.   Is there a difference -- so I
8    just wanted to look at this policy again,
9    Kim. It says Policy 1209 up here,
10   correct, top left?
11       A.   Yes.
12       Q.   And then at the bottom right it
13   says 659, right, page 659, and it says
14   Inmate Telephone Access, correct?
15       A.   Yes.
16       Q.   And the next page, it's still
17   Policy 1209. It says at the bottom right
18   Inmate Telephone Access, 660; is that
19   correct -- or page 660?
20       A.   Yes.
21       Q.   And then if you scroll down a
22   little bit more, this is Bates number 2 --
23   000212. It says up here again Policy
24   1209.
25       Do you see that at the top left?

Page 120

K. HOSTEADTER
1
2        A.   Yes.
3        Q.   And then it says down here at
4    the bottom right, it says Telephone Access
5    For Individuals Detained in the
6    Department, and then it says page 719.
7        Do you see that?
8        A.   Yes.
9        Q.   Can you describe that
10   discrepancy between these two policies?
11       MR. DeVORE: Objection. Form.
12       What's the date on this one,
13   Tim? I'm sorry.
14       MR. GORDON: It says 2021.
15       MR. DeVORE: 2021?
16       MR. GORDON: Yeah.
17       MR. DeVORE: And the other one
18   was from 2018; is that right?
19       MR. GORDON: Yeah.
20       MR. DeVORE: Okay.
21   BY MR. GORDON:
22       Q.   So the only difference between
23   these two policies is that one has the
24   date 2018 at the bottom, and the other one
25   has the date from 2021 at the bottom, the

Page 121

K. HOSTEADTER
1
2    bottom left?
3        MR. DeVORE: Objection. Form.
4        Go ahead.
5        A.   I cannot answer that because I
6    didn't write the policy.
7        Q.   Do you know who did write the
8    policy?
9        A.   No.
10       Q.   Do you know who signed off,
11   though, on the policy?
12       A.   No.
13       Q.   You don't know how these
14   policies are drafted?
15       A.   They're drafted by a policy
16   unit, and the policy unit changes
17   according to the needs of the facility.
18       Q.   And what needs would change the
19   policy or that policy that you just said?
20       MR. DeVORE: Objection. Form.
21       Go ahead.
22       A.   It would change according to the
23   needs of the jail.
24       Q.   Could you give me an example of
25   a need that would change that committee?

31 (Pages 118 - 121)

Page 122

K. HOSTEADTER

1  K. HOSTEADTER
2      MR. DeVORE:  Objection.  Form.
3      You can answer.
4   A.   Not off the top of my head.
5   Q.   How do you know if that policy
6  council was the one that drafted this
7  policy?
8      MR. DeVORE:  Objection.  Form.
9  Speculation.
10     (Reporter clarification.)
11  Q.   Do you know if the policy
12  council was the one that drafted this
13  policy?
14  A.   Objection.
15     MR. DeVORE:  Objection.  Form.
16  Go ahead.
17  A.   I do not, because the policy
18  unit changes according to staffing needs.
19  Q.   Can you explain that further?
20  A.   Depending on staffing needs --
21  there could be people that are retired,
22  new people that have come in, new people
23  that have left positions and activities or
24  assignments may have changed within the
25  unit, and their opinions might be

Page 123

1  K. HOSTEADTER
2  different than the prior one, according to
3  the jail standards or what's needed at the
4  jail.
5   Q.   I'm not asking, like, the
6  specific council that did it, but is
7  there -- so you're saying there's a policy
8  council that drafts policies for the --
9  for the county jail.
10     Is that what would draft this
11  policy, as well, this telephone access
12  policy?
13     MR. DeVORE:  Objection as to
14  form.  Asked and answered.
15     Go ahead.
16  A.   I stand the same.
17     MR. DeVORE:  Are we close, Tim?
18     MR. GORDON:  Yeah, we are.
19     Actually, I think it is a good
20  time to stop.  I have no further
21  questions.
22     THE VIDEOGRAPHER:  Just to check
23  in, will this be the end of the
24  deposition or will there be any
25  follow-up questions for the witness?

Page 124

1  K. HOSTEADTER
2      MR. DeVORE:  I think we're good.
3  Just we'd reserve signature.
4      THE COURT STENOGRAPHER:  Before
5  we go off the record, Mr. DeVore, do
6  you need a copy of this transcript?
7      MR. DeVORE:  Yeah.  If they
8  order one, I'll take a copy of it.
9      MR. GORDON:  Yeah, we will order
10  one.
11     (Testimony continued on the
12  following page.)
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 125

1  K. HOSTEADTER
2      THE VIDEOGRAPHER:  One moment.
3  Let me read us off.
4      We're going off the record at
5  3:48 p.m. CST, and this concludes
6  today's testimony given by Kim
7  Hosteadter.  The total number of media
8  units used was four and will be
9  retained by Veritext.
10     Thank you so much, everybody.
11     (Time noted:  4:48 p.m.)
12
13
14
15
16
17     _____
           KIMBERLY HOSTEADTER
18
19  Subscribed and sworn to before me
20
21  this __ day of _____, 2025.
22
     _____
23     Notary Public
24
25

32 (Pages 122 - 125)

Page 126

```
 1
 2              I N D E X
 3   Witness:  KIMBERLY HOSTEADTER
 4   Examination by:           Page
 5    MR. GORDON              6
 6
 7           E X H I B I T S
 8   PLAINTIFF'S      DESCRIPTION      PAGE
 9   Exhibit 1    Cook County Department of   26
10              Corrections Inmate
11              Information Handbook
12   Exhibit 2    Illinois Department of    60
13              Corrections Inspection
14              Report of the Cook County
15              Jail
16   Exhibit 3    2024 Illinois Department    68
17              of Corrections County Jail
18              Inspection Checklist
19   Exhibit 4    Documents Bates stamped    72
20              CCSAO HENNEBERG 000132
21              through 000332
22
23   Counsel has retained all exhibits.
24
25
```

Page 127

```
 1
 2         LITIGATION SUPPORT INDEX
 3
 4   REQUESTS FOR PRODUCTION OF DOCUMENTS
 5          Page    Line
 6             None
 7
 8      INFORMATION TO BE FURNISHED
 9          Page    Line
10             None
11
12      QUESTIONS MARKED FOR A RULING
13          Page    Line
14             None
15
16   DIRECTION TO WITNESS NOT TO ANSWER
17          Page    Line
18          117    25
19          118    19
20
21
22
23
24
25
```

Page 128

```
 1
 2           C E R T I F I C A T E
 3
 4      I, TAMMY O'BERG, a Notary Public
 5   within and for the State of New York, do
 6   hereby certify:
 7      That KIMBERLY HOSTEADTER, the
 8   witness whose examination is hereinbefore
 9   set forth, was duly sworn by me and that
10   this transcript of such examination is a
11   true record of the testimony given by such
12   witness.
13      I further certify that I am not
14   related to any of the parties to this
15   action by blood or marriage and that I am
16   in no way interested in the outcome of
17   this matter.
18      IN WITNESS WHEREOF, I have hereunto
19   set my hand this 7th day of March, 2025.
20
21
22     _____
       TAMMY O'BERG
23
24
25
```

Page 129

```
 1              ERRATA SHEET
                Veritext Reporting Company
 2                1-800-727-6396
       Name of Case: DONALD HENNEBERG v. TOM DART
 3   Date of Deposition: February 24, 2025
       Name of Deponent: KIMBERLY HOSTEADTER
 4   Page    Line  Change       Reason
 5   _____  _____  _____  _____
 6   _____  _____  _____  _____
 7   _____  _____  _____  _____
 8   _____  _____  _____  _____
 9   _____  _____  _____  _____
10   _____  _____  _____  _____
11   _____  _____  _____  _____
12   _____  _____  _____  _____
13   _____  _____  _____  _____
14   _____  _____  _____  _____
15   _____  _____  _____  _____
16   _____  _____  _____  _____
17   _____  _____  _____  _____
18   _____  _____  _____  _____
19
20      _____
21        KIMBERLY HOSTEADTER
22
23   THIS _____DAY OF _____, 20__.
24
25   NOTARY PUBLIC      COMMISSION EXPIRES
```

33 (Pages 126 - 129)

**[& - 45]** Page 1

**&**

**&** 2:4 5:22

**0**

**000132** 72:6,12
126:20
**000201** 80:23
83:15
**000210** 78:2
80:22 95:4
96:8
**000212** 119:23
**000332** 72:7,12
126:21
**001721** 27:10
**001754** 31:5
**07380** 1:4 4:24

**1**

**1** 4:17 26:16,21
39:17 56:7
67:6 69:6
126:9
**1-800-727-6...**
129:2
**10** 22:22 34:6,8
38:20,24 45:14
116:25 117:2
**117** 127:18
**118** 127:19
**12** 18:6
**12/12/2023**
68:20

**1209** 68:23,24
69:5,6 95:5,23
109:17 119:9
119:17,24
**1209.2** 96:10
**1220** 68:23
**12th** 44:17,23
**13** 21:8 62:25
**14** 62:25
**15** 34:21 36:3
**17th** 73:4
**19** 4:24 127:19
**1:13** 4:4
**1:19** 1:4
**1:36** 25:4
**1:40** 25:7
**1st** 62:22

**2**

**2** 60:6,7 119:22
126:12
**20** 15:5 117:3
129:23
**2000** 78:9
**2001** 30:10,13
76:3 77:20
**2008** 30:10,13
76:3,5,21
77:21
**2010** 76:2 77:4
**2011** 44:17
101:13,20
**2012** 17:25
30:7 76:2,5,13

76:22,23 77:4
78:9
**2014** 45:13
**2017** 101:20
**2018** 29:2 30:5
100:5 120:18
120:24
**2018/12/31**
99:5
**2019** 15:7 22:3
44:18,23 73:4
**2020** 15:7
**2021** 44:24
45:2 101:14,20
120:14,15,25
**2022** 63:2
**2023** 62:23
**2024** 68:3 69:8
126:16
**2025** 1:15 4:5
101:18 125:21
128:19 129:3
**21** 44:24
101:21
**230** 2:13,13
**24** 1:15 129:3
**24th** 4:5
**25** 16:4 17:3
34:8 78:7
127:18
**26** 108:10
126:9
**28** 36:20

**2:07** 50:15
**2:13** 1:15
**2:17** 50:18

**3**

**3** 67:24 68:2,3
69:7 71:2,12
126:16
**30** 1:17 7:13
11:11 13:14
15:13 36:3,8
36:12,14,22
37:8,21,25
39:4 77:19
78:22 102:10
103:6,9,14,17
117:20,20
**3026** 6:10
**33** 69:15
**34** 69:15
**3894** 128:22
**3:01** 91:8
**3:10** 91:5
**3:11** 91:11
**3:48** 125:5
**3rd** 28:25

