Page 1

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

DONALD HENNEBERG,                    )
                                     )
                    Plaintiff,       )
                                     )
          vs                         )Case No. 19-cv-07380
                                     )
TOM DART, et al.,                    )
                                     )
                    Defendants.      )
--------------------------------)

The Video-Recorded Deposition of SUSAN SHEBEL, RN

Date:        Wednesday, February 14, 2024

Time:        9:57 a.m.

Place:       Morgan, Lewis & Bockius, LLP
             110 North Wacker Drive, Suite 2800
             Chicago, Illinois 60606

Called as a witness by the Plaintiff in accordance
with the Federal Rules of Civil Procedure for the
United States District Court, Northern District of
Illinois, pursuant to Notice.

Reported Stenographically by
Angela J. Galipeau, RPR, CSR-IL
Notary Public, State of Indiana
Job No. 6451922

Page 2

1   APPEARANCES:
2      MARIA E. DOUKAS, ESQ.
          Morgan, Lewis & Bockius, LLP
3          110 North Wacker Drive, Suite 2800
          Chicago, Illinois 60606
4          (312) 324-1000
          maria.doukas@morganlewis.com
5
          For the Plaintiff;
6
7      TROY S. RADUNSKY, ESQ.
       JASON E. DEVORE, ESQ.
8          DeVore Radunsky
          230 West Monroe Street, Suite 230
9          Chicago, Illinois 60606
          (312) 300-4479
10         tradunsky@devoreradunsky.com
          jdevore@devoreradunsky.com
11
          For the Defendants;
12
13     ALSO PRESENT
14        Milo Savich, Videographer.
15              *   *   *
16
17
18
19
20
21
22
23
24
25

Page 3

1              I N D E X
       THE VIDEO-RECORDED DEPOSITION OF SUSAN SHEBEL, RN

       DIRECT EXAMINATION
3        By Ms. Doukas............................. Page 5
4      CROSS-EXAMINATION
         By Mr. Radunsky........................... Page 56
5
       REDIRECT EXAMINATION
6        By Ms. Doukas............................. Page 60
7              *   *   *
8            E X H I B I T S
       NO.    DESCRIPTION              PAGE
9      Exhibit 1  Inmate Grievance Form, Bates 32-33    28
10     Exhibit 2  Inmate Grievance Form, Bates 40-41    33
11     Exhibit 3  Inmate Grievance Form, Bates 60-61    35
12     Exhibit 4  Inmate Grievance Form, Bates 68-70    40
13     Exhibit 5  Inmate Grievance Form, Bates 73-74    48
14     Exhibit 6  CCHHS Policy # G-17, Bates 369-370    53
15             *   *   *
16
17
18
19
20
21
22
23
24
25

Page 4

1          THE VIDEOGRAPHER:  Good morning.  We are going on
2      the record at 9:57 a.m. on February 14, 2024.  Please
3      note that the microphones are sensitive and may pick
4      up whispering and private conversations.  Please mute
5      your phones at this time.  Audio and video recording
6      will continue to take place unless all parties agree
7      to go off the record.
8          This is media unit number one of the
9      video-recorded deposition of Susan Shebel, RN, taken
10     by counsel for plaintiff in the matter of Donald
11     Henneberg versus Tom Dart, et al.
12         This case is filed in the United States District
13     Court for the Northern District of Illinois.  The
14     case number is 19-CV-07380.  The location of this
15     deposition is Morgan, Lewis & Bockius, LLP, 110 North
16     Wacker Drive, Suite 2800, Chicago, Illinois 60606.
17         My name is Milo Savich representing Veritext, and
18     I am the videographer.  The court reporter is Angela
19     Galipeau from the firm Veritext.  I am not authorized
20     to administer an oath.  I am not related to any party
21     in this action, nor am I financially interested in
22     the outcome.  If there are any objections to the
23     proceeding, please state them at the time of your
24     appearance.
25         Counsel and all present, including those

Page 5

1      participating remotely, will now please state their
2      appearances and affiliations for the record,
3      beginning with the noticing attorney.
4          MS. DOUKAS:  Maria Doukas from Morgan, Lewis &
5      Bockius on behalf of plaintiff.
6          MR. RADUNSKY:  Troy Radunsky and Jason DeVore on
7      behalf of the defendant, Susan Shebel.
8          THE VIDEOGRAPHER:  Would the court reporter
9      please swear in the witness, and we may then proceed.
10            SUSAN SHEBEL, RN
11     called as a witness by the Plaintiff, having first been
12     duly sworn, was examined and testified as follows:
13            DIRECT EXAMINATION
14     BY MS. DOUKAS:
15     Q.  Good morning.  Can you please state your name for the
16     record?
17     A.  Susan Shebel.
18     Q.  Ms. Shebel, have you ever been deposed before?
19     A.  Yes.
20     Q.  How many times?
21     A.  I don't have an exact number.
22     Q.  Could you approximate?
23     A.  Yes, probably two to three times a year for the last eight
24     years.  25 would be a guesstimate, estimate.
25     Q.  So since you've been deposed, you probably have a good

2 (Pages 2 - 5)

Page 6

1   understanding of the ground rules. I just want to quickly
2   go through them. You understand that you're under oath
3   here today?
4   A. Yes.
5   Q. And that means you have to answer my questions honestly
6   and truthfully. Do you understand that?
7   A. Yes.
8   Q. And if you don't understand one of my questions today,
9   will you please let me know?
10  A. Yes.
11  Q. And if you need a break at any point today, I can
12  accommodate that. I just ask that you answer any
13  questions that are pending. Is that okay?
14  A. I understand.
15      THE VIDEOGRAPHER: Counsel, your mike is -- if
16      you can put it on your other side because you're
17      facing that direction. You can just flip it. You
18      know how.
19      MS. DOUKAS: Did I not do that right? Sure I
20      know how to do that. It's been a while. I do a lot
21      of remote deps.
22      MR. RADUNSKY: I know.
23      MS. DOUKAS: So I don't do a lot of in-person
24      anymore.
25      MR. RADUNSKY: I'm with you.

Page 7

1       MS. DOUKAS: Okay. Thank you.
2       THE VIDEOGRAPHER: Sure.
3   BY MS. DOUKAS:
4   Q. Is there any reason you can think of as to why you might
5   not be able to give accurate answers to my questions
6   today?
7   A. No.
8   Q. You said you've been deposed about two to three times a
9   year for the last eight years. Were you a named defendant
10  in those depositions that you recall?
11  A. Yes.
12  Q. In all of those depositions, were you a named defendant?
13  A. Not all of them. Some I was just, like, a witness.
14  Q. Do you recall when you were a witness and not a named
15  defendant, if you were testifying on behalf of a certain
16  party in the litigation?
17  A. I wouldn't remember the case.
18  Q. Have you in these previous depositions ever testified on
19  behalf of Cook County Health Services?
20  A. I don't understand your question.
21  Q. Do you recall -- let's back up.
22      Where are you currently employed?
23  A. Cook County Health & Hospital System.
24  Q. And when did you become employed at Cook County Health &
25  Hospital Systems?

Page 8

1   A. June of 2012.
2   Q. And in cases that you have been deposed, but not a named
3   defendant, do you recall if a party to that litigation was
4   Cook County Health & Hospital Systems?
5   A. I don't know the answer to that question.
6   Q. That's fine. In cases that you've testified as a named
7   defendant, do you recall what type of claims were brought
8   against you?
9   A. Really, I don't. I do remember one about a medication.
10  Q. Can you tell me what you recall about that?
11  A. He just said he wasn't getting his medication.
12  Q. What's your current job title at Cook County?
13  A. Clinical performance improvement analyst.
14  Q. And have you had that job title since you were hired in
15  2012?
16  A. Yes.
17  Q. Generally, what are your roles and responsibilities?
18  A. I answer the grievances.
19  Q. Is that your only responsibility in that role?
20  A. I investigate to answer the grievances, yes.
21  Q. And when you say "the grievances," are you referring to
22  inmate grievances?
23  A. Correct.
24  Q. And are those inmate grievances coming from inmates housed
25  in Cook County Jail?

Page 9

1   A. Yes.
2   Q. And when you say you investigate to answer the grievances,
3   can you expand on that, please?
4   A. It would depend on -- every grievance is so different.
5   Could you re-ask that? I guess I don't understand the
6   question.
7   Q. Sure. Did you have a meaning when you said you
8   investigate to answer grievances?
9   A. Yes, I check into whatever -- for lack of a word, to help
10  find the answer to their question or concern.
11  Q. We'll come back to the grievance process. But just in
12  terms of your responsibilities with clinic performance
13  improver analyst, have your roles changed at all since you
14  were hired in 2012 to the present?
15  A. Yes.
16  Q. How have they changed?
17  A. When I initially started, I was doing audits, nursing
18  audits.
19  Q. And can you explain what you mean by doing nursing audits?
20  A. Devising audits from the policies, like medication, room
21  audits, operations. Medication, room, operations. What
22  would be another one? Medications. It's quite a big
23  place. What other audits have I done? Intake, and that's
24  all that I can --
25  Q. And when you say you've done audits, let's take as an

3 (Pages 6 - 9)

Page 10

1    example intake. What do you mean audits of intake?
2  A.  I would take a look at the intake policy and see each step
3    that is taken in intake and write -- to see that each step
4    was taken and go over a chart and check that. And then
5    you come up with -- you grab so many charts and kind of
6    get a statistic for improvement.
7  Q.  And "intake" is referring to intake of inmates into Cook
8    County Jail; is that correct?
9  A.  That's correct.
10  Q.  And when you were doing this audit, is it fair to say you
11    were provided inmates -- a number of inmate intake forms
12    to review as part of the audit process?
13  A.  The electronic chart.
14  Q.  So in 2012, the intake forms were electronic charts. Is
15    that what you're saying?
16  A.  I believe so.
17  Q.  Okay. And I just want to understand -- and we can use the
18    intake audit as the example -- were you trying to improve
19    questions that were being asked on the intake form?
20  A.  No. I was checking to make sure that the different parts
21    of the policy were being met.
22  Q.  What policy are you referring to?
23  A.  The intake policy.
24  Q.  And is there a printout of the intake policy that Cook
25    County maintains?

Page 11

1  A.  A printout -- I believe that they can print it out, but
2    it's electronic.
3  Q.  Okay. And where would this electronic intake policy be
4    kept; do you know?
5  A.  It would be on the intranet.
6  Q.  And is this the intranet of Cook County?
7  A.  Correct, Cermak.
8        MR. RADUNSKY: We produced it.
9        MS. DOUKAS: Okay. Thank you.
10        MR. RADUNSKY: I just can't remember the Bates,
11    but we looked at it last week with Brent.
12  BY MS. DOUKAS:
13  Q.  Okay. And you mentioned Cermak. What is the relationship
14    between Cermak and Cook County Health Services?
15  A.  Cermak is the jail. It is the -- I want to use the word
16    "hospital." It's not really a hospital, but it's the
17    medical administration, and then there's the infirmary.
18  Q.  Okay. So is Cermak the medical administration for the
19    inmates in Cook County --
20  A.  Correct.
21  Q.  -- Jail?
22        MR. RADUNSKY: Hold on. Let her finish her
23    question.
24        THE WITNESS: I'm sorry.
25        MR. RADUNSKY: Oh, no. You're doing good.

Page 12

1        Maria, can you say it again, please?
2  BY MS. DOUKAS:
3  Q.  Yeah. Is Cermak the medical administration for inmates
4    housed in Cook County Jail?
5  A.  Correct.
6  Q.  And are you employed by Cermak?
7  A.  By Cook County Health & Hospital Systems at Cermak.
8  Q.  Thank you. And you mentioned an intranet. What
9    organizations is this intranet for?
10  A.  Cook County Health & Hospital Systems.
11  Q.  Does that -- can Cermak employees access that intranet?
12  A.  Yes.
13  Q.  In 2012, when you were hired, why were you doing audits of
14    these various programs, like the intake?
15  A.  It was a good place to start.
16  Q.  Were you --
17  A.  I was a -- yeah. The director of nursing would direct me as
18    to what audits she would like created.
19  Q.  Do you know why the director of nursing was having you
20    create various audits in 2012?
21  A.  No.
22  Q.  Were you aware of certain compliance issues that had been
23    raised by the Department of Justice in Cook County Health
24    Services in 2012 when you were hired?
25  A.  I was aware, yes.

Page 13

1  Q.  What was your -- what do you recall about knowing about
2    those compliance issues?
3  A.  I don't understand the question.
4  Q.  Okay. Do you have any recollection of what noncompliance
5    issues were in effect at that time?
6  A.  Health service request forms.
7  Q.  And what was noncompliant about health service request
8    forms?
9  A.  They were seen timely or -- that's what I recall, or
10    completed.
11  Q.  And just to clarify -- and we're in 2012. Was the issue
12    that there was no timely response to the health service
13    request forms?
14  A.  Yes.
15  Q.  Were changes made by Cook County Health Services to
16    address this untimeliness of health service request forms?
17  A.  That would have been up to the director of nursing to
18    manage that.
19  Q.  Did you report to the director of nursing?
20  A.  I did.
21  Q.  Did she ever direct you to address problems with the
22    health service request forms in the 2012 timeframe?
23  A.  For me to address the problems, no.
24  Q.  Okay. Do you have an understanding if improvements have
25    been made since 2012 to how quickly health service request

4 (Pages 10 - 13)

Page 14

1 forms are addressed?

2 A. I don't have the percentages.

3 Q. Do you know if statistics are kept starting in 2012 to

4 present about how quickly patients are seen? And let me

5 strike that. That's a bad question. Let me rephrase.

6 You said that you don't have the percentages. Do you

7 know if there are any percentages kept by someone or

8 somewhere in Cook County Health Services trying to address

9 these health service request form issues?

10 A. That would be the director of nursing in the nursing

11 department, and I'm in the grievance department now.

12 Q. Were you in the nursing department when you were first

13 hired?

14 A. Yes.

15 Q. And when you were first hired while you were -- until you

16 left the nursing department, did you see records of any

17 statistics being kept regarding the addressing of these

18 health service request forms?

19 A. Could you re-ask the question?

20 Q. Yes. How long were you in the nursing department? Let's

21 start there.

22 A. I left and moved to grievances in -- I believe it was May

23 of 2015.

24 Q. Okay. And is it fair, from 2012, when you were hired,

25 through 2015, when you left the nursing department, you

Page 15

1 were trying to address -- strike that.

2 Are you aware from 2012 to 2015 if steps were taken

3 by Cook County Health Services to address issues with

4 health service request forms?

5 A. That would be the director of nursing that would have

6 handled that.

7 Q. Okay. Do you recall who the director of nursing was at

8 the time?

9 A. Cynthia Kienlen.

10 Q. Do you know how to spell her last name?

11 A. K-i-e-n-l-e-n, to the best of my knowledge.

12 Q. Is she still the director of nursing today?

13 A. No.

14 Q. Do you know who the director of nursing is today?

15 A. Williamson, Williams. Or she could be the assistant.

16 Q. So while you were in the nursing department from 2012 to

17 around, you said, May of 2015, did you have any other

18 roles besides performing audits?

19 A. Yes, I did.

20 Q. What other roles did you have?

21 A. I would assist with bed control. I received the division

22 report from the nurses for the next shift.

23 Q. What do you mean by "bed control"?

24 A. To ensure that detainees are in the correct bed for

25 medical or mental health conditions.

Page 16

1 Q. So at this time, were you seeing inmates at Cook County

2 Jail?

3 A. No.

4 Q. Where were the beds that you had to make sure they were in

5 the proper bed at? Was it at Cook County Jail, those

6 beds?

7 A. Yes.

8 Q. Okay. During this time, did you have any health

9 appointments with inmates as a practicing nurse?

10 A. No.

11 Q. Okay. Did you have any occasion to fill out a health

12 service request form on behalf of any inmates during this

13 time?

14 A. No.

15 Q. Do you know if a health service request form is filled

16 out, what happens to it next? Where does it go? Sort of

17 what's the process?

18 A. No, I don't know the exact process because I'm not

19 involved in that.

20 Q. Okay. During your time, say in the nursing department,

21 had you heard of any complaints that inmates were not

22 getting medical appointments they had requested?