**4**

**4** 67:25,25
70:21,21 71:2
72:3,10 83:8
95:11 126:19
**41** 28:8
**45** 9:24

**[4:48 - annoying]**

| | | | |
|---|---|---|---|
| **4:48** 125:11 | **a** | 120:4 123:11 | **agree** 4:16 8:3 |
| **5** | **abiding** 113:6 | **accompanied** | **agreed** 3:5,10 |
| **5** 83:7 | **ability** 10:21 | 5:20 | 3:14 89:12 |
| **500** 2:6 | 48:24 | **accordance** | **ahead** 34:2 |
| **6** | **able** 15:21 22:7 | 86:9 | 35:8 39:11 |
| **6** 1:17 7:13 | 47:12,13 49:11 | **act** 105:25 | 41:3 42:22 |
| 11:11 13:14 | 58:9 80:24 | **acting** 108:19 | 43:9 49:8 63:3 |
| 15:13 77:19 | 94:7 117:5 | **action** 5:7 | 63:16 66:8 |
| 78:22 126:5 | 118:9,11 | 56:12 71:17 | 71:25 73:12 |
| **60** 126:12 | **above** 64:5 | 128:15 | 92:12 105:15 |
| **60601** 2:7 | **abusive** 118:25 | **activities** | 112:2 117:10 |
| **60806** 6:11 | **accept** 39:14 | 122:23 | 121:4,21 |
| **659** 119:13,13 | 103:2 | **actual** 41:8 | 122:16 123:15 |
| **66** 20:14 | **access** 22:13,16 | 83:4 | **al** 1:12 4:21 |
| **660** 119:18,19 | 39:18 41:24 | **actually** 8:20 | **allotted** 24:15 |
| **68** 126:16 | 45:12 46:8,19 | 49:14 54:23 | 37:21 98:9,15 |
| **7** | 46:20,22 47:7 | 57:7 80:22 | **allow** 26:10 |
| **701.190** 64:13 | 47:9,13 48:6 | 123:19 | 39:20 107:11 |
| **702** 82:8 | 48:25 49:11,15 | **address** 6:10 | 112:23 |
| **702.8** 83:15 | 49:16,21,25 | **administer** 5:5 | **allowed** 24:11 |
| **702.8.1** 84:12 | 51:15,17 53:14 | **administrative** | 24:12 34:20 |
| 92:18 93:22 | 53:20,20,23,23 | 20:12,17 51:5 | 35:3,5 84:8,16 |
| 94:17 | 54:19,24 55:10 | 76:8,15 | 93:4 98:17 |
| **702.8.1.** 91:23 | 55:12,18 59:12 | **administrator** | 102:3,15,17,17 |
| **719** 120:6 | 86:6,7,10 | 49:10 | 103:17 117:21 |
| **72** 126:19 | 87:14 95:16 | **admitted** 92:3 | **allowing** |
| **77** 2:6 | 96:14 97:24 | **affiliations** | 113:17 |
| **7th** 128:19 | 98:5,10 99:23 | 5:14 | **amos** 2:19 4:25 |
| **9** | 100:19 111:22 | **afternoon** 4:3 | **amount** 36:4 |
| **99** 17:6 | 112:11,18 | 5:23 6:3 | 38:16 104:25 |
| | 113:14 115:3,6 | **agencies** 17:14 | 105:2,12 118:7 |
| | 115:23,24 | **agency** 54:14 | **analog** 59:14 |
| | 119:14,18 | **ago** 15:3 | **annoying** 90:16 |

**[answer - aware]** Page 3

| | | | |
|---|---|---|---|
| **answer** 7:21 | 117:25 118:18 | **argument** | **assistant** 20:13 |
| 8:13 10:4,12 | 118:19,21 | 78:13 | 76:15 |
| 14:16 16:14,21 | 119:4 121:5 | **argumentative** | **assume** 7:22 |
| 19:5 26:7,13 | 122:3 127:16 | 78:19 | **assumes** 118:14 |
| 29:17 30:16 | **answered** | **arguments** | **assuming** 115:9 |
| 32:3,17 33:4 | 39:10 77:19 | 79:14,19 | **attend** 43:6 |
| 34:2,13,15,18 | 78:19 80:17 | **arias** 1:11 | **attendance** |
| 37:17,24 38:12 | 89:19 93:2 | **arrangements** | 19:5 |
| 39:11 40:14 | 94:21 104:2,5 | 39:20 | **attention** 80:12 |
| 41:23 42:14,22 | 110:13 114:3 | **arrived** 19:22 | **attorney** 5:16 |
| 45:11 46:16 | 116:16 117:8 | **aside** 12:15 | 10:10,13 11:21 |
| 47:18 49:5 | 117:24 118:2 | **asked** 25:15 | 14:20 39:22 |
| 52:10 53:18 | 118:17,20 | 38:22 39:10 | **attorney's** |
| 54:3,10,16,17 | 123:14 | 77:19 78:19 | 13:21 17:13 |
| 54:20 55:15 | **answers** 107:19 | 80:17 93:2 | 20:13 55:2 |
| 57:5,22 58:13 | **anybody** 112:5 | 94:21 104:2,5 | **attorneys** 2:5 |
| 59:24 65:21,23 | **anyway** 58:12 | 104:6,8,9 | 2:12 3:5 20:18 |
| 66:8,22 67:12 | **appearance** | 105:9 110:12 | **audio** 4:14 |
| 67:20 74:6,11 | 5:11 | 114:3 116:16 | **authorized** 5:5 |
| 75:5,22 79:4 | **appearances** | 117:7,23 | 96:12 |
| 79:11,17 80:6 | 5:14 | 118:16 123:14 | **automated** |
| 80:18 82:25 | **applies** 70:19 | **asking** 23:13 | 36:18,20 |
| 84:3 85:13 | **appreciate** 6:24 | 31:21 51:20 | **automatically** |
| 90:3 93:13 | 8:25 81:12 | 66:6 73:21 | 37:10 |
| 96:17 97:8,16 | 107:11 | 78:20 79:24 | **available** 30:25 |
| 98:8,24 99:8 | **area** 23:12 | 106:24 108:24 | 34:25 35:20,22 |
| 99:14,19 100:7 | 24:10 | 123:5 | 64:18 69:18 |
| 100:21 101:2 | **areas** 18:23,24 | **asks** 54:12 87:8 | 116:19 |
| 102:20 103:13 | 23:21 43:21 | **assigned** 73:19 | **avenue** 6:10 |
| 104:3 107:2 | 45:6 | **assignment** | **average** 36:2 |
| 110:14 111:9 | **argue** 77:10,16 | 18:11 73:16,22 | 38:16 |
| 111:17 113:20 | **arguing** 79:7 | **assignments** | **aware** 67:7 |
| 114:4,14,24 | 89:5 | 19:23 72:24 | 97:20 |
| 116:9,17 | | 122:24 | |

[b - calling]

| b | | | |
|---|---|---|---|
| **b** 1:17 7:13 11:11 13:14 15:13 58:17 64:3,4 77:19 78:22 126:7 | **beachem** 64:3 | **bottom** 27:13 61:22 119:12 119:17 120:4 120:24,25 121:2 | 128:2,2 |
| **back** 22:23 25:7 29:19 39:2,17 43:11 50:18 51:24 52:25 59:5 64:22 84:5 90:6 91:5,11 91:13,22 92:19 109:7,17 | **becoming** 76:12 | | **california** 6:10 |
| | **beds** 33:14 | **bowen** 61:4 62:24 | **call** 6:18,19 24:13,16,17,19 34:21 36:2,5 36:15,17 37:5 37:8,25 38:2,4 38:5,14,15 39:7,14,15 40:4,12 41:16 41:21 42:7,10 42:11,16,17 46:2,4 49:2 52:18,21,24 53:3,5,5 55:5,6 56:18,20,23 57:8,11,19 58:17 64:25 84:9,13,17,22 84:24 85:16,18 85:22 86:3,4 86:12 87:12,19 87:21,25 88:3 88:7,11 89:16 91:23,25 93:22 94:7,14,15 102:3,16,21 103:4,6 104:7 104:16 110:21 113:9 117:18 |
| | **beginning** 5:15 62:21 | | |
| | **behaves** 108:20 | **box** 64:19,20 66:7 | |
| | **behavior** 107:18 | **boxes** 70:7 | |
| | **believe** 8:19 45:16,17 61:12 61:20 81:9 103:19 110:7 | **branch** 20:14 | |
| | | **brass** 19:6,20 20:2 | |
| | **best** 58:15 | **break** 8:16 9:22 9:24 10:2,4 50:8,10,21 90:5 91:5 | |
| **background** 15:25 | **better** 28:7 118:23 | | |
| **backtracking** 52:21 | **big** 33:12 86:17 | **brent** 2:9 5:20 87:3 106:19 107:16 | |
| **bad** 71:15 | **bigger** 27:18 | | |
| **baloney** 62:15 | **bit** 41:13 50:8 119:22 | **brent's** 89:21 | |
| **bars** 105:11 | | **brief** 25:5 50:16 91:9 | |
| **based** 22:10 43:2 48:13 | **blanketed** 16:15 | | |
| | **block** 103:2 | **broken** 112:23 112:25 113:3 | |
| **basically** 19:19 | **blood** 128:15 | | |
| **basis** 48:11 74:25 | **board** 104:15 | **brought** 78:22 80:12 108:12 | |
| | **bob** 61:4 | | |
| **bates** 27:9,12 31:4 61:21 72:5,11 77:25 80:23 83:15 95:4 96:5 119:22 126:19 | **bockius** 2:4 5:22 | **bunch** 33:13 | **caller** 58:16,17 58:17 |
| | **book** 28:21 29:19 | **bunk** 33:14 | |
| | | **business** 6:9 | |
| | **books** 29:7 88:13 | c | **calling** 58:6 84:15,16,21,21 |
| | **bothering** 89:10 | **c** 2:2 44:10 58:17 64:4 | |

85:4,4,21
88:13 93:25,25
94:5,5,18,19
**calls** 17:17
20:24 22:3,5
24:11,13,14
39:19,19,21,25
40:7,21 41:11
42:3 43:20,23
44:2 45:5 46:9
46:10,11,18,22
47:14,14 48:13
48:20 51:15
52:6,8,13,22
53:17 54:24
55:12,19 56:9
56:9,10 58:16
59:2,8 65:4
66:14,16 74:19
82:24 83:17
84:14 85:23
88:10 92:15
93:5,24 99:12
102:18 104:22
105:13 109:20
109:20,23
110:11,16,19
111:15 113:8
**camera** 4:10
**capacity** 7:9,10
13:14 74:2
80:14
**capital** 5:25

**captain** 51:11
**capture** 57:10
**card** 84:21
85:21 88:13
**cards** 84:15
85:4 93:25
94:5,19
**career** 79:23
100:12
**cares** 90:16
**case** 1:4 4:24
15:10,13 40:5
129:2
**cases** 13:20,23
14:2,3,4,6,8
**catch** 57:3
**cause** 108:5
**ccdoc** 31:18
59:19
**ccsao** 27:9 72:5
72:11 126:20
**cell** 33:8,10,15
33:16 35:2,5
58:8
**cellphone** 9:13
**cells** 35:17
**cermak** 115:12
**certain** 10:10
46:6 55:4
97:11 102:21
104:25 105:12
118:7
**certainly** 87:6

**certify** 128:6,13
**change** 22:11
35:11 47:25
49:6,9 121:18
121:22,25
129:4
**changed** 22:21
59:21 77:2
99:11 100:11
122:24
**changes** 100:17
121:16 122:18
**changing** 18:25
**chaos** 108:5
**chapter** 31:2
**charges** 56:14
**chat** 62:4
**check** 123:22
**checked** 66:7
70:7
**checklist** 63:25
68:5,25 69:10
71:10 126:18
**checklists** 71:3
**chicago** 2:7,14
6:11
**choose** 26:2
**circumstances**
40:3,16 41:6
97:17
**citizen** 54:7,12
**civil** 14:3
107:15 108:20

**claims** 15:9
**clarification**
74:6 94:10
108:15 122:10
**clean** 18:22,24
77:5
**cleaning** 78:11
**clear** 58:14
**clearance**
51:21
**cleared** 76:11
**click** 57:14
58:20
**close** 123:17
**clothes** 18:25
**cloud** 43:24
53:12,14
**coleman** 11:22
11:23,24 12:5
12:16
**colleague** 5:20
**collect** 84:16,21
85:5,21 88:12
94:2,5,19
**colloquy**
107:21 108:17
**column** 73:5,6
**columns** 64:19
69:17
**come** 24:16
66:3 85:14
90:6 114:15
122:22

**comes**  49:10
  85:24
**coming**  75:12
**commander**
  20:5 51:11
**commentary**
  105:19 108:17
**commission**
  129:25
**committee**
  121:25
**communicate**
  9:12
**communicating**
  9:19
**communication**
  31:3
**company**  129:1
**completed**  53:6
**completely**
  106:7
**component**
  97:7
**computer**  8:24
**concludes**
  125:5
**conducted**  4:8
**confidential**
  39:21
**confused**  71:15
  84:18 102:15
**confusing**
  58:11