23 A. Could you re-ask that question?

24 Q. And I know this is a while ago I'm asking. So I'm trying

25 to be as specific as possible.

Page 17

1 In the 2012, 2015 timeframe, while you were in the

2 nursing department, had you heard any complaints from

3 inmates or coworkers about timeliness of medical

4 appointments?

5 A. I didn't do the health service request forms. So I

6 wouldn't have known.

7 Q. I think you said around May of 2015, you moved over to

8 grievances; is that correct?

9 A. Approximately, yeah.

10 Q. And in terms of your role in the grievances department,

11 can you explain what you were tasked with doing?

12 A. The DOC would bring over the grievances. They'd code them

13 according to their coding system. And we have, like, a

14 transfer sheet. They write the -- my mind just went

15 blank.

16 Q. That's okay.

17 A. It's not the DOC number. It's the control number. Each

18 grievance has its own control number. So that's listed on

19 this transfer sheet. DOC is bringing it over. And then

20 we -- I would check to make sure that that is what I am

21 receiving.

22 At the same time, I'm giving to the DOC the

23 grievances that have been completed, either by me, which

24 would be nursing, medical, or mental health or dental

25 grievances. They go back to the Department of

1 Corrections, and they would do the same thing with the
2 check-off sheet to make sure that they're receiving --
3 that I'm giving them what they're receiving.
4 Q. And just to -- "DOC" is Department of Corrections?
5 A. Yes.
6 Q. Just want to for clarity of the record.
7 So I want to take it step by step. You said first
8 that the DOC brings over the grievances. Are these paper
9 copies that they're bringing over?
10 A. Correct.
11 Q. At any point between 2015, when you joined the grievance
12 department, and present, have these grievances been sent
13 electronically?
14 A. No.
15 Q. Even today, are they --
16 A. Paper.
17 Q. Still paper?
18 A. Paper.
19 Q. And when the DOC brings the grievances over, are they
20 already coded?
21 A. Correct.
22 Q. And when you say "coded," can you just explain what you
23 mean by that?
24 A. They have a system of coding so that it helps them to
25 determine where the grievances would go. Some would

1 belong to the DOC. Some would belong to medical. Like a
2 mental health issue, it would be coded 210. I don't have
3 all the codes memorized, but -- so dentist would be 50 --
4 05. So that's how they code them. That's their system.
5 Q. Do you know if there's a specific code for vision or
6 eyeglasses?
7 A. It was under medical.
8 Q. And when you say "under medical," is it under the general
9 medical?
10 A. Yes.
11 Q. Do you know what code that is?
12 A. I would say it's 200.
13 MR. RADUNSKY: I think we actually just the other
14 day produced the codes. Yeah, we did, because I
15 wasn't familiar with it either when I was looking
16 through the documents. We produced the codes, yeah.
17 MS. DOUKAS: Okay.
18 A. DOC did come up with some different -- some new codes.
19 They wanted to be more definitive because so much fell
20 into medical.
21 Q. Got it.
22 A. So --
23 Q. Okay. And who is -- at what -- okay. Back up.
24 An inmate fills out the form. Do you know what
25 happens after the inmate fills out the form, where it

1 goes?
2 MR. RADUNSKY: Are you talking about the health
3 services request form or a grievance?
4 MS. DOUKAS: I'm sorry. A grievance form.
5 (Crosstalk.)
6 (Reporter interruption.)
7 BY MS. DOUKAS:
8 Q. Yeah. Let me start over. Let me ask a better question.
9 Do you happen to know if an inmate fills out an
10 inmate grievance form, where it goes next?
11 A. It goes to the DOC, either an officer or they have a box.
12 But I don't know exactly their process.
13 Q. When you say "it goes to the DOC," is that at Cook County
14 Jail?
15 A. Yes.
16 Q. And then, do you know, is the coding done by employees at
17 Cook County Jail?
18 A. Yes.
19 Q. And then in terms of grievances getting to you, are they
20 brought over to Cook County Health Services, a different
21 building than Cook County Jail?
22 A. They're brought to my office.
23 Q. And where is your office located?
24 A. It's in the administration building, Cermak.
25 Q. And is that separate from Cook County Jail?

1 A. There's so many buildings.
2 Q. Okay.
3 A. But it's part of --
4 Q. Okay. I'm not familiar. So I apologize for the dumb
5 questions.
6 A. Come take a tour some time.
7 Q. Okay. So then are only medically coded grievances brought
8 to your office?
9 A. Medical, mental health, dental, yeah.
10 Q. Okay. And can you estimate about how many grievances you
11 may receive in any given day?
12 A. It varies. It can be from zero to -- I've gotten as many
13 as 80 in one day, but that's been a while.
14 Q. Okay. And would you say the zero to 80, that broad range
15 has been pretty constant from 2015 to present?
16 A. No. I would say that they've gone down.
17 Q. When would you say, if you can, approximately what year
18 did they start going down?
19 A. It's kind of a downward trend. And it depends on also
20 that they have the bail thing where -- we have fewer
21 inmates because they can bail out.
22 Q. Okay.
23 A. The last few years.
24 Q. Okay. So you're just kind of walking through the process.
25 The DOC brings over the medical, mental health, dental

Page 22

1 grievances, and a transfer sheet is filled out; is that
2 what you had said before?
3 A. Yeah, they have it filled out before -- mine is filled
4 out. We're ready to go and transfer and check off the
5 boxes.
6 Q. And then after you receive these grievances, what do you
7 do with them?
8 A. First thing I do I date stamp them.
9 My foot is caught on something.
10 MR. RADUNSKY: I'm sorry. What did you say?
11 THE WITNESS: My foot is caught on something.
12 A. I date stamp them.
13 Q. And do you date stamp them on the day that you receive
14 them?
15 A. Yes.
16 Q. Then what do you do next?
17 A. Then I go through the grievances to look at the codes,
18 see -- if it's dental, then it needs to go to the dental
19 department. And then mental health, it goes to the mental
20 health department. And then the rest I keep in my office.
21 Q. And for that rest that you keep in your office, what do
22 you do with them next?
23 A. Then I put them by date due.
24 Q. Is there a certain period of time by which you're required
25 to respond to an inmate grievance?

Page 23

1 A. 15 days, 15 calendar days.
2 Q. Okay. And then after you put them by date due, what do
3 you do next?
4 A. Well, I would deliver those grievances, the mental health
5 grievances. Dental comes in and picks up theirs. Then I
6 would take -- say it's Tuesday. I take out Tuesday's
7 grievances, and then I --
8 Q. So when you say "Tuesday's grievances," are those the ones
9 that are due on Tuesday?
10 A. Getting due, yeah. I like to have them done before
11 they're due, ideally.
12 Q. And then do you review and respond to the grievance form?
13 A. Correct.
14 Q. Okay. And is your response for all the grievance forms
15 handwritten?
16 A. Yes.
17 Q. After you write your response, do you scan a copy of the
18 responded grievance form for your own records?
19 A. No.
20 Q. What do you do with the inmate grievance forms after
21 you've filled out your response?
22 A. After I've completed them, then I set them aside because
23 then they're going to be logged onto the sheet, the
24 transfer sheet for the next day when the DOC comes to pick
25 them up and deliver new grievances to me.

Page 24

1 Q. So that next day, the DOC picks up the completed grievance
2 forms and delivers any new grievance forms; is that
3 correct?
4 A. They bring me the new grievance forms that they have
5 processed.
6 Q. On that transfer sheet, what type of information is
7 logged?
8 A. I've done it again. It's not the DOC number. It's the --
9 I don't know why I have --
10 MR. RADUNSKY: Control number?
11 A. Thank you. It's the control number. Each grievance has a
12 control number.
13 Q. And is the control number different than the code that's
14 associated with the grievance form?
15 A. Yes, they're unrelated.
16 MR. RADUNSKY: Yes. Good explanation.
17 BY MS. DOUKAS:
18 Q. Okay. And then do you know what the DOC does with the
19 inmate grievance forms after you've responded and they
20 take them back?
21 A. No. They would process them and -- but I don't know
22 because I don't work for the DOC.
23 Q. Okay. Do you keep any records of your completed inmate
24 grievance forms with your responses?
25 A. No.

Page 25

1 Q. If you get an inmate grievance form requesting a medical
2 appointment, is it your role to schedule the appointment
3 for that inmate?
4 A. No.
5 Q. Who schedules the appointment?
6 A. The schedulers.
7 Q. And how do the schedulers learn they need to schedule an
8 appointment?
9 MR. RADUNSKY: Of course it's the schedulers.
10 A. So the provider or the nurse in the dispensary that does
11 the health service request form deems that they need to
12 see the provider, or the provider writes an order. But
13 there's an order. And it would be in Power Orders, and
14 that's from -- that's as far as I know as far as the
15 scheduling. I don't have access to the program or any
16 part of it.
17 Q. Okay. Do you have access to -- let's say you get an
18 inmate grievance form from a specific inmate. Do you
19 access to that inmate's medical record when you're
20 responding?
21 A. Yes.
22 Q. Do you have access to the schedule to see if any
23 appointments have been scheduled?
24 A. That particular inmate's schedule, yes.
25 Q. But you personally are not responsible for doing any

7 (Pages 22 - 25)

Page 26

1 scheduling of the inmate's appointments; is that correct?
2 A. That's correct.
3 Q. Do you have occasion to contact the scheduler and kind of
4 follow up if an inmate has complaints about not having
5 appointments, or that's not really your role?
6 A. Could you --
7 Q. Yeah, let me rephrase --
8 A. -- rephrase?
9 Q. Let's say an inmate complains a number of times about not
10 receiving an appointment. Is it at all your role to make
11 sure that the scheduler is making that appointment for the
12 inmate?
13 A. No, that's not my role.
14 Q. Okay. So is it fair to say your role is just providing a
15 response on that form?
16 A. I may ask the scheduler, but it's not my role to tell them
17 when to schedule or --
18 Q. Okay.
19 A. So.
20 Q. Do you know if there's any -- strike that. Let me start
21 over.
22    Just to make sure I understand, everything is still
23 in paper form, even today, with the inmate grievance
24 forms?
25 A. That's correct.

Page 27

1 Q. Okay. Is there an electronic database allowing sort of
2 communication between you receiving a grievance and
3 whoever is dispensing medical care to the inmates at Cook
4 County Jail?
5    MR. RADUNSKY: Object to the form of the
6    question. I'm not sure I understand. You can answer
7    if you understand.
8 A. I don't.
9 Q. Is there any sort of -- let me see. Because I'm trying to
10 understand. You get paper forms of inmate grievance
11 forms. Are any medical records kept electronically for
12 the inmates?
13 A. Yes. He's got an electronic medical record.
14 Q. Okay. And how -- if an inmate submits a grievance form,
15 it goes to you. Do they then have to go back to -- do you
16 know, do they have to go back to see a medical provider at
17 Cook County Jail to keep asking for help? I'm trying to
18 understand, I guess, the process from a response to an
19 inmate grievance form to the inmate actually getting
20 medical care over at Cook County Jail. And perhaps --
21 maybe -- let's just put some -- we'll just start. We'll put
22 some examples.
23 A. Okay.
24    MR. RADUNSKY: Yeah, use some hypotheticals or
25    something. We can maybe break it down, yeah.

Page 28

1    MS. DOUKAS: So let's mark as Exhibit 1 --
2    MR. RADUNSKY: Two-sided paper.
3    MS. DOUKAS: I'm trying to conserve trees
4    somewhat.
5    (Exhibit 1 marked for identification.)
6 BY MS. DOUKAS:
7 Q. So we've marked as Exhibit 1 what has Bates numbers CCSAO
8 Henneberg 32 and 33. You can take a look through it.
9 Have you seen this document before?
10 A. Yes.
11 Q. Okay. And you see at the top, there's a control number.
12 Is this the control number you were referring to before?
13 A. Yes.
14 Q. And what is -- do you know what this control number is
15 used for besides being put on the intake form? Is there
16 any purpose to it?
17 A. It identifies -- this grievance, also, it would show me
18 that it's 2019; 584 grievances so far of that year.
19 Q. Okay.
20    MR. RADUNSKY: Okay. That's interesting.
21 BY MS. DOUKAS:
22 Q. And then the inmate ID is specific to the particular
23 inmate; is that correct?
24 A. Correct.
25 Q. And you see that this particular grievance form is for

Page 29

1 Donald Henneberg, right?
2 A. Correct.
3 Q. And it's dated January 8, 2019, right?
4    MR. RADUNSKY: Yeah. She's --
5 BY MS. DOUKAS:
6 Q. Up top. Sorry. So you can read on the Bates 32,
7 Mr. Henneberg says, "I have not been able to see eye
8 doctor," and the copy is very bad. "My eyes have been
9 getting worse with blurred vision and have been wanting to
10 work but can't see." Do you see that?
11 A. I do.
12 Q. So you would have received this as a part of your role?
13 A. Correct.
14 Q. And if you flip over, in Bates ending 33, is that your
15 name and your signature under the "Response by Personnel"?
16 A. It is.
17 Q. Okay. And can you read what your response is? I had a
18 hard time reading it exactly.
19 A. "You have an order and will be scheduled. You may refer
20 to the inmate handbook related to vision care for further
21 information."
22 Q. And you say you "will be scheduled." Did you contact the
23 scheduler to affect that scheduling here? Do you recall?
24 A. I wouldn't recall. It's been so long ago.
25 Q. So is it typical when you respond not to note a date or an

8 (Pages 26 - 29)

Page 30

1  appointment date that the inmate would have been scheduled
2  if they are requesting an appointment?
3  A. They're not supposed to know appointment dates because of
4  security reasons.
5  Q. Okay. Can you explain why? Just what security is
6  concerning there?
7  A. Movement. They could -- lots of things can happen if
8  different people know you're going to be at a certain
9  place at a certain time.
10  Q. Okay. So it's standard practice not to note the exact
11  appointment date --
12  A. That's correct.
13  Q. -- is that correct?
14      Okay. When do inmates get informed that they are
15  going to go to an appointment?
16  A. When they're being taken.
17  Q. The actual day of the appointment?
18  A. It would depend upon the circumstance.
19  Q. Okay.
20  A. Some appointments may require a prep. So obviously
21  they're going to know that they're going.
22  Q. And do you know, after this inmate grievance form had been
23  sent back to Mr. Henneberg, could he follow -- is there
24  someone at Cook County Jail he could follow up with to
25  ensure the appointment was scheduled?

Page 31

1  A. Well, he didn't appeal.
2      (Reporter interruption.)
3  A. Did not.
4  Q. Would providing this response necessarily result in an
5  appointment being scheduled for Mr. Henneberg?
6  A. He has an order, and that's what the schedules go by, is
7  orders.
8  Q. And how would you have known that he had an order? Is
9  that on the database, the electronic database?
10  A. That would be in the medical record under his orders,
11  specifically him.
12  Q. Okay.
13  A. It would either be from a provider or from a nurse from
14  health service, you know, in the dispensary.
15  Q. Okay. And then your response also refers to the inmate
16  handbook. Was there something in particular you were
17  referring to in the handbook?
18  A. The vision care. It was lengthy. So I wanted him to have
19  access to all the information regarding vision care. So
20  that was how I worded it so that he could go to the
21  handbook and see his options.
22  Q. And the handbook, inmates aren't allowed to have metal
23  frames; is that correct?
24  A. That's correct.
25  Q. The lenses and the frames have to both be plastic; is that

Page 32

1  right?
2  A. Correct.
3  Q. So if an inmate had metal on their glasses, their personal
4  glasses, they wouldn't be able to use them in the Cook
5  County Jail; is that correct?
6  A. That's correct.
7  Q. And it's fair to say that when a person orders a new pair
8  of glasses, they need a prescription for the lenses in the
9  glasses; is that right?
10      MR. RADUNSKY: Just objection. I think it may
11      call for an expert opinion because she's not an
12      optometrist. But if you know, you can answer.
13  A. Readers. You can order readers.
14  Q. If we're talking about -- and, again, that's soliciting
15  expert opinion. Maybe asking as a layperson, someone that
16  wears glasses as well, if you want to order a new pair of
17  glasses, if you're nearsighted or farsighted, you
18  typically have a prescription, correct?
19  A. That's correct. I have a prescription.
20  Q. Do you know if prescriptions are indefinite and don't
21  expire?
22      MR. RADUNSKY: Same objection. I think it calls
23      for an expert opinion. Subject to that, you can
24      answer.
25  A. No, I don't.