**confusion**
  85:24 87:17
**connect**  57:14
**connected**
  57:24
**connecting**
  58:7
**connection**
  4:10
**consistent**
  83:22
**constantly**  75:9
**continue**  4:15
  25:15
**continued**
  124:11
**continues**
  62:16
**continuing**
  10:8
**contract**  45:17
**control**  97:18
  98:13
**controlled**
  10:20
**conversation**
  37:12 38:9
  45:23
**conversations**
  45:22
**cook**  1:11 11:10
  16:3,7,9,12
  20:8,24,25
  26:21 27:5

  60:9 61:3
  63:23,24 78:4
  78:7,18 82:6
  93:17 94:16
  100:18 104:14
  104:19 105:4,9
  126:9,14
**copies**  29:21
**copy**  124:6,8
**corporate**  7:13
  99:21 101:5,7
  101:15
**correct**  11:12
  13:15 21:21
  23:6,22 25:24
  25:25 29:2
  32:23 35:19
  36:10 37:18
  44:6 45:3,7
  49:21 51:3
  76:2,16,18,19
  84:9 92:8
  93:10 94:19
  99:3 101:14
  102:12 103:10
  109:24 117:6
  119:10,14,19
**correction**
  16:12 80:13
**correctional**
  1:10 18:3,5,8
  20:9 74:15,24
  75:25 76:14,20
  76:21,25 78:9

**corrections**
  26:22 27:6
  60:8 61:2
  63:22 68:4
  69:9 82:7
  93:17 94:16
  126:10,13,17
**correctly**  8:24
**council**  122:6
  122:12 123:6,8
**counsel**  4:19
  5:12,18 6:8
  11:16,25 13:3
  126:23
**counsel's**  119:3
**counts**  19:4,20
**county**  1:11
  11:11 16:3,7,9
  16:12 20:8,24
  20:25 26:22
  27:6 60:9 61:3
  63:23,24,24
  68:5 69:9 78:5
  78:7,18 82:6
  93:17 94:16
  100:18 104:14
  104:19 105:4,9
  123:9 126:9,14
  126:17
**couple**  64:16
**course**  28:11
  43:15 66:25
  79:23 100:12

[court - detail]                                                    Page 7

**court** 1:2 3:18
  4:23 5:3 6:7
  7:24 8:7 10:7
  90:25 91:15
  124:4
**courthouse**
  17:22 23:10
**covers** 95:25
**covid** 15:4
  115:16
**crazy** 9:2 63:15
**created** 28:22
**criminal** 13:20
  14:2,4 56:13
**crosstalk** 69:3
  70:15 71:18
  81:23 86:15
  89:8 97:5
  105:23 106:3
  106:13,16
  109:11
**cst** 4:4 25:4,7
  50:15,18 91:8
  91:11 125:5
**curiosity** 19:12
**current** 16:6
  17:7 49:7
  80:13 99:2,25
  100:23 101:18
  101:22
**currently** 24:3
  31:25 95:24
**custody** 35:15
  82:7 93:18

94:17
**cv** 1:4 4:24

**d**

**d** 5:24 44:10
  126:2
**daily** 46:24
  72:9,21,22,25
  74:24 77:7
**dart** 1:9 4:21
  13:18,19 14:25
  129:2
**database** 53:6
**date** 26:24
  60:10 62:8,24
  68:7,19 72:14
  73:3 120:12,24
  120:25 129:3
**dated** 62:19
**david** 5:24
**day** 6:25 18:11
  33:16 73:3
  100:15,15
  125:21 128:19
  129:23
**dayroom** 35:3
  35:6 75:8
  98:17 116:18
  118:13
**days** 9:3 57:13
  88:5
**deal** 86:17
**december**
  62:25

**decide** 98:14
**decides** 39:14
**decision** 48:3
  48:18,21
**decline** 103:2
**defendants**
  1:10,13 2:12
  6:2 27:9 70:23
  72:5
**defender** 55:3
**defending** 6:3
**delegated** 46:4
**department**
  11:11 12:2
  14:14,19 16:3
  16:8,10,12,16
  20:25 26:22
  27:6 46:18,24
  47:3,5,20,21,22
  48:4,8,9,10
  54:22 60:8,25
  63:22 68:4
  69:8 82:7,20
  93:17 94:16
  120:6 126:9,12
  126:16
**departments**
  47:6 48:8
**depend** 48:5
  57:4
**depending**
  17:21 18:10,17
  41:5 43:25
  47:20 55:23

122:20
**depends** 4:9
  21:13 32:18
  35:9,12 40:3
  42:23 43:25
  59:3 97:17
**deponent** 129:3
**deposed** 7:6,8
  7:12
**deposition** 1:17
  3:14 4:7,18 7:2
  7:25 8:24 9:20
  11:10,15 12:21
  12:24 13:8
  27:11 61:15
  73:10 90:17,18
  90:20 123:24
  129:3
**describe** 23:23
  120:9
**describing**
  21:25
**description**
  60:22 126:8
**designated**
  24:10 51:18
  53:19 54:16,22
  65:19 70:14
  111:11,13
**designee** 96:12
**desk** 8:20 9:15
  59:14
**detail** 79:21

[detained - district]                                                Page 8

| | | | |
|---|---|---|---|
| **detained** 120:5 | 53:16,25 54:8 | 118:14,19,23 | **discipline's** |
| **detainees** 64:24 | 55:13 58:10 | 119:5 120:11 | 98:20 |
| 65:9,18 66:15 | 59:23 60:12,16 | 120:15,17,20 | **discovering** |
| **detect** 58:4,9 | 60:19,23 61:10 | 121:3,20 122:2 | 21:2 |
| **detected** 56:24 | 61:13 62:7,14 | 122:8,15 | **discreetly** |
| 56:25 57:17 | 65:10 66:20 | 123:13,17 | 58:23 |
| **detention** 61:5 | 67:8,10,18 | 124:2,5,7 | **discrepancies** |
| **determine** | 68:10,13,23 | **dial** 37:11 | 92:6 93:9 |
| 46:21 98:4 | 69:4,11 70:10 | **dictates** 85:9 | **discrepancy** |
| 104:11,15 | 70:17 73:8 | **difference** 33:9 | 88:23 89:13 |
| 114:7,10,21 | 74:4,18 75:3 | 51:8 100:13 | 94:11 102:14 |
| **determined** | 75:20 77:11,18 | 119:7 120:22 | 120:10 |
| 103:16 | 78:15,25 79:9 | **different** 8:18 | **discuss** 20:21 |
| **determines** | 79:16 80:4,15 | 19:24 22:10,15 | 50:14 88:6 |
| 103:22 104:6 | 81:16,21 82:23 | 23:21 24:2 | **discussed** 56:3 |
| **determining** | 84:2 85:12 | 42:25 43:4,5 | 104:13 109:18 |
| 116:12,13 | 87:10 92:9,25 | 43:13,20 44:4 | 110:4 111:24 |
| **develop** 96:12 | 93:11,19 94:20 | 45:6 47:21,22 | 115:3 |
| **device** 9:11 | 96:16,25 97:6 | 99:17 123:2 | **discussing** |
| **devore** 2:11,15 | 97:15 98:6,22 | **difficult** 81:22 | 48:18 50:22 |
| 5:23,24 6:5 | 99:7,12,18 | **direction** 89:17 | 91:24 |
| 13:25 14:15,19 | 100:6,20,25 | 127:16 | **discussion** |
| 14:22 16:13,19 | 101:13,17 | **directly** 51:14 | 24:25 26:25 |
| 25:12,21 26:5 | 102:19 103:11 | **director** 96:11 | 87:7 91:17 |
| 26:12 27:17,21 | 103:24 104:21 | **disappointed** | **discussions** |
| 28:2,8 29:16 | 105:7,13,24 | 107:4 | 12:20 |
| 30:15 32:2,15 | 106:4 107:20 | **disbelief** 106:2 | **disrespectfully** |
| 33:3,24 34:12 | 109:5,7,12,15 | **disciplinary** | 106:18 |
| 35:7 37:15,22 | 110:12 111:5 | 56:12,12,13 | **distance** 84:14 |
| 38:11,21 39:9 | 111:15,25 | 96:21,24 98:11 | 88:19 93:24 |
| 40:13,25 41:22 | 113:19 114:2 | 98:12,15 | **distinction** 92:5 |
| 42:12,20 45:10 | 114:12,23 | **discipline** 97:7 | **district** 1:2,3 |
| 46:14 47:17 | 116:8,15 117:7 | 97:21 | 4:22,23 |
| 49:3 52:9 | 117:16,23 | | |

**division**  19:7
19:17 23:5,17
24:5 29:23
30:22,24 31:25
32:25 33:21
34:23 36:8
38:17,20,24
72:9 73:19
74:9,22 77:6
78:6,8 92:3
**divisional**
72:23
**divisions**  34:11
**document**
27:19 28:18
55:20 60:17
61:8,11,17
62:7 63:19
69:14,20,23
70:21 72:4,18
81:5,20 82:15
83:4
**documented**
48:21 55:17
**documents**  9:6
12:23 72:11
126:19 127:4
**doe**  1:9
**doing**  19:12
90:18,23
107:16 108:2
108:14,21
**dom**  64:3

**don**  5:19
**donald**  1:6 4:21
129:2
**dorm**  33:7,10
33:11
**double**  86:24
**download**
46:10 47:12,15
**dr**  2:6 64:2
**draft**  123:10
**drafted**  121:14
121:15 122:6
122:12
**drafts**  123:8
**drop**  62:3
**drug**  10:20
**duly**  6:12 128:9
**duties**  77:8
82:16

**e**

**e**  2:2,2 5:24,25
44:10,10 49:10
51:6 64:3,4,4
126:2,7 128:2
128:2
**earlier**  102:8
110:5
**easier**  8:3
**edition**  28:25
29:5,24 30:3
**editions**  30:14
**edvo**  44:10,19
44:19,21,22

56:4
**edwin**  61:4
**effect**  3:16
**effective**  28:25
**efficiently**  57:6
57:16
**efrat**  2:19 4:25
**eight**  31:3
**either**  52:18
89:15
**elaborate**  43:18
**employer**  16:6
**employment**
15:25
**enacted**  99:3,6
99:11,25 100:3
100:5,24
101:10
**ended**  36:17
37:25 38:4,15
57:20
**enforcement**
54:13
**enforces**  98:19
**ensure**  9:18
19:20 111:21
112:10,17
113:13,17
116:5
**entail**  18:20
**enter**  42:4
**enters**  8:15
**entire**  75:15

**entirety**  45:22
118:12
**entities**  97:19
**entity**  48:9
54:25
**equal**  113:17
**equitable**
111:22 112:11
112:18 113:14
115:2,23
**errata**  129:1
**escort**  18:15
**especially**  7:19
**esq**  2:8,9,15,16
**established**
66:19 67:2
**establishing**
96:13
**et**  1:11 4:21
**everybody**
19:22 33:12
125:10
**evidence**  92:10
118:15
**exact**  66:4
**exactly**  62:18
**examination**
6:15 126:4
128:8,10
**examined**  6:13
**example**
112:15 121:24
**exceeded**  36:17