Page 33

1  Q. Okay. I'll mark as Exhibit 2 Bates ending 40 to 41.
2      (Exhibit 2 marked for identification.)
3  Q. Have you seen this document before?
4  A. Yes, I have.
5  Q. And, again, if we look up top, we see Donald Henneberg's
6  name. Do you see that?
7  A. Yes.
8  Q. And the date on this one is February 19, 2019, at the top.
9  Do you see that?
10  A. Yes.
11  Q. So this is about a month after what we just looked at as
12  Exhibit 1, correct?
13      MR. RADUNSKY: Just for the record, it's Bates 40
14      and 41.
15  BY MS. DOUKAS:
16  Q. It's about a month?
17  A. Approximately, yes.
18  Q. Okay. And do you see Mr. Henneberg's grievance? He says,
19  "Again, I have been trying to see eye doctor for over
20  three months now. I never signed refusal or anything.
21  Don't know why I haven't been able to see the doctor, and
22  now my eyes have been getting worse. I can't read any
23  signs or follow directions when told where to go because I
24  can't see the writing."
25      You would have read this in responding to the

9 (Pages 30 - 33)

Page 34

1 grievance form, correct?
2 A. Correct.
3 Q. And if you look at the back, is that your signature and
4 response --
5 A. It is.
6 Q. -- on Bates ending 41? Can you please read what your
7 response was back to Mr. Henneberg?
8 A. "You are scheduled for an appointment. Refer to inmate
9 handbook regarding vision care for further information."
10 Q. So after a month, Mr. Henneberg still had not seen an eye
11 doctor, correct?
12 A. He's scheduled.
13 Q. In your experience, is it typical to take more than a
14 month to be able to see an eye doctor and correct vision
15 problems?
16 A. Are you asking for me personally?
17 Q. Sorry. Let me rephrase. In your experience working at
18 Cook County Health Services, is it your experience that
19 inmates typically have to wait longer than a month to
20 receive vision care?
21 A. I don't have a lot of knowledge about that regarding their
22 schedule.
23 Q. Sorry. Do you know of anyone that would have knowledge
24 about sort of the duration between requesting an
25 appointment and obtaining an appointment?

Page 35

1 A. Perhaps a scheduler would be a guesstimate.
2 Q. Do you know if the scheduler keeps appointments --
3 requests and appointment schedules electronically?
4 A. They work on the computer. I don't know their process or
5 their program or anything.
6 Q. Who does the scheduler work for?
7 A. Cook County.
8 Q. Is it Cook County --
9 A. Cermak.
10 Q. Cermak. Okay. And, again, with your response, you
11 referred Mr. Henneberg to the same inmate handbook.
12 A. Correct.
13 Q. Okay. So when you would have sent this back to
14 Mr. Henneberg -- sorry. Strike that. When you filled out
15 the inmate grievance response, it goes back to DOC. Do
16 you recall if you followed up with Mr. Henneberg while he
17 was -- actually, strike that. Strike that question.
18     Let's mark as Exhibit 3 a document bearing Bates 60
19 and 61.
20     (Exhibit 3 marked for identification.)
21 Q. Okay. And have you seen this document before?
22 A. I have.
23 Q. And, again, the Bates ending 60, you see at the top it's
24 Donald Henneberg is the inmate?
25 A. Yes.

Page 36

1 Q. And this is his grievance form dated May 15, 2019?
2 A. Yes.
3 Q. And, again, if you look at the description on Bates ending
4 60, Mr. Henneberg says, "I have been putting in medical
5 slips for the past six months to see the eye doctor and
6 still haven't been able to see anyone. And because of
7 this, my eyes have only gotten worse." You would have
8 read this when you received this response, correct?
9 A. Yes.
10 Q. Do you know what he means by, "I've been putting in" --
11 strike that.
12     Where would an inmate put in medical slips to receive
13 treatment?
14 A. There would be a health service request form.
15 Q. Has it been your experience receiving inmate grievances,
16 is it typical for inmates to complain -- to be waiting six
17 months for an appointment to see a specialist?
18 A. Not that I recall.
19 Q. You'd agree six months is a long time to wait to correct
20 your vision, isn't it?
21 A. I don't really know their length of time, their patient
22 load or --
23 Q. So do you know in terms of optometrists or
24 ophthalmologists, are those off-site doctors that inmates
25 have to go visit to get treated for any vision problems?

Page 37

1 A. No. There are -- there's Stroger, but then there's an
2 optometry clinic at Cermak.
3 Q. So there is an optometry clinic at Cermak?
4 A. Correct.
5 Q. And is that where inmates go to get their eyes checked to
6 get a prescription if they need it for eyeglasses?
7 A. Correct.
8 Q. And since I have not taken a tour, is that optometry
9 clinic in a building within the Cook County Jail where
10 inmates --
11 A. Correct, yes.
12 Q. So they don't have to be bussed off site in order to go
13 visit an optometrist; is that correct?
14 A. Correct.
15 Q. Do you know how many optometrists work at the optometry
16 clinic?
17 A. No.
18 Q. Do you know how often optometry appointments are held?
19 A. I don't know their schedule.
20     MR. RADUNSKY: Let's take a little break. I can
21 tell she's getting a little tired.
22     THE VIDEOGRAPHER: We're taking a break?
23     MS. DOUKAS: Yes, we can go off record.
24     THE VIDEOGRAPHER: The time is 10:51 a.m. This
25 is the end of media unit one, and we're going off the

10 (Pages 34 - 37)

Page 38

1    video record.
2        (Recess taken.)
3        THE VIDEOGRAPHER:  The time is 11:01.  This is
4    the beginning of media unit two, and we're back on
5    the video record.
6  BY MS. DOUKAS:
7  Q.  So we went on break.  I think we were talking about that
8    there was an optometry clinic in Cook County Jail, right?
9  A.  Correct.
10 Q.  And schedulers would be -- the scheduler you had
11   referenced before would be responsible for scheduling an
12   inmate to go see an optometrist there; is that right?
13 A.  Yes.
14 Q.  And you don't know how many optometrists are on staff at
15   any given time with the clinic; is that right?
16 A.  I know of one.  But no, that is correct.
17 Q.  And you said you know of one.  Do you know if that's a
18   full-time optometrist on staff?
19 A.  I don't.
20 Q.  Okay.  And if we go back to -- I believe it's Exhibit 3,
21   the Bates ending 60.
22       MR. RADUNSKY:  You got it right here, Susan.
23       You're right.
24 A.  Okay.
25 Q.  If you look again, Mr. Henneberg says he's been putting in

Page 39

1    medical slips for the past six months.  When you read
2    that, did you take any steps to check when his -- to check
3    that he could get in sooner for an eye appointment?
4  A.  I don't recall, but that would be something that I would
5    do typically.
6  Q.  And what would you do?  Would you contact the scheduler?
7  A.  Yes.
8  Q.  And typically, would you ask the scheduler to try to
9    expedite when the appointment would occur?
10 A.  Yes.  Can you bump him up?
11 Q.  And when you do that, is the scheduler typically, in your
12   experience, able to bump up the appointment?
13 A.  I haven't done it often.  If I ask them and they can, they
14   do.
15 Q.  Do you recall if you asked that specifically for
16   Mr. Henneberg when you read this?
17 A.  No, I don't.  Just that would be my practice, would be --
18 Q.  I mean, you'd agree -- I think I asked this before.  You
19   agree six months with him saying he still can't see and
20   his eyes have gotten worse would be a medical concern that
21   should be taken seriously, right?
22 A.  Yes, I do.
23 Q.  You can put that one to the side.  Let's mark as Exhibit 4
24   what's bearing Bates 68 and 69.  I'm sorry, 68 to 70.
25   Apologies.

Page 40

1        (Exhibit 4 marked for identification.)
2  Q.  Okay.  Have you seen this document before?
3  A.  Yes.
4  Q.  Okay.  And if we start on the first page bearing Bates 68,
5    you see at the top again this is Donald Henneberg?
6  A.  Yes.
7  Q.  And the date of his inmate grievance is dated June 30,
8    2019.  Do you see that?
9  A.  Yes.
10 Q.  And this is about a little over a month after what we
11   looked at as Exhibit 3 in his previous inmate grievance,
12   correct?
13 A.  Yes.
14 Q.  Okay.  And staying on Bates 68, Mr. Henneberg says, "I
15   have been trying to see an eye doctor for eight months
16   now, and I still have not been able to see one, and my
17   eyes are just getting worse now."  You would have read
18   that when you received this inmate grievance form,
19   correct?
20 A.  Correct.
21 Q.  Do you recall if you called anybody to try to see what was
22   going on about his eye doctor appointment?
23 A.  I wouldn't recall.  It's been years.  But that would have
24   been something that I would have done.  That would have
25   been my practice.

Page 41

1  Q.  And who would you have called?
2  A.  The scheduler.
3  Q.  And what would you have asked the scheduler to do?
4  A.  If they can get him scheduled sooner.
5  Q.  If we skip ahead to Bates ending 70, it's the last page
6    there.  Do you see there's a "Response by Personnel
7    Handling Referral," and that's your signature there,
8    correct?
9  A.  Yes.
10 Q.  Okay.  And you state, "Appointment for optometry scheduled
11   in October," right?
12 A.  Yes.
13 Q.  And going back to this, the date of this grievance is
14   June 30, 2019, right?
15 A.  Yes.
16 Q.  So you're telling Mr. Henneberg that his optometry
17   appointment is four months out, right?
18 A.  Uh-huh.
19 Q.  And this is after he's told you that he's been waiting to
20   see an eye doctor for eight months, correct?
21 A.  Correct.
22 Q.  You'd agree waiting what would now be about a year to see
23   an eye doctor is a long time to --
24 A.  Yes.
25 Q.  -- to correct vision?

11 (Pages 38 - 41)

Page 42

1  Do you know why it would have taken them till October
2  to schedule an eye appointment?
3  A. I do not.
4  Q. Did you try and contact scheduling to bump it up earlier
5  than October?
6  A. That would have been something that I would have done, but
7  I don't remember this person or the -- okay.
8  Q. Okay. When you contact scheduling, is that via phone or
9  e-mail?
10 A. Or in person.
11 Q. Do you ever send e-mails to scheduling?
12 A. I don't. I didn't then. I do now.
13 Q. When did you start sending e-mails?
14 A. A couple years ago; two, three years. I'll say two.
15 Q. Why did you start sending e-mails?
16 A. Easier to reach the scheduling. I believe the one
17 scheduler works a different shift than me, and it's just
18 easier.
19 Q. Do you keep a log of every contact you made with the
20 schedulers if it was in person?
21 A. No.
22 Q. Do you keep a log of the contacts you would have made with
23 the schedulers over the phone?
24 A. No.
25 Q. Do you know if the schedulers keep a record of reach-outs

Page 43

1  you've made to them regarding patient scheduling?
2  A. I do not.
3  Q. Do you know if Mr. Henneberg had any other options to see
4  an eye doctor? Strike that.
5  Do you know if Mr. Henneberg had any other avenues
6  forward to see an eye doctor sooner than October?
7  A. I had referred him to the inmate handbook of other options
8  to get glasses. He could go through the CRW that could
9  contact his family, or he could contact his family who
10 could contact the eye doctor, get the prescription.
11 Perhaps he could order them online. There's options all
12 listed in the handbook, and that's why I kept referring
13 him to that handbook.
14 Q. Those options require -- if he needs -- strike that. If
15 Mr. Henneberg needed a prescription, each of those options
16 would require him to have that prescription, correct?
17 A. If he had an eye doctor before he came in, they would have
18 that prescription.
19 Q. You understand prescriptions expire, correct?
20 MR. RADUNSKY: Objection, foundation, assumes
21 facts not in evidence. You can answer.
22 A. I don't know how long till they expire. I don't.
23 Q. If Mr. Henneberg did not have a valid prescription, would
24 your referral to the handbook have been helpful to him?
25 MR. RADUNSKY: Objection, foundation. It assumes

Page 44

1  facts not in evidence. You can answer if you know.
2  A. I don't know.
3  Q. If an inmate does not have a valid prescription but is
4  requesting vision care, is the standard practice to
5  provide him an appointment with an optometrist?
6  A. Yes.
7  Q. And is the standard practice to make them wait -- an
8  inmate wait a year to see the optometrist to correct the
9  vision problems?
10 A. Not that I'm aware of.
11 Q. Do you know why it was taking so long for Mr. Henneberg to
12 see --
13 A. I do not.
14 Q. Do you know who would have a better understanding of why
15 it was taking so long for Mr. Henneberg to see the
16 optometrist?
17 A. Scheduling. I'm -- really do not know the person to
18 direct you to if that's what you're asking.
19 Q. Yes, I was going to ask that with my next question; do you
20 know a name of someone. You headed me off.
21 Does scheduling -- if you know, does scheduling
22 receive the health request forms that are submitted by the
23 nursing staff?
24 MR. RADUNSKY: If you know.
25

Page 45

1 BY MS. DOUKAS:
2 Q. And if you don't, I can rephrase.
3 Could you rephrase that?
4 Q. Yes. Yeah. If an inmate requests vision assistance, who
5 can -- before doing the inmate grievance, who can they
6 contact in Cook County Health Services?
7 A. The health services request form, is that what you're
8 asking?
9 Q. Is that -- does the inmate fill out the health service
10 request form?
11 A. The inmate fills that out.
12 Q. Okay. And then after the inmate fills it out, do you know
13 where the health service request form goes?
14 A. It goes to nursing.
15 Q. And "nursing" is the nursing department?
16 A. Correct.
17 Q. And do you know from your time working in the nursing
18 department what happens next?
19 A. The nurses in the dispensary each -- I want to say
20 "compound," but that's not the word they use there. Each
21 division has dispensaries, and there's nurses that work in
22 the dispensaries in those divisions, and then the nurses
23 triage and see those detainees.
24 Q. Do the nurses ever perform vision exams for detainees, as
25 far as you know?

12 (Pages 42 - 45)

Page 46

1  A.  As far as I'm aware, yes.
2  Q.  And through those vision exams, do nurses -- are they
3      authorized to prescribe lenses for glasses?
4  A.  No.  No.
5  Q.  In your experience, after a nurse performs a vision exam,
6      what would be the next step if there's an issue with the
7      inmate's vision?
8  A.  They'd refer him to optometry.
9  Q.  And during your time in the nursing department, did you
10     have a feeling of how long it would take to see an
11     optometrist as an inmate?
12 A.  No.
13 Q.  If an inmate, say Mr. Henneberg, he's gone through the
14     inmate grievance process, he wants to have an earlier
15     appointment from October, could it be your
16     role to reach out to the scheduler to make that happen?
17 A.  That's up to the scheduler following the Power Orders.
18     And then he didn't appeal.
19 Q.  Okay.  What are "Power Orders"?
20 A.  Those are different orders from the providers, either the
21     doctor or the physician assistants, or there's also Power
22     Orders from health service request forms, nursing.  They
23     all go into the orders.  There's also included in the
24     orders our medications, any directions from, like,
25     lower -- just orders from the providers; mental health,

Page 47

1      dental, medical.
2  Q.  When you say "power," is it a ranking system or --
3  A.  That's just what they call it.
4  Q.  Okay.  Do you know if the health service request forms --
5      and I apologize if I asked this already -- are stored
6      electronically?
7  A.  They are scanned.
8  Q.  So after an inmate fills out a health service request
9      form, it gets scanned; is that correct?
10 A.  I don't know exactly when it gets scanned.  I don't
11     believe that nursing does the scanning.  I believe it
12     would be medical records.
13 Q.  Okay.  And after they're scanned, do you know if they're
14     stored on an electronic database available to all
15     providers?
16 A.  They're in the medical record.
17 Q.  Okay.  Do you know if they're text searchable, these
18     medical records?
19 A.  Could you repeat that?
20 Q.  Yeah.  Do you know if you -- if someone looking at the
21     medical records could run a search for a certain
22     keyword --
23 A.  Yeah --
24 Q.  -- in those records?
25 A.  -- that would be nice.