**[except - forth]** Page 10

except 3:10
102:4 112:25
excuse 106:8
109:2
executive 96:11
exhibit 26:16
26:21 39:17
56:7 60:6,7
61:15 67:6,24
67:25,25 68:2
68:3 69:6,7
70:20,21 71:2
71:12 72:3,10
95:11 126:9,12
126:16,19
exhibits 126:23
experienced
78:12
expires 129:25
explain 13:22
15:19 43:13
46:5 52:23
58:15 72:20
73:5 102:14
117:10 122:19
explained
58:25
extent 70:19
73:12 75:5
110:15
external 8:14
9:12
eyes 74:16

eyesight 74:17
74:25 75:14

**f**

f 128:2
face 107:18
facility 15:21
17:21 24:16
58:16,19 86:8
88:5,10 110:22
121:17
factors 35:10
110:24
facts 118:15
fair 21:16
41:14 116:6
familiar 28:17
82:10 95:7
family 85:15,22
87:25 88:4,9
88:12
far 29:3 67:13
fashion 26:11
43:20,22 113:5
fault 82:3
feature 62:4
february 1:15
4:5 62:22
129:3
feed 42:10
75:11 77:6
feel 66:4
fifteen 24:18

fight 40:17
80:3
filed 4:22
filing 3:6
financially 5:7
find 40:21
fine 19:11
71:22 82:3
90:7
finish 8:5
firm 5:4
first 6:11,23
7:4,5 20:8 23:4
27:8 60:22
71:6 72:6,8
81:14 86:25
90:21 114:15
114:16
five 64:25
102:3,16,18
103:4 117:19
fixed 113:5
foia 55:4
follow 114:21
123:25
following
124:12
follows 6:14
food 18:22
force 3:16
foremost 87:2
form 3:11
13:25 14:15
16:13,19 25:21

26:6,12 29:16
30:15 32:2,16
33:3,25 34:12
35:7 37:16,22
38:21 39:9
40:13,25 41:2
41:23 42:13,21
45:10 46:15
47:17 49:4
52:9 53:16,25
54:9,21 55:13
58:10 59:23
65:11 66:21
67:8,10,18
70:12 73:9
74:4,19 75:3
75:20 77:11
79:10,16 80:5
82:23 84:2
85:12 92:9
93:2,11 94:20
96:16 97:15
98:6,22 99:7
99:18 100:6,20
102:19 103:12
104:21 111:25
113:19 114:2
114:12,23
116:8,15
120:11 121:3
121:20 122:2,8
122:15 123:14
forth 84:5
128:9

| | | | |
|---|---|---|---|
| **forward** 9:4 | **gain** 22:13 | 56:4 | 64:10 66:3 |
| **found** 31:10 | 53:23 54:18 | **go** 4:16 7:3,16 | 67:23 69:20 |
| **foundation** | **gained** 22:16 | 13:10 15:24 | 70:3,11 75:10 |
| 14:8 15:14,17 | **garbage** 18:22 | 20:20 21:10 | 84:7 89:17 |
| 117:9 118:16 | **general** 11:25 | 22:23 28:7 | 91:7,10 106:4 |
| **four** 31:3 56:7 | 14:5 20:21 | 29:8 31:2 34:2 | 118:19 125:4 |
| 83:9 125:8 | 39:18 63:11 | 35:8 38:18 | **good** 4:2 5:23 |
| **frankly** 107:21 | 65:13 73:11 | 39:11,15 41:3 | 25:12 31:6 |
| **fraudulent** | **generally** 13:20 | 41:7,19 42:22 | 59:10 63:4,5 |
| 56:9 | 21:10 54:20 | 43:9 49:8 | 90:24 108:8,8 |
| **free** 24:15 | 56:24 57:18 | 51:16,24 52:25 | 123:19 124:2 |
| 34:20 84:8,17 | 59:7 80:2 | 53:6 56:6 60:5 | **gordon** 2:8 |
| 84:22,24 85:16 | 103:4 | 62:18,20 63:3 | 5:17,18 6:16 |
| 85:18 86:4,12 | **generated** 51:7 | 63:5,16 64:10 | 6:18 14:21,23 |
| 87:11,19,21,24 | 55:22 | 64:23 66:7 | 25:8,10,13,14 |
| 88:3,7 89:16 | **gestures** 8:8 | 68:19 69:16 | 26:15 27:2,20 |
| 91:25 93:4 | **getting** 62:10 | 70:3,8,20 | 27:25 28:4,10 |
| 94:7,13,15 | 107:25 | 71:25 73:12 | 28:14 50:9,19 |
| **friday** 12:9 | **give** 29:20 | 77:25 80:21,22 | 60:5,11,15,18 |
| 81:6 82:12 | 30:19,21 46:22 | 81:10,13,14 | 60:20,24 61:7 |
| **friends** 85:22 | 49:11,15 60:21 | 82:17 83:13,14 | 61:12,19 62:2 |
| 88:9 | 64:15 81:19 | 91:2,3,22 | 62:16,20 63:13 |
| **front** 88:17,18 | 83:19 94:22 | 92:12,19 | 63:17 65:15,22 |
| 108:22 | 110:20 112:15 | 102:22 105:15 | 66:10 67:23 |
| **fulfill** 17:12 | 121:24 | 112:2 117:10 | 68:8,12,16 |
| **furnished** | **given** 75:16 | 118:11 121:4 | 69:2,7,13,22 |
| 127:8 | 84:22,24 85:16 | 121:21 122:16 | 70:8,16,20 |
| **further** 3:9,13 | 85:18 87:24 | 123:15 124:5 | 71:6,9,13,16 |
| 43:18 122:19 | 88:3 90:2 | **goes** 56:20 | 72:2,15 74:21 |
| 123:20 128:13 | 125:6 128:11 | **going** 4:3 7:16 | 77:22,24 78:23 |
| **g** | **gives** 107:2 | 9:4 25:3,6,18 | 79:3 82:2 83:8 |
| **g** 64:3 | **giving** 46:20 | 39:2,16 40:8 | 83:10,12 87:13 |
| | **global** 44:11,14 | 41:7 50:14,17 | 87:16 88:25 |
| | 44:25 53:10 | 60:13 63:9,14 | 89:5,23 90:9 |

**[gordon - hosteadter]**                                            Page 12

| | | | |
|---|---|---|---|
| 91:3,12,18 | **gtl** 44:14 | 93:15 | **hereto** 3:6 |
| 95:2,6,12,13 | **gubser** 64:3 | **handy** 55:21 | **hereunto** |
| 96:7,9 97:3 | **guess** 19:15 | **hang** 36:15 | 128:18 |
| 101:3,7,15,23 | 34:9,13 59:9 | **happen** 80:7 | **hey** 103:4 |
| 101:25 104:4 | 59:14 62:4 | **happened** | **hi** 6:17 91:13 |
| 104:10 105:21 | 110:24 116:21 | 79:20 | 91:19 |
| 106:14 107:12 | **guessing** 118:3 | **happens** 37:2 | **high** 40:5 |
| 107:22 109:6,9 | **guidelines** | 39:6,7 | **higher** 32:20 |
| 109:14,16 | 96:13 104:15 | **harassing** 56:9 | **highest** 32:24 |
| 114:19 118:21 | **gun** 16:5 | **hard** 108:4 | 34:11 |
| 119:2 120:14 | **guys** 71:20 | **hawkins** 2:9 | **hold** 45:8 92:19 |
| 120:16,19,21 | **h** | 5:21 86:18,23 | **holding** 9:14 |
| 123:18 124:9 | | 87:3 106:8 | **honestly** |
| 126:5 | **h** 64:4 126:7 | 107:7 | 105:20 |
| **gosh** 109:14 | **half** 27:24 | **head** 8:8 46:17 | **hope** 106:19 |
| **governing** | 63:10 | 46:24 47:3,5 | **hopefully** 9:8 |
| 66:18,25 67:16 | **hand** 29:7 | 51:19 54:23 | **hoping** 62:3 |
| **grant** 48:24 | 128:19 | 105:5 122:4 | **hospital** 115:12 |
| 49:21,25 51:6 | **handbook** | **heads** 98:14 | 115:17 |
| 51:16 | 26:23 27:7 | **hear** 7:18 107:6 | **hosteadter** 1:18 |
| **granted** 46:7 | 67:4,5 71:7 | **heard** 4:12 79:7 | 4:19 6:1,9,17 |
| 49:16 50:23 | 83:24 86:13 | 108:4 | 7:1 8:1 9:1 |
| 51:20 55:11 | 89:25 94:12 | **held** 1:19 | 10:1 11:1 12:1 |
| **grants** 51:2 | 126:11 | **help** 77:5 | 13:1 14:1 15:1 |
| **grasp** 59:7 | **handcuffs** | **helpful** 63:2 | 16:1 17:1 18:1 |
| **great** 6:22 8:12 | 19:21 | 88:15,16 | 19:1 20:1 21:1 |
| 10:16 11:8 | **handed** 19:7 | **helping** 16:25 | 22:1 23:1 24:1 |
| 13:7 16:5 | 29:22 | **henneberg** 1:6 | 25:1 26:1 27:1 |
| 28:22 31:13 | **handing** 29:25 | 4:20 5:19 | 28:1 29:1 30:1 |
| 33:12 45:18 | 30:3 | 27:10 72:6,12 | 31:1 32:1 33:1 |
| 52:5 | **handles** 19:19 | 126:20 129:2 | 34:1 35:1 36:1 |
| **ground** 7:4,16 | **handout** 28:21 | **hereinbefore** | 37:1 38:1 39:1 |
| **group** 18:21 | 29:18 67:13 | 128:8 | 40:1 41:1 42:1 |
| | 81:8 83:2 | | 43:1 44:1 45:1 |

**[hosteadter - inmates]**

46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
61:1 62:1 63:1
64:1 65:1 66:1
67:1 68:1 69:1
70:1 71:1 72:1
73:1 74:1 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1
106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1,7
125:17 126:3
128:7 129:3,21

**hour**   12:11
   37:14 38:10
   63:10
**housed**   23:6
   30:22,23 33:16
   86:8 96:19
**hundred**   33:22
**hung**   36:24
   37:9,13 39:4
**hypothetical**
   75:21 118:16
   118:22

**i**

**idea**   38:19
**identification**
   26:24 60:10
   68:6 72:13
**illinois**   1:11 2:7
   2:14 4:24 6:11
   60:7,25 63:21
   68:4 69:8
   126:12,16
**imagine**   23:21
**impair**   10:22
**impaired**   11:2
**important**   8:12
**impossible**
   56:22
**improper**   21:2
   48:15
**inaudible**   91:14
**incarcerated**
   15:21 21:20

23:17 24:4
   95:25
**include**   32:7
**including**   5:13
**incomplete**
   75:21 118:15
**index**   127:2
**indicate**   64:22
**individual**   7:9
   46:7 54:6 55:4
   110:17,18
**individuals**
   15:20 18:16
   35:15 55:10
   120:5
**information**
   26:23 27:7
   40:22 42:4
   55:25 126:11
   127:8
**initial**   21:19
**inmate**   16:22
   19:16 20:22,23
   21:7 23:14
   25:18 26:2,23
   27:6 28:21
   37:8,20 38:8
   39:3 41:15
   45:21 56:17
   58:6 67:5 71:7
   75:17 79:14
   81:8 82:9 83:2
   83:13,17,24
   84:4,11,15,19