Page 48

1  Q.  Is that a no?
2  A.  Yeah, it is.  I would love that.
3  Q.  Do you know if they are organized in any specific way with
4      categories such as optometry?
5  A.  Health service request forms are categorized.  They're in
6      the health service request form section, and they are
7      by -- listed by the date that they came into the jail.  So
8      they would all be listed under that date.
9  Q.  So if a certain inmate has multiple health service request
10     forms, they would be organized under his admittance date?
11 A.  One date.
12 Q.  Okay.
13     (Reporter interruption.)
14 A.  One date.  The intake date.
15 Q.  Okay.  Do you know if steps have been taken to try to --
16     what's the word I'm looking for?  Improve the sort of
17     retention process of the medical records, improve the
18     organization system of medical records?
19 A.  I would have no knowledge of that department.  I think
20     we're always trying to improve things.
21 Q.  Okay.  I want to mark as 4 --
22     MR. RADUNSKY:  5.
23 BY MS. DOUKAS:
24 Q.  5, Bates 73, 74.
25     (Exhibit 5 marked for identification.)

Page 49

1  Q.  Have you seen this document before?
2  A.  I have.
3  Q.  Okay.  And, again, if we look, start at Bates 73 at the
4      top, you see it's Donald Henneberg as the inmate?
5  A.  I do.
6  Q.  And the date of this inmate grievance form is August 25,
7      2019.  Do you see that?
8  A.  I do.
9  Q.  And Mr. Henneberg, again, is stating he's been, "...trying
10     to see an eye doctor now for ten months, and all I keep
11     getting told is I have an appointment, but never have
12     gotten called or ever signed any refusal.  So when will I
13     ever see the eye doctor?"
14     And he states, "My eyes have only gotten worse.  I
15     can't see more than a foot in front of me, and I've had
16     multiple accidents in here already from not being able to
17     see where I'm going."  You would have read this --
18 A.  Yes.
19 Q.  -- right?
20     And if you look on Bates ending 74, this is your
21     signature under the response, correct?
22 A.  Yes.  Yes.
23 Q.  And can you just read what you stated in that first
24     sentence?
25 A.  "Record reflects you reported you did not wear glasses at

13 (Pages 46 - 49)

1   intake, 11-29-18."  You want me to continue?

2   Q. I'll ask questions there.  Why did it matter that he

3      didn't report wearing glasses -- if he didn't report

4      wearing glasses, why did it matter?

5   A. It didn't really.  It's just something important that he

6      should have reported at intake if he wanted to expedite

7      issues with his glasses.

8   Q. So if -- so because -- are you saying because he, as

9      you're representing, he did not report wearing glasses,

10     that that's why it was taking now more than ten months to

11     get an eye doctor appointment?

12  A. No, I'm not saying that.

13        THE VIDEOGRAPHER:  Excuse me, Counsel.  Your mike

14     has fallen.

15        MS. DOUKAS:  Thank you.  Better?

16        THE VIDEOGRAPHER:  Better.  That's much better.

17     Thank you.

18  BY MS. DOUKAS:

19  Q. And then, again, you say in your response, the second

20     sentence, "You are scheduled an appointment with optometry

21     in October."  Do you see that?

22  A. I do.

23  Q. And that's the same response you had given on the previous

24     grievance form we looked as Exhibit 4, isn't it?

25  A. Is it 4?

1   Q. That is the one dated June 30, 2019.

2   A. Yes.  Yes, that's correct.

3   Q. So between June -- the previous grievance dated June 30,

4      2019, and this one, August 30, 2019, there had been no

5      movement on moving his eye doctor appointment up earlier

6      than October, has there been?

7   A. No.

8   Q. Would you have -- do you recall taking any steps after

9      getting yet another grievance asking scheduling to put him

10     in with the optometrist sooner?

11  A. I don't recall, but that would have been something that I

12     would have done.

13  Q. Okay.  And there would be no record, though, of you doing

14     that?

15  A. No.

16  Q. And if you look at the bottom, it looks like Mr. Henneberg

17     appealed; is that correct?

18  A. Correct.

19  Q. And he states, "I did report I wear glasses and requesting

20     to see an eye doctor since I have gotten here."  Would you

21     have received this appeal notice?

22  A. This would have gone higher up.

23  Q. Okay.  And who does it go to after it's appealed?

24  A. A manager.  A grievance manager.

25  Q. Do you report to that grievance manager?

1   A. I did.

2   Q. And what is the name listed here?  Is that the grievance

3      manager?

4   A. Anna Jimenez.

5   Q. Do you know if she's still the grievance manager?

6   A. No, she is not.

7   Q. Do you know if she's still employed by Cook County Health

8      Services?

9   A. She's not at Cermak.

10  Q. And when it goes up on appeal, do you know what the

11     process is, sort of what happens next?

12  A. She would further investigate, check it.

13  Q. And she checked, it looks like, for

14     "Administrator/Designee's Acceptance of Inmate's Appeal?

15     No."  Do you have any understanding why someone would

16     check "no"?

17  A. You'd probably have to ask her.

18  Q. And then she states, "Appointment for optometry is

19     scheduled and confirmed."  Do you know if Mr. Henneberg

20     would have received this back with this inmate appeal

21     being checked "no"?

22  A. Yes.

23  Q. So fair to say then Mr. Henneberg would just have to

24     continue to wait until that appointment and he gets called

25     to see the optometrist?

1   A. That would be my understanding from this.

2   Q. I'll just marking Exhibit 6, bearing Bates 369 and 370.

3        (Exhibit 6 marked for identification.)

4   Q. Have you seen this document before?

5   A. Yes.

6   Q. And this is -- it looks like it's a policy.  Under the

7      "Purpose," on Bates 369, "To provide guidelines regarding

8      prescription, nonprescription eyeglasses and contact

9      eyewear."  Do you see that?

10  A. Yes.

11  Q. And at the very top, it says, "Posting Date:  April 10,

12     2017."

13  A. Yes.

14  Q. Would you have had a copy of this as part of your work?

15  A. I would have had access to it, yes.

16  Q. Do you know if there's an updated policy beyond this

17     April 10, 2017?

18  A. Yes.

19  Q. Is there an updated one?

20  A. Yes, there is.

21  Q. And where would that updated policy be stored?

22  A. It would be on the intranet.

23        MS. DOUKAS:  Counsel, I don't know if an updated

24     policy has been produced.

25        MR. RADUNSKY:  I don't know if there is an

Page 54

1 updated one. She could be wrong. We gave you all
2 the ones that we had up to date that would have been
3 applicable at the time. But I'll look again and see
4 if there's an updated one.
5 THE WITNESS: I could be incorrect.
6 (Crosstalk.)
7 (Reporter interruption.)
8 MS. DOUKAS: So I'll make a -- we can follow up
9 with an e-mail, but I'll make a request. To the
10 extent there's an updated policy, we would request
11 it, please.
12 MR. RADUNSKY: Okay.
13 MS. DOUKAS: Thank you.
14 THE WITNESS: If there's an updated policy, it
15 would be on the intranet.
16 MS. DOUKAS: Thank you.
17 THE WITNESS: How's that?
18 MR. RADUNSKY: Okay.
19 BY MS. DOUKAS:
20 Q. And under the -- I'm still on Bates 369, the heading
21 "Policy." At the very bottom, it says, "Regarding visual
22 impairment, see Cermak Policy G-02.3." Do you know what
23 that policy is?
24 A. Not offhand. I don't have numbers memorized.
25 Q. Would that Cermak policy, G-02.3, be on the intranet?

Page 55

1 A. Yes, unless it's been updated. Sometimes they're
2 combined, and they have different numbers, or sometimes
3 they're retired or not relevant. But that's where it
4 would be if it exists.
5 MS. DOUKAS: And, Counsel, to the extent it
6 hasn't been produced, if that could be produced,
7 please.
8 MR. RADUNSKY: Uh-huh, if we have it.
9 MS. DOUKAS: If you have it.
10 MR. RADUNSKY: Uh-huh.
11 BY MS. DOUKAS:
12 Q. And if you look under "Procedure," still on Bates 369,
13 "B. Cermak Health Services," number 1 says, "Provides eye
14 and vision exams. Made available through the HSRF process
15 and upon request provides a prescription for eyewear if
16 warranted."
17 Is the HSRF process the health service request form
18 that we've been discussing?
19 A. Yes.
20 Q. Are you aware of any policies describing sort of a
21 standard of how long an inmate should wait between
22 requesting an optometrist appointment and actually
23 obtaining an optometrist appointment?
24 A. No, I do not.
25 MS. DOUKAS: Can we go off the record for a few

Page 56

1 minutes?
2 MR. RADUNSKY: Sure.
3 THE VIDEOGRAPHER: The time is 11:28 a.m. This
4 is the end of media unit two, and we're going off the
5 video record.
6 (Recess taken.)
7 THE VIDEOGRAPHER: The time is 11:33 a.m. This
8 is the beginning of media unit three, and we're back
9 on the video record.
10 MS. DOUKAS: Ms. Shebel, I have no other
11 questions right now. I just want to leave the
12 deposition open pending the outcome of our motion to
13 compel.
14 CROSS-EXAMINATION
15 BY MR. RADUNSKY:
16 Q. Just a couple questions. In all of the grievances that we
17 just looked at from Exhibits 1 to 5, did Mr. Henneberg
18 ever say that he had followed any of the steps that were
19 recommended in the inmate handbook to get glasses and had
20 been unsuccessful?
21 A. No, he did not.
22 Q. And in the inmate handbook, which you were talking about
23 before, what are the ways, given your understanding, of
24 how inmates can get plastic frames in glasses into the
25 jail?

Page 57

1 A. They can contact their family. They can work with the CRW
2 that can work with the family, or the CRW could assist
3 them to get a prescription from their optometrist. They
4 could order them online. Family could bring them in.
5 Q. And are those methods that you just talked about that are
6 recommended in the inmate handbook, are those things that,
7 in your experience, inmates have used in the past to
8 successfully get plastic frames into the jail?
9 A. Yes, that's how they do it.
10 Q. Okay. Is this type of grievance, this over vision, are
11 those types of grievances, are they common, are they
12 infrequent, are they rare? Do you see them a lot?
13 A. They're infrequent.
14 Q. Okay. And I wanted to ask about the DOJ investigation.
15 Do you have any understanding if the DOJ around 2019 or
16 prior to 2019 had approved of the Cermak process for
17 getting inmates appointments and those issues that you
18 talked about with the delays had improved?
19 A. Yeah, we had cleared all of that. They were very, very
20 pleased.
21 Q. And when you say you "cleared all of that," I want to sort
22 of nail this down. So there were issues for a few years
23 between 2012 and 2015, and then the DOJ came in and the
24 system improved?
25 A. The DOJ was there when I came in 2012, and it was constant

15 (Pages 54 - 57)

Page 58

1 improvement from there.
2 Q. And by the time that the DOJ had been done monitoring, it
3   was your understanding that the HSRF review process and
4   issuing timely responses was improving?
5 A. Yes.
6 Q. Okay.
7 A. They were very pleased.
8 Q. It's never perfect, but it's improving?
9 A. Right.
10 Q. All right. And I think you made this clear a thousand
11   times. But you only review medical grievances. You don't
12   review grievances related to the jail side?
13 A. That's correct.
14 Q. Okay. In other words, if there was a fight among inmates
15   or some sort of altercation, that would not be a grievance
16   that you would look at if one of those inmates grieved;
17   that would go to the jail?
18 A. That's correct.
19 Q. Okay. Now, one other thing, and I'm almost done. Just a
20   few questions.
21     In Exhibit 1, this grievance from January 2018, which
22   is Bates stamped page 32 and 33, did Mr. Henneberg appeal
23   that?
24 A. No, he did not.
25 Q. Okay. So he did not exhaust the grievance process there?

Page 59

1 A. That's correct.
2 Q. And in Exhibit 2, the grievance from February 15, 2019,
3   Bates 40 and 41, did Mr. Henneberg appeal that one?
4 A. No, he did not.
5 Q. All right. And he could have appealed as we saw as he did
6   later, correct?
7 A. Correct.
8 Q. But he did not appeal Exhibit 2.
9     Now, Exhibit 3 is the grievance from 5-10-2019. Did
10   Mr. Henneberg appeal that one?
11 A. No, he did not.
12 Q. And he had that mechanism available to him to appeal,
13   correct?
14 A. Correct.
15 Q. And we know that he -- I'm sorry. Based on the last two
16   grievances, 4 and 5, where he did file a grievance, based
17   on that, do you believe that he understood what the
18   grievance process was? In other words, he could have
19   filed appeals if he wanted to?
20 A. Yes.
21 Q. Did you ever tell him not to file an appeal?
22 A. No. I've never spoken to him.
23 Q. So on three of the five grievances that we looked at, he
24   did not appeal, correct?
25 A. That's correct.

Page 60

1     MR. RADUNSKY: All right. I think we're good.
2     MS. DOUKAS: I have a few quick follow-ups from
3   that.
4     MR. RADUNSKY: Okay.
5     REDIRECT EXAMINATION
6 BY MS. DOUKAS:
7 Q. You stated that grievances related to vision were
8   infrequent; is that correct?
9 A. That's correct.
10 Q. Does that mean that not many inmates were seeking vision
11   care, in your experience?
12 A. No. That means I did not receive a lot of grievances
13   regarding vision care.
14 Q. And if you hadn't received a lot of grievances regarding
15   vision care, do you would being surprised to see
16   Mr. Henneberg repeatedly ask for assistance in scheduling
17   his optometrist appointment?
18 A. I don't know if "surprised" is -- I was concerned.
19 Q. And you were concerned --
20 A. I would have been concerned. I don't recall him or his
21   grievance or anything, but I would have been concerned.
22 Q. And do you have -- I think we talked about this before.
23   Do you have recollection specifically relating to
24   Mr. Henneberg reaching out to scheduling, trying to get
25   him into the optometrist sooner?