84:25 85:4,9
   85:10,14,25,25
   86:9,13 89:25
   93:14,25 94:2
   94:12,18 95:15
   95:24 96:18,19
   99:22,23
   101:16 102:10
   103:23 104:12
   104:19,24
   105:2,11 115:5
   116:13,23
   119:14,18
   126:10
**inmate's**   41:21
   42:4
**inmates**   14:9
   14:10,14 21:12
   21:18 22:15,25
   23:3,25 24:3,4
   24:8,23 26:10
   30:19 31:24
   32:11,14 33:20
   33:22 34:6,8
   34:17,20,22
   36:7 59:12
   67:17 77:10,16
   78:13 79:7,19
   79:22 80:2
   82:21 84:7
   86:7 109:22
   111:21 112:10
   112:17,24
   114:6,7,10,18

| | | | |
|---|---|---|---|
| 114:21 115:24 | **intel** 47:7,8,24 | 54:15 58:4,5,8 | 12:1 13:1 14:1 |
| 116:22 117:2,4 | **interested** 5:8 | 59:12 60:4,9 | 15:1 16:1 17:1 |
| 118:5,10 | 128:16 | 61:3,5 63:23 | 18:1 19:1 20:1 |
| **input** 8:13 | **interfere** 10:21 | 63:25 68:5 | 21:1 22:1 23:1 |
| **inquiring** 21:14 | **internet** 4:10 | 69:9 71:2 | 24:1 25:1 26:1 |
| 55:24 59:4 | **interrupt** 8:4 | 74:23 78:5,7 | 27:1 28:1 29:1 |
| **ins** 73:16 | **interrupted** | 82:20 97:19 | 30:1 31:1 32:1 |
| **inside** 32:4,6,8 | 90:15 | 121:23 123:3,4 | 33:1 34:1 35:1 |
| 58:16 60:3 | **interrupting** | 123:9 126:15 | 36:1 37:1 38:1 |
| **inspection** 60:8 | 41:4 89:2 | 126:17 | 39:1 40:1 41:1 |
| 61:2 62:25 | 90:12 | **jane** 64:2 | 42:1 43:1 44:1 |
| 63:22,25 68:5 | **interviewed** | **jason** 2:15 5:24 | 45:1 46:1 47:1 |
| 68:20 69:9 | 64:5 | 11:17,17,18 | 48:1 49:1 50:1 |
| 71:2 126:13,18 | **investigator** | 12:4,16 25:10 | 51:1 52:1 53:1 |
| **instruct** 107:9 | 17:8,9,11,24 | 62:10 70:9 | 54:1 55:1 56:1 |
| **instructing** | 40:5 51:5,12 | 89:18 101:24 | 57:1 58:1 59:1 |
| 65:22 | 52:20 76:10,12 | 104:9 106:23 | 60:1 61:1 62:1 |
| **instruction** | 76:24 112:5 | 107:22 | 63:1 64:1 65:1 |
| 119:4 | **involve** 14:9 | **job** 47:4 49:18 | 66:1 67:1 68:1 |
| **instructs** 10:13 | **involved** 13:20 | 90:24 | 69:1 70:1 71:1 |
| **intake** 21:19 | **involvement** | **jobs** 77:7 | 72:1 73:1 74:1 |
| 22:24 23:4,15 | 14:12 | **john** 1:9 | 75:1 76:1 77:1 |
| 24:2,9,22 | **involvements** | **jorge** 1:11 | 78:1 79:1 80:1 |
| 25:18 26:3 | 13:23 | **judge** 106:19 | 81:1 82:1 83:1 |
| 29:22 30:20 | **isolation** | 106:23 107:18 | 84:1 85:1 86:1 |
| 31:23 32:8 | 115:16,17 | 108:14 | 87:1 88:1 89:1 |
| 34:19 82:9 | **issue** 24:21 | **jumped** 16:5 | 90:1 91:1 92:1 |
| 83:14,24 84:8 | 25:17,23 40:22 | **june** 29:2 44:17 | 93:1 94:1 95:1 |
| 84:12,20,23 | 66:4 108:13 | 44:23 73:3 | 96:1 97:1 98:1 |
| 85:2,10,10 | **issues** 108:25 | **justify** 102:5 | 99:1 100:1 |
| 86:2 87:24 | **j** | **k** | 101:1 102:1 |
| 92:2,13,17,18 | | | 103:1 104:1 |
| 94:3 95:17,18 | **jail** 17:14,15,16 | **k** 6:1 7:1 8:1 | 105:1 106:1 |
| 95:20,23,24 | 32:5,7,8 47:8 | 9:1 10:1 11:1 | 107:1 108:1 |

[k - litigation]

109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1
**keep** 9:17 89:13
89:17 91:20
105:18,21
**keeping** 82:18
**keeps** 107:24
**keys** 19:21
**khara** 11:22,23
11:24 12:4,16
**kick** 118:6
**kicked** 102:11
**kim** 4:18 6:19
6:22 17:2 25:9
25:16 26:18
27:3,11 28:15
31:7 50:20
52:3 54:11
56:15 61:9
63:4,18 64:13
66:8 68:9
69:24 72:17
79:4 80:24
81:18 89:19
90:2 91:13,19
95:8 101:10
102:6 109:24

118:13 119:4,9
125:6
**kimberly** 1:18
6:9 125:17
126:3 128:7
129:3,21
**kind** 19:11
59:13 60:21
**know** 8:14,17
9:6 13:4 14:5
15:8,9 21:17
21:17,19 22:4
22:5,6,12,14,18
22:18,20 25:16
25:22 26:9,19
27:15,22,23
28:3,22 29:3,4
31:6 33:7 34:3
34:4,15,18
36:11,13 38:16
38:18,23 40:18
41:25 46:25
47:19 49:23
52:23 53:18
54:16 56:17,19
57:7 58:6
59:25 66:2
67:13,15 71:13
71:13 72:8
73:15,25 78:6
78:10 79:20,25
86:16 88:4,21
88:24 89:11
92:3,14 98:25

99:9,10,15,20
99:24 100:2
105:6,16
107:25 108:3,9
110:3 111:14
111:18 114:15
121:7,10,13
122:5,11
**knowledge**
21:17 26:14
29:6 48:16,22
60:2 67:21
74:8 110:25
113:21 114:5,9
114:25 116:10
**knows** 108:21

**l**

**l** 3:2
**land** 63:12
**large** 70:21
72:3 83:10
**larger** 48:8
**laundry** 18:24
**law** 54:13
**lawsuit** 13:14
**lawyer** 108:10
**lay** 14:7 15:14
15:16 63:12
**lectured** 108:11
108:18
**left** 36:22 73:7
119:10,25
121:2 122:23

**length** 104:16
**letter** 62:23
**lewis** 2:4 5:22
**lieutenant**
51:11
**lieutenants**
20:4
**limitations**
102:5
**limited** 97:11
97:13,25 98:2
98:3
**limits** 98:20
**line** 58:21
117:4 118:10
127:5,9,13,17
129:4
**line's** 45:22
**linens** 18:25
**link** 44:11,14
53:11 56:4
**list** 48:20 55:9
55:17 64:6,7
**listen** 40:6,20
40:21 41:19,20
42:2,8 46:2,4,9
46:10 47:13
48:19,25 52:25
53:4 55:18
56:20
**listening** 57:7
74:14 113:8
**litigation** 127:2

**litigations**
  13:11
**little**  27:24
  28:13 41:13
  50:8 58:11
  119:22
**live**  42:10 46:2
  46:4,11,22
  47:14 48:13,19
  48:25 50:23
  51:15 52:15,19
  53:3,4 55:5,12
  55:18
**living**  18:23
  32:11 33:6
  35:13 85:11,11
  85:17 88:2
**llc**  2:11 6:5
**llp**  2:4 5:22
**local**  84:14
  88:19 93:23
**locate**  22:19
**located**  23:20
**location**  44:2
**lockup**  35:11
  37:6
**log**  42:3
**long**  12:10 15:3
  16:2 17:23
  21:6 24:17
  27:22 35:20,24
  45:8 78:17
  84:14 88:19
  93:23,24

103:23 104:7
104:12,19
113:24
**longer**  31:9
**look**  31:6 61:18
  61:20,24 63:4
  63:6 64:16
  68:13 119:8
**looked**  67:6
**looking**  55:7
  63:10 73:24
**looks**  60:24
  61:3 63:21,25
  72:8
**loss**  56:11
**lost**  115:14

**m**

**m**  64:4
**made**  48:18
  71:16 85:17
  88:11,20,22
**mail**  49:10 51:6
**maintain**  77:5
**maintenance**
  18:19 76:7
  78:11
**make**  8:2 18:23
  19:22 24:11,12
  27:17 29:21,21
  48:2 58:13
  88:10 94:7
  100:13 102:18
  112:20 113:3

115:22
**makers**  48:21
**makes**  20:6
  59:17 115:20
**making**  56:18
  73:25 86:17
  110:21
**manager**  61:5
**manual**  82:7
  93:18 94:17
**march**  128:19
**mark**  39:5 60:6
  67:23
**marked**  26:23
  60:9 64:20
  68:6 72:13
  83:7 127:12
**marriage**
  128:15
**matter**  4:20
  71:23 86:12
  128:17
**maximum**  36:4
  105:2 116:23
  117:14,21
**mean**  15:18
  20:2 34:5
  52:15,16,17
  54:4 57:9 66:2
  70:10 75:8
  77:20 86:13
  90:7 96:15
  103:8 106:18
  116:11

**means**  10:6
**measures**  70:18
**media**  4:17
  125:7
**medical**  1:10
  18:16
**medication**
  10:19
**meet**  12:3,4
**meeting**  12:5,7
  12:8,13
**meetings**  12:6
**member**  111:20
  113:12,15
**members**  73:17
  111:24 112:3
  115:22 116:4
**memory**  10:23
  11:2
**message**  36:21
**met**  11:16
**mind**  7:4
**minimal**  103:5
**minimum**
  102:2,15
  117:17,18
**minute**  36:16
  36:16 39:4
  64:25 91:4
**minutes**  9:24
  24:18 34:21
  36:3,6,7,9,12
  36:14,20,21,22
  37:9,21,25

[minutes - objection]                                                    Page 17

38:5 102:3,11
102:16,18
103:4,6,9,14,17
117:19,20,21
**mischaracteri...**
37:23 67:11
92:10 93:12
103:25 111:6
117:12
**mischaracteri...**
78:16 80:16
**misunderstood**
109:13
**moment** 125:2
**money** 88:12
**monitor** 40:12
41:8,15 48:13
50:23 55:12
73:19 111:20
112:9 113:12
113:16,22
116:4
**monitored**
39:19 40:2,4,9
52:6,8,14,19
53:7 66:14
109:21 110:3,4
110:5,9,11,16
110:20,23
111:3,4
**monitoring**
20:23 41:9,10
52:12,15,16,20
65:5 74:2,5,12

112:16
**monologue**
21:11
**monroe** 2:13
**month** 73:3
**morgan** 2:4
5:22
**move** 89:3,19
90:2 95:3
119:6
**moved** 90:14
**multiple** 40:15
47:6 48:7,7
98:7 117:8

**n**

**n** 2:2 3:2 126:2
**name** 4:25 5:17
48:23 64:7
102:24 108:12
129:2,3
**name's** 6:17
**names** 44:7
**nature** 14:6
**near** 73:20,24
74:25
**necessarily**
75:8,15
**need** 9:23 18:17
22:2,4,18,20
35:24 41:12
43:6 47:11,12
48:11 54:15
66:10 77:22

81:17 107:20
108:11,18
121:25 124:6
**needed** 8:16
123:3
**needs** 19:5
20:17 48:10
49:17 53:4
121:17,18,23
122:18,20
**never** 77:15
78:12,12 80:11
104:6
**new** 1:3,22 6:13
122:22,22
128:5
**nine** 91:4
**nods** 8:8
**normal** 40:24
**normally** 58:20
**northern** 1:3
4:23
**notary** 1:21
3:15 6:12
125:23 128:4
129:25
**note** 4:6,6
**noted** 125:11
**notice** 1:19
66:13 109:19
**noticing** 5:16
**notify** 85:15
87:25

**number** 4:24
27:9,12,13
31:5 37:12
39:6,8,18
41:16 56:7
72:5 73:6 78:2
80:23 83:15
102:23 119:22
125:7
**numberings**
61:21

**o**

**o** 3:2 5:25
44:10
**o'berg** 1:20 5:4
87:4 128:4,22
**oath** 5:6 10:5,8
**object** 59:23
74:4
**objecting** 87:6
**objection** 13:25
14:15 16:13,19
25:21 26:5,12
29:16 30:15
32:2,15 33:3
33:24,25 34:12
35:7 37:15,22
38:11,21 39:9
40:13,25 41:2
41:22 42:12,20
45:10 46:14
47:17 49:3
52:9 53:16,25