Page 61

1 A. No, I do not.
2 Q. And just real quick, going back to the inmate handbook
3   that you were asked by counsel, the process that was
4   described for inmates to get plastic frames into the jail,
5   those all require a valid prescription, correct?
6     MR. RADUNSKY: Objection. I think it calls for
7     an expert opinion. You can answer if you know.
8 A. His glasses, I don't know if a prescription would have --
9 Q. If an inmate can't use one of those processes to get
10   glasses into the jail, are they entitled to vision care
11   through an optometrist provided by Cook County Jail?
12 A. Yes.
13     MS. DOUKAS: Okay. I have nothing else.
14     MR. RADUNSKY: That's it. I think we will
15   reserve. We'll reserve signature.
16     MS. DOUKAS: I had left it open previously. Did
17   I not clarify?
18     MR. RADUNSKY: If there's more discovery.
19     MS. DOUKAS: I left it open based on the motion
20   to compel.
21     MR. RADUNSKY: Oh, on the motion to compel.
22     MS. DOUKAS: Yes.
23     THE VIDEOGRAPHER: All right. The time is
24   11:40 a.m. This is the end of media unit three.
25   It's also the end of the deposition of Susan Shebel,

16 (Pages 58 - 61)

Page 62

1    RN, and we're going off the video record.
2        MR. RADUNSKY:  Did you order?
3        MS. DOUKAS:  I ordered.
4        MR. RADUNSKY:  I'll take a copy, please, just my
5    usual order, mini, index.
6        (Ending Time:  11:40 a.m.)
7                *    *    *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 64

1            Veritext Legal Solutions
             1100 Superior Ave
2              Suite 1820
             Cleveland, Ohio 44114
3            Phone: 216-523-1313
4
     February 21st, 2024
5
     To: TROY S. RADUNSKY, ESQ.
6
     Case Name: Henneberg, Donald v. Dart, Tom, Et Al.
7
     Veritext Reference Number: 6451922
8
     Witness:  Susan Shebel , RN      Deposition Date:  2/14/2024
9
10   Dear Sir/Madam:
11
     Enclosed please find a deposition transcript.  Please have the witness
12
     review the transcript and note any changes or corrections on the
13
     included errata sheet, indicating the page, line number, change, and
14
     the reason for the change.  Have the witness' signature notarized and
15
     forward the completed page(s) back to us at the Production address
16   shown
17   above, or email to production-midwest@veritext.com.
18
     If the errata is not returned within thirty days of your receipt of
19
     this letter, the reading and signing will be deemed waived.
20
21   Sincerely,
22   Production Department
23
24
25   NO NOTARY REQUIRED IN CA

Page 63

1
2            CERTIFICATE
3
        I, Angela J. Galipeau, a Notary Public, in and for
4    the County of Porter and State of Indiana, do hereby
     certify:
5
        That SUSAN SHEBEL, RN, appeared before me on
6    Wednesday, February 14, 2024, and was duly sworn or
     affirmed to testify the truth, the whole truth, and
7    nothing but the truth to questions propounded at the
     taking of the foregoing deposition in a cause now pending
8    and undetermined in said court;
9        That I further certify that I then and there
     reported stenographically the proceedings at the said time
10   and place; that the proceedings were then transcribed from
     my original shorthand notes; and that the foregoing
11   typewritten transcript is a true and correct record
     thereof;
12
        That I am not a relative or employee or attorney
13   or counsel, nor a relative or employee of such attorney or
     counsel for any of the parties hereto, nor am I interested
14   directly or indirectly in the outcome of this action;
15      IN WITNESS WHEREOF, I have hereunto set my hand
     and affixed my notarial seal this 17th day of February,
16   2024.
17
18
                    *Angela J Galipeau*
19      _____
20      Angela J. Galipeau, RPR, CSR-IL
        Notary Public, State of Indiana
21      Residence:  Porter County
        Commission Expires:  4-23-25
22
23
24
25

Page 65

1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
     ASSIGNMENT REFERENCE NO: 6451922
3    CASE NAME: Henneberg, Donald v. Dart, Tom, Et Al.
     DATE OF DEPOSITION: 2/14/2024
4    WITNESS' NAME: Susan Shebel , RN
5    In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7    I have made no changes to the testimony
     as transcribed by the court reporter.
8    _____
9    Date           Susan Shebel , RN
10   Sworn to and subscribed before me, a
     Notary Public in and for the State and County,
11   the referenced witness did personally appear
     and acknowledge that:
12
     They have read the transcript;
13   They signed the foregoing Sworn
         Statement; and
14   Their execution of this Statement is of
         their free act and deed.
15
     I have affixed my name and official seal
16
     this _____ day of_____, 20____.
17
     _____
18   Notary Public
19   _____
     Commission Expiration Date
20
21
22
23
24
25

Page 66

```
1        DEPOSITION REVIEW
         CERTIFICATION OF WITNESS
2
         ASSIGNMENT REFERENCE NO: 6451922
3    CASE NAME: Henneberg, Donald v. Dart, Tom, Et Al.
     DATE OF DEPOSITION: 2/14/2024
4    WITNESS' NAME: Susan Shebel , RN
5      In accordance with the Rules of Civil
     Procedure, I have read the entire transcript of
6    my testimony or it has been read to me.
7        I have listed my changes on the attached
     Errata Sheet, listing page and line numbers as
8    well as the reason(s) for the change(s).
9        I request that these changes be entered
     as part of the record of my testimony.
10
         I have executed the Errata Sheet, as well
11   as this Certificate, and request and authorize
     that both be appended to the transcript of my
12   testimony and be incorporated therein.
13   _____
     Date          Susan Shebel , RN
14
         Sworn to and subscribed before me, a
15   Notary Public in and for the State and County,
     the referenced witness did personally appear
16   and acknowledge that:
17       They have read the transcript;
         They have listed all of their corrections
18        in the appended Errata Sheet;
         They signed the foregoing Sworn
19          Statement; and
         Their execution of this Statement is of
20          their free act and deed.
21   I have affixed my name and official seal
22   this _____ day of_____, 20____.
23   _____
         Notary Public
24
25   Commission Expiration Date
```

Page 67

```
1        ERRATA SHEET
         VERITEXT LEGAL SOLUTIONS MIDWEST
2        ASSIGNMENT NO: 6451922
3    PAGE/LINE(S) /       CHANGE      /REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19
     _____    _____
20   Date            Susan Shebel , RN
21   SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22   DAY OF _____, 20_____ .
23   _____
         Notary Public
24
     _____
25   Commission Expiration Date
```

| & | 2 | 25664 63:18 | 44114 64:2 |
|---|---|---|---|

**&** 1:12 2:2 4:15 5:4 7:23,24 8:4 12:7,10

**2** 3:10 33:1,2 59:2,8

**2/14/2024** 64:8 65:3 66:3

**28** 3:9

**2800** 1:13 2:3 4:16

**48** 3:13

**3**

| 0 | | | **5** |
|---|---|---|---|

**02.3** 54:25
**02.3.** 54:22
**05** 19:4
**07380** 1:6 4:14

**20** 65:16 66:22 67:22
**200** 19:12
**2012** 8:1,15 9:14 10:14 12:13,20,24 13:11,22,25 14:3,24 15:2 15:16 17:1 57:23,25

**3** 3:11 35:18,20 38:20 40:11 59:9
**30** 40:7 41:14 51:1,3,4
**300-4479** 2:9
**312** 2:4,9
**32** 28:8 29:6 58:22
**32-33** 3:9
**324-1000** 2:4
**33** 3:10 28:8 29:14 58:22
**35** 3:11
**369** 53:2,7 54:20 55:12
**369-370** 3:14
**370** 53:2

**5** 3:3,13 48:22 48:24,25 56:17 59:16
**5-10-2019** 59:9
**50** 19:3
**53** 3:14
**56** 3:4
**584** 28:18

| 1 | | | **6** |
|---|---|---|---|

**1** 1:1 3:9 28:1,5 28:7 33:12 55:13 56:17 58:21
**10** 53:11,17
**10:51** 37:24
**11-29-18** 50:1
**110** 1:13 2:3 4:15
**1100** 64:1
**11:01** 38:3
**11:28** 56:3
**11:33** 56:7
**11:40** 61:24 62:6
**14** 1:10 4:2 63:6
**15** 23:1,1 36:1 59:2
**17** 3:14
**17th** 63:15
**1820** 64:2
**19** 1:6 4:14 33:8

**2015** 14:23,25 15:2,17 17:1,7 18:11 21:15 57:23
**2017** 53:12,17
**2018** 58:21
**2019** 28:18 29:3 33:8 36:1 40:8 41:14 49:7 51:1,4,4 57:15,16 59:2
**2024** 1:10 4:2 63:6,16 64:4
**210** 19:2
**216-523-1313** 64:3
**21st** 64:4
**230** 2:8,8
**25** 5:24 49:6

**6** 3:14 53:2,3
**60** 3:6 35:18,23 36:4 38:21
**60-61** 3:11
**60606** 1:13 2:3 2:9 4:16
**61** 35:19
**6451922** 1:25 64:7 65:2 66:2 67:2
**68** 39:24,24 40:4,14
**68-70** 3:12
**69** 39:24

| | | **4** | **7** |
|---|---|---|---|

**4** 3:12 39:23 40:1 48:21 50:24,25 59:16
**4-23-25** 63:21
**40** 3:12 33:1,13 59:3
**40-41** 3:10
**41** 33:1,14 34:6 59:3

**70** 39:24 41:5
**73** 48:24 49:3
**73-74** 3:13
**74** 48:24 49:20

**8**

**8**   29:3
**80**   21:13,14

**9**

**9:57**   1:11 4:2

**a**

**a.m.**   1:11 4:2
   37:24 56:3,7
   61:24 62:6
**able**   7:5 29:7
   32:4 33:21
   34:14 36:6
   39:12 40:16
   49:16
**above**   64:17
**acceptance**
   52:14
**access**   12:11
   25:15,17,19,22
   31:19 53:15
**accidents**   49:16
**accommodate**
   6:12
**accordance**
   1:15 65:5 66:5
**accurate**   7:5
**acknowledge**
   65:11 66:16
**act**   65:14 66:20
**action**   4:21
   63:14
**actual**   30:17
**actually**   19:13
   27:19 35:17

55:22
**address**   13:16
   13:21,23 14:8
   15:1,3 64:15
**addressed**   14:1
**addressing**
   14:17
**administer**
   4:20
**administration**
   11:17,18 12:3
   20:24
**administrator**
   52:14
**admittance**
   48:10
**affect**   29:23
**affiliations**   5:2
**affirmed**   63:6
**affixed**   63:15
   65:15 66:21
**ago**   16:24
   29:24 42:14
**agree**   4:6 36:19
   39:18,19 41:22
**ahead**   41:5
**al**   1:7 4:11 64:6
   65:3 66:3
**allowed**   31:22
**allowing**   27:1
**altercation**
   58:15
**analyst**   8:13
   9:13

**angela**   1:23
   4:18 63:3,19
**anna**   52:4
**answer**   6:5,12
   8:5,18,20 9:2,8
   9:10 27:6
   32:12,24 43:21
   44:1 61:7
**answers**   7:5
**anybody**   40:21
**anymore**   6:24
**apologies**   39:25
**apologize**   21:4
   47:5
**appeal**   31:1
   46:18 51:21
   52:10,14,20
   58:22 59:3,8
   59:10,12,21,24
**appealed**   51:17
   51:23 59:5
**appeals**   59:19
**appear**   65:11
   66:15
**appearance**
   4:24
**appearances**
   2:1 5:2
**appeared**   63:5
**appended**
   66:11,18
**applicable**   54:3
**appointment**
   25:2,2,5,8
   26:10,11 30:1

30:2,3,11,15,17
   30:25 31:5
   34:8,25,25
   35:3 36:17
   39:3,9,12
   40:22 41:10,17
   42:2 44:5
   46:15 49:11
   50:11,20 51:5
   52:18,24 55:22
   55:23 60:17
**appointments**
   16:9,22 17:4
   25:23 26:1,5
   30:20 35:2
   37:18 57:17
**approved**
   57:16
**approximate**
   5:22
**approximately**
   17:9 21:17
   33:17
**april**   53:11,17
**aside**   23:22
**asked**   10:19
   39:15,18 41:3
   47:5 61:3
**asking**   16:24
   27:17 32:15
   34:16 44:18
   45:8 51:9
**assignment**
   65:2 66:2 67:2

**[assist - cermak]**                                    Page 3

| assist 15:21 | **b** | behalf 5:5,7 | building 20:21 |
|---|---|---|---|

assist 15:21
57:2
assistance 45:4
60:16
assistant 15:15
assistants
46:21
associated
24:14
assumes 43:20
43:25
attached 66:7
attorney 5:3
63:12,13
audio 4:5
audit 10:10,12
10:18
audits 9:17,18
9:19,20,21,23
9:25 10:1
12:13,18,20
15:18
august 49:6
51:4
authorize
66:11
authorized
4:19 46:3
available 47:14
55:14 59:12
ave 64:1
avenues 43:5
aware 12:22,25
15:2 44:10
46:1 55:20

**b**

b 3:8 55:13
back 7:21 9:11
17:25 19:23
24:20 27:15,16
30:23 34:3,7
35:13,15 38:4
38:20 41:13
52:20 56:8
61:2 64:15
bad 14:5 29:8
bail 21:20,21
based 59:15,16
61:19
bates 3:9,10,11
3:12,13,14
11:10 28:7
29:6,14 33:1
33:13 34:6
35:18,23 36:3
38:21 39:24
40:4,14 41:5
48:24 49:3,20
53:2,7 54:20
55:12 58:22
59:3
bearing 35:18
39:24 40:4
53:2
bed 15:21,23
15:24 16:5
beds 16:4,6
beginning 5:3
38:4 56:8

behalf 5:5,7
7:15,19 16:12
believe 10:16
11:1 14:22
38:20 42:16
47:11,11 59:17
belong 19:1,1
best 15:11
better 20:8
44:14 50:15,16
50:16
beyond 53:16
big 9:22
blank 17:15
blurred 29:9
bockius 1:12
2:2 4:15 5:5
bottom 51:16
54:21
box 20:11
boxes 22:5
break 6:11
27:25 37:20,22
38:7
brent 11:11
bring 17:12
24:4 57:4
bringing 17:19
18:9
brings 18:8,19
21:25
broad 21:14
brought 8:7
20:20,22 21:7

building 20:21
20:24 37:9
buildings 21:1
bump 39:10,12
42:4
bussed 37:12

**c**

ca 64:25
calendar 23:1
call 32:11 47:3
called 1:15 5:11
40:21 41:1
49:12 52:24
calls 32:22 61:6
care 27:3,20
29:20 31:18,19
34:9,20 44:4
60:11,13,15
61:10
case 1:6 4:12
4:14 7:17 64:6
65:3 66:3
cases 8:2,6
categories 48:4
categorized
48:5
caught 22:9,11
cause 63:7
cchhs 3:14
ccsao 28:7
cermak 11:7,13
11:14,15,18
12:3,6,7,11
20:24 35:9,10
37:2,3 52:9

**[cermak - correct]** Page 4

54:22,25 55:13
57:16
**certain** 7:15
12:22 22:24
30:8,9 47:21
48:9
**certificate** 63:2
66:11
**certification**
65:1 66:1
**certify** 63:4,9
**change** 64:13
64:14 66:8
67:3
**changed** 9:13
9:16
**changes** 13:15
64:12 65:7
66:7,9
**chart** 10:4,13
**charts** 10:5,14
**check** 9:9 10:4
17:20 18:2
22:4 39:2,2
52:12,16
**checked** 37:5
52:13,21
**checking** 10:20
**chicago** 1:13
2:3,9 4:16
**circumstance**
30:18
**civil** 1:16 65:5
66:5

**claims** 8:7
**clarify** 13:11
61:17
**clarity** 18:6
**clear** 58:10
**cleared** 57:19
57:21
**cleveland** 64:2
**clinic** 9:12 37:2
37:3,9,16 38:8
38:15
**clinical** 8:13
**code** 17:12 19:4
19:5,11 24:13
**coded** 18:20,22
19:2 21:7
**codes** 19:3,14
19:16,18 22:17
**coding** 17:13
18:24 20:16
**combined** 55:2
**come** 9:11 10:5
19:18 21:6
**comes** 23:5,24
**coming** 8:24
**commission**
63:21 65:19
66:25 67:25
**common** 57:11
**communication**
27:2
**compel** 56:13
61:20,21
**complain** 36:16

**complains** 26:9
**complaints**
16:21 17:2
26:4
**completed**
13:10 17:23
23:22 24:1,23
64:15
**compliance**
12:22 13:2
**compound**
45:20
**computer** 35:4
**concern** 9:10
39:20
**concerned**
60:18,19,20,21
**concerning**
30:6
**conditions**
15:25
**confirmed**
52:19
**conserve** 28:3
**constant** 21:15
57:25
**contact** 26:3
29:22 39:6
42:4,8,19 43:9
43:9,10 45:6
53:8 57:1
**contacts** 42:22
**continue** 4:6
50:1 52:24

**control** 15:21
15:23 17:17,18
24:10,11,12,13
28:11,12,14
**conversations**
4:4
**cook** 7:19,23,24
8:4,12,25 10:7
10:24 11:6,14
11:19 12:4,7
12:10,23 13:15
14:8 15:3 16:1
16:5 20:13,17
20:20,21,25
27:3,17,20
30:24 32:4
34:18 35:7,8
37:9 38:8 45:6
52:7 61:11
**copies** 18:9
**copy** 23:17
29:8 53:14
62:4
**correct** 8:23
10:8,9 11:7,20
12:5 15:24
17:8 18:10,21
23:13 24:3
26:1,2,25
28:23,24 29:2
29:13 30:12,13
31:23,24 32:2
32:5,6,18,19
33:12 34:1,2
34:11,14 35:12