**[objection - p.m.]**                                          Page 18

| | | | |
|---|---|---|---|
| 54:8 55:13 | **objects** 10:10 | 11:17,20,23 | 92:2 |
| 58:10 65:10,11 | **observed** | 12:3,10 13:4 | **one's** 35:22 |
| 65:20 66:20 | 111:23 112:12 | 13:22 14:5,9 | **ones** 13:2 47:11 |
| 67:8,10,18 | 112:19 | 14:11,18,24 | **ongoing** 86:6,6 |
| 70:11,17 73:8 | **obviously** 63:8 | 15:8,16,23 | **opinions** 78:20 |
| 74:18,19 75:3 | 68:14 | 16:17,24 17:23 | 122:25 |
| 75:20 77:11,18 | **occurred** 17:20 | 18:12 19:2,25 | **opposed** 78:21 |
| 78:15 79:16 | **occurrence** | 20:6,6,19 22:9 | **oral** 67:19 |
| 80:4,15 82:23 | 40:24 | 22:23 23:20,23 | **order** 22:13 |
| 84:2 85:12 | **odd** 77:6 | 24:8 29:8,11 | 88:9 113:4 |
| 87:10 90:7 | **office** 8:18,21 | 29:24 30:6,12 | 114:18 124:8,9 |
| 92:9,25 93:11 | 13:21 17:13 | 31:2,22 32:6 | **orderly** 26:11 |
| 94:20 96:16,25 | 20:14 55:2 | 32:10,20 33:18 | **orders** 112:22 |
| 97:6,15 98:6 | 78:18 | 34:16,19 35:4 | **original** 57:15 |
| 98:22 99:7,12 | **officer** 1:10 | 37:19 38:7 | **outcome** 5:8 |
| 99:18 100:6,20 | 18:3,5,9,15,17 | 43:12 45:18 | 128:16 |
| 100:25 102:19 | 19:3,14,18 | 48:12 49:20 | **outs** 73:16 |
| 103:11,24 | 20:9 29:13,19 | 50:10 51:23 | **outside** 9:19 |
| 104:21 105:7 | 30:8 51:10 | 52:2,13 53:9 | 17:13 31:3,18 |
| 105:13 110:12 | 73:23 74:16,24 | 59:9,17 60:5 | 54:14,21,25 |
| 111:5,15,25 | 75:7,19,24,25 | 61:13,19 62:14 | 58:5,18,21 |
| 113:19 114:2 | 76:4,14,20,22 | 62:15 63:2,7 | 65:25 66:5 |
| 114:12,23 | 76:25 77:21 | 63:16 67:15,22 | 70:12 86:21 |
| 116:8,15 117:7 | 78:9 80:13 | 69:5,11 70:2 | 87:11 98:23 |
| 117:16,23 | 112:14,16,20 | 70:16 73:18 | **own** 7:9 19:12 |
| 118:14 120:11 | 113:12 | 77:3,25 82:21 | 48:9,10 110:18 |
| 121:3,20 122:2 | **officers** 112:4 | 83:3,9,13,21 | 110:24 |
| 122:8,14,15 | **officials** 64:4 | 85:24 90:19 | **p** |
| 123:13 | **oh** 28:4 31:10 | 94:25 96:3 | |
| **objections** 3:10 | 60:18 71:11 | 103:5,7 106:21 | **p** 2:2,2 3:2 |
| 5:9 66:12 | 109:8,8 | 107:23 111:19 | **p.m.** 1:15 4:4 |
| 77:23 78:24 | **okay** 6:19 7:8 | 112:7 120:20 | 25:7 50:18 |
| 79:9 86:25 | 7:12,15 8:22 | **once** 50:2 51:6 | 91:11 125:5,11 |
| | 8:22 9:9,10 | 53:5 85:14,16 | |

packet 83:11
page 27:8,22
  31:3 63:24
  72:7,7,9 81:13
  81:14 119:13
  119:16,19
  120:6 124:12
  126:4,8 127:5
  127:9,13,17
  129:4
pages 28:9
  63:11 69:15
  110:7 111:8
paid 84:14 85:3
  93:24 94:18
paper 70:2
part 27:21
  31:16 44:17
  45:17 54:14
  81:17 82:4,16
  82:18 112:6
participants
  4:11
particular 22:8
  33:20 41:25
  82:4
parties 3:6 4:16
  8:14 9:12
  13:18 53:23
  112:8,8 128:14
parts 31:14
party 5:6 54:5
  57:14 59:2

passage 58:21
past 37:21
  81:14
pause 43:10
pay 59:13,16
  85:23
payroll 19:23
pc 35:14 40:18
peek 28:13
pending 9:21
  10:3
people 9:19
  25:18 31:18
  55:18 57:15
  64:6 75:12
  98:20 122:21
  122:22,22
perfect 27:5
  33:18 50:6
performing
  49:18
period 65:19
permission
  50:23
permitted
  64:24
perpetuity
  116:25
person 7:9 8:2
  22:7 39:13
  41:25 45:21
  46:19 47:11,13
  52:20 54:25
  87:5 102:25

110:21
personal 10:19
  78:20 108:25
personally
  36:13 108:13
phases 46:6
phone 8:22 9:2
  9:8,11,14
  15:19 22:7,22
  23:3,19 24:3
  24:11,13,13,13
  24:15,17 26:3
  31:9 34:24,25
  36:2,14,19,24
  37:3 38:3 39:5
  39:15 40:12
  41:11,16,18,24
  42:2,3,5,6,9,10
  42:16,17 43:19
  43:23 44:2
  46:8,18,22
  47:7,9 48:13
  49:12 50:2
  51:21 52:18,22
  52:24 53:3,4,5
  53:20 55:23,23
  56:3,20,23,24
  57:3,4,8,11,18
  57:19 58:22
  59:3,8,16
  73:11 75:9
  81:21 84:8,17
  84:22,24 85:23
  86:4,12 87:12

87:19,21,25
  88:3,7,10,11
  89:16 91:25
  92:7,24 93:4,9
  94:7,12,13,15
  95:15,20 96:19
  97:9 98:10,11
  98:21 100:14
  102:10,21,23
  103:3,3,5
  104:16,24
  105:3 110:19
  110:21 111:12
  112:23,24
  113:2,4,8,23
  114:22 115:13
  115:18 116:19
  116:20,24
phones 15:22
  24:22 25:19
  26:10 33:6,8
  34:6,8,8,10
  48:6 57:2,13
  58:7,18 59:6
  59:13,14 67:14
  74:10 75:14
  95:21 96:22,23
  97:22,24 98:18
  112:21,22
  113:2
phrase 102:24
physically
  23:18 73:20
  74:3,13 75:18

**[pick - produced]**

Page 20

pick  18:22
37:10 39:5
41:17 57:19
59:2
picking  37:3
pickup  59:14
place  4:15
64:24 66:16
79:22 109:23
115:10
places  23:8
plaintiff  1:7,19
2:5 4:20 5:19
plaintiff's
26:21 60:7
68:3 72:10
126:8
play  71:16
please  4:6,6
5:10 6:7 7:20
8:4,14 43:8
66:24 88:25
90:11,16,22
106:10 107:8
113:24
point  75:16
88:21
police  47:8 48:3
policies  13:5
16:18 24:6
26:9 42:25
43:4 67:16
87:15 92:7
93:10 94:12

99:22 100:3
101:4 111:14
120:10,23
121:14 123:8
policy  22:10,11
23:24,24 24:2
27:15 31:23,24
32:4 34:7,16
45:15,16 46:12
46:13 69:4,6
82:5,6,8,10,17
82:19,22 83:23
83:25 84:5,12
85:2,8 86:2,10
87:13,20 88:17
88:18 93:15,16
95:4,8,14,21,23
96:11 97:4,20
97:21,22,23
98:19 99:2,10
99:11,16,25
100:8,9,19,23
103:18 104:18
104:23 105:4
105:10 109:17
110:6,10,18
111:2 114:17
114:20 118:6
119:8,9,17,23
121:6,8,11,15
121:16,19,19
122:5,7,11,13
122:17 123:7
123:11,12

populated
34:11
population
32:18,21,24
position  20:8
43:16 47:4
49:24 50:25
51:9 76:6
positions  18:13
29:15 122:23
possible  80:9
80:10 118:13
possibly  10:21
15:7 80:7
100:11
posted  66:14
109:21
potentially
35:17
pre  15:4
prefer  70:9
preliminary
10:17
prepare  11:14
13:8
prepared  12:24
present  5:12
12:17
presented
100:9
pretty  63:14
prevent  11:5
previous  30:12
30:13

prior  13:11
30:5,6 39:20
67:11 78:16
80:16 81:6
82:12 92:10,11
99:16 100:3
103:25 111:7
123:2
prison  45:25,25
private  7:10
54:6
privileges
56:11
pro  55:3
probably  7:17
9:23 100:13
procedure
51:17 114:21
procedures
82:19 84:13
86:3 91:23
93:23 96:13
proceed  6:8
proceeding
5:10
process  24:9,22
25:19 26:4
30:20 36:18
46:5 51:13
84:20,23 94:3
procure  14:13
produced
20:20 27:8
61:11 70:22

**[produced - record]**

Page 21

72:4

**production**
127:4

**professional**
107:15 108:19

**profile** 40:5

**prohibited** 56:8
56:10

**promise** 63:15
68:17

**protective**
35:14

**provide** 7:2
42:7

**provided** 13:3

**public** 1:21
3:16 6:12 55:2
111:21 112:9
112:16 113:13
113:16 116:4
125:23 128:4
129:25

**purpose** 21:2
73:10 108:2

**pursuant** 1:19

**put** 19:23 26:15
49:15 78:25
88:12 102:22
115:16

**q**

**quality** 4:8,9

**quarters** 85:11

**question** 3:11
7:19,22 8:6
10:3,3 42:15
52:12 54:17
58:14 66:23
70:4 89:6 90:6
92:16 93:20
102:2 108:7
118:24

**questioner** 87:8
107:9

**questions** 8:13
9:20 10:11,12
10:18,22 31:21
64:16,21 70:6
86:19 87:8
90:13 98:7
106:6,21
107:10,12
123:21,25
127:12

**quick** 25:11
31:20 51:24
58:7 91:20

**quite** 57:16

**r**

**r** 2:2 5:25 44:10
61:4 64:3
128:2

**r.n.** 1:9

**radunsky** 2:11
2:16 6:4,5 50:7
54:10 61:23

62:9,17,22
63:8,16 65:20
65:24 70:24
71:8,11,14,22
81:10 83:6,9
86:11,16,21
88:20 89:3,9
89:24 90:23
95:10 96:4
105:18 106:11
106:17 107:7
107:14 108:9
108:16

**rails** 107:25

**random** 40:9

**ranking** 51:10

**ratio** 33:19
34:3,17

**ratios** 38:18

**reaction** 106:21

**read** 31:7,15
81:16 82:17
125:3

**reading** 103:8

**reads** 27:7

**real** 25:11
31:20 51:23

**really** 27:25
37:19 90:16,24
108:8 116:11
116:12

**reason** 10:25
11:4 129:4

**reasonable**
111:22 112:10
112:18 115:2
115:22

**reasons** 102:4

**recall** 15:11
77:14 79:5,6
79:12 80:8,20
110:15

**receive** 51:14
82:21 83:2,3
87:19,21 91:25
94:13,15

**received** 76:23

**receiving** 92:15

**recent** 29:5

**reception** 82:9
83:14 84:11
85:2,9,25
92:13 94:3

**recess** 25:5
50:16 91:9

**recollection**
33:5

**reconcile** 87:22
92:5

**record** 4:4,16
5:15 8:2 24:25
25:3,4,7 26:25
45:4 48:19
50:13,15,18,20
50:21 68:18
70:7 71:20
87:4 88:22

**[record - rights]** Page 22

91:2,4,7,8,11
91:16,17 96:6
105:19,22
106:10 107:8
109:3,10 124:5
125:4 128:11
**recorded** 4:13
4:18 42:16,17
47:14 52:19,21
52:25 53:8
55:5 66:14
109:21 110:23
**recording** 4:9
4:14 20:23
42:9 43:2
**recordings**
45:9,19 50:24
52:16 53:11,15
53:21,24 54:7
54:19 55:11
**records** 14:10
14:13 15:15,17
17:14,16,18
21:7 22:13,19
**redialing** 37:4
**redirect** 89:20
**redundant**
118:24
**reference** 27:14
84:5
**referring** 27:12
56:2 67:3
93:14,16