[correct - different]                                          Page 5

36:8,19 37:4,7
37:11,13,14
38:9,16 40:12
40:19,20 41:8
41:20,21,25
43:16,19 44:8
45:16 47:9
49:21 51:2,17
51:18 58:13,18
59:1,6,7,13,14
59:24,25 60:8
60:9 61:5
63:11
**corrections**
18:1,4 64:12
66:17
**counsel** 4:10,25
6:15 50:13
53:23 55:5
61:3 63:13,13
**county** 7:19,23
7:24 8:4,12,25
10:8,25 11:6
11:14,19 12:4
12:7,10,23
13:15 14:8
15:3 16:1,5
20:13,17,20,21
20:25 27:4,17
27:20 30:24
32:5 34:18
35:7,8 37:9
38:8 45:6 52:7
61:11 63:4,20
65:10 66:15

**couple** 42:14
56:16
**course** 25:9
**court** 1:2,16
4:13,18 5:8
63:8 65:7
**coworkers** 17:3
**create** 12:20
**created** 12:18
**cross** 3:4 56:14
**crosstalk** 20:5
54:6
**crw** 43:8 57:1,2
**csr** 1:23 63:19
**current** 8:12
**currently** 7:22
**cv** 1:6 4:14
**cynthia** 15:9

**d**

**d** 3:1
**dart** 1:7 4:11
64:6 65:3 66:3
**database** 27:1
31:9,9 47:14
**date** 1:10 22:8
22:12,13,23
23:2 29:25
30:1,11 33:8
40:7 41:13
48:7,8,10,11,14
48:14 49:6
53:11 54:2
64:8 65:3,9,19
66:3,13,25
67:20,25

**dated** 29:3 36:1
40:7 51:1,3
**dates** 30:3
**day** 19:14
21:11,13 22:13
23:24 24:1
30:17 63:15
65:16 66:22
67:22
**days** 23:1,1
64:18
**dear** 64:10
**deed** 65:14
66:20
**deemed** 64:19
**deems** 25:11
**defendant** 5:7
7:9,12,15 8:3,7
**defendants** 1:8
2:11
**definitive** 19:19
**delays** 57:18
**deliver** 23:4,25
**delivers** 24:2
**dental** 17:24
21:9,25 22:18
22:18 23:5
47:1
**dentist** 19:3
**department**
12:23 14:11,11
14:12,16,20,25
15:16 16:20
17:2,10,25
18:4,12 22:19

22:20 45:15,18
46:9 48:19
64:22
**depend** 9:4
30:18
**depends** 21:19
**deposed** 5:18
5:25 7:8 8:2
**deposition** 1:9
3:1 4:9,15
56:12 61:25
63:7 64:8,11
65:1,3 66:1,3
**depositions**
7:10,12,18
**deps** 6:21
**described** 61:4
**describing**
55:20
**description** 3:8
36:3
**designee's**
52:14
**detainees** 15:24
45:23,24
**determine**
18:25
**devising** 9:20
**devore** 2:7,8
5:6
**devoreraduns...**
2:10,10
**different** 9:4
10:20 19:18
20:20 24:13

30:8 42:17
46:20 55:2
**direct** 3:2 5:13
12:17 13:21
44:18
**direction** 6:17
**directions**
33:23 46:24
**directly** 63:14
**director** 12:17
12:19 13:17,19
14:10 15:5,7
15:12,14
**discovery**
61:18
**discussing**
55:18
**dispensaries**
45:21,22
**dispensary**
25:10 31:14
45:19
**dispensing** 27:3
**district** 1:2,3
1:16,16 4:12
4:13
**division** 15:21
45:21
**divisions** 45:22
**doc** 17:12,17,19
17:22 18:4,8
18:19 19:1,18
20:11,13 21:25
23:24 24:1,8
24:18,22 35:15

**doctor** 29:8
33:19,21 34:11
34:14 36:5
40:15,22 41:20
41:23 43:4,6
43:10,17 46:21
49:10,13 50:11
51:5,20
**doctors** 36:24
**document** 28:9
33:3 35:18,21
40:2 49:1 53:4
**documents**
19:16
**doing** 9:17,19
10:10 11:25
12:13 17:11
25:25 45:5
51:13
**doj** 57:14,15,23
57:25 58:2
**donald** 1:4 4:10
29:1 33:5
35:24 40:5
49:4 64:6 65:3
66:3
**doukas** 2:2 3:3
3:6 5:4,4,14
6:19,23 7:1,3
11:9,12 12:2
19:17 20:4,7
24:17 28:1,3,6
28:21 29:5
33:15 37:23
38:6 45:1

48:23 50:15,18
53:23 54:8,13
54:16,19 55:5
55:9,11,25
56:10 60:2,6
61:13,16,19,22
62:3
**downward**
21:19
**drive** 1:13 2:3
4:16
**due** 22:23 23:2
23:9,10,11
**duly** 5:12 63:6
**dumb** 21:4
**duration** 34:24

**e**

**e** 2:2,7 3:1,8
15:11,11 42:9
42:11,13,15
54:9
**earlier** 42:4
46:14 51:5
**easier** 42:16,18
**effect** 13:5
**eight** 5:23 7:9
40:15 41:20
**either** 17:23
19:15 20:11
31:13 46:20
**electronic**
10:13,14 11:2
11:3 27:1,13
31:9 47:14

**electronically**
18:13 27:11
35:3 47:6
**email** 64:17
**employed** 7:22
7:24 12:6 52:7
**employee** 63:12
63:13
**employees**
12:11 20:16
**enclosed** 64:11
**ensure** 15:24
30:25
**entered** 66:9
**entire** 65:5 66:5
**entitled** 61:10
**errata** 64:13,18
66:7,10,18
67:1
**esq** 2:2,7,7 64:5
**estimate** 5:24
21:10
**et** 1:7 4:11 64:6
65:3 66:3
**evidence** 43:21
44:1
**exact** 5:21
16:18 30:10
**exactly** 20:12
29:18 47:10
**exam** 46:5
**examination**
3:2,4,5 5:13
56:14 60:5

**examined** 5:12
**example** 10:1
  10:18
**examples** 27:22
**exams** 45:24
  46:2 55:14
**excuse** 50:13
**executed** 66:10
**execution**
  65:14 66:19
**exhaust** 58:25
**exhibit** 3:9,10
  3:11,12,13,14
  28:1,5,7 33:1,2
  33:12 35:18,20
  38:20 39:23
  40:1,11 48:25
  50:24 53:2,3
  58:21 59:2,8,9
**exhibits** 56:17
**exists** 55:4
**expand** 9:3
**expedite** 39:9
  50:6
**experience**
  34:13,17,18
  36:15 39:12
  46:5 57:7
  60:11
**expert** 32:11,15
  32:23 61:7
**expiration**
  65:19 66:25
  67:25

**expire** 32:21
  43:19,22
**expires** 63:21
**explain** 9:19
  17:11 18:22
  30:5
**explanation**
  24:16
**extent** 54:10
  55:5
**eye** 29:7 33:19
  34:10,14 36:5
  39:3 40:15,22
  41:20,23 42:2
  43:4,6,10,17
  49:10,13 50:11
  51:5,20 55:13
**eyeglasses** 19:6
  37:6 53:8
**eyes** 29:8 33:22
  36:7 37:5
  39:20 40:17
  49:14
**eyewear** 53:9
  55:15

**f**

**facing** 6:17
**facts** 43:21
  44:1
**fair** 10:10
  14:24 26:14
  32:7 52:23
**fallen** 50:14
**familiar** 19:15
  21:4

**family** 43:9,9
  57:1,2,4
**far** 25:14,14
  28:18 45:25
  46:1
**farsighted**
  32:17
**february** 1:10
  4:2 33:8 59:2
  63:6,15 64:4
**federal** 1:16
**feeling** 46:10
**fell** 19:19
**fewer** 21:20
**fight** 58:14
**file** 59:16,21
**filed** 4:12 59:19
**fill** 16:11 45:9
**filled** 16:15
  22:1,3,3 23:21
  35:14
**fills** 19:24,25
  20:9 45:11,12
  47:8
**financially** 4:21
**find** 9:10 64:11
**fine** 8:6
**finish** 11:22
**firm** 4:19
**first** 5:11 14:12
  14:15 18:7
  22:8 40:4
  49:23
**five** 59:23

**flip** 29:14
**flop** 6:17
**follow** 26:4
  30:23,24 33:23
  54:8 60:2
**followed** 35:16
  56:18
**following** 46:17
**follows** 5:12
**foot** 22:9,11
  49:15
**foregoing** 63:7
  63:10 65:13
  66:18
**form** 3:9,10,11
  3:12,13 10:19
  14:9 16:12,15
  19:24,25 20:3
  20:4,10 23:12
  23:18 24:14
  25:1,11,18
  26:15,23 27:5
  27:14,19 28:15
  28:25 30:22
  34:1 36:1,14
  40:18 45:7,10
  45:13 47:9
  48:6 49:6
  50:24 55:17
**forms** 10:11,14
  13:6,8,13,16,22
  14:1,18 15:4
  17:5 23:14,20
  24:2,2,4,19,24
  26:24 27:10,11

44:22 46:22
47:4 48:5,10
**forward** 43:6
64:15
**foundation**
43:20,25
**four** 41:17
**frames** 31:23
31:25 56:24
57:8 61:4
**free** 65:14
66:20
**front** 49:15
**full** 38:18
**further** 29:20
34:9 52:12
63:9

**g**

**g** 3:14 54:22,25
**galipeau** 1:23
4:19 63:3,19
**general** 19:8
**generally** 8:17
**getting** 8:11
16:22 20:19
23:10 27:19
29:9 33:22
37:21 40:17
49:11 51:9
57:17
**give** 7:5
**given** 21:11
38:15 50:23
56:23

**giving** 17:22
18:3
**glasses** 32:3,4,8
32:9,16,17
43:8 46:3
49:25 50:3,4,7
50:9 51:19
56:19,24 61:8
61:10
**go** 4:7 6:2 10:4
16:16 17:25
18:25 22:4,17
22:18 27:15,16
30:15 31:6,20
33:23 36:25
37:5,12,23
38:12,20 43:8
46:23 51:23
55:25 58:17
**goes** 20:1,10,11
20:13 22:19
27:15 35:15
45:13,14 52:10
**going** 4:1 21:18
23:23 30:8,15
30:21,21 37:25
40:22 41:13
44:19 49:17
56:4 61:2 62:1
**good** 4:1 5:15
5:25 11:25
12:15 24:16
60:1
**gotten** 21:12
36:7 39:20

49:12,14 51:20
**grab** 10:5
**grievance** 3:9
3:10,11,12,13
9:4,11 14:11
17:18 18:11
20:3,4,10
22:25 23:12,14
23:18,20 24:1
24:2,4,11,14,19
24:24 25:1,18
26:23 27:2,10
27:14,19 28:17
28:25 30:22
33:18 34:1
35:15 36:1
40:7,11,18
41:13 45:5
46:14 49:6
50:24 51:3,9
51:24,25 52:2
52:5 57:10
58:15,21,25
59:2,9,16,18
60:21
**grievances** 8:18
8:20,21,22,24
9:2,8 14:22
17:8,10,12,23
17:25 18:8,12
18:19,25 20:19
21:7,10 22:1,6
22:17 23:4,5,7
23:8,25 28:18
36:15 56:16

57:11 58:11,12
59:16,23 60:7
60:12,14
**grieved** 58:16
**ground** 6:1
**guess** 9:5 27:18
**guesstimate**
5:24 35:1
**guidelines** 53:7

**h**

**h** 3:8
**hand** 63:15
**handbook**
29:20 31:16,17
31:21,22 34:9
35:11 43:7,12
43:13,24 56:19
56:22 57:6
61:2
**handled** 15:6
**handling** 41:7
**handwritten**
23:15
**happen** 20:9
30:7 46:16
**happens** 16:16
19:25 45:18
52:11
**hard** 29:18
**headed** 44:20
**heading** 54:20
**health** 7:19,23
7:24 8:4 11:14
12:7,10,23
13:6,7,12,15,16

**[health - inmates]**

13:22,25 14:8
14:9,18 15:3,4
15:25 16:8,11
16:15 17:5,24
19:2 20:2,20
21:9,25 22:19
22:20 23:4
25:11 31:14
34:18 36:14
44:22 45:6,7,9
45:13 46:22,25
47:4,8 48:5,6,9
52:7 55:13,17
**heard** 16:21
17:2
**held** 37:18
**help** 9:9 27:17
**helpful** 43:24
**helps** 18:24
**henneberg** 1:4
4:11 28:8 29:1
29:7 30:23
31:5 34:7,10
35:11,14,16,24
36:4 38:25
39:16 40:5,14
41:16 43:3,5
43:15,23 44:11
44:15 46:13
49:4,9 51:16
52:19,23 56:17
58:22 59:3,10
60:16,24 64:6
65:3 66:3

**henneberg's**
33:5,18
**hereto** 63:13
**hereunto** 63:15
**higher** 51:22
**hired** 8:14 9:14
12:13,24 14:13
14:15,24
**hold** 11:22
**honestly** 6:5
**hospital** 7:23
7:25 8:4 11:16
11:16 12:7,10
**housed** 8:24
12:4
**how's** 54:17
**hsrf** 55:14,17
58:3
**huh** 41:18 55:8
55:10
**hypotheticals**
27:24

**i**

**ideally** 23:11
**identification**
28:5 33:2
35:20 40:1
48:25 53:3
**identifies** 28:17
**il** 1:23 63:19
**illinois** 1:3,13
1:17 2:3,9 4:13
4:16
**impairment**
54:22

**important** 50:5
**improve** 10:18
48:16,17,20
**improved**
57:18,24
**improvement**
8:13 10:6 58:1
**improvements**
13:24
**improver** 9:13
**improving** 58:4
58:8
**included** 46:23
64:13
**including** 4:25
**incorporated**
66:12
**incorrect** 54:5
**indefinite**
32:20
**index** 62:5
**indiana** 1:24
63:4,20
**indicating**
64:13
**indirectly**
63:14
**infirmary**
11:17
**information**
24:6 29:21
31:19 34:9
**informed** 30:14
**infrequent**
57:12,13 60:8

**initially** 9:17
**inmate** 3:9,10
3:11,12,13
8:22,24 10:11
19:24,25 20:9
20:10 22:25
23:20 24:19,23
25:1,3,18,18
26:4,9,12,23
27:10,14,19,19
28:22,23 29:20
30:1,22 31:15
32:3 34:8
35:11,15,24
36:12,15 38:12
40:7,11,18
43:7 44:3,8
45:4,5,9,11,12
46:11,13,14
47:8 48:9 49:4
49:6 52:20
55:21 56:19,22
57:6 61:2,9
**inmate's** 25:19
25:24 26:1
46:7 52:14
**inmates** 8:24
10:7,11 11:19
12:3 16:1,9,12
16:21 17:3
21:21 27:3,12
30:14 31:22
34:19 36:16,24
37:5,10 56:24
57:7,17 58:14

58:16 60:10
61:4
**intake**   9:23
  10:1,1,2,3,7,7
  10:11,14,18,19
  10:23,24 11:3
  12:14 28:15
  48:14 50:1,6
**interested**   4:21
  63:13
**interesting**
  28:20
**interruption**
  20:6 31:2
  48:13 54:7
**intranet**   11:5,6
  12:8,9,11
  53:22 54:15,25
**investigate**
  8:20 9:2,8
  52:12
**investigation**
  57:14
**involved**   16:19
**issue**   13:11
  19:2 46:6
**issues**   12:22
  13:2,5 14:9
  15:3 50:7
  57:17,22
**issuing**   58:4

**j**

**j**   1:23 63:3,19
**jail**   8:25 10:8
  11:15,21 12:4

16:2,5 20:14
20:17,21,25
27:4,17,20
30:24 32:5
37:9 38:8 48:7
56:25 57:8
58:12,17 61:4
61:10,11
**january**   29:3
  58:21
**jason**   2:7 5:6
**jdevore**   2:10
**jimenez**   52:4
**job**   1:25 8:12
  8:14
**joined**   18:11
**june**   8:1 40:7
  41:14 51:1,3,3
**justice**   12:23

**k**

**k**   15:11
**keep**   22:20,21
  24:23 27:17
  42:19,22,25
  49:10
**keeps**   35:2
**kept**   11:4 14:3
  14:7,17 27:11
  43:12
**keyword**   47:22
**kienlen**   15:9
**kind**   10:5 21:19
  21:24 26:3
**know**   6:9,18,20
  6:22 8:5 11:4