**regard** 67:9
**regarding**
12:20 16:22
78:17 99:22
110:19
**regardless**
36:22,23
**regenerated**
38:14
**register** 85:20
**regular** 47:8
**regulation**
20:22
**reinitiated** 39:7
**reinstated** 38:5
**reissue** 38:2
**relate** 16:11
**related** 5:6
17:10 128:14
**relative** 73:9
**relevant** 19:13
**remedial** 70:18
**remember**
18:14 19:9
44:7 77:16
79:21 100:17
102:8
**remotely** 5:13
**repeat** 7:21
**rephrase** 7:21
**report** 56:12
60:9 61:2
63:23 126:14

**reporter** 1:21
5:3 6:7 7:24
8:7 94:10
108:15 122:10
**reporting**
129:1
**reports** 19:6
**representing**
5:2 6:2 11:10
**request** 17:22
40:9,11,18
48:12 49:14,16
50:2 51:14,19
54:7
**requested**
17:20 29:18
30:24 77:7
**requesters**
17:14
**requesting** 42:6
42:24 46:18
**requests** 51:2
127:4
**reserve** 124:3
**reserved** 3:12
**resolve** 40:22
**respect** 106:24
**respective** 3:6
**respond** 8:6
73:13,15 77:13
107:13
**responding** 8:5
**responsibilities**
17:10 18:8,14

77:4
**restricted**
96:22,24 97:10
**restricting**
37:20
**restroom** 9:25
**result** 56:10
65:8,17
**resulting** 79:14
**retained** 125:9
126:23
**retention** 45:15
**retired** 122:21
**review** 12:23
**reviewed**
100:10
**ridiculous**
106:7
**right** 7:20 8:19
20:19 21:4
27:13 49:20
52:2 53:11
68:25 71:5
83:16 89:21
92:3 95:2
99:25 100:24
101:10 104:9
107:17 108:23
109:4 117:15
117:22 119:12
119:13,17
120:4,18
**rights** 51:5
54:23

**[risk - served]**                                                    Page 23

| | | | |
|---|---|---|---|
| **risk** 110:24 | 89:22 92:4 | 101:13 | 68:9 70:14 |
| **role** 15:12 17:7 | 93:6,7,21 | **scratch** 114:19 | 77:10 80:24 |
| 17:10,12 18:2 | 94:14 106:6 | **screen** 4:12 9:5 | 81:11 83:16 |
| 20:11,16 | 123:7 | 26:17 28:6 | 84:4 102:6,7 |
| **roles** 18:13 | **says** 28:25 31:4 | 51:23 92:22,23 | 102:25 103:14 |
| 19:2 | 31:17 32:10 | **scroll** 60:20 | 106:20 111:19 |
| **room** 8:10,15 | 39:17 52:5 | 61:23 62:12 | 113:9 119:25 |
| 8:18,19 33:12 | 56:7 63:24 | 119:21 | 120:7 |
| 33:17 115:13 | 64:4,10,13,18 | **scrolling** 68:21 | **seeing** 27:24 |
| 115:18 | 71:12 73:3 | 69:18 110:6 | 92:21 109:18 |
| **roster** 72:9,21 | 82:6 83:17 | **se** 55:3 | 110:8 117:20 |
| 72:22 | 84:25 85:25 | **sealing** 3:7 | **seen** 4:11 27:16 |
| **rotate** 35:13 | 86:2,5,13 | **second** 39:14 | 29:9,11 61:8 |
| **roundabout** | 87:18,20 93:22 | 43:8 44:12 | 61:16 63:18 |
| 15:6 34:9 | 94:4,13,17 | 63:23 64:15 | 68:15 69:23 |
| **rule** 67:7,14 | 96:10 99:5 | 71:9 83:19 | 72:16,17,18 |
| **rules** 7:4,16 | 103:9 104:24 | 90:19 92:20 | 77:16 81:2,4 |
| 65:8,17 66:18 | 106:11 109:18 | **section** 31:19 | 82:11,14 |
| 66:25 67:16 | 110:2 111:19 | 64:12,20 69:21 | 100:10 |
| 111:23 112:11 | 113:14 119:9 | **securing** 19:16 | **send** 51:19 |
| 112:19 113:7 | 119:13,13,17 | **security** 18:17 | **sense** 20:6 |
| **ruling** 127:12 | 119:23 120:3,4 | 19:3,14,18 | 59:17 115:20 |
| **s** | 120:6,14 | 29:12,20 30:8 | **sent** 62:23 |
| **s** 2:2 3:2,2 | **scan** 31:16,19 | **securus** 44:9,15 | **sentence** 115:4 |
| 44:10,10 64:3 | 83:19 | 44:16 45:13 | **separate** 12:6 |
| 126:7 | **scenario** 38:7 | 56:3 59:5 | 24:5 43:17 |
| **safe** 93:8 | 39:2 118:4 | **see** 9:6,8 26:18 | **september** |
| **safety** 19:16 | **scope** 55:14 | 26:19 27:3,18 | 44:24 45:2 |
| **sanctions** 56:13 | 65:12,25 66:5 | 28:15 31:8 | **sergeant** 51:11 |
| **savvy** 57:23 | 70:13 73:9 | 32:10 39:16,23 | **sergeants** 20:3 |
| **saying** 36:21 | 77:12 80:4 | 40:7,21 48:14 | 20:4 |
| 64:7 65:25 | 86:22 87:11 | 52:3 56:15 | **serve** 18:22 |
| 87:18 89:13,15 | 96:25 98:23 | 60:16 61:16 | **served** 114:16 |
| | 100:25 101:3 | 62:12,19 64:12 | |

**set** 74:16 88:8
  128:9,19
**sets** 98:3
**setting** 33:7,8
  33:10,10,11,15
**seven** 81:13
**several** 79:18
  79:19 94:21
  111:7 118:2
**share** 26:16
  32:11,14 51:23
**shares** 33:12
**sharing** 9:5
  28:5 92:22,23
**shebel** 1:9
**sheet** 27:24
  114:6 129:1
**sheets** 19:5
**sheriff** 13:17,19
  14:25
**sheriff's** 11:11
  12:2 16:3,7,9
  20:25 47:8
  48:3 54:22
  78:18
**shift** 35:11
  72:23
**shorthand** 1:20
**shot** 94:22
**show** 9:5 38:3
  60:12 64:8,17
  69:19 70:5
**shows** 64:9

**side** 9:18
**sign** 114:6
**signature** 124:3
  128:22
**signed** 3:15,17
  61:4 121:10
**similar** 59:16
  68:16 84:6
**simple** 106:24
**simply** 66:7
**single** 38:8
**sleeping** 33:13
**smart** 57:2,10
  57:13 58:6,18
  58:19,22 59:5
  59:6
**sneak** 28:13
**somebody**
  40:20 47:23
  55:3 108:20,21
  113:7 115:15
**soon** 91:21
**sorry** 14:20
  16:5 19:9
  23:24 28:5,11
  30:19 33:25
  41:4 44:22
  49:8 50:9
  51:24 60:11,18
  62:2 63:24
  65:11 67:24
  71:4,14,25
  74:19 76:10
  78:3 80:21

  81:25 83:11
  92:21,22 95:3
  95:10,18
  109:12,15
  115:18 120:13
**sound** 21:4
**sounds** 22:9
**south** 6:10
**space** 33:13
**speak** 11:20
  25:11 66:11
  75:23 105:25
**speaking** 66:11
  77:23 78:23
**special** 39:20
**specific** 14:14
  40:7 41:13,16
  47:4 51:21
  53:4 54:15
  57:22 123:6
**specifically**
  93:21
**specifics** 41:8
  79:24
**speculation**
  16:20 53:17
  54:2,9 66:21
  74:20 75:4
  82:24 99:13
  104:22 105:8
  105:14 111:16
  114:13 122:9
**spend** 63:9

**spoke** 70:6
**staff** 72:24
  112:6
**staffing** 73:6,17
  122:18,20
**stamp** 96:5
**stamped** 72:11
  126:19
**stand** 38:13
  93:3 123:16
**standards** 61:6
  123:3
**standing** 73:24
**stands** 90:8
**start** 17:4
  31:20 108:19
**started** 76:12
**state** 1:21 5:10
  5:13 6:13
  14:14,19 128:5
**state's** 13:21
  14:20 17:13
  20:13,18 55:2
**stated** 50:24
  117:19
**states** 1:2 4:22
  46:12,13
**stating** 6:9
  66:13 94:6
  109:19 110:8
  111:2
**stay** 31:17
  71:20 104:20
  104:24 105:3

106:9 107:8
109:3,10
**stenographer**
90:25 91:15
124:4
**steps** 46:6
**stipulated** 3:4,9
3:13
**stop** 88:25
90:11 108:4,16
108:17 123:20
**stopping** 37:3
**store** 43:19,22
**stored** 42:19
44:3 45:5
55:22
**storing** 43:2
**straightened**
71:23
**street** 2:13
**struggling**
81:24
**subject** 47:24
65:5
**submitted** 50:3
113:4
**subpoena** 55:4
**subscribed**
125:19
**subsequent**
70:18
**substance**
10:20

**substantial**
100:17 102:4
**substantially**
59:22,24 68:22
69:14
**subtle** 100:12
**suite** 2:6,13
**superintendent**
64:2
**superior** 47:22
47:23 49:7
51:2,4,9,10,16
51:18
**superiors** 47:10
47:16 48:17,24
49:6,9,13
**supervisor**
40:10,11,20
41:15,20 73:14
74:9
**supervisors**
20:3 49:13
**support** 127:2
**sure** 7:11 18:24
19:22 23:13
24:24 29:21
52:11 54:4
58:14 60:23,23
110:17 112:20
113:3 115:22
**susan** 1:9
**suspension**
65:8,17

**swear** 6:7
**sworn** 3:15,17
6:12 111:20,24
112:3,6 113:12
113:15 115:21
116:3 125:19
128:9
**system** 15:20
20:22 21:13,15
22:8,22 36:15
38:3 41:25
42:4,5,6 46:8
47:9 49:12
50:2 51:22
53:20 54:24
55:23,24 56:21
56:25 57:3,4
57:18 58:3,8
59:3,7 74:14
85:20 100:14
111:12
**systems** 21:24
21:24 45:13
56:3 73:11