12:19 14:3,7
15:10,14 16:15
16:18,24 19:5
19:11,24 20:9
20:12,16 24:9
24:18,21 25:14
26:20 27:16
28:14 30:3,8
30:21,22 31:14
32:12,20 33:21
34:23 35:2,4
36:10,21,23
37:15,18,19
38:14,16,17,17
42:1,25 43:3,5
43:22 44:1,2
44:11,14,17,20
44:21,24 45:12
45:17,25 47:4
47:10,13,17,20
48:3,15 52:5,7
52:10,19 53:16
53:23,25 54:22
59:15 60:18
61:7,8
**knowing**   13:1
**knowledge**
  15:11 34:21,23
  48:19
**known**   17:6
  31:8

**l**

**l**   15:11
**lack**   9:9

**layperson**
  32:15
**learn**   25:7
**leave**   56:11
**left**   14:16,22,25
  61:16,19
**legal**   64:1 67:1
**length**   36:21
**lengthy**   31:18
**lenses**   31:25
  32:8 46:3
**letter**   64:19
**lewis**   1:12 2:2
  4:15 5:4
**line**   64:13 66:7
  67:3
**listed**   17:18
  43:12 48:7,8
  52:2 66:7,17
**listing**   66:7
**litigation**   7:16
  8:3
**little**   37:20,21
  40:10
**llp**   1:12 2:2
  4:15
**load**   36:22
**located**   20:23
**location**   4:14
**log**   42:19,22
**logged**   23:23
  24:7
**long**   14:20
  29:24 36:19
  41:23 43:22

**[long - mute]**

44:11,15 46:10 55:21
**longer** 34:19
**look** 10:2 22:17 28:8 33:5 34:3 36:3 38:25 49:3,20 51:16 54:3 55:12 58:16
**looked** 11:11 33:11 40:11 50:24 56:17 59:23
**looking** 19:15 47:20 48:16
**looks** 51:16 52:13 53:6
**lot** 6:20,23 34:21 57:12 60:12,14
**lots** 30:7
**love** 48:2
**lower** 46:25

**m**

**madam** 64:10
**made** 13:15,25 42:19,22 43:1 55:14 58:10 65:7
**mail** 42:9 54:9
**mails** 42:11,13 42:15
**maintains** 10:25

**make** 10:20 16:4 17:20 18:2 26:10,22 44:7 46:16 54:8,9
**making** 26:11
**manage** 13:18
**manager** 51:24 51:24,25 52:3 52:5
**maria** 2:2 5:4 12:1
**maria.doukas** 2:4
**mark** 28:1 33:1 35:18 39:23 48:21
**marked** 28:5,7 33:2 35:20 40:1 48:25 53:3
**marking** 53:2
**matter** 4:10 50:2,4
**mean** 9:19 10:1 15:23 18:23 39:18 60:10
**meaning** 9:7
**means** 6:5 36:10 60:12
**mechanism** 59:12
**media** 4:8 37:25 38:4 56:4,8 61:24

**medical** 11:17 11:18 12:3 15:25 16:22 17:3,24 19:1,7 19:8,9,20 21:9 21:25 25:1,19 27:3,11,13,16 27:20 31:10 36:4,12 39:1 39:20 47:1,12 47:16,18,21 48:17,18 58:11
**medically** 21:7
**medication** 8:9 8:11 9:20,21
**medications** 9:22 46:24
**memorized** 19:3 54:24
**mental** 15:25 17:24 19:2 21:9,25 22:19 22:19 23:4 46:25
**mentioned** 11:13 12:8
**met** 10:21
**metal** 31:22 32:3
**methods** 57:5
**microphones** 4:3
**midwest** 64:17 67:1

**mike** 6:15 50:13
**milo** 2:14 4:17
**mind** 17:14
**mine** 22:3
**mini** 62:5
**minutes** 56:1
**monitoring** 58:2
**monroe** 2:8
**month** 33:11,16 34:10,14,19 40:10
**months** 33:20 36:5,17,19 39:1,19 40:15 41:17,20 49:10 50:10
**morgan** 1:12 2:2 4:15 5:4
**morganlewis....** 2:4
**morning** 4:1 5:15
**motion** 56:12 61:19,21
**moved** 14:22 17:7
**movement** 30:7 51:5
**moving** 51:5
**multiple** 48:9 49:16
**mute** 4:4

| n | | | |
|---|---|---|---|
| **n** 3:1 15:11,11 | **north** 1:13 2:3 | 13:17,19 14:10 | **okay** 6:13 7:1 |
| **nail** 57:22 | 4:15 | 14:10,12,16,20 | 10:17 11:3,9 |
| **name** 4:17 5:15 | **northern** 1:3 | 14:25 15:5,7 | 11:13,18 13:4 |
| 15:10 29:15 | 1:16 4:13 | 15:12,14,16 | 13:24 14:24 |
| 33:6 44:20 | **notarial** 63:15 | 16:20 17:2,24 | 15:7 16:8,11 |
| 52:2 64:6 65:3 | **notarized** | 44:23 45:14,15 | 16:20 17:16 |
| 65:4,15 66:3,4 | 64:14 | 45:15,17 46:9 | 19:17,23,23 |
| 66:21 | **notary** 1:24 | 46:22 47:11 | 21:2,4,7,10,14 |
| **named** 7:9,12 | 63:3,20 64:25 | | 21:22,24 23:2 |
| 7:14 8:2,6 | 65:10,18 66:15 | **o** | 23:14 24:18,23 |
| **nearsighted** | 66:23 67:23 | **oath** 4:20 6:2 | 25:17 26:14,18 |
| 32:17 | **note** 4:3 29:25 | **object** 27:5 | 27:1,14,23 |
| **necessarily** | 30:10 64:12 | **objection** 32:10 | 28:11,19,20 |
| 31:4 | **notes** 63:10 | 32:22 43:20,25 | 29:17 30:5,10 |
| **need** 6:11 25:7 | **notice** 1:17 | 61:6 | 30:14,19 31:12 |
| 25:11 32:8 | 51:21 | **objections** 4:22 | 31:15 33:1,18 |
| 37:6 | **noticing** 5:3 | **obtaining** | 35:10,13,21 |
| **needed** 43:15 | **number** 4:8,14 | 34:25 55:23 | 38:20,24 40:2 |
| **needs** 22:18 | 5:21 10:11 | **obviously** | 40:4,14 41:10 |
| 43:14 | 17:17,17,18 | 30:20 | 42:7,8 45:12 |
| **never** 33:20 | 24:8,10,11,12 | **occasion** 16:11 | 46:19 47:4,13 |
| 49:11 58:8 | 24:13 26:9 | 26:3 | 47:17 48:12,15 |
| 59:22 | 28:11,12,14 | **occur** 39:9 | 48:21 49:3 |
| **new** 19:18 | 55:13 64:7,13 | **october** 41:11 | 51:13,23 54:12 |
| 23:25 24:2,4 | **numbers** 28:7 | 42:1,5 43:6 | 54:18 57:10,14 |
| 32:7,16 | 54:24 55:2 | 46:15 50:21 | 58:6,14,19,25 |
| **nice** 47:25 | 66:7 | 51:6 | 60:4 61:13 |
| **noncompliance** | **nurse** 16:9 | **offhand** 54:24 | **ones** 23:8 54:2 |
| 13:4 | 25:10 31:13 | **office** 20:22,23 | **online** 43:11 |
| **noncompliant** | 46:5 | 21:8 22:20,21 | 57:4 |
| 13:7 | **nurses** 15:22 | **officer** 20:11 | **open** 56:12 |
| **nonprescripti...** | 45:19,21,22,24 | **official** 65:15 | 61:16,19 |
| 53:8 | 46:2 | 66:21 | **operations** 9:21 |
| | **nursing** 9:17 | **oh** 11:25 61:21 | 9:21 |
| | 9:19 12:17,19 | **ohio** 64:2 | |

**ophthalmolo...** 36:24
**opinion** 32:11 32:15,23 61:7
**options** 31:21 43:3,7,11,14,15
**optometrist** 32:12 37:13 38:12,18 44:5 44:8,16 46:11 51:10 52:25 55:22,23 57:3 60:17,25 61:11
**optometrists** 36:23 37:15 38:14
**optometry** 37:2 37:3,8,15,18 38:8 41:10,16 46:8 48:4 50:20 52:18
**order** 25:12,13 29:19 31:6,8 32:13,16 37:12 43:11 57:4 62:2,5
**ordered** 62:3
**orders** 25:13 31:7,10 32:7 46:17,19,20,22 46:23,24,25
**organization** 48:18
**organizations** 12:9

**organized** 48:3 48:10
**original** 63:10
**outcome** 4:22 56:12 63:14
**outs** 42:25
**own** 17:18 23:18

**p**

**page** 1:1 3:3,4,6 3:8 40:4 41:5 58:22 64:13,15 66:7 67:3
**pair** 32:7,16
**paper** 18:8,16 18:17,18 26:23 27:10 28:2
**part** 10:12 21:3 25:16 29:12 53:14 66:9
**participating** 5:1
**particular** 25:24 28:22,25 31:16
**parties** 4:6 63:13
**parts** 10:20
**party** 4:20 7:16 8:3
**past** 36:5 39:1 57:7
**patient** 36:21 43:1

**patients** 14:4
**pending** 6:13 56:12 63:7
**people** 30:8
**percentages** 14:2,6,7
**perfect** 58:8
**perform** 45:24
**performance** 8:13 9:12
**performing** 15:18
**performs** 46:5
**period** 22:24
**person** 6:23 32:7 42:7,10 42:20 44:17
**personal** 32:3
**personally** 25:25 34:16 65:11 66:15
**personnel** 29:15 41:6
**phone** 42:8,23 64:3
**phones** 4:5
**physician** 46:21
**pick** 4:3 23:24
**picks** 23:5 24:1
**place** 1:12 4:6 9:23 12:15 30:9 63:10
**plaintiff** 1:5,15 2:5 4:10 5:5,11

**plastic** 31:25 56:24 57:8 61:4
**please** 4:2,4,23 5:1,9,15 6:9 9:3 12:1 34:6 54:11 55:7 62:4 64:11,11
**pleased** 57:20 58:7
**point** 6:11 18:11
**policies** 9:20 55:20
**policy** 3:14 10:2,21,22,23 10:24 11:3 53:6,16,21,24 54:10,14,21,22 54:23,25
**porter** 63:4,20
**possible** 16:25
**posting** 53:11
**power** 25:13 46:17,19,21 47:2
**practice** 30:10 39:17 40:25 44:4,7
**practicing** 16:9
**prep** 30:20
**prescribe** 46:3
**prescription** 32:8,18,19 37:6 43:10,15

43:16,18,23
44:3 53:8
55:15 57:3
61:5,8
**prescriptions**
32:20 43:19
**present** 2:13
4:25 9:14 14:4
18:12 21:15
**pretty** 21:15
**previous** 7:18
40:11 50:23
51:3
**previously**
61:16
**print** 11:1
**printout** 10:24
11:1
**prior** 57:16
**private** 4:4
**probably** 5:23
5:25 52:17
**problems** 13:21
13:23 34:15
36:25 44:9
**procedure** 1:16
55:12 65:5
66:5
**proceed** 5:9
**proceeding**
4:23
**proceedings**
63:9,10
**process** 9:11
10:12 16:17,18

20:12 21:24
24:21 27:18
35:4 46:14
48:17 52:11
55:14,17 57:16
58:3,25 59:18
61:3
**processed** 24:5
**processes** 61:9
**produced** 11:8
19:14,16 53:24
55:6,6
**production**
64:15,17,22
**program** 25:15
35:5
**programs**
12:14
**proper** 16:5
**propounded**
63:7
**provide** 44:5
53:7
**provided** 10:11
61:11
**provider** 25:10
25:12,12 27:16
31:13
**providers**
46:20,25 47:15
**provides** 55:13
55:15
**providing**
26:14 31:4

**public** 1:24
63:3,20 65:10
65:18 66:15,23
67:23
**purpose** 28:16
53:7
**pursuant** 1:17
**put** 6:16 22:23
23:2 27:21,21
28:15 36:12
39:23 51:9
**putting** 36:4,10
38:25

**q**

**question** 7:20
8:5 9:6,10
11:23 13:3
14:5,19 16:23
20:8 27:6
35:17 44:19
**questions** 6:5,8
6:13 7:5 10:19
21:5 50:2
56:11,16 58:20
63:7
**quick** 60:2 61:2
**quickly** 6:1
13:25 14:4
**quite** 9:22

**r**

**radunsky** 2:7,8
3:4 5:6,6 6:22
6:25 11:8,10
11:22,25 19:13

20:2 22:10
24:10,16 25:9
27:5,24 28:2
28:20 29:4
32:10,22 33:13
37:20 38:22
43:20,25 44:24
48:22 53:25
54:12,18 55:8
55:10 56:2,15
60:1,4 61:6,14
61:18,21 62:2
62:4 64:5
**raised** 12:23
**range** 21:14
**ranking** 47:2
**rare** 57:12
**reach** 42:16,25
46:16
**reaching** 60:24
**read** 29:6,17
33:22,25 34:6
36:8 39:1,16
40:17 49:17,23
65:5,6,12 66:5
66:6,17
**readers** 32:13
32:13
**reading** 29:18
64:19
**ready** 22:4
**real** 61:2
**really** 8:9 11:16
26:5 36:21
44:17 50:5

**reason** 7:4
64:14 66:8
67:3
**reasons** 30:4
**recall** 7:10,14
7:21 8:3,7,10
13:1,9 15:7
29:23,24 35:16
36:18 39:4,15
40:21,23 51:8
51:11 60:15,20
**receipt** 64:18
**receive** 21:11
22:6,13 34:20
36:12 44:22
60:12
**received** 15:21
29:12 36:8
40:18 51:21
52:20 60:14
**receiving** 17:21
18:2,3 26:10
27:2 36:15
**recess** 38:2
56:6
**recollection**
13:4 60:23
**recommended**
56:19 57:6
**record** 4:2,7
5:2,16 18:6
25:19 27:13
31:10 33:13
37:23 38:1,5
42:25 47:16

49:25 51:13
55:25 56:5,9
62:1 63:11
66:9
**recorded** 1:9
3:1 4:9
**recording** 4:5
**records** 14:16
23:18 24:23
27:11 47:12,18
47:21,24 48:17
48:18
**redirect** 3:5
60:5
**refer** 29:19
34:8 46:8
**reference** 64:7
65:2 66:2
**referenced**
38:11 65:11
66:15
**referral** 41:7
43:24
**referred** 35:11
43:7
**referring** 8:21
10:7,22 28:12
31:17 43:12
**refers** 31:15
**reflects** 49:25
**refusal** 33:20
49:12
**regarding**
14:17 31:19
34:9,21 43:1

53:7 54:21
60:13,14
**related** 4:20
29:20 58:12
60:7
**relating** 60:23
**relationship**
11:13
**relative** 63:12
63:13
**relevant** 55:3
**remember** 7:17
8:9 11:10 42:7
**remote** 6:21
**remotely** 5:1
**repeat** 47:19
**repeatedly**
60:16
**rephrase** 14:5
26:7,8 34:17
45:2,3
**report** 13:19
15:22 50:3,3,9
51:19,25
**reported** 1:22
49:25 50:6
63:9
**reporter** 4:18
5:8 20:6 31:2
48:13 54:7
65:7
**representing**
4:17 50:9
**request** 13:6,7
13:13,16,22,25

14:9,18 15:4
16:12,15 17:5
20:3 25:11
36:14 44:22
45:7,10,13
46:22 47:4,8
48:5,6,9 54:9
54:10 55:15,17
66:9,11
**requested**
16:22
**requesting** 25:1
30:2 34:24
44:4 51:19
55:22
**requests** 35:3
45:4
**require** 30:20
43:14,16 61:5
**required** 22:24
64:25
**reserve** 61:15
61:15
**residence** 63:20
**respond** 22:25
23:12 29:25
**responded**
23:18 24:19
**responding**
25:20 33:25
**response** 13:12
23:14,17,21
26:15 27:18
29:15,17 31:4
31:15 34:4,7