**t**

**t** 3:2,2 126:7
128:2,2
**tactic** 108:3
**take** 4:15 8:16
9:22 10:2,4
19:4,20 25:2
37:8 50:7,10
50:13 61:18,24

68:13 90:4
91:4,7 106:19
107:12 108:14
124:8
**taken** 1:18 4:19
25:5 50:16
62:5 90:20
91:9
**takes** 79:21
103:3
**talk** 107:17
108:24
**talked** 101:20
**talking** 36:19
57:15 65:13
74:21,22 77:20
87:14 90:11
101:18,21
**tammy** 1:20 5:4
128:4,22
**targeted** 63:14
**tasks** 46:24,25
49:17
**teaming** 86:24
**tech** 57:23
**technically**
41:10
**technology** 9:3
**tel** 44:11,14,25
53:10 56:4
**telephone**
14:10,11,13
15:15,17 17:17
17:18 20:22,24

| | | | |
|---|---|---|---|
| 21:2,7,12,15,18 | **telephones** | **testify**   66:3 | 75:10 79:19 |
| 23:15,25 31:4 | 16:23 22:16 | 97:2 | 82:18 86:23 |
| 31:19 34:20,23 | 23:9,16 24:9 | **testifying**   11:6 | 102:22 |
| 36:5,8 37:4,11 | 32:11,13,22,25 | **testimony**   7:2 | **think**   11:5 |
| 37:21 38:9 | 33:20,23 34:17 | 37:23 67:11 | 19:25 20:19 |
| 39:3,17,18,19 | 35:18 38:17,19 | 78:16 80:16 | 38:22 90:2 |
| 39:21,25 40:4 | 38:23 57:10 | 92:11 93:12 | 104:4,8 111:6 |
| 41:17,19,21 | 58:5 59:11,11 | 102:9 103:25 | 115:15 123:19 |
| 42:7 45:5 | 59:15 65:14 | 111:7 117:13 | 124:2 |
| 48:14,20 49:2 | 66:19 67:2,9 | 124:11 125:6 | **thinking**   62:11 |
| 50:24 51:15 | 67:17 73:20,25 | 128:11 | **third**   53:22 |
| 52:6,8,13,14 | 74:17 75:2 | **thank**   5:17 6:22 | 54:5 57:14 |
| 55:12,19 56:8 | 79:15 80:3 | 6:23 7:15 | 59:2 |
| 56:11,18 58:3 | 98:5 111:21 | 10:16 11:8 | **thirteen**   21:9 |
| 58:8 64:11,13 | 112:9,17 | 13:10 14:22 | **thirty**   36:6,7 |
| 64:20,25 65:4 | 113:13,16,18 | 15:23 16:24,24 | **thought**   70:24 |
| 65:7,9,16,18 | 114:8 115:11 | 16:25 25:9 | **thousand**   34:5 |
| 66:13,15 69:20 | 115:23 116:5,7 | 28:13 30:18 | 34:7 |
| 75:17 77:10,17 | 116:25 117:3,5 | 33:18 43:11 | **three**   12:15 |
| 78:14 79:8 | 117:15,22 | 50:6 53:9 55:8 | 43:16 44:4 |
| 83:17 84:13 | 118:4,7,12 | 69:12 87:9,15 | 45:12 46:11 |
| 85:2,8 86:2,6,7 | **tell**   10:6 18:12 | 91:19 94:25 | 56:3,8,18,23 |
| 86:9 87:13,14 | 21:10 100:4 | 101:12,24 | 57:11 69:17 |
| 91:23 93:22 | 107:4,5 | 107:22 110:2 | 89:20 113:9 |
| 99:22,23 | **telling**   107:3 | 125:10 | **throw**   68:18 |
| 100:19 101:4 | **ten**   72:9 | **thanks**   60:19 | **tier**   18:15 29:13 |
| 101:16 103:23 | **tender**   61:14 | 106:4 | 29:19 30:8,11 |
| 104:7,12,20 | **tenure**   100:18 | **theoretically** | 32:19 40:17,19 |
| 105:12 109:19 | **term**   58:24 | 37:7 | 40:23 74:10 |
| 109:20,22 | **terms**   11:9 | **thing**   60:13 | 75:7,13,23 |
| 110:11 114:11 | 65:12 66:21 | 62:11 68:17 | 76:4 77:21 |
| 115:5 116:14 | 70:12 87:11 | 88:16 | 95:20 96:20 |
| 119:14,18 | **testified**   6:14 | **things**   8:3 | 112:4,14,16,20 |
| 120:4 123:11 | 102:9 | 19:24 54:15 | 115:7,9 |

**[tiers - unfortunately]** Page 27

**tiers** 115:21
**till** 76:3
**tim** 5:18 6:18
  6:18 27:17
  61:24 63:3
  70:24 71:25
  74:22 81:10
  83:6 88:20
  96:5 105:19
  107:5 108:10
  120:13 123:17
**tim's** 66:5
  106:20
**time** 3:12 5:11
  6:24 7:5 8:2,11
  9:25 20:4 26:4
  29:25 35:2,3,6
  35:11,12,16
  36:5,9,17,23
  37:6 42:5 53:2
  53:7 59:10
  65:19 66:24
  75:15 77:9
  80:19 82:11
  90:10 95:19
  96:20,21 97:12
  97:14 98:2,2,3
  98:5,10,15,16
  102:2,15
  104:25 105:2
  105:12 108:6
  113:17 116:19
  116:23 117:14
  117:18,21

118:8 123:20
  125:11
**timeframe**
  21:14 22:4,6
  42:13,21,23
  43:3 101:19
**timely** 113:5
**times** 10:9 23:3
  34:25 82:14
  89:20 94:21
  96:23 117:8
  118:2
**timothy** 2:8
**title** 76:23 77:2
**titles** 64:5
**today** 10:9 11:2
  11:6 63:20
  69:25 81:6
**today's** 11:9,15
  12:24 13:8
  125:6
**together** 33:14
**tom** 1:9 4:21
  129:2
**top** 81:11,12
  82:8 105:5
  119:10,25
  122:4
**topic** 78:4
**topics** 65:12
  70:13
**total** 125:7
**totally** 71:3

**touch** 31:17
**transcribe** 8:8
**transcribing**
  7:25
**transcript**
  124:6 128:10
**transparency**
  64:8
**treasurer**
  104:14
**trial** 3:12
**tried** 38:18
  89:18,20
**troy** 2:16 6:4
  11:18,18 12:4
  12:16 66:11
  86:18,18 90:10
  105:22 106:9
  108:2
**true** 128:11
**truth** 10:6
  107:3,5
**truthfully** 11:6
**try** 9:7 91:19
  91:20
**trying** 57:25
  61:16 76:10
  107:23 108:5
  115:15
**turkey** 62:15
**turn** 35:23
  116:6
**turned** 19:21

**tv** 75:11
**two** 22:25 23:2
  23:3 24:5,13
  33:15 36:16,21
  57:15 79:22
  86:23 87:23
  110:7 120:10
  120:23
**two's** 41:16
**type** 13:23
  17:15,19 23:19
  51:21 54:21
  59:10,11,15
  69:19 79:13

**u**

**u** 3:2 44:10,10
  64:3
**unable** 26:19
  58:4
**unaware** 79:13
**under** 10:5
  16:15 98:13
**understand**
  7:18 10:11,22
  84:19 88:21,23
  88:24 89:14
**understood**
  7:22 10:14
  58:12
**unfortunate**
  62:6
**unfortunately**
  31:8

**[unit - watching]** Page 28

**unit** 4:17 33:7
  40:6,7 48:5
  51:19 54:23
  61:6 85:17
  88:2 98:14
  111:11 112:22
  113:2 121:16
  121:16 122:18
  122:25
**united** 1:2 4:22
**units** 32:12
  35:14 48:7
  85:7 110:17,18
  111:13 112:14
  125:8
**unrest** 40:19
**upset** 89:7,9
**usage** 21:3
  77:10,17 96:14
  99:23,24 101:4
  101:16
**use** 9:24 15:22
  21:12,18,20
  22:7 23:2,3,9
  23:25 24:3,8
  24:23 26:3,10
  34:23,24 35:17
  36:8,14 56:8
  65:9,13,18
  66:18 67:2,16
  73:11 79:14
  80:3 95:21
  96:19 97:9
  98:9,18,21

100:15 103:23
  104:12 111:20
  111:23 112:9
  112:11,16,19
  112:24 113:13
  113:16,18,25
  114:7,7,8,22
  115:10,25
  116:4,13,20,23
  116:24 117:5
  117:15,22
  118:11
**used** 36:11
  118:5 125:8
**using** 9:2 23:15
  23:17 37:20
  48:14 78:14
  79:7 84:15,20
  85:4 93:25
  94:4,18 105:11
  113:23 116:7
  117:3
**usually** 49:9
**utilize** 100:14
**utilizes** 111:12

**v**

**v** 5:25 44:10
  129:2
**vague** 41:12
**vaguely** 22:2
**various** 14:7
  18:10,13,13

**vary** 112:13
**vendor** 43:25
  44:15,16
  103:20,22
  104:6,11,14
**vendors** 22:21
  43:5,13,17,19
  44:5,8
**verbally** 8:7
**veritext** 5:2,4
  125:9 129:1
**versions** 70:3
**versus** 4:21
**victor** 5:25
**video** 4:14,18
**videographer**
  2:19 4:2 5:3
  6:6 25:2,6
  50:12,17 71:19
  91:6,10 109:2
  123:22 125:2
**videos** 17:18,19
  17:20
**videotaped**
  1:17
**violating** 113:6
**violations** 65:7
  65:16
**virtual** 7:19
**virtually** 4:8
**visiting** 88:5
**visits** 18:16
**visual** 75:7

**w**

**wacker** 2:6
**wait** 8:4 31:10
  35:23,25 68:24
  102:24
**waiting** 117:4
  118:10
**waived** 3:8
**want** 7:3 13:10
  15:24 22:3
  26:15 40:18
  41:15 56:6
  58:13 60:21
  62:12,19 64:23
  68:17 71:4
  80:22 85:21
  86:19 87:9
  88:6 89:25
  91:2,22 101:23
  105:24 106:18
  117:10
**wanted** 22:4
  63:11 64:8
  70:5 119:8
**wants** 48:6
  107:5
**warning** 36:16
  110:22
**washroom**
  75:11
**watched** 75:18
**watching** 75:9

**[way - zoom]**                                                          Page 29

| | | | **z** |
|---|---|---|---|
| **way** 48:15 52:7 52:7,14 56:8 56:18,23 57:6 57:11 58:15,23 59:18 90:21 105:25 113:9 128:16 | **witness's** 107:19 | **write** 49:19 121:6,7 | **zoom** 1:20 31:5 62:5 64:17,22 |

**way** 48:15 52:7
52:7,14 56:8
56:18,23 57:6
57:11 58:15,23
59:18 90:21
105:25 113:9
128:16
**ways** 22:15,25
23:2 100:12
**we've** 43:16
61:16 67:6
**week** 22:5 65:2
**welcome** 91:13
**went** 7:17
**west** 2:6
**whatnot** 9:25
78:11
**whereof** 128:18
**whoops** 28:4
**wish** 70:2 81:19
**witness** 1:17
4:12 6:3,8 7:13
11:12 13:15
15:13 20:21
63:6 66:2
77:19 81:24
86:20 91:14
99:21 101:5,8
101:15 105:25
106:25 108:7
108:22 118:25
123:25 126:3
127:16 128:8
128:12,18

**witness's** 107:19
**witnessed** 78:13
**wondering** 54:18 79:25
**word** 44:13 115:14
**work** 8:24 51:13,17 112:22 113:3
**workaround** 9:7
**worked** 76:7 78:17
**workers** 18:21 77:6
**working** 16:2 17:4 21:6 29:12 54:14 55:3 57:5 78:4 78:5,7,8 92:24 112:21 115:5 115:24,25
**works** 15:20 47:24
**worries** 8:25 43:12 72:2
**worrisome** 116:21
**wow** 105:17 106:6,25
**wrap** 91:20 101:24 107:24

**write** 49:19 121:6,7
**written** 46:13 67:19 88:17,18 96:12 103:18 104:18,23 105:3,10 110:10 111:2 111:14 114:17 114:20
**wrong** 28:6 58:24 71:3

**x**

**x** 1:5,14 126:2 126:7

**y**

**yeah** 25:12,13 28:2 50:9 57:25 62:2,17 62:17 63:8,13 68:12 71:8 73:23 81:19 120:16,19 123:18 124:7,9
**year** 15:6 22:2 22:18,20 45:14
**years** 16:4 17:4 18:4,6 21:8,9 22:12,14,22 78:7 108:10
**york** 1:3,22 6:13 128:5

**z**

**zoom** 1:20 31:5 62:5 64:17,22

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2)  Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.