**[response - service]** Page 16

35:10,15 36:8
41:6 49:21
50:19,23
**responses**
24:24 58:4
**responsibilities**
8:17 9:12
**responsibility**
8:19
**responsible**
25:25 38:11
**rest** 22:20,21
**result** 31:4
**retention** 48:17
**retired** 55:3
**returned** 64:18
**review** 10:12
23:12 58:3,11
58:12 64:12
65:1 66:1
**right** 6:19 29:1
29:3 32:1,9
38:8,12,15,22
38:23 39:21
41:11,14,17
49:19 56:11
58:9,10 59:5
60:1 61:23
**rn** 1:9 3:1 4:9
5:10 62:1 63:5
64:8 65:4,9
66:4,13 67:20
**role** 8:19 17:10
25:2 26:5,10
26:13,14,16

29:12 46:16
**roles** 8:17 9:13
15:18,20
**room** 9:20,21
**rpr** 1:23 63:19
**rules** 1:16 6:1
65:5 66:5
**run** 47:21

**s**

**s** 2:7 3:8 64:5
64:15 66:8,8
67:3
**savich** 2:14
4:17
**saw** 59:5
**saying** 10:15
39:19 50:8,12
**says** 29:7 33:18
36:4 38:25
40:14 53:11
54:21 55:13
**scan** 23:17
**scanned** 47:7,9
47:10,13
**scanning** 47:11
**schedule** 25:2,7
25:22,24 26:17
34:22 37:19
42:2
**scheduled**
25:23 29:19,22
30:1,25 31:5
34:8,12 41:4
41:10 50:20
52:19

**scheduler** 26:3
26:11,16 29:23
35:1,2,6 38:10
39:6,8,11 41:2
41:3 42:17
46:16,17
**schedulers** 25:6
25:7,9 38:10
42:20,23,25
**schedules** 25:5
31:6 35:3
**scheduling**
25:15 26:1
29:23 38:11
42:4,8,11,16
43:1 44:17,21
44:21 51:9
60:16,24
**seal** 63:15
65:15 66:21
**search** 47:21
**searchable**
47:17
**second** 50:19
**section** 48:6
**security** 30:4,5
**see** 10:2,3
14:16 22:18
25:12,22 27:9
27:16 28:11,25
29:7,10,10
31:21 33:5,6,9
33:18,19,21,24
34:14 35:23
36:5,6,17

38:12 39:19
40:5,8,15,16,21
41:6,20,22
43:3,6 44:8,12
44:15 45:23
46:10 49:4,7
49:10,13,15,17
50:21 51:20
52:25 53:9
54:3,22 57:12
60:15
**seeing** 16:1
**seeking** 60:10
**seen** 13:9 14:4
28:9 33:3
34:10 35:21
40:2 49:1 53:4
**send** 42:11
**sending** 42:13
42:15
**sensitive** 4:3
**sent** 18:12
30:23 35:13
**sentence** 49:24
50:20
**separate** 20:25
**seriously** 39:21
**service** 13:6,7
13:12,16,22,25
14:9,18 15:4
16:12,15 17:5
25:11 31:14
36:14 45:9,13
46:22 47:4,8
48:5,6,9 55:17

| | | | |
|---|---|---|---|
| **services** 7:19 11:14 12:24 13:15 14:8 15:3 20:3,20 34:18 45:6,7 52:8 55:13 | **signing** 64:19 **signs** 33:23 **sincerely** 64:21 **sir** 64:10 **site** 36:24 37:12 **six** 36:5,16,19 39:1,19 | **spell** 15:10 **spoken** 59:22 **staff** 38:14,18 44:23 **stamp** 22:8,12 22:13 **stamped** 58:22 | **step** 10:2,3 18:7 18:7 46:6 **steps** 15:2 39:2 48:15 51:8 56:18 **stored** 47:5,14 53:21 |
| **set** 23:22 63:15 **shebel** 1:9 3:1 4:9 5:7,10,17 5:18 56:10 61:25 63:5 64:8 65:4,9 66:4,13 67:20 | **skip** 41:5 **slips** 36:5,12 39:1 **soliciting** 32:14 **solutions** 64:1 67:1 | **standard** 30:10 44:4,7 55:21 **start** 12:15 14:21 20:8 21:18 26:20 27:21 40:4 | **street** 2:8 **strike** 14:5 15:1 26:20 35:14,17 35:17 36:11 43:4,14 **stroger** 37:1 |
| **sheet** 17:14,19 18:2 22:1 23:23,24 24:6 64:13 66:7,10 66:18 67:1 | **somewhat** 28:4 **sooner** 39:3 41:4 43:6 51:10 60:25 | 42:13,15 49:3 **started** 9:17 **starting** 14:3 **state** 1:24 4:23 5:1,15 41:10 | **subject** 32:23 **submits** 27:14 **submitted** 44:22 **subscribed** 65:10 66:14 |
| **shift** 15:22 42:17 **shorthand** 63:10 | **sorry** 11:24 20:4 22:10 29:6 34:17,23 35:14 39:24 59:15 | 63:4,20 65:10 66:15 **stated** 49:23 60:7 **statement** | 67:21 **successfully** 57:8 **suite** 1:13 2:3,8 4:16 64:2 |
| **show** 28:17 **shown** 64:16 **side** 6:16 39:23 58:12 **sided** 28:2 **signature** 29:15 34:3 41:7 49:21 61:15 63:18 64:14 | **sort** 16:16 27:1 27:9 34:24 48:16 52:11 55:20 57:21 58:15 **specialist** 36:17 **specific** 16:25 19:5 25:18 28:22 48:3 | 65:13,14 66:19 66:19 **states** 1:2,16 4:12 49:14 51:19 52:18 **stating** 49:9 **statistic** 10:6 **statistics** 14:3 | **superior** 64:1 **supposed** 30:3 **sure** 6:19 7:2 9:7 10:20 16:4 17:20 18:2 26:11,22 27:6 56:2 **surprised** |
| **signed** 33:20 49:12 65:13 66:18 | **specifically** 31:11 39:15 60:23 | 14:17 **staying** 40:14 **stenographic...** 1:22 63:9 | 60:15,18 **susan** 1:9 3:1 4:9 5:7,10,17 |

38:22 61:25
63:5 64:8 65:4
65:9 66:4,13
67:20
**swear**  5:9
**sworn**  5:12
63:6 65:10,13
66:14,18 67:21
**system**  7:23
17:13 18:24
19:4 47:2
48:18 57:24
**systems**  7:25
8:4 12:7,10

**t**

**t**  3:8
**take**  4:6 9:25
10:2 18:7 21:6
23:6,6 24:20
28:8 34:13
37:20 39:2
46:10 62:4
**taken**  4:9 10:3
10:4 15:2
30:16 37:8
38:2 39:21
42:1 48:15
56:6
**talked**  57:5,18
60:22
**talking**  20:2
32:14 38:7
56:22
**tasked**  17:11

**tell**  8:10 26:16
37:21 59:21
**telling**  41:16
**ten**  49:10 50:10
**terms**  9:12
17:10 20:19
36:23
**testified**  5:12
7:18 8:6
**testify**  63:6
**testifying**  7:15
**testimony**  65:6
65:7 66:6,9,12
**text**  47:17
**thank**  7:1 11:9
12:8 24:11
50:15,17 54:13
54:16
**theirs**  23:5
**thereof**  63:11
**thing**  18:1
21:20 22:8
58:19
**things**  30:7
48:20 57:6
**think**  7:4 17:7
19:13 32:10,22
38:7 39:18
48:19 58:10
60:1,22 61:6
61:14
**thirty**  64:18
**thousand**  58:10
**three**  5:23 7:8
33:20 42:14

56:8 59:23
61:24
**till**  42:1 43:22
**time**  1:11 4:5
4:23 13:5 15:8
16:1,8,13,20
17:22 21:6
22:24 29:18
30:9 36:19,21
37:24 38:3,15
38:18 41:23
45:17 46:9
54:3 56:3,7
58:2 61:23
62:6 63:9
**timeframe**  13:22 17:1
**timeliness**  17:3
**timely**  13:9,12
58:4
**times**  5:20,23
7:8 26:9 58:11
**tired**  37:21
**title**  8:12,14
**today**  6:3,8,11
7:6 15:12,14
18:15 26:23
**told**  33:23
41:19 49:11
**tom**  1:7 4:11
64:6 65:3 66:3
**top**  28:11 29:6
33:5,8 35:23
40:5 49:4
53:11

**tour**  21:6 37:8
**tradunsky**  2:10
**transcribed**
63:10 65:7
**transcript**
63:11 64:11,12
65:5,12 66:5
66:11,17
**transfer**  17:14
17:19 22:1,4
23:24 24:6
**treated**  36:25
**treatment**
36:13
**trees**  28:3
**trend**  21:19
**triage**  45:23
**troy**  2:7 5:6
64:5
**true**  63:11
**truth**  63:6,6,7
**truthfully**  6:6
**try**  39:8 40:21
42:4 48:15
**trying**  10:18
14:8 15:1
16:24 27:9,17
28:3 33:19
40:15 48:20
49:9 60:24
**tuesday**  23:6,9
**tuesday's**  23:6
23:8
**two**  5:23 7:8
28:2 38:4

**[two - witness]**

42:14,14 56:4
59:15
**type** 8:7 24:6
57:10
**types** 57:11
**typewritten**
63:11
**typical** 29:25
34:13 36:16
**typically** 32:18
34:19 39:5,8
39:11

**u**

**uh** 41:18 55:8
55:10
**under** 6:2 19:7
19:8,8 29:15
31:10 48:8,10
49:21 53:6
54:20 55:12
**understand** 6:2
6:6,8,14 7:20
9:5 10:17 13:3
26:22 27:6,7
27:10,18 43:19
**understanding**
6:1 13:24
44:14 52:15
53:1 56:23
57:15 58:3
**understood**
59:17
**undetermined**
63:8

**unit** 4:8 37:25
38:4 56:4,8
61:24
**united** 1:2,16
4:12
**unrelated**
24:15
**unsuccessful**
56:20
**untimeliness**
13:16
**updated** 53:16
53:19,21,23
54:1,4,10,14
55:1
**ups** 60:2
**use** 10:17 11:15
27:24 32:4
45:20 61:9
**used** 28:15 57:7
**usual** 62:5

**v**

**v** 64:6 65:3
66:3
**valid** 43:23
44:3 61:5
**varies** 21:12
**various** 12:14
12:20
**veritext** 4:17,19
64:1,7 67:1
**veritext.com.**
64:17
**versus** 4:11

**video** 1:9 3:1
4:5,9 38:1,5
56:5,9 62:1
**videographer**
2:14 4:1,18 5:8
6:15 7:2 37:22
37:24 38:3
50:13,16 56:3
56:7 61:23
**vision** 19:5
29:9,20 31:18
31:19 34:9,14
34:20 36:20,25
41:25 44:4,9
45:4,24 46:2,5
46:7 55:14
57:10 60:7,10
60:13,15 61:10
**visit** 36:25
37:13
**visual** 54:21
**vs** 1:6

**w**

**wacker** 1:13
2:3 4:16
**wait** 34:19
36:19 44:7,8
52:24 55:21
**waiting** 36:16
41:19,22
**waived** 64:19
**walking** 21:24
**want** 6:1 10:17
11:15 18:6,7
32:16 45:19

48:21 50:1
56:11 57:21
**wanted** 19:19
31:18 50:6
57:14 59:19
**wanting** 29:9
**wants** 46:14
**warranted**
55:16
**way** 48:3
**ways** 56:23
**we've** 28:7
55:18
**wear** 49:25
51:19
**wearing** 50:3,4
50:9
**wears** 32:16
**wednesday**
1:10 63:6
**week** 11:11
**went** 17:14
38:7
**west** 2:8
**whereof** 63:15
**whispering** 4:4
**williams** 15:15
**williamson**
15:15
**witness** 1:15
5:9,11 7:13,14
11:24 22:11
54:5,14,17
63:15 64:8,11
65:1,4,11 66:1

**[witness - zero]**                                    Page 20

| | |
|---|---|
| 66:4,15 | **year**  5:23 7:9 |
| **witness'**  64:14 | 21:17 28:18 |
| **word**  9:9 11:15 | 41:22 44:8 |
| 45:20 48:16 | **years**  5:24 7:9 |
| **worded**  31:20 | 21:23 40:23 |
| **words**  58:14 | 42:14,14 57:22 |
| 59:18 | **z** |
| **work**  24:22 | **zero**  21:12,14 |
| 29:10 35:4,6 | |
| 37:15 45:21 | |
| 53:14 57:1,2 | |
| **working**  34:17 | |
| 45:17 | |
| **works**  42:17 | |
| **worse**  29:9 | |
| 33:22 36:7 | |
| 39:20 40:17 | |
| 49:14 | |
| **write**  10:3 | |
| 17:14 23:17 | |
| **writes**  25:12 | |
| **writing**  33:24 | |
| **wrong**  54:1 | |
| **x** | |
| **x**  3:1,8 | |
| **y** | |
| **yeah**  12:3,17 | |
| 17:9 19:14,16 | |
| 20:8 21:9 22:3 | |
| 23:10 26:7 | |
| 27:24,25 29:4 | |
| 45:4 47:20,23 | |
| 48:2 57:19 | |

Illinois Code of Civil Procedure

Article II, Part E

Rule 207, Signing and Filing Depositions

**Signing and Filing Depositions**

(a) Submission to Deponent; Changes; Signing.
Unless signature is waived by the deponent, the
officer shall instruct the deponent that if the
testimony is transcribed the deponent will be
afforded an opportunity to examine the deposition
at the office of the officer or reporter, or
elsewhere, by reasonable arrangement at the
deponent's expense, and that corrections based on
errors in reporting or transcription which the
deponent desires to make will be entered upon the
deposition with a statement by the deponent that
the reporter erred in reporting or transcribing the
answer or answers involved. The deponent may not
otherwise change either the form or substance of
his or her answers. The deponent shall provide the
officer with an electronic or physical address to
which notice is to be sent when the transcript is
available for examination and signing. When the
deposition is fully transcribed, the officer shall
deliver to the deponent, at the address supplied,

notice that it is available and may be examined at a stated place at stated times, or pursuant to arrangement. After the deponent has examined the deposition, the officer shall enter upon it any changes the deponent desires to make, with the reasons the deponent gives for making them. If the deponent does not appear at the place specified in the notice within 28 days after the mailing of the notice, or within the same 28 days make other arrangements for examination of the deposition, or after examining the deposition refuses to sign it, or after it has been made available to the deponent by arrangement it remains unsigned for 28 days, the officer's certificate shall state the reason for the omission of the signature, including any reason given by the deponent for a refusal to sign. The deposition may then be used as fully as though signed, unless on a motion to suppress under Rule 211(d) the court holds that the reasons given by the deponent for a refusal to sign require rejection of the deposition in whole or in part.

(b) Certification, Filing, and Notice of Filing.

(1) If the testimony is transcribed, the officer

shall certify within the deposition transcript that the deponent was duly sworn by the officer and that the deposition is a true record of the testimony given by the deponent. A deposition so certified requires no further proof of authenticity

(2) Deposition transcripts shall not be filed with the clerk of the court as a matter of course. The party filing a deposition shall promptly serve notice thereof on the other parties and shall file the transcript and any exhibits in the form and manner specified by local rule.

DISCLAIMER: THE FOREGOING CIVIL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE STATE RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the

foregoing transcript is a true, correct and complete

transcript of the colloquies, questions and answers

as submitted by the court reporter. Veritext Legal

Solutions further represents that the attached

exhibits, if any, are true, correct and complete

documents as submitted by the court reporter and/or

attorneys in relation to this deposition and that

the documents were processed in accordance with

our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining

the confidentiality of client and witness information,

in accordance with the regulations promulgated under

the Health Insurance Portability and Accountability

Act (HIPAA), as amended with respect to protected

health information and the Gramm-Leach-Bliley Act, as

amended, with respect to Personally Identifiable

Information (PII). Physical transcripts and exhibits

are managed under strict facility and personnel access

controls. Electronic files of documents are stored

in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.