Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

CASE NO:  19-CV-07380

 - - - - - - - - - - - - - X

DONALD HENNEBERG,

                    Plaintiff,

        -against-

TOM DART, ET AL,

                    Defendants.

 - - - - - - - - - - - - - X

                    Virtual Deposition

                    Chicago, IL

                    January 29, 2025

                    12:25 p.m., EST


           REMOTE ZOOM EXAMINATION BEFORE

TRIAL of DR. ANDREW Q. DEFUNIAK, a 30B6

Witness in the above-entitled action, held

at the above time and place, pursuant to

Notice, taken before Tracie Shand, a

shorthand reporter and Notary Public

within and for the State of New York.

Page 2

Dr. Andrew Q. DeFuniak

1
2  A P P E A R A N C E S:
3
   MORGAN, LEWIS & BOCKIUS, LLP
4     Attorneys for Plaintiff
      110 North Wacker Drive
5     Chicago, Illinois 60606
   BY:  JOHN P. GUYETTE, ESQ.
6        VIA ZOOM
7
8  DEVORE RADUNSKY, LLC
      Attorneys for Defendants
9     230 W Monroe, Suite 230
      Chicago, Illinois 60606
10 BY:  JASON DEVORE, ESQ.
         VIA ZOOM
11
12
13
   ALSO PRESENT:
14   Troy S. Radunsky, Esq., DeVore
     Radunsky, Esq.
15   Tim Gordan, Esq., Morgan Lewis &
     Bockius
16
17
18
19
20
21
22
23
24
25

Page 3

Dr. Andrew Q. DeFuniak

1
2       S T I P U L A T I O N S
3       IT IS HEREBY STIPULATED AND
     AGREED by and between the attorneys for
4  the respective parties herein, that
     filing, sealing and certification be and
5  the same are hereby waived.
            IT IS FURTHER STIPULATED AND
6  AGREED that all objections, except as to
     the form of the question shall be reserved
7  to the time of the trial.
            IT IS FURTHER STIPULATED AND
8  AGREED that the within deposition may be
     signed and sworn to before any officer
9  authorized to administer an oath, with the
     same force and effect as if signed and
10 sworn to before The Court.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

Dr. Andrew Q. DeFuniak

1
2       THE VIDEOGRAPHER:  Good
3  afternoon or good morning, everyone.
4  We are going on the record at 11:23
5  a.m. (Central standard time) on
6  January 29, 2025.
7       Please, note that this
8  deposition is being conducted
9  virtually.  Quality of recording
10 depends on the quality of camera and
11 internet connection of the
12 participants.  What is seen from the
13 witness and heard on screen is what
14 will be recorded.  Audio and video
15 recording will continue to take place
16 unless all parties agree to go off the
17 record.
18      This is media unit one in the
19 video recorded deposition of Dr.
20 Andrew Q. DeFuniak, taken by counsel
21 in the matter of Henneberg, Donald,
22 versus Dart, Tom, et al.  Filed in the
23 US District Court for The Northern
24 District of ILLINOIS, case number 19,
25 hyphen, CV, hyphen, 07380.

Page 5

Dr. Andrew Q. DeFuniak

1
2       This deposition is being
3  conducted remotely using virtual
4  technology.  My name is Rob Adams
5  representing Veritext Legal Solutions
6  and I'm the videographer.
7       The court reporter is Tracie
8  Shand from the firm Veritext Legal
9  Solutions.
10      I'm not authorized to administer
11 an oath.  I'm not related to any party
12 in this action, nor, am I financially
13 interested in the outcome.
14      If there are any objections to
15 proceeding, please, state them at the
16 time of your appearance.
17      Counsel and all present,
18 including remotely, will now state
19 their appearances and affiliations for
20 the record, beginning with the
21 noticing attorney.
22      MR. GUYETTE:  Good morning.  My
23 name is John Paul Guyette with the law
24 firm Morgan, Lewis & Bockius, LLP, on
25 behalf of the plaintiff, Donald

2 (Pages 2 - 5)

Page 6

1 Dr. Andrew Q. DeFuniak
2 Henneberg. I'm also joined by my
3 colleague, Tim Gordan.
4 MR. DEVORE: Good morning.
5 Jason DeVore D-E-V-O-R-E, of DeVore
6 Radunsky, LLC, representing Cook
7 County Sheriff's Office, and Cook
8 County, and presenting the witness
9 today.
10 MR. RADUNSKY: Troy Radunsky,
11 also, for the defendant, Cook County.
12 THE WITNESS: Dr. Andrew
13 DeFuniak, D-E-F-U-N-I-A-K, with Cook
14 County.
15 THE VIDEOGRAPHER: Tracie, you
16 can go ahead and swear in the witness.
17 THE REPORTER: Counsel, I have a
18 short statement I would like to make
19 to help everything go as smoothly as
20 possible considering we are not all in
21 the same room.
22 Because we are all appearing
23 remotely, I would like to ask everyone
24 to be more conscious than ever of not
25 speaking over each other. If I cannot

Page 7

1 Dr. Andrew Q. DeFuniak
2 hear the end of a question, or the
3 beginning of an answer, you are going
4 to have a very poor record. If the
5 witness can take a pause before
6 answering to allow the attorneys to
7 object, this will be extremely
8 helpful. I really don't want to
9 disrupt your deposition flow, but
10 understand, my goal is to provide you
11 with a clear record of today's
12 proceedings.
13 If everyone is ready, I will
14 swear in the witness, Before I do
15 that, I am going to need a stipulation
16 to allow me to swear the witness
17 remotely. I just need a stipulation
18 to allow me to swear in the witness
19 over the phone/Veritext virtual
20 videoconference, Zoom, and that the
21 witness has verified that he is, in
22 fact, Dr. Andrew Q. DeFuniak.
23 THE WITNESS: Yes.
24 MR. DEVORE: So stipulated.
25 MR. GUYETTE: Plaintiff agrees.

Page 8

1 Dr. Andrew Q. DeFuniak
2 DR. A N D R E W Q. D E F U N I A K, the
3 witness herein, having been first duly
4 sworn by a Notary Public of the State of
5 New York, was examined and testified as
6 follows via Zoom:
7 EXAMINATION BY
8 MR. GUYETTE:
9 THE REPORTER: State your name
10 for the record, please.
11 THE WITNESS: Dr. Andrew Q.
12 DeFuniak. A-N-D-R-E-W,
13 D-E-F-U-N-I-A-K.
14 THE REPORTER: State your
15 business address for the record,
16 please.
17 THE WITNESS: Cermack Health
18 Services, C-E-R-M-A-K, 2800 South
19 California Avenue, Chiacgo, IL 60608.
20 Q. Good morning, Dr. DeFuniak. My
21 name is John Paul Guyette. I'm an
22 attorney with the firm Morgan, Lewis &
23 Bockius. We represent the plaintiff,
24 Donald Henneberg, in this matter. We
25 appreciate you taking the time today.

Page 9

1 Dr. Andrew Q. DeFuniak
2 Can you tell me who your current
3 employer is?
4 A. I'm employed by Cook County, in
5 general, but within the Cook County health
6 system.
7 Q. What's your current title, Dr.
8 DeFuniak?
9 A. My title is division chair of
10 correctional medicine.
11 THE REPORTER: Give me one
12 minute.
13 Thanks.
14 Q. Can you repeat your title, Dr.
15 DeFuniak?
16 A. Sure.
17 Division chair of correctional
18 medicine.
19 Q. How long have you held that
20 title?
21 A. About five years.
22 Q. So, since 2020, approximately?
23 A. Approximately.
24 2019, approximately.
25 Q. Dr. DeFuniak, before we begin I

3 (Pages 6 - 9)

Page 10

1    Dr. Andrew Q. DeFuniak
2  just want to go over a few of the ground
3  rules for the deposition; okay?
4        If you don't hear or understand
5  my question, please, let me know.  If you
6  answer the question, I'll assume you
7  understood it; okay?
8    A.   Okay.
9    Q.   It's important to answer
10 verbally as Tracie, our wonderful court
11 reporter, is taking all of the words down
12 via transcription.  So, she can't take
13 down head nods, or shakes of the head, or
14 hand gestures; do you understand that?
15   A.   Yes.
16   Q.   Is there anyone else in the room
17 with you?
18   A.   No.
19   Q.   Do you have a phone with you or
20 other device that you can communicate on?
21   A.   There's a desk phone here.  I do
22 have a cellphone.
23   Q.   I just ask that you mute your
24 cellphone or put it in airplane mode so
25 we're not disturbed during the deposition;

Page 11

1    Dr. Andrew Q. DeFuniak
2  okay?
3    A.   Okay.
4    Q.   If at any time you need a break
5  during the deposition, just let me know.
6  I'm happy to take a break.  The one
7  caveat, if there's a question pending, I
8  just ask that you answer the question
9  first before taking the break; do you
10 understand?
11   A.   Yes.
12   Q.   Same thing goes for me, I might
13 need a break after 40 minutes, maybe, to
14 use the bathroom.  I'll let you know.
15 We'll take a break, then, we'll come back
16 and continue with the deposition; does
17 that make sense?
18   A.   Yes.
19   Q.   You're under oath during the
20 deposition just like you would be in
21 court; do you understand what that means?
22   A.   Yes.
23   Q.   There may be times today when
24 your attorney, Mr. DeVore, objections to
25 one of my questions, which is fine.  He'll

Page 12

1    Dr. Andrew Q. DeFuniak
2  direct you whether you can answer the
3  question or not.  It's important that you
4  understand my question so that we can
5  create a clear record.
6        Again, if you don't understand,
7  please, let me know; do you understand?
8    A.   Yes.
9    Q.   You have been called as a
10 witness to testify on behalf of Cook
11 County today, not as a fact witness; do
12 you understand what that means?
13   A.   Yes.
14   Q.   What does that mean, in your own
15 words?
16   A.   I have been asked to testify on
17 behalf of Cook County regarding policies
18 and procedures within the jail.
19   Q.   Before we begin, these are
20 questions we ask in every deposition, it's
21 not meant to pry into your personal life,
22 but are there any medications or
23 controlled substances that you may have
24 taken that would impair your ability to
25 testify truthfully today?

Page 13

1    Dr. Andrew Q. DeFuniak
2    A.   No.
3    Q.   Is there anything that you can
4  think of that would somehow impair your
5  ability to testify today?
6    A.   No.
7    Q.   Have you ever been deposed
8  before, Dr. DeFuniak?
9    A.   Yes.
10   Q.   How many times?
11   A.   I don't keep track.
12        More than 10.
13   Q.   More than 10 times.
14        Were you ever deposed in your
15 personal capacity?
16   A.   Do you mean outside of --
17        (Simultaneous speaking.)
18   Q.   Outside of your employment with
19 Cook County?
20   A.   No.
21   Q.   So, all of the depositions that
22 you were referring to, were those in some
23 capacity regarding your employment with
24 Cook County?
25   A.   Yes.

Page 14

Dr. Andrew Q. DeFuniak

1
2    Q.    When was the last time you were
3    deposed?
4    A.    About a week ago.
5    Q.    What was the nature of that
6    deposition?
7    A.    It was another 30B6 deposition.
8    Q.    Do you know what the claims were
9    in that case?
10    A.    It was -- give me one second.
11        It was regarding a patient that
12    required some surgery at Cook County
13    Hospital.
14    Q.    Was the patient an inmate at
15    Cook County Jail or some other patient?
16    A.    He was an inmate at Cook County
17    Jail.
18    Q.    Do you know what the nature of
19    that particular inmate's claims were?
20    A.    He had wanted surgery to be done
21    sooner than it was scheduled.
22    Q.    Was type of surgery was it?
23    A.    He had a chronic neck condition.
24    They did surgery on his neck.
25    Q.    Do you know what the current

Page 15

Dr. Andrew Q. DeFuniak

1
2    status is of that case?
3    A.    No.
4    Q.    Have you been involved in any
5    other cases regarding the provision of
6    medical services?
7        MR. DEVORE:  Objection to form.
8    Q.    Have you been deposed in any
9    other cases that involved the provision of
10    medical services?
11    A.    All the cases I'm involved with
12    are referencing patients and medical
13    services.
14    Q.    So, when you testified about
15    being deposed, approximately, more than 10
16    times, all of those cases involved inmates
17    and the provision of medical services?
18    A.    I don't have a specific
19    recollection of all of them.  It's been
20    over the past 20 years.
21        In general, I think, they are
22    regarding medical issues.
23    Q.    Do you know if Cook County has
24    settled any cases involving medical
25    issues?

Page 16

Dr. Andrew Q. DeFuniak

1
2        MR. DEVORE:  Objection.
3        Form.
4        Outside the scope.
5    A.    In general has Cook County ever
6    settled a case; is that the question?
7    Q.    In the cases where you have been
8    deposed, do you know if Cook County has
9    ever settled any cases involving the
10    provision of medical services?
11        MR. DEVORE:  Same objection.
12    A.    I never follow-up on the outcome
13    of the cases.
14    Q.    Did you do anything to prepare
15    for today's deposition?
16    A.    I reviewed some policies
17    regarding our intake procedures and vision
18    procedures.
19    Q.    Do you recall what those
20    policies were titled?
21    A.    One was intake screening
22    process, I think.  I can't recall the
23    other one.
24    Q.    Aside from reviewing the vision
25    and intake policies, did you review any

Page 17

Dr. Andrew Q. DeFuniak

1
2    other documents?
3    A.    There were -- I think, I
4    reviewed some parts of the inmate
5    handbook.  I did see the intake note on
6    this patient.
7    Q.    When you say "this patient," are
8    you referring to Mr. Henneberg?
9    A.    Yes.
10    Q.    You said you reviewed the intake
11    note; what is that?
12    A.    Every time anyone comes into the
13    jail, they receive a medical and mental
14    health screening.
15        We call it intake.
16    Q.    Is that intake documented in a
17    note or notes?
18    A.    Yes.  The intake note is
19    documented in our electronic medical
20    system.
21    Q.    What's the name of that system?
22    A.    It's called C-E-R-N-E-R.
23    Cerner.
24    Q.    C-E-R-N-E-R?
25    A.    Yes.

5 (Pages 14 - 17)

Page 18

Dr. Andrew Q. DeFuniak

1
2    Q.   Do you know how long that system
3  has been in place?
4    A.   No.  More than 10 years.
5    Q.   Since 2015, approximately?
6    A.   At least, yes.
7    Q.   Do you know if there was a
8  system used before Cerner?
9    A.   Before Cerner, we used paper
10  charts.
11    Q.   Paper charts?
12    A.   Yes.
13    Q.   Were those paper charts
14  collected anywhere?
15    A.   The ones here at the jail were
16  collected, yes, and kept in the health
17  records department.
18    Q.   Where is the health records
19  department located?
20    A.   It's in the main building of
21  Cerner -- Cermak, sorry.
22    Q.   When you say "main building," is
23  that the same address that you stated
24  earlier?
25    A.   Yes.

Page 19

Dr. Andrew Q. DeFuniak

1
2    Q.   The 2800 South California Avenue
3  address?
4    A.   Yes.
5    Q.   We'll get back to the Cerner
6  system a bit later.
7         Other than the vision intake,
8  those two policies, as well as portions of
9  the inmate handbook, did you review any
10  other documents?
11    A.   Those were the main ones.  There
12  may have been some other policies that I
13  don't recall right now.
14    Q.   Did you meet with anyone to
15  prepare for today?
16    A.   Yes.  I met with my attorneys.
17    Q.   When did you meet with your
18  attorneys?
19    A.   We met, maybe, about a month
20  ago.  And we met a few days ago.  On
21  Monday.
22    Q.   When you met a month ago, for
23  how long?
24    A.   I don't recall.
25    Q.   How about a few days ago, how

Page 20

Dr. Andrew Q. DeFuniak

1
2  long was that meeting?
3    A.   Yeah, I wasn't keeping track.
4    Q.   Was anyone else present other
5  than you and your attorneys during those
6  meetings?
7    A.   No.
8    Q.   Did you discuss your deposition
9  today with anyone, other than your
10  attorneys?
11    A.   No.
12    Q.   Other than reviewing those
13  documents we already discussed, and
14  meeting with your attorneys, did you do
15  anything else to prepare for today's
16  deposition?
17    A.   No.
18    Q.   Dr. DeFuniak, I'm going to pull
19  up a document on the screen.  It's a copy
20  of your resume, which was forwarded to us
21  yesterday by your attorneys.
22         Just give me one second.
23         Let me know when you see that on
24  your screen?
25    A.   I see it.

Page 21

Dr. Andrew Q. DeFuniak

1
2    Q.   Do you recognize this document?
3    A.   Yes.
4    Q.   And what is it?
5    A.   It's my CV.
6    Q.   Is that curriculum vitae?
7    A.   Yes.
8    Q.   And is this current?
9    A.   It's fairly current.  I have
10  not -- I didn't have the opportunity to
11  update my title now.  My job title.
12    Q.   If I didn't say it before --
13         MR. GUYETTE:  We're going to
14  mark this as Plaintiff's Exhibit 1.
15  This is the CV of Dr. Andrew DeFuniak.
16         It's not currently Bates
17  stamped.  So, Jason, I would just
18  ask -- I'm sure it's not a problem --
19  some time after the deposition, if you
20  could send us an updated copy,
21  wherever we left off on the Bates
22  numbering, that would be great.
23         MR. DEVORE:  Sure.
24         (Whereupon, Plaintiff's Exhibit
25  1, CV was marked, for identification,

6 (Pages 18 - 21)

Page 22

1       Dr. Andrew Q. DeFuniak
2   as of this date.)
3       Q.   Dr. DeFuniak, do you know how
4   current this CV is?
5           For example, what date this CV
6   is current as of?
7       A.   Well, so, when I was asked to
8   send the CV yesterday, I just took a look
9   at it and updated my license and board
10  certifications, so, those are current.
11  Just given the timing, I didn't have the
12  opportunity to put in my -- my current
13  position, but other than that, it's
14  current.
15      Q.   Got it.
16          Dr. DeFuniak, do you see the
17  education section here?
18      A.   Yes.
19      Q.   Is all of that current and
20  accurate, to your knowledge?
21      A.   Yes.
22      Q.   And moving down to the work
23  experience section.  This resume doesn't
24  reflect your current position; is that
25  correct?

Page 23

1       Dr. Andrew Q. DeFuniak
2       A.   Correct.
3       Q.   But other than not reflecting
4   your current position, is everything else
5   in this work experience section correct
6   and accurate?
7       A.   Yes.
8       Q.   Just so I'm clear, I believe,
9   you testified at the beginning of the
10  deposition that your current position is
11  division chair of correctional medicine;
12  is that correct?
13      A.   Yes.
14      Q.   And, I believe, you indicated
15  that you've held that position for,
16  approximately, five years, or since 2019;
17  is that correct?
18      A.   Yes.
19      Q.   Was the position that you held
20  prior to that position this senior
21  attending physician position for Cook
22  County Department of Corrections?
23      A.   Yes.
24      Q.   Dr. DeFuniak, can you describe,
25  generally, for me what your job duties are

Page 24

1       Dr. Andrew Q. DeFuniak
2   as the division chair of correctional
3   medicine for Cook County?
4       A.   Sure.
5           My job is -- remains mostly
6   clinical.  Whereas, I manage the special
7   care unit within the Cook County health
8   system, which is our housing units with
9   patients with higher medical needs.  So, I
10  continue to lead the work in that special
11  care unit.  With the position as division
12  chair, I have some more administrative
13  duties.  Mostly, supporting the medical
14  director, but my duties would include some
15  staffing and scheduling and, basically,
16  you know, working with patients that are
17  in the hospital and coming back and forth
18  in the hospital.
19          And other clinical situations
20  that may arise in a given day.
21      Q.   I understand.
22          What is the special care unit?
23      A.   So, the special care unit is a
24  unit, basically, it used to be called our
25  medical infirmary.  So, it's the unit

Page 25

1       Dr. Andrew Q. DeFuniak
2   where patients -- as I said -- with higher
3   medical needs are housed.  Post-op
4   patients, dialysis patients, severely --
5   severe medical issues that require more
6   intensive medical care.
7       Q.   So, in other words, this
8   wouldn't include patients who have, you
9   know, your run of the mill illness, or
10  dental issue, or something like that?
11      A.   No.
12      Q.   Are there other units, aside
13  from the special care unit?
14      A.   Well, we basically have three
15  levels of care here at Cermak Medical.
16  They range from the highest level, which
17  patients would be housed in the special
18  care unit.  We have a mid level
19  designation of care for patients that, you
20  know, are independent, but, maybe, have a
21  little bit higher medical needs that would
22  require 24-hour nursing care.  An example,
23  would be a patient that is insulin
24  diabetic, insulin required diabetic, would
25  be housed there.  Patients with mobility

7 (Pages 22 - 25)

Page 26

1        Dr. Andrew Q. DeFuniak
2   issues, paraplegia, things of that nature,
3   are housed in that unit, and, then, the
4   final level is, basically, the general
5   population.  These are patients that
6   either have no medical issues or have, you
7   know, well controlled chronic medical
8   issues that they don't require 24/7
9   nursing and medical care.
10      Q.   So, aside from those three
11  levels, the medical, mid level, and
12  general population, are there any other
13  levels?
14      A.   No.
15      Q.   Do you have managerial
16  responsibilities over all three?
17      A.   In general.  I mean, I don't --
18  I don't round day-to-day on all three
19  levels, but I manage or help manage a team
20  of physicians and physician assistants
21  that do round and work with all of these
22  patient population.
23      Q.   Do you have any oversight
24  regarding the provision of vision care to
25  inmates?

Page 27

1        Dr. Andrew Q. DeFuniak
2       A.   Can you specify oversight?
3       Q.   Do you oversee any optometrists
4   or ophthalmologists?
5       A.   We have a staff optometrist
6   who -- in general, yes, I guess, they
7   would fall under our medical team here.
8       Q.   When you say "a staff
9   optometrist," is that someone who's at
10  Cook County Jail?
11      A.   Yes.
12      Q.   How long have you had a staff
13  optometrist?
14      A.   Well, I started in 2003 here
15  and, I believe, we've had a staff
16  optometrist, at least since then.
17      Q.   So, for the last 22 years
18  there's been a staff optometrist at the
19  Cook County Jail?
20      A.   Yes.
21      Q.   Is there only one staff
22  optometrist or is there more than one?
23      A.   There's one primary, but there
24  may be others that come, if someone is
25  out, or vacation, things like that.  Those

Page 28

1        Dr. Andrew Q. DeFuniak
2   optometrists are -- work primarily within
3   the Cook County Hospital system.
4   Typically, over at Stroger Hospital.
5       THE REPORTER:  Typically, what?
6       THE WITNESS:  Over at Stroger
7   Hospital, S-T-R-O-G-E-R.
8       It's Cook County's primary
9   hospital.
10      Q.   Who is the current staff
11  optometrist?
12      A.   His name is Nader, N-A-D-E-R,
13  Fakhoury.  F, as in Frank, A-K-H-O-U-R-Y.
14      Q.   Nader Fakhoury; am I pronouncing
15  that correctly?
16      A.   Yes.
17      Q.   Do you know how long Mr.
18  Fakhoury has held that position of staff
19  optometrist?
20      A.   I don't have his date of hire,
21  but I can say it's been since, at least,
22  five years.
23      Q.   So, since, approximately, 2019?
24      A.   I don't know when he started,
25  but I know he was here in 2020.

Page 29

1        Dr. Andrew Q. DeFuniak
2       Q.   Do you know who held that
3   position prior to Mr. Fakhoury?
4       A.   I remember her first name was
5   Lucy.  I can't remember her last name.
6       I think, I think, her name was
7   Weinstein, W-E-I-N-S-T-E-I-N.
8       And I don't know her dates of
9   hiring.
10      Q.   Do you know how long she was in
11  the role, approximately?
12      A.   I don't.
13      Q.   Is the staff optometrist also
14  employed by Cook County, to your
15  knowledge?
16      A.   Yes.
17      Q.   Just real quick going back here
18  to Plaintiff's 1, your resume.
19      I think, you testified earlier
20  that you've worked for Cook County for a
21  little over 20 years; is that right?
22      A.   Yes.  Yes.
23      Q.   Was your first position with
24  Cook County this attending physician
25  position in August of 2003?

8 (Pages 26 - 29)

Page 30

1    Dr. Andrew Q. DeFuniak
2    A.  Well, I started -- technically,
3  I was a resident.  I did my resident
4  training at Cook County Hospital starting
5  in 2000.
6        In 2003, I came over to work at
7  the jail.
8    Q.  Understood.
9        I see here July 2000 to July
10  2003, Cook County Hospital, postgraduate
11  physician; is that the residency that
12  you're referring to, Dr. DeFuniak?
13    A.  Yes.
14    Q.  So, basically, since July 2000
15  to the present, you've worked for Cook
16  County at the Cook County Jail; is that
17  right?
18    A.  So, I worked at Cook County
19  Hospital from July 2000 to 2003, which is
20  separate from the jail.
21        It -- technically from August
22  2003 to August 2006, I was employed, paid
23  by the US government with the US Public
24  Health Service, but I was stationed at the
25  Cook County Jail.  But I did all of my

Page 31

1    Dr. Andrew Q. DeFuniak
2  clinical work starting in August 2003 at
3  the Cook County Jail.
4    Q.  Understood.
5        So, since August 2003 to the
6  present, you've worked at the Cook County
7  Jail?
8    A.  Yes.
9    Q.  During that time, have you been
10  familiar with the intake and mental health
11  screening processes at the Cook County
12  Jail?
13    A.  Yes.
14    Q.  During that period, have you,
15  also, been familiar with the collection
16  and management of those processes?
17    A.  Yes.  In general, yes.
18    Q.  Are you also familiar with the
19  storage, updating, and processing inmates'
20  medical records?
21    A.  Yes.
22        Again, in general, I used the
23  electronic health record system.  I don't
24  have the specifics of, like, where the
25  data is stored, things like that, but I'm

Page 32

1    Dr. Andrew Q. DeFuniak
2  familiar with the system.
3    Q.  When you talk about the system,
4  is that the Cerner system that we touched
5  upon earlier?
6    A.  Yes.
7    Q.  I believe, you said that system
8  was implemented in or around 2015; is that
9  correct?
10    A.  Yeah.
11        I don't want to give a specific
12  date.  It's been a while though.  2010,
13  2015.
14    Q.  Prior to that, I think, you said
15  it was all paper records; is that right?
16    A.  Yes.
17    Q.  Is there anything else on this
18  resume, other than what we already talked
19  about, regarding your experience that's
20  inaccurate?
21    A.  No.
22        MR. GUYETTE:  I'm going to show
23  you another document that we'll mark
24  here.
25        We'll mark this as Plaintiffs 2.

Page 33

1    Dr. Andrew Q. DeFuniak
2        (Whereupon, Plaintiff's Exhibit
3        2, inmate handbook was marked, for
4        identification, as of this date.)
5    Q.  Dr. DeFuniak, please, let me
6  know when that's on your screen?
7    A.  Yes.
8    Q.  I'm just showing you now the
9  first page of this document.
10        Do you recognize what this is?
11    A.  Yes.  It looks like the -- they
12  call it the inmate handbook.
13    Q.  Please, let me know if I'm
14  scrolling too fast or too slow as I'm
15  sharing the screen; okay?
16    A.  Okay.
17    Q.  So, is this the inmate handbook
18  that you referred to earlier?
19    A.  Yes.
20    Q.  At the top of this first page,
21  it says, "third edition, effective June
22  2018;" do you see that there?
23    A.  Yes.
24    Q.  Do you know if this is the
25  current version of the inmate handbook?

9 (Pages 30 - 33)

Page 34

1    Dr. Andrew Q. DeFuniak
2    A.  I don't -- I'm not aware if it's
3  been updated since 2018.
4    Q.   I think, you said you reviewed
5  portions of the inmate handbook in
6  preparing for the deposition; is that
7  correct?
8    A.  Yes.
9    Q.   Do you know if you reviewed
10  portions of the third edition?
11    A.  I believe so, but I don't know
12  for sure.
13    Q.   Are you familiar with any prior
14  editions of this handbook?
15    A.  Not that I would recall them,
16  no.
17    Q.   Do you know if there's a first
18  and second edition?
19    MR. DEVORE:  Objection.
20    A.  I am assuming, but I don't
21  recall, no.
22    Q.   I'm going to turn to page six.
23    Dr. DeFuniak, this is page six
24  of the third edition of the inmate
25  handbook.  I might refer to what's called

Page 35

1    Dr. Andrew Q. DeFuniak
2  a Bates number, that's this number at the
3  bottom of the page.  I'll just call it
4  CCSAO, Henneberg 001726.
5    I may just refer to the last
6  four digits during your deposition today.
7  So, if I'm referring to that, I just want
8  to be clear with you what that is.
9    So, on page six here, it
10  includes the CCDOC intake process; do you
11  see that there?
12    A.  Yes.
13    Q.   In the first sentence, under
14  medical and mental health screening, it
15  says, "by the time you receive this
16  handbook, you will have gone through the
17  intake process and receive medical and
18  mental health screenings;" do you see that
19  there?
20    A.  Yes.
21    Q.   Do inmates receive the handbook
22  after the intake process?
23    A.  You know, I've never seen them
24  with it during the process, so, I have to
25  assume, yes, but I don't know specifically

Page 36

1    Dr. Andrew Q. DeFuniak
2  when it is given to them.
3    For example, I don't see them --
4  when I'm working intake, they are not
5  holding this booklet.
6    Q.   Is there any policy or procedure
7  for the intake process that requires
8  providing inmates with a copy of this
9  handbook?
10    A.  Not on the medical side.  It
11  would be something done through the
12  department of corrections.
13    Q.   In this paragraph it also
14  states, "be sure to inform CCDOC staff,
15  CRWs, or Cermak Medical staff about any
16  matters related to medical problems,
17  psychological problems, drug additions,
18  and prescription drugs that you have
19  taken;" do you see that there?
20    A.  Yes.
21    Q.   Do you know what's meant by
22  CCDOC staff in this paragraph?
23    A.  I believe, that's referring to
24  the correctional officers and correctional
25  staff.

Page 37

1    Dr. Andrew Q. DeFuniak
2    Q.   What about Cermak medical staff?
3    A.  Cermak medical staff would be
4  the, you know, the physicians, the
5  physician assistants, the nurses, the
6  patient care attendants, the nurse
7  assistants, things of that nature.  I
8  think, mental health would fall under
9  that, too.
10    Q.   Would vision care also fall
11  under that?
12    A.  Yes.
13    Q.   What are CRWs?
14    A.  CRWs are the correctional social
15  workers.  And I do not know what CRW
16  stands for.  I've just always known them
17  as the social workers that work -- that
18  are employed by the department of
19  corrections.
20    Q.   Social workers.  Okay.
21    Do those folks work directly in
22  the jail?
23    A.  Yes.
24    Q.   Same thing with the Cermak
25  medical staff, are they located at the

10 (Pages 34 - 37)

Page 38

Dr. Andrew Q. DeFuniak
1
2  jail or are they at Cermak's offices?
3      A.   No.  The medical staff is
4  disbursed throughout the compound.  The
5  compound has almost a dozen different
6  housing units where people -- detainee's
7  stay.
8      Q.   Dr. DeFuniak, would you say that
9  this section here is one of the governing
10  policies regarding the intake process?
11      A.   Well, we have our own intake
12  policy, intake screening policy.  This is
13  put out by the department of corrections.
14      Q.   When you say you have your own,
15  do you mean, Cook County has its own?
16      A.   Cook County Health.  Cermak
17  Health Services has an intake screening
18  policy.
19      Q.   Does that differ from this
20  intake process policy?
21      A.   I mean, in general, no.  It's
22  much more detailed, but the gist of it is
23  the same.
24      Q.   I'm going to jump ahead here to
25  page 25.

Page 39

Dr. Andrew Q. DeFuniak
1
2       This is Bates marked 1745.  This
3  is page 25 of the inmate handbook.
4       Dr. DeFuniak, at the top of the
5  page it says "chapter six, healthcare
6  services;" do you see that there?
7      A.   Yes.
8      Q.   Under medical, vision, dental,
9  and mental healthcare, states, "while at
10  the CCDOC you're allowed to receive
11  medical, mental health, nursing, pharmacy,
12  dental, and vision care;" do you see that
13  there?
14      A.   Yes.
15      Q.   Does vision care include
16  prescription eyeglasses?
17      A.   Yes.
18      Q.   In the following sentence it
19  says "Cermak provides healthcare to
20  inmates in the CCDOC;" do you see that
21  there?
22      A.   Yes.
23      Q.   Does Cermak provide prescription
24  eyeglasses to inmates?
25          MR. DEVORE:  Objection as to

Page 40

Dr. Andrew Q. DeFuniak
1
2  form, in terms of time period.
3      Q.   From your understanding, as of
4  today, does Cermak provide prescription
5  eyeglasses to inmates?
6      A.   My understanding is today Cermak
7  does not provide the actual eyeglasses.
8      Q.   Do you know if at any time
9  during your employment with Cook County,
10  since 2003, I believe, when you said you
11  have been at Cook County Jail, has Cermak
12  ever provided prescription eyeglasses to
13  inmates?
14      A.   To my recollection, there was a
15  time when Cermak contracted with a vendor
16  and would provide the actual eyeglasses.
17      Q.   Do you recall when that time
18  period was?
19      A.   I don't know.  It was when I
20  first started here, in 2003, I know it was
21  in existence, but I don't have the exact
22  date.
23      Q.   Do you know when Cermak stopped
24  using that vendor?
25      A.   No.  I don't have the exact

Page 41

Dr. Andrew Q. DeFuniak
1
2  date.  I believe, it was during COVID, but
3  I'm not sure.
4      Q.   When you say "during COVID,"
5  some time between March of 2020 and March
6  of 2022?
7      A.   Yeah.  I would say, some time --
8  some time within that time period.
9      Q.   Do you know the name of the
10  vendor that Cermak used for prescription
11  eyeglasses?
12      A.   Again, I believe, it was
13  something done through the Illinois
14  Department of Corrections, through the
15  prison system, but I may be misspeaking.
16  So, I probably -- I can't say for sure who
17  the glasses came from.
18      Q.   Do you know if it was only one
19  vendor?
20      A.   I don't.
21      Q.   Under point three here, under
22  vision care, it states, "if you had an eye
23  appointment with Cermak and you don't wish
24  to wait for the glasses that will be made
25  by Cermak, which take on average greater

11 (Pages 38 - 41)

Page 42

Dr. Andrew Q. DeFuniak

1
2 than 12 weeks, then, you can take direct
3 receipt of your prescription and it can be
4 sent to your family via postal mail or
5 your CRW can assist in getting that
6 prescription;" do you see that paragraph
7 there?
8     A.   Yes.
9     Q.   In terms of this section about
10 "if you don't wish to wait for the glasses
11 to be made by Cermak," is that a situation
12 where Cermak is using a vendor to actually
13 make prescription eyeglasses for an
14 inmate?
15     A.   That reference there, I believe,
16 is, you know, pertains to when we did have
17 a vendor to make glasses, you know, in
18 addition to the families just bringing in
19 their own glasses.
20     Q.   If an inmate needs prescription
21 eyeglasses, can they ask Cermak to have
22 their vendor make them prescription
23 eyeglasses?
24         MR. DEVORE:  Objection as to
25     form.

Page 43

Dr. Andrew Q. DeFuniak

1
2     Q.   If an inmate -- let me rephrase.
3 Sorry.
4         If an inmate needs glasses, and
5 I'm only talking about prescription
6 glasses, can they have -- can they request
7 them from Cermak?
8     A.   So, there was a time before --
9 if they felt like they, you know, couldn't
10 have someone bring them in, or they didn't
11 want their family to pay for them, or
12 whatnot, they could -- get them ordered
13 through Cermak and they went through this
14 vendor, but I remember it was typically a
15 long wait.  And most people just brought
16 them in on their own.
17     Q.   Do you know how long the wait
18 was?
19     A.   I don't recall.
20     Q.   Here it says "on average greater
21 than 12 weeks."  Does that seem accurate?
22         MR. DEVORE:  Objection as to
23     form.
24         Asked and answered.
25     A.   Yes.

Page 44

Dr. Andrew Q. DeFuniak

1
2     I think, on average it would
3 have been more than 12 weeks, yeah.
4     Q.   These requests for eyeglasses
5 through Cermak, could inmates request that
6 prior to the pandemic or March of 2020?
7     A.   Yeah, I don't recall when we
8 stopped using that vendor.
9     Q.   Point six, it says here, "should
10 you require an appointment with an
11 optometrist, please, complete the Cermak
12 health request form;" do you see that?
13     A.   Yes.
14     Q.   What is the Cermak health
15 request form?
16     A.   The health request form is a
17 paper form that is kept on the units and
18 the detainees can fill this out, and
19 submit them, and they are collected, I
20 believe, on a daily basis.
21     Q.   How does an inmate submit the
22 form?
23     A.   So, I believe, there are, like
24 boxes on each living unit where they could
25 submit the forms.

Page 45

Dr. Andrew Q. DeFuniak

1
2     Q.   I think, you said you believe
3 they are collected on a daily basis?
4     A.   Yes.
5     Q.   Do you know who collects the
6 forms?
7     A.   The nursing staff collects the
8 forms.
9     Q.   Do you know what's done with the
10 forms once they are collected?
11     A.   The nurses, they would triage
12 the form and, then, you know, make
13 decisions based on what the request was.
14     Q.   Are those hard copied forms
15 entered into any sort of database?
16     A.   They are scanned into the
17 electronic medical record.
18     Q.   Do you know how long it
19 typically takes to get an appointment with
20 an optometrist?
21         MR. DEVORE:  Objection.
22     A.   It depends on the situation and,
23 you know, what the appointment is for.
24 So, the timing would vary.
25     Q.   If it was an appointment to get

12 (Pages 42 - 45)

Page 46

Dr. Andrew Q. DeFuniak
1 prescription eyeglasses, how long would
2 that take, generally?
3     A.   Yeah, I can't give a general
4 idea, but I know there are sometimes more
5 urgent appointments that would come up.
6 It could take a few weeks to months.
7     Q.   In here, in number six, it says
8 "an appointment with an optometrist;" do
9 you see that there?
10    A.   Yes.
11    Q.   Is that an appointment with, you
12 know, the on-staff optometrist or with
13 some other optometrist?
14    A.   I think, in general, that means
15 the on-staff optometrist.  There are also
16 optometrists and ophthalmologists at
17 Stroger Hospital.
18    Q.   Does Cook County work with
19 Stroger Hospital optometrists to set up
20 these appointments?
21    A.   Yes.
22    Q.   Who at Cook County is
23 responsible for setting up optometrist
24 appointments; today?

Page 47

Dr. Andrew Q. DeFuniak
1     A.   At Cermak, there is a scheduling
2 department that handles the scheduling of
3 these appointments at Cermak.
4        There's also a scheduling
5 department for the eye clinic at Stroger
6 Hospital and they handle those
7 appointments and scheduling.
8     Q.   How many employees are in the
9 scheduling department at Cermak?
10    A.   I -- in general, I don't know
11 for sure.  I mean, probably -- this would
12 be handling all appointments, like, on the
13 compound; is that what you're asking?
14    Q.   Well, I think, you said
15 optometry appointments are handled by the
16 scheduling department; is that correct?
17    A.   Yes.
18    Q.   So, I'm only asking about
19 optometry appointments.
20       How many folks are there in the
21 scheduling department?
22    A.   I think, there are five or six.
23    Q.   And these five or six folks
24 would handle scheduling of optometry

Page 48

Dr. Andrew Q. DeFuniak
1 appointments; is that correct?
2     A.   Optometry, and all specialty
3 appointments, and primary care
4 appointments on the compound.
5     Q.   Understood.
6        So, the scheduling department
7 handles all of these medical appointments,
8 which may include optometry appointments;
9 is that right?
10    A.   Yes.
11    Q.   How does the scheduling
12 department know to schedule these
13 appointments?
14    A.   Well, the referral will come in
15 electronically.  And they would -- I don't
16 know the ins and outs, but they go into a
17 scheduling cue.  The appointment is made
18 electronically.
19    Q.   Walk me through it.
20       The inmate fills out the
21 healthcare request form and then puts that
22 form in a box, right?
23    A.   Yes.
24    Q.   Then, someone collects the

Page 49

Dr. Andrew Q. DeFuniak
1 hardcopy form from the box?
2     A.   Yes.
3     Q.   The next step in that process is
4 that the form is scanned?
5     A.   The next step would be, the form
6 is reviewed by the nurse and, then, you
7 know, a determination is made of what
8 needs to be done, what the request is and
9 what needs to be done.  Then, after --
10 after they are completed, then, the form
11 is scanned.
12    Q.   So, once the nurse or medical
13 staff makes the determination on what
14 needs to be done, do they do anything else
15 before scanning the form?
16    A.   Well, depending on what the
17 request is, they would -- you know, they
18 would act on that request.
19    Q.   Let's say the request was for an
20 optometry appointment, what would they do
21 next?
22    A.   So, typically, what they would
23 do is, you know, electronically add them
24 to the scheduling cue, like, a referral

13 (Pages 46 - 49)

Dr. Andrew Q. DeFuniak
1
2  would be placed.
3      Q.   When you say "typically," are
4  there any circumstances where they
5  wouldn't refer that to the scheduling
6  department?
7      A.   Well, I don't -- yeah, there may
8  be some circumstances.  I'm not sure.
9  Maybe, they spoke to the person and it was
10 not indicated or they felt the situation
11 had been resolved.  It wouldn't be 100
12 percent, but they, you know, they would
13 typically meet with the person.  Make that
14 determination.
15     Q.   Once the nurse -- I'm just
16 talking about an optometry appointment --
17 once a nurse or a medical staff refers the
18 request for an optometry appointment to
19 the scheduling department, does the nurse
20 or medical staff conduct any follow-up
21 after that?
22     A.   I mean, typically not.  Unless,
23 there was, you know, the patient, you
24 know, put in another request or, you know,
25 spoke to them during med pass or something

Dr. Andrew Q. DeFuniak
1
2  like that.
3          But, no, I think, once they, you
4  know, complete the task, then, they just
5  closeout the health request.
6      Q.   Let's look at page 26 here under
7  "routine health services;" do you see that
8  section there?
9      A.   Yes.
10     Q.   Do you see any reference to
11 vision care in this section?
12     A.   (The witness is reviewing the
13 document.)
14         I think, it would just fall
15 under physical health.  They do have a
16 specific -- they don't specify vision
17 care.
18     Q.   So, you would consider vision
19 care to fall under physical health?
20     A.   Yes, I would.
21     Q.   It says here, in the third line,
22 "you were also asked about your current
23 health needs or concerns;" do you know, is
24 that referring to the intake process or
25 some other screening?

Dr. Andrew Q. DeFuniak
1
2      A.   My interpretation is that this
3  is referring to the intake process.
4      Q.   Can you describe to me what
5  occurs at the intake screening process?
6      A.   Sure.
7          Every individual that comes into
8  the Cook County Jail goes through an
9  intake screening.  It happens every single
10 day.  The intake screening involves -- you
11 know, an initial person would be either a
12 registered nurse, or correctional medical
13 tech, would do, you know, a pretty
14 extensive review of systems and medical
15 history, vitals are done, mental health
16 history.  And based on what the patient's
17 needs are, their answers are, they are
18 referred to a physician assistant or a
19 physician, based on, you know, this health
20 screening.
21     Q.   How long, typically, is the
22 initial health screening with the
23 registered nurse?
24     A.   I don't do them.  They tell me
25 it takes about 20 or 30 minutes to go

Dr. Andrew Q. DeFuniak
1
2  through the full meeting.
3      Q.   Is there a form or document
4  that's filled out during this screening?
5      A.   Yes.  It's part of the
6  electronic medical record.  It's called
7  intake screening, I believe.
8      Q.   Is that another record that's
9  housed on the Cerner platform?
10     A.   Yes.
11     Q.   Is that form filled out
12 electronically?
13     A.   Yes.
14     Q.   During this initial screening,
15 are inmates provided with an eye exam?
16     A.   I mean, if they have an eye
17 issue, they would be, but it's not --
18 there's no general eye exam.
19     Q.   What's provided during the
20 initial screening?
21         Do they take their blood
22 pressure?
23         What do they do?
24     A.   They -- yes, they do a set of
25 vitals, blood pressure, pulse, respiratory

14 (Pages 50 - 53)

Page 54

Dr. Andrew Q. DeFuniak
1
2  rate, oxygen levels, temperature.  They
3  are screened for tuberculosis with a chest
4  X-ray.  The women of child bearing age are
5  offered pregnancy tests.  We offer
6  vaccinations as indicated in the
7  screening.  And now we offer sexually
8  transmitted infection screening.
9      Q.   Has that screening process been
10  the same in your employment with Cook
11  County or has it changed at any point in
12  time?
13     A.   I mean, in general, as the years
14  have gone on it's become more expansive, I
15  think, but overall, it's been the same
16  since I have been employed here.
17     Q.   Where does the screening take
18  place; is it at the jail?
19     A.   It's at the jail.  There's a
20  building, it's called the residential
21  treatment unit, or division eight it's
22  called.  It's all on the first floor.
23  It's on the compound.
24     Q.   Do you know, is this the first
25  step in the process when an inmate arrives

Page 55

Dr. Andrew Q. DeFuniak
1
2  at the Cook County Jail?
3      A.   Well, when -- the very first
4  time they arrive, my understanding -- I'm
5  not part of this process, but they go
6  through security.  They get scanned.  They
7  have their property, you know, intake
8  taken down.  Property.  Given a COC
9  uniform.  They get classified.  Input into
10  the system, then, a medical record is made
11  for them within the Cerner system.
12     Q.   And that medical record that's
13  made, that comes from this initial
14  screening process; is that right?
15     A.   Yes.
16     Q.   Does the screening happen in an
17  exam room?
18     A.   There are booths.  I don't know
19  if they are rooms.  The screening is done
20  in these exam booths.  They are separate
21  booths.  Then, there are private exam
22  rooms for any sensitive exams.
23     Q.   I think, you said as part of
24  this regular screening inmates aren't
25  given any sort of eye exam; is that right?

Page 56

Dr. Andrew Q. DeFuniak
1
2      A.   They would be given an eye exam
3  if they brought upon an eye issue, but in
4  general, there's not a general eye exam
5  done, no.
6      Q.   So, if they don't bring it up,
7  there's no standard, look at the letters
8  on the wall and tell me what you see eye
9  exam?
10     A.   No.  Not if they don't bring it
11  up.
12     Q.   What happens, if they do bring
13  up if they need glasses, what happens
14  next?
15     A.   I can speak for myself and
16  what's in the handbook.  If they say I
17  need a pair of glasses, we let them know
18  that their family can bring in a pair of
19  glasses for them.  They have that option.
20     Q.   What if their family doesn't
21  have a prescription, what's the next
22  option?
23     A.   If the family has no
24  prescription, they have no other pairs of
25  glasses, and nothing on file, like, with a

Page 57

Dr. Andrew Q. DeFuniak
1
2  Lens Crafters or something like that?
3      Q.   Yes.
4          What would be the next option?
5      A.   So, that option, if they are
6  asking, if they just say that they don't
7  have a prescription that's current or know
8  where to get it, then, they, typically,
9  would be referred to the optometrist.
10     Q.   And would that referral happen
11  during the intake process if it was raised
12  by the inmate during the intake that they
13  needed prescription eyeglasses?
14     A.   It could be, if all of this was
15  discussed and they said that they had
16  exhausted every option, certainly, it
17  could be made during the intake.
18     Q.   If it wasn't made by the inmate
19  during the intake process, would the other
20  avenue for them be filing out the health
21  request form?
22         MR. DEVORE:  Objection as to
23  form.
24     A.   They could fill out the health
25  request form.  They could bring it up with

15 (Pages 54 - 57)

Page 58

Dr. Andrew Q. DeFuniak
1
2  the providers, if there are encounters,
3  they could bring it up with the social
4  workers, or the nurses.
5      Q.   When you say they can bring it
6  up with the providers at their encounters,
7  what does that mean?
8      A.   So, I'm speaking if a patient
9  had some chronic issues and they were
10 being seen or seen for other issues, they
11 could bring up, you know, the request to
12 be -- to get a prescription.
13     Q.   And they could also bring it up
14 with the health request form, correct?
15     A.   Yes.
16     Q.   Then, I think, you also
17 mentioned they could bring it up to the
18 nurses; is that right?
19     A.   Yeah.  They could bring it up to
20 the nurses.
21     Q.   Any other avenues to request
22 eyeglasses?
23     A.   I mean, they could bring it
24 up -- it's not just eyeglasses, any health
25 issue they could bring up to anybody, the

Page 59

Dr. Andrew Q. DeFuniak
1
2  mental health worker, the correctional
3  officers, sanitation people.
4  Environmental workers.
5      Q.   What would a sanitation
6  environmental worker do with a request for
7  medical care?
8      A.   Well, I am speaking for myself.
9  We collaborate with everybody.  So, I have
10 had people come up to me and say, oh, hey,
11 by the way, John Smith is asking for this,
12 if you get a second, things like that.
13 It's not a formalized process.
14     Q.   Got it.
15          Turning back to this document
16 here, which, again, is the inmate
17 handbook, in the last sentence it says
18 "you will continue to be seen throughout
19 your stay at intervals determined by your
20 physical and mental health needs and the
21 level of control of your disease;" do you
22 see that there?
23     A.   Yes.
24     Q.   My understanding is, those
25 intervals can vary, depending on the

Page 60

Dr. Andrew Q. DeFuniak
1
2  medical circumstances of the inmate?
3      A.   Yes.
4      Q.   In other words, there's no hard
5  and fast interval of time by which an
6  inmate will be seen to monitor their
7  medical needs?
8      A.   No.
9          I mean, we kind of mirror what
10 happens in the community.  There's not
11 like a set rule of when we would need to
12 see someone back.
13     Q.   Is there, like, a scheduled
14 checkup; say, for example, a dental
15 checkup every six months for an inmate?
16     A.   There's no scheduled dental
17 checkup, no.
18     Q.   Is there like an annual eye exam
19 for inmates?
20     A.   No.
21     Q.   Under this section, health
22 service request process, do you see that
23 there, Dr. DeFuniak?
24     A.   Yes.
25     Q.   Is this the process that you

Page 61

Dr. Andrew Q. DeFuniak
1
2  described regarding, you know, someone
3  picking up the health service request
4  forms?
5      A.   Yes.
6      Q.   Do you know if this process has
7  changed at any point during your
8  employment?
9      A.   No.  Not significantly.  I
10 think, now, it's more electronic than when
11 they started with things on paper.
12     Q.   Well, the actual healthcare
13 request forms, those are still paper,
14 correct?
15     A.   Correct.
16     Q.   And they've always been a paper
17 form during your employment, correct?
18     A.   Yes.
19     Q.   In terms of the processing of
20 those forms, are you saying that that's
21 become more electronic?
22     A.   Well, I'm saying, I guess, the
23 collection, the ultimate collection, like,
24 scanning them into the chart, you know,
25 inputting information regarding the

16 (Pages 58 - 61)

Page 62

1        Dr. Andrew Q. DeFuniak
2  encounter into the chart is electronic
3  now.
4     Q.   And are all of these health
5  service request forms, are all of them
6  scanned?
7     A.   I believe so, yes.
8     Q.   Would there be any circumstances
9  why a health service request form wouldn't
10 be scanned?
11       MR. DEVORE:  Objection to form.
12    A.   Not that I can think of.
13    Q.   Is there any policy that you're
14 aware of requiring these forms to be
15 scanned?
16       MR. DEVORE:  Same objection.
17    A.   Yeah, I don't know if that is a
18 specific policy.
19    Q.   It says here that "the nurse
20 reviews each of these requests within 24
21 hours of receiving them?"
22    A.   Yes.
23    Q.   Do you see that?
24    A.   Yes.
25    Q.   Are there any policies or

Page 63

1        Dr. Andrew Q. DeFuniak
2  procedures in place to ensure the review
3  of these requests within 24 hours?
4     A.   I don't know this policy, but I
5  know that we have -- you know, we track
6  these.  We have continuous quality
7  improvement department that tracks these
8  requests.
9     Q.   How are they tracked?
10       In what form?
11    A.   They are tracked based on when
12 the form was submitted and when the review
13 was performed.
14    Q.   How do you track when the form
15 was submitted by the inmate?
16    A.   It would be based on the date it
17 was collected.
18    Q.   Are those forms time stamped or
19 some other way the time of receipt is
20 recorded?
21    A.   I don't know if they are time
22 stamped.  I know they are submitted
23 electronically now.  So, you could see
24 that based on, you know, based on the EMR.
25    Q.   What's the EMR?

Page 64

1        Dr. Andrew Q. DeFuniak
2     A.   The electronic medical record.
3  Sorry.  Cerner system.
4     Q.   The EMR indicates a timestamp?
5     A.   Yeah.  From the ones I recall,
6  it has a timestamp, and it's dated.  It
7  usually has the date that the patient puts
8  on the form, too.
9     Q.   Then, you said the quality
10 department tracks these forms.
11       How many employees are there in
12 the quality department?
13    A.   Probably two to three now.
14    Q.   Has that number of employees
15 changed at all during your employment with
16 Cook County?
17    A.   I don't know.
18    Q.   Do you know if there were two to
19 three employees in the quality department
20 in 2010?
21    A.   There have been since I can
22 recall.
23       So, I would say it's likely,
24 yes, but I don't know for sure.
25    Q.   Does the quality department

Page 65

1        Dr. Andrew Q. DeFuniak
2  generate reports on compliance with this
3  health service request process?
4     A.   They do.
5     Q.   In what form are those reports
6  in?
7     A.   I'm not sure what -- you're
8  asking what the format is?
9     Q.   Yes; is it, like, an Excel
10 spreadsheet or do they provide reports in
11 some other format?
12    A.   I can't recall the exact format.
13 I want to say it's like -- it's presented
14 at the quality improvement meetings or the
15 quarterly meetings.
16    Q.   Does the quality department
17 provide these reports at each quarterly
18 meeting?
19    A.   I believe so, yes.
20    Q.   In your capacity, do you review
21 those reports?
22    A.   I mean, I would just see them
23 during the meeting, but I don't review
24 them, like, on a day-to-day basis.
25    Q.   Do you know who does, if anyone?

17 (Pages 62 - 65)

Page 66
Dr. Andrew Q. DeFuniak
1
2     A.   These reports are generally done
3  under the nursing department.
4     Q.   Do you know what happens if,
5  say, for example, the jail is not
6  complying with its policies?
7        MR. DEVORE:  Objection.
8        Form.
9     A.   Well, we get an accreditation
10 from the NCCHC, the National Commission on
11 Correctional Health Care, so, we have to
12 submit all of these -- this information to
13 them to get our accreditation.
14    Q.   How about internally, say, for
15 example, here a nurse is reviewing these
16 requests within 24 hours, if that's not
17 happening, is there any sort of quality
18 control mechanism to fix that?
19    A.   I think, it would go through the
20 quality department and the nursing
21 department, whatever would need to be
22 adjusted, if they found something to be
23 insufficient.
24    Q.   Are you aware of any periods
25 during your employment where nurses were

Page 67
Dr. Andrew Q. DeFuniak
1
2  not reviewing these requests within 24
3  hours?
4     A.   It wasn't specifically brought
5  to my attention.  I imagine during COVID
6  there was issues, but I don't have that
7  data.
8        By COVID, I mean, March of 2020
9  into probably the next year.
10    Q.   Do you know, the quality
11 department reports, do you know where
12 those are kept?
13       Are those kept on the Cerner
14 system or some other system?
15    A.   They are not kept on the Cerner
16 system.  They have their own, you know,
17 database.  I'm not sure how they store it,
18 but they keep their own records.
19    Q.   Do you know who's in charge of
20 the quality department?
21    A.   Well, Estrada, Jesus Estrada,
22 E-S-T-R-A-D-A, is the chief operating
23 officer of Cermak.  So, would overall be
24 in charge of the quality department.
25    Q.   And as far as you understand, he

Page 68
Dr. Andrew Q. DeFuniak
1
2  would have access to those reports?
3     A.   Yes.
4        THE REPORTER:  Could we take a
5  break soon?
6        MR. GUYETTE:  Yeah, I was just
7  about to say that.  This is a perfect
8  break.
9        Do you want to take five?
10       THE REPORTER:  Could we take 10
11 minute?
12       MR. GUYETTE:  10 is good.
13       Why don't we come back at 2:00?
14 Yeah, 1:00 central time.
15       THE VIDEOGRAPHER:  We're going
16 off the record.  The time is 1:46 p.m.
17 (Eastern standard time)
18       (Whereupon, a recess was taken
19 at this time.)
20       THE VIDEOGRAPHER:  We're back on
21 the record.  The time is 1:02 p.m.
22 (Central standard time)
23    Q.   Dr. DeFuniak, before we were
24 talking about the intake screening; do you
25 recall that testimony?

Page 69
Dr. Andrew Q. DeFuniak
1
2     A.   Yes.
3     Q.   We talked about there's an
4  electronic form that gets filled out; do
5  you remember that?
6     A.   Yes.
7     Q.   Do you know if there's a
8  question on the form that asks the inmate
9  whether or not he or she needs
10 prescription eyeglasses?
11    A.   There is a question about
12 glasses, yes, if they have glasses or not.
13    Q.   Is that a question that the
14 registered nurse or the physician's
15 assistant will ask when going through that
16 form?
17    A.   The screener asks that.  So,
18 yes, the nurse or the correctional med
19 tech asks that.
20    Q.   And that would be a question
21 that's asked of every inmate during the
22 screening process, correct?
23    A.   It's supposed to be, yes.
24    Q.   Are you aware of any
25 circumstances where that question is not

18 (Pages 66 - 69)

Page 70

1    Dr. Andrew Q. DeFuniak
2    asked?
3    A.   No.
4    Q.   I'm going to show another
5    document here.  Just bear with me.
6        MR. GUYETTE:  We'll mark this as
7    Plaintiff's 3, I believe, we're up to.
8        (Whereupon, Plaintiff's Exhibit
9        3, intake policy was marked, for
10       identification, as of this date.)
11   Q.   Dr. DeFuniak, do you recognize
12   the first page of that document?
13   A.   Yes.
14   Q.   What is this document?
15   A.   This is a policy pertaining to
16   intake health screening.
17   Q.   Is this a policy of Cook County?
18   A.   Overall, it's a policy of Cook
19   County, Cermak Health services, it's a
20   category within the Cook County Health
21   System.
22   Q.   Have you reviewed this policy?
23   A.   I did.
24   Q.   Just for identification
25   purposes, this is a policy titled intake

Page 71

1    Dr. Andrew Q. DeFuniak
2    health screening, and it is Bates numbered
3    CCSAO, Henneberg 000357.
4        Up at the top here it says
5    "approval date, January 25, 2016;" do you
6    see that?
7    A.   Yes.
8    Q.   What does approval date mean?
9    A.   There's, like, a policy
10   committee, a review committee, that
11   updates the policies every couple of
12   years.  So, that would be, I believe,
13   that's the date that the committee
14   approved this.
15   Q.   Let's just scroll to page four
16   of this policy, because, I think, that
17   will help.
18       Are these approval parties part
19   of that committee that you referred to,
20   Dr. DeFuniak?
21   A.   Yes, I believe so.
22   Q.   So, here, it looks like there's
23   four approval parties; do you see that?
24   A.   Yes.
25   Q.   Do you know who these folks are?

Page 72

1    Dr. Andrew Q. DeFuniak
2    A.   I know what the chair of
3    correctional health is.
4    Q.   Who is that?
5        I can't read the signature,
6    that's why I'm asking.
7    A.   Back then it was Connie
8    Mennella, C-O-N-N-I-E, M-E-N-N-E-L-L-A.
9    Q.   And she was the chair of
10   correctional health?
11   A.   Yes.
12   Q.   Who's the chief operating
13   officer?
14   A.   Yeah, I can't tell by the
15   signature.
16   Q.   Sorry.
17       Connie Mennella, chair of
18   correctional health, is that for Cook
19   County?
20   A.   It's for Cermak Health Services
21   within the Cook County hospital system.
22   Q.   How about the director of
23   nursing, do you know who this person is?
24   A.   I cannot make it out either.
25   Q.   Do you recall who the director

Page 73

1    Dr. Andrew Q. DeFuniak
2    of nursing was when this policy was
3    approved, which was in 2016, January 2016?
4    A.   No.
5    Q.   Do you recall who the chief
6    operating officer was in January 2016?
7    A.   Yeah, I can't make out that
8    signature.
9        I'm sure it's written down
10   somewhere, if you read me the name I would
11   probably recognize it, but I can't make it
12   out.
13   Q.   How about the director of
14   quality improvement?
15   A.   I cannot make that out.
16   Q.   Just going to the next page on
17   this form, Bates marked 361.  It has a
18   review date and a posting date; do you see
19   that?
20   A.   Yes.
21   Q.   What is the review date, as far
22   as you know?
23   A.   I mean, I believe, that's when
24   the policy review committee would have met
25   to discuss the policy.

19 (Pages 70 - 73)

Page 74

Dr. Andrew Q. DeFuniak

1
2    Q.   So, that's January 4, 2017 here?
3    A.   Yes.
4    Q.   Then, it has a posting date that
5    looks like April 10, 2017; do you see
6    that?
7    A.   Yes.
8    Q.   What's the posting date
9    referring to?
10   A.   I believe, that's when it was,
11   you know, made official and it's, you
12   know, put up on the -- on the
13   electronic -- put up on the intranet, Cook
14   County's intranet.
15   Q.   It's posted on Cook County's
16   intranet?
17   A.   Yes.
18   Q.   Is it posted anywhere else?
19   A.   Not that I'm aware of.
20   Q.   Do inmates at Cook County Jail
21   have access to this policy?
22   A.   No, not that I'm aware of.
23   Q.   Then, if you see here on -- this
24   is, again, on page Bates marked 360, it
25   has a review history; do you see that?

Page 75

Dr. Andrew Q. DeFuniak

1
2    A.   Yes.
3    Q.   Is it your understanding that
4    these, you know, these policies are
5    reviewed periodically?
6    A.   Yes.
7    Q.   And this policy here says that
8    it was written October 13, 2011; do you
9    see that?
10   A.   Yes.
11   Q.   Do you know who would have
12   written this policy or who did write this
13   policy?
14   A.   No.
15   Q.   Did you have any role in
16   drafting this policy?
17   A.   No.
18   Q.   Then, it has a couple of revise
19   dates here, November 5, 2014, revised
20   again on January 16, 2016; do you see that
21   there?
22   A.   Yes.
23   Q.   Do you know if this is the
24   current version of this policy?
25   A.   I don't believe so.

Page 76

Dr. Andrew Q. DeFuniak

1
2        MR. DEVORE:  We produced it,
3    John.
4        MR. GUYETTE:  You produced the
5    current version?
6        MR. DEVORE:  Yeah, look at Bates
7    stamp 236641.
8    Q.   These also indicate when the
9    policy is posted; do you see that?
10   A.   Yes.
11   Q.   Dr. DeFuniak.
12       Do you know why there would be a
13   reason for, you know, a couple of months
14   duration between the approval date and the
15   posting date?
16   A.   No, I don't know why that would
17   have happened.
18   Q.   Do you have any role in posting
19   this policy?
20   A.   No.
21   Q.   Any role in approving it?
22   A.   No.
23   Q.   You see there's a red line here?
24   A.   Yes.
25   Q.   Do you know who would have made

Page 77

Dr. Andrew Q. DeFuniak

1
2    that red line?
3    A.   I don't.
4    Q.   Back to the top here.  This
5    policy, this intake health screening
6    policy, sets forth a procedure; do you see
7    the procedure?
8    A.   Yes.
9    Q.   Do you know if that procedure
10   has changed in any material way during
11   your employment with Cook County?
12   A.   Well, as I said, the location is
13   different.
14       As far as the actual procedure?
15   I think, it's been expanded since I
16   started, but, you know, the gist of it is
17   the same, medical, mental health screening
18   happens in intake.
19   Q.   Under this policy statement it
20   says "Cermak Health Services will screen
21   inmates entering the Cook County
22   Department of Corrections campus in order
23   to identify and meet urgent, known, and
24   easily identifiable health needs of
25   inmates that may require medical

20 (Pages 74 - 77)

Page 78

Dr. Andrew Q. DeFuniak

1   intervention;" do you see that sentence?
2   A.   Yes.
3   Q.   Does that also include vision
4   care?
5   A.   Yes.  Vision issues would fall
6   under medical care, health needs.
7   Q.   Do you know, under procedure 6D,
8   it includes a list of potential medical
9   conditions; do you see that list?
10  A.   Yes.
11  Q.   Is this an exhaustive list?
12       MR. DEVORE:  Objection.
13       Form.
14       He answered that question as
15  well.
16       Go ahead.
17  A.   I mean, can you go down to the
18  bottom?
19  Q.   Sure.
20  A.   (The witness is reviewing the
21  document.)
22       I would say it's pretty
23  extensive.  I don't know if it's
24  exhaustive.  I mean, it might not include

Page 79

Dr. Andrew Q. DeFuniak

1   every single health issue that a patient
2   might be experiencing.
3   Q.   It includes dental problems
4   here; do you know why that was included?
5   A.   I mean, I think, it's just part
6   of the overall health screening.
7   Q.   It also includes allergies, do
8   you know why that was included?
9   A.   Again, all of those are part of
10  just trying to get a good overall, you
11  know, feel for what a patient's medical,
12  mental health needs might be at that time.
13  Q.   Do you know why vision care is
14  not included on this list?
15       MR. DEVORE:  Objection as to
16  form.
17       It mischaracterizes testimony
18  and the content.
19       MR. GUYETTE:  I'm not
20  characterizing his testimony.  I'm
21  asking him a question.
22       Jason, you don't have to offer a
23  speaking objection.  You can object as
24  to form.  You don't need to speak on

Page 80

Dr. Andrew Q. DeFuniak

1   your objection.
2       MR. DEVORE:  Understood.
3       Objection to form.
4   Q.   My question was, do you know why
5   vision care was not included on this list?
6   A.   So, I think, you asked earlier,
7   it's not a completely exhaustive list, so,
8   that, you know, vision care would probably
9   fall under other health problems.
10  Q.   When you say "probably," do you
11  know that?
12  A.   I know that if someone is having
13  issues with their vision, that they could
14  speak about it and it would be addressed.
15  Q.   But it's not specifically
16  articulated, like, allergies or dental
17  problems, correct?
18  A.   I don't see where it's specific,
19  but, like I said, it's not an exhaustive
20  list.  So, if a patient certainly is
21  having an issue, they can bring it up.
22  Q.   So, is it on the patient to
23  bring up or do, you know, these registered
24  nurses and health professionals ask the

Page 81

Dr. Andrew Q. DeFuniak

1   question?
2   A.   I mean, our patients that come
3   through here are all adults, so, we're
4   assuming, you know, that they are going to
5   be able to verbalize what issues they are
6   having.  It would take forever for us to
7   try and ease out every single thing that
8   might be going on, but, yeah, we do have
9   an understanding.  If the patient is
10  having an issue though, they'll bring it
11  up.
12  Q.   I think, you testified earlier
13  that there was a question on the intake
14  form about whether the inmate needed
15  eyeglasses; is that correct?
16  A.   Yes.
17  Q.   Down here, at point nine, it
18  says, "intake health screening forms are
19  dated, and timed, and include the title of
20  the person completing the form;" do you
21  see that there?
22       Number nine.
23  A.   Yes, I see that.
24  Q.   These are the electronic forms

Page 82

Dr. Andrew Q. DeFuniak

1      Dr. Andrew Q. DeFuniak
2  that we talked about earlier?
3      A.   Yes.
4      Q.   I'm going to show you another
5  policy, Dr. DeFuniak.
6          Before I do that, I'll show
7  you -- this is document Bates marked 364.
8  It's a dental HSRF flow chart; do you see
9  that, Dr. DeFuniak?
10     A.   Yes.
11     Q.   Do you know what HSRF means?
12     A.   It means health service request
13 form.
14     Q.   You understand -- or what is
15 your understanding of what this chart
16 depicts?
17     A.   Well, this is -- it's depicting
18 a tool for the nurses to triage a patient
19 that's put in a dental request.
20     Q.   And these are steps to process
21 that request?
22     A.   Yes.
23     Q.   It also indicates here at the
24 bottom, "dental offices located in the
25 following divisions;" do you see that

Page 83

1      Dr. Andrew Q. DeFuniak
2  there?
3      A.   Yes.
4      Q.   Are these dental offices within
5  Cook County Jail?
6      A.   Yes.
7      Q.   Are there any optometrist
8  offices within Cook County Jail?
9      A.   Yes.
10     Q.   How many offices are there?
11     A.   There's one office.
12     Q.   Where is that located?
13     A.   It's located in the Cermak
14 building, in this main medical building.
15         It's in the area where the
16 specialty clinics are held.
17     Q.   Do you know if there's a similar
18 flow chart for vision care requests?
19     A.   No. I'm not aware of one.
20     Q.   Dr. DeFuniak, this is a policy
21 titled eyeglasses and contact lenses; do
22 you see that at the top?
23     A.   Yes.
24     Q.   Do you recognize this policy?
25     A.   Yes.

Page 84

Dr. Andrew Q. DeFuniak

1      Dr. Andrew Q. DeFuniak
2      Q.   Have you reviewed this policy?
3      A.   Yes.
4      Q.   You see here it says approval
5  date and posting date, April 3, 2017 and
6  April 10, 2017 respectively?
7      A.   Yes.
8      Q.   Do you know who maintains these
9  policies for Cook County Health and
10 Hospital system?
11     A.   Well, I mean, I think, I
12 testified earlier, they are maintained on
13 the intranet.
14     Q.   But do you know who at Cook
15 County Health and Hospital system is
16 responsible for maintaining the actual
17 policies themselves on the intranet?
18     A.   That would go through -- under
19 Mr. Estrada's office and the quality
20 committee.
21     Q.   Is Mr. Estrada the COO of
22 Cermak?
23     A.   Yes.
24     Q.   Do you know if it's someone in
25 his office who's actually, physically,

Page 85

1      Dr. Andrew Q. DeFuniak
2  typing out this policy?
3      A.   Someone in his office is doing
4  it, yes.
5      Q.   Under the policy section, the
6  last sentence it says, "patients accessing
7  eyewear through their property or delivery
8  through visitation do not require
9  clearance or approval by Cermak medical
10 personnel;" what does that mean?
11     A.   Well, like, I think, we
12 discussed earlier, a patient can, if they
13 are wearing their glasses, or if they want
14 a friend or family member to bring them
15 their glasses, they don't have to go
16 through Cermak, they just go through the
17 CRW, the social worker, and they can just
18 drop them off.
19     Q.   What does it mean "accessing
20 eyewear through their property?"
21     A.   Well, like I said, if they come
22 in wearing glasses, they can just wear
23 their glasses. They don't need approval
24 from medical to do that.
25     Q.   What if they come in wearing

22 (Pages 82 - 85)

Page 86

1    Dr. Andrew Q. DeFuniak
2  glasses with metal frames?
3    A.   Depending on the frames, that's,
4  you know, department of corrections
5  determination.
6       So, if the frames are
7  determined, like, a safety risk,
8  typically, the patients, you know, can
9  just have their glasses -- you know,
10 plastic frame glasses made or have the
11 lenses swapped out with a plastic frame.
12   Q.   How would they go about doing
13 that?
14   A.   I believe, that would go through
15 their family if they chose to do that.
16   Q.   Could they also go through
17 Cermak for that service?
18   A.   To have glasses made?
19   Q.   Well, to have their lenses
20 swapped from a metal frame to a plastic
21 frame?
22   A.   Like I testified before, we
23 don't provide the frames anymore.
24      So, no, it would be something
25 they would do, you know, with their

Page 87

1    Dr. Andrew Q. DeFuniak
2  families or friends.
3    Q.   Under this procedure section,
4  Cermak Health Services, point two, it
5  says, "does not make eyewear nor provide
6  contact supplies;" do you see that there?
7    A.   Yes.
8    Q.   During your employment with Cook
9  County, has it always been the case that
10 Cermak Health Services did not make
11 eyewear?
12   A.   Yes.
13      We never made eyewear here on
14 site.
15   Q.   And Cermak has never provided
16 contact supplies?
17   A.   No.
18   Q.   Down here in the relevant
19 regulatory or other reference, there's a
20 number of acronyms here.  I know we talked
21 about the NCCHC standards.
22      Can you just tell us what that
23 acronym stands for again?
24   A.   Well, it's a national governing
25 body that governs correctional

Page 88

1    Dr. Andrew Q. DeFuniak
2  institutions.  It's the National
3  Commission on Correctional Health Care.
4  And they issue a set of standards for, you
5  know, healthcare to detainees and, then,
6  they give a designation if the facility
7  meets these standards.
8    Q.   What about ACA standards?
9    A.   I do not know what ACA stands
10 for.
11   Q.   It also lists other related
12 Cermak policies; do you see that?
13   A.   Yes.
14   Q.   It says G, dash, 02 point three,
15 do you see that?
16   A.   Yes.
17   Q.   If you scroll up in the
18 document, under policy, it also says
19 "regarding visual impairment, see Cermak
20 policy G, dash, 02 point three?"
21   A.   Yes, I see that.
22   Q.   Are you familiar with that
23 policy?
24   A.   I'm not familiar specifically.
25 I haven't reviewed that.

Page 89

1    Dr. Andrew Q. DeFuniak
2    Q.   On the last page we see approval
3  parties; do you see those names listed
4  there?
5    A.   Yes.
6    Q.   The first name is the chief
7  operating officer; do you know who that is
8  there?
9    A.   This one is -- her name was
10 Linda Follwenweiler.
11      I'm not going to spell it right.
12 F-O-L-L-E-N-W-I-E-L-E-R.
13   Q.   How about the chair of
14 correctional health?
15   A.   That's the same as I testified
16 before, Connie Mennella.
17   Q.   How about the director of
18 nursing?
19   A.   I don't know that name.
20   Q.   It also has a review history
21 here.  It says that it was written June
22 11, 2012; do you see that?
23   A.   Yes.
24   Q.   Are you aware of any similar
25 policy before June 11, 2012?

23 (Pages 86 - 89)

Page 90

Dr. Andrew Q. DeFuniak

1
2      A.   Yeah.  I don't know the specific
3 policies before that.  I know we've always
4 had policies, but I don't have the
5 specifics from prior to those dates --
6 that date.
7      Q.   This policy, like, the other
8 policy we just looked at is kept on
9 Cermak's intranet site?
10     A.   Yes.
11     Q.   Would this policy also fall
12 under the purview of Mr. Estrada?
13     A.   Yes.
14     Q.   It also notes down here the
15 revised approved dates, posted dates,
16 like, the other policy; do you see that
17 there?
18     A.   Yes.
19     Q.   On the bottom line it says it
20 was approved April 5, 2017; do you see
21 that?
22     A.   Yes.
23     Q.   Do you know why that date is
24 different from the date at the top that
25 says April 3rd?

Page 91

Dr. Andrew Q. DeFuniak

1
2      A.   I don't know why.
3      Q.   Do you know what a policy lead
4 is?
5      A.   A policy lead; L-E-A-D?
6      Q.   Yes.
7           Do you know what a policy lead
8 is?
9      A.   I don't.
10     Q.   Do you know if this is -- is the
11 current policy -- or if there was an
12 updated policy?
13     A.   I am assuming it's been updated
14 since 2017.
15          MR. DEVORE:  Can you scroll up
16 on this exhibit.
17          Yeah, that's what I wanted to
18 see.  Every three years.  Thanks.
19     Q.   Do you know if inmates are
20 provided a copy of this policy, eyeglasses
21 and contact lenses?
22     A.   No, I don't believe so.
23     Q.   I'll take that one down.
24          Dr. DeFuniak, are you familiar
25 with Donald Henneberg?

Page 92

Dr. Andrew Q. DeFuniak

1
2      A.   I don't have any independent
3 recollection of him, no.
4      Q.   Did you review any documents
5 concerning Mr. Henneberg?
6      A.   Well, like I -- I think, I
7 testified these policies and, then, I was
8 shown his intake form.  That's it.
9      Q.   I'm just going to show --
10          MR. GUYETTE:  I'll mark this as
11 Plaintiff's 4.
12          (Whereupon, Plaintiff's Exhibit
13          4, grievance was marked, for
14          identification, as of this date.)
15     Q.   Dr. DeFuniak, let me know when
16 you see that on your screen?
17     A.   I see it.
18     Q.   I'll just scroll through the
19 form.
20          Do you recognize this document?
21     A.   I recognize the form, yes.
22     Q.   The form is an inmate grievance
23 form, yes?
24     A.   Yes.
25     Q.   This one is filled out by Donald

Page 93

Dr. Andrew Q. DeFuniak

1
2 Henneberg.
3           Do you know if you've ever seen
4 or reviewed this form?
5      A.   This specific form?
6      Q.   That's correct.
7      A.   No, I have not seen it before.
8      Q.   Is this the standard form for
9 any inmate at Cook County Jail to raise a
10 grievance?
11          MR. DEVORE:  Objection as to
12 form.
13     A.   It looks standard.
14     Q.   Down at the bottom here Mr.
15 Henneberg states "I have been requesting
16 eye doctor.  I'm almost blind without
17 glasses and now it's getting worse and I
18 was told eye doctor has glasses he can
19 give you if they're close to the
20 prescription."
21          Does Cermak or Cook County offer
22 any eyeglasses to inmates?
23     A.   Well, we don't -- back when we
24 were having them made, sometimes the
25 glasses would come and the person would

24 (Pages 90 - 93)

Page 94

Dr. Andrew Q. DeFuniak

1 have been discharged already. So, they
2 would just be, you know, go unused, right.
3 So, I know at some point when the glasses
4 were being made, that sometimes the eye
5 doctor was able to, you know, match up the
6 prescription with a pair that he or she
7 had.
8    Q.   Is this the -- this is the
9 optometrist?
10    A.   Yes.
11    Q.   And I believe, you said this was
12 Nader Fakhoury at least until 2020; is
13 that right?
14    A.   2020, yes.
15    Q.   I believe, you said Lucy
16 Weinstein was the optometrist before that?
17    A.   Yes, I believe so.
18    Q.   So, these glasses, these
19 eyeglasses that would come in after an
20 inmate left, do you know where those were
21 collected?
22    A.   I don't know specifically where
23 they were kept. I am assuming they were
24 in the optometrist's office.

*Note: line numbering above corresponds to lines 1-25.*

Page 95

Dr. Andrew Q. DeFuniak

1    Q.   Do you have an idea of how many
2 glasses we're talking about?
3    A.   No.
4    Q.   Do you know if that's still an
5 option for inmates?
6       Can they get a pair of glasses
7 that's close to their prescription,
8 assuming the optometrist has glasses in
9 their office?
10    A.   We don't have glasses anymore
11 since the vendor stopped making them.
12    Q.   My understanding is that, if an
13 inmate orders glasses, and then they are
14 discharged, there's a pair of glasses
15 laying around; do you have that incorrect?
16    A.   No.
17       But this was years ago. Prior
18 to 2020.
19    Q.   What happens if an inmate
20 requests their family member to bring
21 glasses and they get discharged before the
22 glasses get to them, are those collected
23 at the jail?
24    A.   No.

Page 96

Dr. Andrew Q. DeFuniak

1       MR. DEVORE: Objection to form.
2    Incomplete hypothetical.
3    A.   No, because the family member
4 would come to drop them off and they would
5 be told that they weren't there anymore.
6 So, they would just give them back to the
7 family member.
8    Q.   What about through the mail,
9 could inmates receive glasses through the
10 mail?
11    A.   I don't know if they can receive
12 glasses through the mail.
13       In general, they are brought by
14 the family members.
15    Q.   So, today, am I right, that
16 there's no extra pair of glasses laying
17 around that could be given to an inmate?
18    A.   That's correct.
19    Q.   But at one time there may have
20 been extra pairs of glasses, given the
21 circumstances that you described?
22    A.   Yes.
23    Q.   Do you know if those glasses
24 were available in 2019?

Page 97

Dr. Andrew Q. DeFuniak

1       MR. DEVORE: Objection to form.
2    A.   I don't know.
3    Q.   Does the optometrist also keep
4 medical records?
5    A.   No, not that I'm aware of.
6    Q.   So, are vision care related
7 issues, are those just contained in the
8 general medical record for an inmate?
9    A.   Yes.
10    Q.   In other words, there's no
11 separate database or system that tracks
12 vision care, specifically?
13    A.   No.
14    Q.   Is it the same for dental
15 records; are those kept in the general
16 medical record for inmates?
17    A.   Yes.
18    Q.   Dr. DeFuniak, do you know if the
19 provision of medical services at Cook
20 County Jail has ever been reviewed or
21 investigated by another governmental
22 agency?
23       MR. DEVORE: Objection to form.
24    A.   It was years ago. And I can't

25 (Pages 94 - 97)

Page 98
1    Dr. Andrew Q. DeFuniak
2 even remember the specifics of it.
3      We were under a federal decree.
4      MR. DEVORE:  Objection as to
5 scope as well.
6      Outside the scope of the topics
7 of this notice.
8   Q.   You said you were under a
9 federal decree?
10     MR. DEVORE:  Same objection.
11   A.  I can't give you the specifics
12 of it. It's been many, many years.
13   Q.   Do you know if it involved the
14 administration of medical care at Cook
15 County Jail?
16     MR. DEVORE:  Objection as to
17 scope.
18     It's outside --
19     (Simultaneous speaking.)
20     MR. GUYETTE:  It's included in
21 topic three.
22     MR. DEVORE:  Topic three, okay.
23     In topic three?
24     MR. GUYETTE:  The administration
25 of medical care.  I think, whether

Page 99
1    Dr. Andrew Q. DeFuniak
2 that's been reviewed by an outside
3 entity is certainly germane to that
4 topic.
5      MR. DEVORE:  I disagree with
6 that.
7      I don't think so.  We did talk
8 lot about these subjects, and I don't
9 think that we've ever seen that
10 particular aspect brought up within
11 the construct of our discussions over
12 the past three months.
13     MR. GUYETTE:  Well, I'm asking
14 the witness if he's aware.  He said he
15 was aware of a federal decree, but
16 that it's been some time.
17     MR. RADUNSKY:  The objection is
18 to scope.
19     Your notice says what is says
20 and we brought him in to testify --
21     (Simultaneous speaking.)
22     MR. GUYETTE:  We --
23     MR. RADUNSKY:  Hold on.  Let me
24 finish.  Let me finish.
25     We brought him in to testify to

Page 100
1    Dr. Andrew Q. DeFuniak
2 the topics in your notice, which we've
3 had multiple conversations about, so,
4 this is outside the scope.
5      We'll let him answer this one
6 question and that's it.
7      So, you can answer.
8   A.   Again, I don't recall any of the
9 specifics of this.  I was not really
10 involved at the time that -- I think, it
11 did involve medical care and healthcare,
12 but I have no idea of the specifics of it.
13   Q.   Are you aware of any judgements
14 against Cook County for the administration
15 of inadequate medical care?
16     MR. DEVORE:  Same objection as
17 to scope.
18   A.  No.
19     MR. GUYETTE:  Give me five
20 minutes to review my notes.  I think,
21 we're almost done.  Probably done.
22     THE VIDEOGRAPHER:  Counsel, do
23 you want to go off the record?
24     MR. RADUNSKY:  It's 1:46.  Let's
25 come back --

Page 101
1    Dr. Andrew Q. DeFuniak
2      Is five minutes enough, Doctor?
3      Do you need 10; what do you
4 need?
5      MR. GUYETTE:  I need 10.  Let's
6 come back at 2:00. (Central standard
7 time)
8      MR. RADUNSKY:  Perfect.
9      It's 1:46 (Central standard
10 time).  We'll come back at 2:00.
11     THE VIDEOGRAPHER:  We're going
12 off the record.
13     The time is 1:46 p.m. (Central
14 standard time)
15     (Whereupon, a recess was taken
16 at this time.)
17     THE VIDEOGRAPHER:  We're back on
18 the record.  The time is 2:02 p.m.
19 (Central standard time)
20     MR. GUYETTE:  Dr. DeFuniak, we
21 appreciate your time today.  I have no
22 further questions at this time.
23     Thank you.
24     MR. DEVORE:  Thank you, Doctor.
25     MR. RADUNSKY:  Hold on.

26 (Pages 98 - 101)

Page 102

1      Dr. Andrew Q. DeFuniak
2          Dr. DeFuniak, do you want to
3    reserve signature or waive signature?
4          THE WITNESS:  Waive, please.
5          MR. RADUNSKY:  Okay.
6          Let the record reflect the
7    deponents waive signature.
8          Thank you so much for your time
9    today, Doctor.
10         MR. GUYETTE:  Thank you.
11         MR. RADUNSKY:  Tracie, we'll
12   take a copy if they order, that would
13   be great.
14         THE VIDEOGRAPHER:  We're off the
15   record at 2:02 p.m.
16         This concludes today's testimony
17   given by Dr. Andrew Q. DeFuniak.
18         The total number of media unit
19   used was three and will be retained by
20   Veritext Legal Solutions.
21         Thank you everyone.
22         (TIME NOTED:  3:02 P.M., Eastern
23             standard time)
24
25

Page 103

1      Dr. Andrew Q. DeFuniak
2      A C K N O W L E D G E M E N T
3    STATE OF NEW YORK)
4                    :ss
5    COUNTY OF COOK)
6
7      I, DR. ANDREW Q. DEFUNIAK, hereby
8    certify that I have read the transcript of
9    my testimony taken under oath on
10   January 29, 2025, that the transcript is a
11   true, complete and correct record of what
12   was asked, answered and said during my
13   testimony under oath, and that the answers
14   on the record as given by me are true and
15   correct.
16
17      _____
18         DR. ANDREW Q. DEFUNIAK
19
20   Signed and subscribed to
21   before me, this _____ day
22   of _____, _____.
23
24   _____
25   Notary Public

Page 104

1            I N D E X
2
3    WITNESS       EXAMINATION BY       PAGE
4    Dr. Andrew Q.    Mr. Guyette      8
5    DeFuniak
6
7            EXHIBIT
8    PLAINTIFF'S    DESCRIPTION      PAGE
9    Exhibit 1  CV              21
10   Exhibit 2  inmate handbook      33
11   Exhibit 3  intake policy       70
12   Exhibit 4  grievance          92
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 105

1        C E R T I F I C A T E
2
3        I, TRACIE SHAND, a shorthand
4    reporter and Notary Public within and
5    for the State of New York, do hereby
6    certify:
7        That the witness(es) whose
8    testimony is hereinbefore set forth
9    was duly sworn by me, and the
10   foregoing transcript is a true record
11   of the testimony given by such
12   witness(es).
13       I further certify that I am not
14   related to any of the parties to this
15   action by blood or marriage, and that
16   I am in no way interested in the
17   outcome of this matter.
18
19
20   _Tracie Shand_
     TRACIE SHAND
21
22
23
24
25

27 (Pages 102 - 105)

Page 106

```
1              ERRATA SHEET
         VERITEXT/NEW YORK REPORTING, LLC
2
   CASE NAME: Henneberg, Donald v. Dart, Tom, Et Al.
3  DATE OF DEPOSITION: 1/29/2025
   WITNESSES' NAME: Dr. Andrew  Q. DeFuniak
4
5  PAGE  LINE (S)    CHANGE        REASON
   _____
6     |      |           |              |
   _____
7     |      |           |              |
   _____
8     |      |           |              |
   _____
9     |      |           |              |
   _____
10    |      |           |              |
   _____
11    |      |           |              |
   _____
12    |      |           |              |
   _____
13    |      |           |              |
   _____
14    |      |           |              |
   _____
15    |      |           |              |
   _____
16    |      |           |              |
   _____
17    |      |           |              |
   _____
18    |      |           |              |
   _____
19    |      |           |              |
   _____
20
21          Dr. Andrew   Q. DeFuniak
22 SUBSCRIBED AND SWORN TO BEFORE ME
   THIS _____ DAY OF _____, 20__.
23
24 _____
25 (NOTARY PUBLIC)           MY COMMISSION EXPIRES:
```

Veritext Legal Solutions

212-267-6868                www.veritext.com                516-608-2400

[& - accreditation]                                                    Page 1

| & | 2 | | 3rd 90:25 |
|---|---|---|---|

**&**

**&** 2:3,15 5:24
  8:22

**0**

**000357** 71:3
**001726** 35:4
**02** 88:14,20
**07380** 1:4 4:25

**1**

**1** 21:14,25
  29:18 104:9
**1/29/2025**
  106:3
**10** 13:12,13
  15:15 18:4
  68:10,12 74:5
  84:6 101:3,5
**100** 50:11
**11** 89:22,25
**110** 2:4
**12** 42:2 43:21
  44:3
**12:25** 1:14
**13** 75:8
**16** 75:20
**17003** 105:19
**1745** 39:2
**19** 1:4 4:24
**1:00** 68:14
**1:02** 68:21
**1:46** 68:16
  100:24 101:9

101:13

**2**

**2** 32:25 33:3
  104:10
**20** 15:20 29:21
  52:25 106:22
**2000** 30:5,9,14
  30:19
**2003** 27:14
  29:25 30:6,10
  30:19,22 31:2
  31:5 40:10,20
**2006** 30:22
**2010** 32:12
  64:20
**2011** 75:8
**2012** 89:22,25
**2014** 75:19
**2015** 18:5 32:8
  32:13
**2016** 71:5 73:3
  73:3,6 75:20
**2017** 74:2,5
  84:5,6 90:20
  91:14
**2018** 33:22
  34:3
**2019** 9:24
  23:16 28:23
  96:25
**2020** 9:22
  28:25 41:5
  44:6 67:8

94:13,15 95:19
**2022** 41:6
**2025** 1:13 4:6
  103:10
**21** 104:9
**22** 27:17
**230** 2:9,9
**236641** 76:7
**24** 25:22 62:20
  63:3 66:16
  67:2
**24/7** 26:8
**25** 38:25 39:3
  71:5
**26** 51:6
**2800** 8:18 19:2
**29** 1:13 4:6
  103:10
**2:00** 68:13
  101:6,10
**2:02** 101:18
  102:15

**3**

**3** 70:7,9 84:5
  104:11
**30** 52:25
**30b6** 1:17 14:7
**33** 104:10
**360** 74:24
**361** 73:17
**364** 82:7
**3:02** 102:22

**3rd** 90:25

**4**

**4** 74:2 92:11,13
  104:12
**40** 11:13

**5**

**5** 75:19 90:20

**6**

**60606** 2:5,9
**60608** 8:19
**6d** 78:8

**7**

**70** 104:11

**8**

**8** 104:4

**9**

**92** 104:12

**a**

**a.m.** 4:5
**ability** 12:24
  13:5
**able** 81:6 94:6
**above** 1:18,19
**aca** 88:8,9
**access** 68:2
  74:21
**accessing** 85:6
  85:19
**accreditation**
  66:9,13

accurate 22:20
  23:6 43:21
acronym 87:23
acronyms
  87:20
act 49:19
action 1:18
  5:12 105:15
actual 40:7,16
  61:12 77:14
  84:16
actually 42:12
  84:25
adams 5:4
add 49:24
addition 42:18
additions 36:17
address 8:15
  18:23 19:3
addressed
  80:15
adjusted 66:22
administer 3:9
  5:10
administration
  98:14,24
  100:14
administrative
  24:12
adults 81:4
affiliations
  5:19
afternoon 4:3

age 54:4
agency 97:23
ago 14:4 19:20
  19:20,22,25
  95:18 97:25
agree 4:16
agreed 3:3,6,8
agrees 7:25
ahead 6:16
  38:24 78:17
airplane 10:24
al 1:9 4:22
  106:2
allergies 79:8
  80:17
allow 7:6,16,18
allowed 39:10
andrew 1:17
  2:1 3:1 4:1,20
  5:1 6:1,12 7:1
  7:22 8:1,11 9:1
  10:1 11:1 12:1
  13:1 14:1 15:1
  16:1 17:1 18:1
  19:1 20:1 21:1
  21:15 22:1
  23:1 24:1 25:1
  26:1 27:1 28:1
  29:1 30:1 31:1
  32:1 33:1 34:1
  35:1 36:1 37:1
  38:1 39:1 40:1
  41:1 42:1 43:1
  44:1 45:1 46:1

47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1 84:1 85:1
86:1 87:1 88:1
89:1 90:1 91:1
92:1 93:1 94:1
95:1 96:1 97:1
98:1 99:1
100:1 101:1
102:1,17 103:1
103:7,18 104:4
106:3,21
annual 60:18
answer 7:3
  10:6,9 11:8
  12:2 100:5,7
answered
  43:24 78:15
  103:12
answering 7:6
answers 52:17
  103:13
anybody 58:25

anymore 86:23
  95:11 96:6
appearance
  5:16
appearances
  5:19
appearing 6:22
appointment
  41:23 44:10
  45:19,23,25
  46:9,12 48:18
  49:21 50:16,18
appointments
  46:6,21,25
  47:4,8,13,16,20
  48:2,4,5,8,9,14
appreciate 8:25
  101:21
approval 71:5
  71:8,18,23
  76:14 84:4
  85:9,23 89:2
approved
  71:14 73:3
  90:15,20
approving
  76:21
approximately
  9:22,23,24
  15:15 18:5
  23:16 28:23
  29:11
april 74:5 84:5
  84:6 90:20,25

| | | | |
|---|---|---|---|
| **area** 83:15 | **attorneys** 2:4,8 | 63:16,24,24 | **board** 22:9 |
| **arrive** 55:4 | 3:3 7:6 19:16 | **basically** 24:15 | **bockius** 2:3,15 |
| **arrives** 54:25 | 19:18 20:5,10 | 24:24 25:14 | 5:24 8:23 |
| **articulated** | 20:14,21 | 26:4 30:14 | **body** 87:25 |
| 80:17 | **audio** 4:14 | **basis** 44:20 | **booklet** 36:5 |
| **aside** 16:24 | **august** 29:25 | 45:3 65:24 | **booths** 55:18 |
| 25:12 26:10 | 30:21,22 31:2 | **bates** 21:16,21 | 55:20,21 |
| **asked** 12:16 | 31:5 | 35:2 39:2 71:2 | **bottom** 35:3 |
| 22:7 43:24 | **authorized** 3:9 | 73:17 74:24 | 78:19 82:24 |
| 51:22 69:21 | 5:10 | 76:6 82:7 | 90:19 93:14 |
| 70:2 80:7 | **available** 96:25 | **bathroom** | **box** 48:23 49:2 |
| 103:12 | **avenue** 8:19 | 11:14 | **boxes** 44:24 |
| **asking** 47:14,19 | 19:2 57:20 | **bear** 70:5 | **break** 11:4,6,9 |
| 57:6 59:11 | **avenues** 58:21 | **bearing** 54:4 | 11:13,15 68:5 |
| 65:8 72:6 | **average** 41:25 | **beginning** 5:20 | 68:8 |
| 79:22 99:13 | 43:20 44:2 | 7:3 23:9 | **bring** 43:10 |
| **asks** 69:8,17,19 | **aware** 34:2 | **behalf** 5:25 | 56:6,10,12,18 |
| **aspect** 99:10 | 62:14 66:24 | 12:10,17 | 57:25 58:3,5 |
| **assist** 42:5 | 69:24 74:19,22 | **believe** 23:8,14 | 58:11,13,17,19 |
| **assistant** 52:18 | 83:19 89:24 | 27:15 32:7 | 58:23,25 80:22 |
| 69:15 | 97:6 99:14,15 | 34:11 36:23 | 80:24 81:11 |
| **assistants** | 100:13 | 40:10 41:2,12 | 85:14 95:21 |
| 26:20 37:5,7 | | 42:15 44:20,23 | **bringing** 42:18 |
| **assume** 10:6 | **b** | 45:2 53:7 62:7 | **brought** 43:15 |
| 35:25 | | 65:19 70:7 | 56:3 67:4 |
| **assuming** 34:20 | **back** 11:15 | 71:12,21 73:23 | 96:14 99:10,20 |
| 81:5 91:13 | 19:5 24:17 | 74:10 75:25 | 99:25 |
| 94:24 95:9 | 29:17 59:15 | 86:14 91:22 | **building** 18:20 |
| **attendants** 37:6 | 60:12 68:13,20 | 94:12,16,18 | 18:22 54:20 |
| **attending** | 72:7 77:4 | **bit** 19:6 25:21 | 83:14,14 |
| 23:21 29:24 | 93:23 96:7 | **blind** 93:16 | **business** 8:15 |
| **attention** 67:5 | 100:25 101:6 | **blood** 53:21,25 | |
| **attorney** 5:21 | 101:10,17 | 105:15 | |
| 8:22 11:24 | **based** 45:13 | | |
| | 52:16,19 63:11 | | |

**[c - collected]**

| c | | | |
|---|---|---|---|
| **c** 2:2 8:18 17:22 17:24 72:8 103:2 105:1,1 | **cases** 15:5,9,11 15:16,24 16:7 16:9,13 | **cerner** 17:23 18:8,9,21 19:5 32:4 53:9 55:11 64:3 67:13,15 | **chest** 54:3 |

**c**  2:2 8:18 17:22
　17:24 72:8
　103:2 105:1,1
**california**  8:19
　19:2
**call**  17:15
　33:12 35:3
**called**  12:9
　17:22 24:24
　34:25 53:6
　54:20,22
**camera**  4:10
**campus**  77:22
**capacity**  13:15
　13:23 65:20
**care**  24:7,11,22
　24:23 25:6,13
　25:15,18,19,22
　26:9,24 37:6
　37:10 39:12,15
　41:22 48:4
　51:11,17,19
　59:7 66:11
　78:5,7 79:14
　80:6,9 83:18
　88:3 97:7,13
　98:14,25
　100:11,15
**case**  1:4 4:24
　14:9 15:2 16:6
　87:9 106:2

**cases**  15:5,9,11
　15:16,24 16:7
　16:9,13
**category**  70:20
**caveat**  11:7
**ccdoc**  35:10
　36:14,22 39:10
　39:20
**ccsao**  35:4 71:3
**cellphone**
　10:22,24
**central**  4:5
　68:14,22 101:6
　101:9,13,19
**cermack**  8:17
**cermak**  18:21
　25:15 36:15
　37:2,3,24
　38:16 39:19,23
　40:4,6,11,15,23
　41:10,23,25
　42:11,12,21
　43:7,13 44:5
　44:11,14 47:2
　47:4,10 67:23
　70:19 72:20
　77:20 83:13
　84:22 85:9,16
　86:17 87:4,10
　87:15 88:12,19
　93:21
**cermak's**  38:2
　90:9

**cerner**  17:23
　18:8,9,21 19:5
　32:4 53:9
　55:11 64:3
　67:13,15
**certainly**  57:16
　80:21 99:3
**certification**
　3:4
**certifications**
　22:10
**certify**  103:8
　105:6,13
**chair**  9:9,17
　23:11 24:2,12
　72:2,9,17
　89:13
**change**  106:5
**changed**  54:11
　61:7 64:15
　77:10
**chapter**  39:5
**characterizing**
　79:21
**charge**  67:19
　67:24
**chart**  61:24
　62:2 82:8,15
　83:18
**charts**  18:10,11
　18:13
**checkup**  60:14
　60:15,17

**chest**  54:3
**chiacgo**  8:19
**chicago**  1:12
　2:5,9
**chief**  67:22
　72:12 73:5
　89:6
**child**  54:4
**chose**  86:15
**chronic**  14:23
　26:7 58:9
**circumstances**
　50:4,8 60:2
　62:8 69:25
　96:22
**claims**  14:8,19
**classified**  55:9
**clear**  7:11 12:5
　23:8 35:8
**clearance**  85:9
**clinic**  47:6
**clinical**  24:6,19
　31:2
**clinics**  83:16
**close**  93:19
　95:8
**closeout**  51:5
**coc**  55:8
**collaborate**
　59:9
**colleague**  6:3
**collected**  18:14
　18:16 44:19
　45:3,10 63:17

94:22 95:23
**collection**
  31:15 61:23,23
**collects** 45:5,7
  48:25
**come** 11:15
  27:24 46:6
  48:15 59:10
  68:13 81:3
  85:21,25 93:25
  94:20 96:5
  100:25 101:6
  101:10
**comes** 17:12
  52:7 55:13
**coming** 24:17
**commission**
  66:10 88:3
  106:25
**committee**
  71:10,10,13,19
  73:24 84:20
**communicate**
  10:20
**community**
  60:10
**complete** 44:11
  51:4 103:11
**completed**
  49:11
**completely**
  80:8
**completing**
  81:21

**compliance**
  65:2
**complying** 66:6
**compound** 38:4
  38:5 47:14
  48:5 54:23
**concerning**
  92:5
**concerns** 51:23
**concludes**
  102:16
**condition** 14:23
**conditions**
  78:10
**conduct** 50:20
**conducted** 4:8
  5:3
**connection**
  4:11
**connie** 72:7,17
  89:16
**conscious** 6:24
**consider** 51:18
**considering**
  6:20
**construct** 99:11
**contact** 83:21
  87:6,16 91:21
**contained** 97:8
**content** 79:19
**continue** 4:15
  11:16 24:10
  59:18

**continuous**
  63:6
**contracted**
  40:15
**control** 59:21
  66:18
**controlled**
  12:23 26:7
**conversations**
  100:3
**coo** 84:21
**cook** 6:6,7,11
  6:13 9:4,5
  12:10,17 13:19
  13:24 14:12,15
  14:16 15:23
  16:5,8 23:21
  24:3,7 27:10
  27:19 28:3,8
  29:14,20,24
  30:4,10,15,16
  30:18,25 31:3
  31:6,11 38:15
  38:16 40:9,11
  46:19,23 52:8
  54:10 55:2
  64:16 70:17,18
  70:20 72:18,21
  74:13,15,20
  77:11,21 83:5
  83:8 84:9,14
  87:8 93:9,21
  97:20 98:14
  100:14 103:5

**copied** 45:14
**copy** 20:19
  21:20 36:8
  91:20 102:12
**correct** 22:25
  23:2,5,12,17
  32:9 34:7
  47:17 48:2
  58:14 61:14,15
  61:17 69:22
  80:18 81:16
  93:6 96:19
  103:11,15
**correctional**
  9:10,17 23:11
  24:2 36:24,24
  37:14 52:12
  59:2 66:11
  69:18 72:3,10
  72:18 87:25
  88:3 89:14
**corrections**
  23:22 36:12
  37:19 38:13
  41:14 77:22
  86:4
**correctly** 28:15
**counsel** 4:20
  5:17 6:17
  100:22
**county** 6:7,8,11
  6:14 9:4,5
  12:11,17 13:19
  13:24 14:12,15

14:16 15:23
16:5,8 23:22
24:3,7 27:10
27:19 28:3
29:14,20,24
30:4,10,16,16
30:18,25 31:3
31:6,11 38:15
38:16 40:9,11
46:19,23 52:8
54:11 55:2
64:16 70:17,19
70:20 72:19,21
74:20 77:11,21
83:5,8 84:9,15
87:9 93:9,21
97:21 98:15
100:14 103:5
**county's** 28:8
74:14,15
**couple** 71:11
75:18 76:13
**court** 1:2 3:10
4:23 5:7 10:10
11:21
**covid** 41:2,4
67:5,8
**crafters** 57:2
**create** 12:5
**crw** 37:15 42:5
85:17
**crws** 36:15
37:13,14

**cue** 48:18 49:25
**current** 9:2,7
14:25 21:8,9
22:4,6,10,12,14
22:19,24 23:4
23:10 28:10
33:25 51:22
57:7 75:24
76:5 91:11
**currently** 21:16
**curriculum**
21:6
**cv** 1:4 4:25 21:5
21:15,25 22:4
22:5,8 104:9

**d**

**d** 6:5,13 8:2,2
8:12,13 28:12
67:22 91:5
103:2 104:1
**daily** 44:20
45:3
**dart** 1:9 4:22
106:2
**dash** 88:14,20
**data** 31:25 67:7
**database** 45:15
67:17 97:12
**date** 22:2,5
28:20 32:12
33:4 40:22
41:2 63:16
64:7 70:10

71:5,8,13
73:18,18,21
74:4,8 76:14
76:15 84:5,5
90:6,23,24
92:14 106:3
**dated** 64:6
81:20
**dates** 29:8
75:19 90:5,15
90:15
**day** 24:20
26:18,18 52:10
65:24,24
103:21 106:22
**days** 19:20,25
**decisions** 45:13
**decree** 98:3,9
99:15
**defendant** 6:11
**defendants**
1:10 2:8
**defuniak** 1:17
2:1 3:1 4:1,20
5:1 6:1,13 7:1
7:22 8:1,12,20
9:1,8,15,25
10:1 11:1 12:1
13:1,8 14:1
15:1 16:1 17:1
18:1 19:1 20:1
20:18 21:1,15
22:1,3,16 23:1
23:24 24:1

25:1 26:1 27:1
28:1 29:1 30:1
30:12 31:1
32:1 33:1,5
34:1,23 35:1
36:1 37:1 38:1
38:8 39:1,4
40:1 41:1 42:1
43:1 44:1 45:1
46:1 47:1 48:1
49:1 50:1 51:1
52:1 53:1 54:1
55:1 56:1 57:1
58:1 59:1 60:1
60:23 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1,23 69:1
70:1,11 71:1
71:20 72:1
73:1 74:1 75:1
76:1,11 77:1
78:1 79:1 80:1
81:1 82:1,5,9
83:1,20 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1,24 92:1
92:15 93:1
94:1 95:1 96:1
97:1,19 98:1
99:1 100:1
101:1,20 102:1
102:2,17 103:1

**[defuniak - dozen]** Page 7

103:7,18 104:5
106:3,21
**delivery** 85:7
**dental** 25:10
39:8,12 60:14
60:16 79:4
80:17 82:8,19
82:24 83:4
97:15
**department**
18:17,19 23:22
36:12 37:18
38:13 41:14
47:3,6,10,17,22
48:7,13 50:6
50:19 63:7
64:10,12,19,25
65:16 66:3,20
66:21 67:11,20
67:24 77:22
86:4
**depending**
49:17 59:25
86:3
**depends** 4:10
45:22
**depicting** 82:17
**depicts** 82:16
**deponents**
102:7
**deposed** 13:7
13:14 14:3
15:8,15 16:8

**deposition** 1:12
3:8 4:8,19 5:2
7:9 10:3,25
11:5,16,20
12:20 14:6,7
16:15 20:8,16
21:19 23:10
34:6 35:6
106:3
**depositions**
13:21
**describe** 23:24
52:4
**described** 61:2
96:22
**description**
104:8
**designation**
25:19 88:6
**desk** 10:21
**detailed** 38:22
**detainee's** 38:6
**detainees** 44:18
88:5
**determination**
49:8,14 50:14
86:5
**determined**
59:19 86:7
**device** 10:20
**devore** 2:8,10
2:14 6:4,5,5
7:24 11:24
15:7 16:2,11

21:23 34:19
39:25 42:24
43:22 45:21
57:22 62:11,16
66:7 76:2,6
78:13 79:16
80:3 91:15
93:11 96:2
97:2,24 98:4
98:10,16,22
99:5 100:16
101:24
**diabetic** 25:24
25:24
**dialysis** 25:4
**differ** 38:19
**different** 38:5
77:13 90:24
**digits** 35:6
**direct** 12:2 42:2
**directly** 37:21
**director** 24:14
72:22,25 73:13
89:17
**disagree** 99:5
**disbursed** 38:4
**discharged**
94:2 95:15,22
**discuss** 20:8
73:25
**discussed** 20:13
57:15 85:12
**discussions**
99:11

**disease** 59:21
**disrupt** 7:9
**district** 1:2,3
4:23,24
**disturbed**
10:25
**division** 9:9,17
23:11 24:2,11
54:21
**divisions** 82:25
**doctor** 93:16,18
94:6 101:2,24
102:9
**document**
20:19 21:2
32:23 33:9
51:13 53:3
59:15 70:5,12
70:14 78:22
82:7 88:18
92:20
**documented**
17:16,19
**documents**
17:2 19:10
20:13 92:4
**doing** 85:3
86:12
**donald** 1:6 4:21
5:25 8:24
91:25 92:25
106:2
**dozen** 38:5

**[dr - exam]** Page 8

| | | | |
|---|---|---|---|
| **dr** 1:17 2:1 3:1 4:1,19 5:1 6:1 6:12 7:1,22 8:1 8:2,11,20 9:1,7 9:14,25 10:1 11:1 12:1 13:1 13:8 14:1 15:1 16:1 17:1 18:1 19:1 20:1,18 21:1,15 22:1,3 22:16 23:1,24 24:1 25:1 26:1 27:1 28:1 29:1 30:1,12 31:1 32:1 33:1,5 34:1,23 35:1 36:1 37:1 38:1 38:8 39:1,4 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 60:23 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1,23 69:1 70:1,11 71:1 71:20 72:1 73:1 74:1 75:1 76:1,11 77:1 78:1 79:1 80:1 | 81:1 82:1,5,9 83:1,20 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1,24 92:1 92:15 93:1 94:1 95:1 96:1 97:1,19 98:1 99:1 100:1 101:1,20 102:1 102:2,17 103:1 103:7,18 104:4 106:3,21 **drafting** 75:16 **drive** 2:4 **drop** 85:18 96:5 **drug** 36:17 **drugs** 36:18 **duly** 8:3 105:9 **duration** 76:14 **duties** 23:25 24:13,14 **e** **e** 2:2,2 6:5,5,13 8:2,2,12,13,18 17:22,22,24,24 28:7,12 29:7,7 67:22 72:8,8,8 89:12,12,12 91:5 103:2,2,2 104:1 105:1,1 | **earlier** 18:24 29:19 32:5 33:18 80:7 81:13 82:2 84:12 85:12 **ease** 81:8 **easily** 77:24 **eastern** 68:17 102:22 **edition** 33:21 34:10,18,24 **editions** 34:14 **education** 22:17 **effect** 3:9 **effective** 33:21 **eight** 54:21 **either** 26:6 52:11 72:24 **electronic** 17:19 31:23 45:17 53:6 61:10,21 62:2 64:2 69:4 74:13 81:25 **electronically** 48:16,19 49:24 53:12 63:23 **employed** 9:4 29:14 30:22 37:18 54:16 **employees** 47:9 64:11,14,19 | **employer** 9:3 **employment** 13:18,23 40:9 54:10 61:8,17 64:15 66:25 77:11 87:8 **emr** 63:24,25 64:4 **encounter** 62:2 **encounters** 58:2,6 **ensure** 63:2 **entered** 45:15 **entering** 77:21 **entitled** 1:18 **entity** 99:3 **environmental** 59:4,6 **errata** 106:1 **es** 105:7,12 **esq** 2:5,10,14 2:14,15 **est** 1:14 **estrada** 67:21 67:21 84:21 90:12 **estrada's** 84:19 **et** 1:9 4:22 106:2 **everybody** 59:9 **exact** 40:21,25 65:12 **exam** 53:15,18 55:17,20,21,25 |

56:2,4,9 60:18
**examination**
  1:16 8:7 104:3
**examined** 8:5
**example** 22:5
  25:22 36:3
  60:14 66:5,15
**exams** 55:22
**excel** 65:9
**except** 3:6
**exhausted**
  57:16
**exhaustive**
  78:12,25 80:8
  80:20
**exhibit** 21:14
  21:24 33:2
  70:8 91:16
  92:12 104:7,9
  104:10,11,12
**existence** 40:21
**expanded**
  77:15
**expansive**
  54:14
**experience**
  22:23 23:5
  32:19
**experiencing**
  79:3
**expires** 106:25
**extensive** 52:14
  78:24

**extra** 96:17,21
**extremely** 7:7
**eye** 41:22 47:6
  53:15,16,18
  55:25 56:2,3,4
  56:8 60:18
  93:16,18 94:5
**eyeglasses**
  39:16,24 40:5
  40:7,12,16
  41:11 42:13,21
  42:23 44:4
  46:2 57:13
  58:22,24 69:10
  81:16 83:21
  91:20 93:22
  94:20
**eyewear** 85:7
  85:20 87:5,11
  87:13

**f**

**f** 6:13 8:2,13
  28:13 89:12
  105:1
**facility** 88:6
**fact** 7:22 12:11
**fairly** 21:9
**fakhoury** 28:13
  28:14,18 29:3
  94:13
**fall** 27:7 37:8
  37:10 51:14,19
  78:6 80:10

90:11
**familiar** 31:10
  31:15,18 32:2
  34:13 88:22,24
  91:24
**families** 42:18
  87:2
**family** 42:4
  43:11 56:18,20
  56:23 85:14
  86:15 95:21
  96:4,8,15
**far** 67:25 73:21
  77:14
**fast** 33:14 60:5
**federal** 98:3,9
  99:15
**feel** 79:12
**felt** 43:9 50:10
**file** 56:25
**filed** 4:22
**filing** 3:4 57:20
**fill** 44:18 57:24
**filled** 53:4,11
  69:4 92:25
**fills** 48:21
**final** 26:4
**financially** 5:12
**fine** 11:25
**finish** 99:24,24
**firm** 5:8,24
  8:22
**first** 8:3 11:9
  29:4,23 33:9

33:20 34:17
  35:13 40:20
  54:22,24 55:3
  70:12 89:6
**five** 9:21 23:16
  28:22 47:23,24
  68:9 100:19
  101:2
**fix** 66:18
**floor** 54:22
**flow** 7:9 82:8
  83:18
**folks** 37:21
  47:21,24 71:25
**follow** 16:12
  50:20
**following** 39:18
  82:25
**follows** 8:6
**follwenweiler**
  89:10
**force** 3:9
**foregoing**
  105:10
**forever** 81:7
**form** 3:6 15:7
  16:3 40:2
  42:25 43:23
  44:12,15,16,17
  44:22 45:12
  48:22,23 49:2
  49:5,6,11,16
  53:3,11 57:21
  57:23,25 58:14

**[form - h]**                                    Page 10

61:17 62:9,11
63:10,12,14
64:8 65:5 66:8
69:4,8,16
73:17 78:14
79:17,25 80:4
81:15,21 82:13
92:8,19,21,22
92:23 93:4,5,8
93:12 96:2
97:2,24
**formalized**
59:13
**format** 65:8,11
65:12
**forms** 44:25
45:6,8,10,14
61:4,13,20
62:5,14 63:18
64:10 81:19,25
**forth** 24:17
77:6 105:8
**forwarded**
20:20
**found** 66:22
**four** 35:6 71:15
71:23
**frame** 86:10,11
86:20,21
**frames** 86:2,3,6
86:23
**frank** 28:13
**friend** 85:14

**friends** 87:2
**full** 53:2
**further** 3:5,7
101:22 105:13

**g**

**g** 28:7 88:14,20
103:2
**general** 9:5
15:21 16:5
26:4,12,17
27:6 31:17,22
38:21 46:4,15
47:11 53:18
54:13 56:4,4
96:14 97:9,16
**generally** 23:25
46:3 66:2
**generate** 65:2
**germane** 99:3
**gestures** 10:14
**getting** 42:5
93:17
**gist** 38:22
77:16
**give** 9:11 14:10
20:22 32:11
46:4 88:6
93:19 96:7
98:11 100:19
**given** 22:11
24:20 36:2
55:8,25 56:2
96:18,21

102:17 103:14
105:11
**glasses** 41:17
41:24 42:10,17
42:19 43:4,6
56:13,17,19,25
69:12,12 85:13
85:15,22,23
86:2,9,10,18
93:17,18,25
94:4,19 95:3,7
95:9,11,14,15
95:22,23 96:10
96:13,17,21,24
**go** 4:16 6:16,19
10:2 48:17
52:25 55:5
66:19 78:17,18
84:18 85:15,16
86:12,14,16
94:3 100:23
**goal** 7:10
**goes** 11:12 52:8
**going** 4:4 7:3
7:15 20:18
21:13 29:17
32:22 34:22
38:24 68:15
69:15 70:4
73:16 81:5,9
82:4 89:11
92:9 101:11
**good** 4:2,3 5:22
6:4 8:20 68:12

79:11
**gordan** 2:15
6:3
**governing** 38:9
87:24
**government**
30:23
**governmental**
97:22
**governs** 87:25
**great** 21:22
102:13
**greater** 41:25
43:20
**grievance**
92:13,22 93:10
104:12
**ground** 10:2
**guess** 27:6
61:22
**guyette** 2:5
5:22,23 7:25
8:8,21 21:13
32:22 68:6,12
70:6 76:4
79:20 92:10
98:20,24 99:13
99:22 100:19
101:5,20
102:10 104:4

**h**

**h** 28:13

**[hand - include]** Page 11

| | | | i |
|---|---|---|---|
| **hand** 10:14 | 38:16,17 39:11 | **hereinbefore** | |
| **handbook** 17:5 | 44:12,14,16 | 105:8 | **idea** 46:5 95:2 |
| 19:9 33:3,12 | 51:5,7,15,19,23 | **hey** 59:10 | 100:12 |
| 33:17,25 34:5 | 52:15,19,22 | **higher** 24:9 | **identifiable** |
| 34:14,25 35:16 | 57:20,24 58:14 | 25:2,21 | 77:24 |
| 35:21 36:9 | 58:24 59:2,20 | **highest** 25:16 | **identification** |
| 39:3 56:16 | 60:21 61:3 | **hire** 28:20 | 21:25 33:4 |
| 59:17 104:10 | 62:4,9 65:3 | **hiring** 29:9 | 70:10,24 92:14 |
| **handle** 47:7,25 | 66:11 70:16,19 | **history** 52:15 | **identify** 77:23 |
| **handled** 47:16 | 70:20 71:2 | 52:16 74:25 | **il** 1:12 8:19 |
| **handles** 47:3 | 72:3,10,18,20 | 89:20 | **illinois** 1:3 2:5 |
| 48:8 | 77:5,17,20,24 | **hold** 99:23 | 2:9 4:24 41:13 |
| **handling** 47:13 | 78:7 79:2,7,13 | 101:25 | **illness** 25:9 |
| **happen** 55:16 | 80:10,25 81:19 | **holding** 36:5 | **imagine** 67:5 |
| 57:10 | 82:12 84:9,15 | **hospital** 14:13 | **impair** 12:24 |
| **happened** | 87:4,10 88:3 | 24:17,18 28:3 | 13:4 |
| 76:17 | 89:14 | 28:4,7,9 30:4 | **impairment** |
| **happening** | **healthcare** 39:5 | 30:10,19 46:18 | 88:19 |
| 66:17 | 39:9,19 48:22 | 46:20 47:7 | **implemented** |
| **happens** 52:9 | 61:12 88:5 | 72:21 84:10,15 | 32:8 |
| 56:12,13 60:10 | 100:11 | **hour** 25:22 | **important** 10:9 |
| 66:4 77:18 | **hear** 7:2 10:4 | **hours** 62:21 | 12:3 |
| 95:20 | **heard** 4:13 | 63:3 66:16 | **improvement** |
| **happy** 11:6 | **held** 1:18 9:19 | 67:3 | 63:7 65:14 |
| **hard** 45:14 | 23:15,19 28:18 | **housed** 25:3,17 | 73:14 |
| 60:4 | 29:2 83:16 | 25:25 26:3 | **inaccurate** |
| **hardcopy** 49:2 | **help** 6:19 26:19 | 53:9 | 32:20 |
| **he'll** 11:25 | 71:17 | **housing** 24:8 | **inadequate** |
| **head** 10:13,13 | **helpful** 7:8 | 38:6 | 100:15 |
| **health** 8:17 9:5 | **henneberg** 1:6 | **hsrf** 82:8,11 | **include** 24:14 |
| 17:14 18:16,18 | 4:21 6:2 8:24 | **hyphen** 4:25,25 | 25:8 39:15 |
| 24:7 30:24 | 17:8 35:4 71:3 | **hypothetical** | 48:9 78:4,25 |
| 31:10,23 35:14 | 91:25 92:5 | 96:3 | 81:20 |
| 35:18 37:8 | 93:2,15 106:2 | | |

**included** 79:5,9
  79:15 80:6
  98:20
**includes** 35:10
  78:9 79:4,8
**including** 5:18
**incomplete**
  96:3
**incorrect** 95:16
**independent**
  25:20 92:2
**indicate** 76:8
**indicated** 23:14
  50:10 54:6
**indicates** 64:4
  82:23
**individual** 52:7
**infection** 54:8
**infirmary**
  24:25
**inform** 36:14
**information**
  61:25 66:12
**initial** 52:11,22
  53:14,20 55:13
**inmate** 14:14
  14:16 17:4
  19:9 33:3,12
  33:17,25 34:5
  34:24 39:3
  42:14,20 43:2
  43:4 44:21
  48:21 54:25
  57:12,18 59:16

  60:2,6,15
  63:15 69:8,21
  81:15 92:22
  93:9 94:21
  95:14,20 96:18
  97:9 104:10
**inmate's** 14:19
**inmates** 15:16
  26:25 31:19
  35:21 36:8
  39:20,24 40:5
  40:13 44:5
  53:15 55:24
  60:19 74:20
  77:21,25 91:19
  93:22 95:6
  96:10 97:17
**input** 55:9
**inputting** 61:25
**ins** 48:17
**institutions**
  88:2
**insufficient**
  66:23
**insulin** 25:23
  25:24
**intake** 16:17,21
  16:25 17:5,10
  17:15,16,18
  19:7 31:10
  35:10,17,22
  36:4,7 38:10
  38:11,12,17,20
  51:24 52:3,5,9

  52:10 53:7
  55:7 57:11,12
  57:17,19 68:24
  70:9,16,25
  77:5,18 81:14
  81:19 92:8
  104:11
**intensive** 25:6
**interested** 5:13
  105:16
**internally**
  66:14
**internet** 4:11
**interpretation**
  52:2
**interval** 60:5
**intervals** 59:19
  59:25
**intervention**
  78:2
**intranet** 74:13
  74:14,16 84:13
  84:17 90:9
**investigated**
  97:22
**involve** 100:11
**involved** 15:4,9
  15:11,16 98:13
  100:10
**involves** 52:10
**involving** 15:24
  16:9
**issue** 25:10
  53:17 56:3

  58:25 79:2
  80:22 81:11
  88:4
**issues** 15:22,25
  25:5 26:2,6,8
  58:9,10 67:6
  78:6 80:14
  81:6 97:8

**j**

**jail** 12:18 14:15
  14:17 17:13
  18:15 27:10,19
  30:7,16,20,25
  31:3,7,12
  37:22 38:2
  40:11 52:8
  54:18,19 55:2
  66:5 74:20
  83:5,8 93:9
  95:24 97:21
  98:15
**january** 1:13
  4:6 71:5 73:3,6
  74:2 75:20
  103:10
**jason** 2:10 6:5
  21:17 79:23
**jesus** 67:21
**job** 21:11 23:25
  24:5
**john** 2:5 5:23
  8:21 59:11
  76:3

joined 6:2
judgements
  100:13
july 30:9,9,14
  30:19
jump 38:24
june 33:21
  89:21,25

**k**

k 6:13 8:2,13
  8:18 28:13
  103:2
keep 13:11
  67:18 97:4
keeping 20:3
kept 18:16
  44:17 67:12,13
  67:15 90:8
  94:24 97:16
kind 60:9
know 10:5 11:5
  11:14 12:7
  14:8,18,25
  15:23 16:8
  18:2,7 20:23
  22:3 24:16
  25:9,20 26:7
  28:17,24,25
  29:2,8,10 33:6
  33:13,24 34:9
  34:11,17 35:23
  35:25 36:21
  37:4,15 40:8

40:19,20,23
41:9,18 42:16
42:17 43:9,17
45:5,9,12,18,23
46:5,13 47:11
48:13,17 49:8
49:18,24 50:12
50:23,24,24
51:4,23 52:11
52:13,19 54:24
55:7,18 56:17
57:7 58:11
61:2,6,24
62:17 63:4,5,5
63:21,22,24
64:17,18,24
65:25 66:4
67:10,11,16,19
69:7 71:25
72:2,23 73:22
74:11,12 75:4
75:11,23 76:12
76:13,16,25
77:9,16 78:8
78:24 79:5,9
79:12,14 80:5
80:9,12,13,24
81:5 82:11
83:17 84:8,14
84:24 86:4,8,9
86:25 87:20
88:5,9 89:7,19
90:2,3,23 91:2
91:3,7,10,19

92:15 93:3
94:3,4,6,21,23
95:5 96:12,24
97:3,19 98:13
knowledge
  22:20 29:15
known 37:16
  77:23

**l**

l 3:2 72:8,8
  89:12,12,12
  91:5 103:2
law 5:23
laying 95:16
  96:17
lead 24:10 91:3
  91:5,7
left 21:21 94:21
legal 5:5,8
  102:20
lens 57:2
lenses 83:21
  86:11,19 91:21
letters 56:7
level 25:16,18
  26:4,11 59:21
levels 25:15
  26:11,13,19
  54:2
lewis 2:3,15
  5:24 8:22
license 22:9

life 12:21
likely 64:23
linda 89:10
line 51:21
  76:23 77:2
  90:19 106:5
list 78:9,10,12
  79:15 80:6,8
  80:21
listed 89:3
lists 88:11
little 25:21
  29:21
living 44:24
llc 2:8 6:6
  106:1
llp 2:3 5:24
located 18:19
  37:25 82:24
  83:12,13
location 77:12
long 9:19 18:2
  19:23 20:2
  27:12 28:17
  29:10 43:15,17
  45:18 46:2
  52:21
look 22:8 51:6
  56:7 76:6
looked 90:8
looks 33:11
  71:22 74:5
  93:13

| | | | |
|---|---|---|---|
| **lot** 99:8 | **managerial** | **mechanism** | **meet** 19:14,17 |
| **lucy** 29:5 94:16 | 26:15 | 66:18 | 50:13 77:23 |
| **m** | **march** 41:5,5 | **med** 50:25 | **meeting** 20:2 |
| **m** 8:18 72:8 | 44:6 67:8 | 69:18 | 20:14 53:2 |
| 103:2 | **mark** 21:14 | **media** 4:18 | 65:18,23 |
| **made** 41:24 | 32:23,25 70:6 | 102:18 | **meetings** 20:6 |
| 42:11 48:18 | 92:10 | **medical** 15:6 | 65:14,15 |
| 49:8 55:10,13 | **marked** 21:25 | 15:10,12,17,22 | **meets** 88:7 |
| 57:17,18 74:11 | 33:3 39:2 70:9 | 15:24 16:10 | **member** 85:14 |
| 76:25 86:10,18 | 73:17 74:24 | 17:13,19 24:9 | 95:21 96:4,8 |
| 87:13 93:24 | 82:7 92:13 | 24:13,25 25:3 | **members** 96:15 |
| 94:5 | **marriage** | 25:5,6,15,21 | **mennella** 72:8 |
| **mail** 42:4 96:9 | 105:15 | 26:6,7,9,11 | 72:17 89:16 |
| 96:11,13 | **match** 94:6 | 27:7 31:20 | **mental** 17:13 |
| **main** 18:20,22 | **material** 77:10 | 35:14,17 36:10 | 31:10 35:14,18 |
| 19:11 83:14 | **matter** 4:21 | 36:15,16 37:2 | 37:8 39:9,11 |
| **maintained** | 8:24 105:17 | 37:3,25 38:3 | 52:15 59:2,20 |
| 84:12 | **matters** 36:16 | 39:8,11 45:17 | 77:17 79:13 |
| **maintaining** | **mean** 12:14 | 48:8 49:13 | **mentioned** |
| 84:16 | 13:16 26:17 | 50:17,20 52:12 | 58:17 |
| **maintains** 84:8 | 38:15,21 47:12 | 52:14 53:6 | **met** 19:16,19 |
| **make** 6:18 | 50:22 53:16 | 55:10,12 59:7 | 19:20,22 73:24 |
| 11:17 42:13,17 | 54:13 58:7,23 | 60:2,7 64:2 | **metal** 86:2,20 |
| 42:22 45:12 | 60:9 65:22 | 77:17,25 78:7 | **mid** 25:18 |
| 50:13 72:24 | 67:8 71:8 | 78:9 79:12 | 26:11 |
| 73:7,11,15 | 73:23 78:18,25 | 83:14 85:9,24 | **mill** 25:9 |
| 87:5,10 | 79:6 81:3 | 97:5,9,17,20 | **minute** 9:12 |
| **makes** 49:14 | 84:11 85:10,19 | 98:14,25 | 68:11 |
| **making** 95:12 | **means** 11:21 | 100:11,15 | **minutes** 11:13 |
| **manage** 24:6 | 12:12 46:15 | **medications** | 52:25 100:20 |
| 26:19,19 | 82:11,12 | 12:22 | 101:2 |
| **management** | **meant** 12:21 | **medicine** 9:10 | **mirror** 60:9 |
| 31:16 | 36:21 | 9:18 23:11 | **mischaracteri...** |
| | | 24:3 | 79:18 |

**[misspeaking - officer]**

**misspeaking**
  41:15
**mobility**  25:25
**mode**  10:24
**monday**  19:21
**monitor**  60:6
**monroe**  2:9
**month**  19:19,22
**months**  46:7
  60:15 76:13
  99:12
**morgan**  2:3,15
  5:24 8:22
**morning**  4:3
  5:22 6:4 8:20
**moving**  22:22
**multiple**  100:3
**mute**  10:23

**n**

**n**  2:2 3:2 6:13
  8:2,2,12,13
  17:22,24 28:12
  29:7,7 72:8,8,8
  72:8 89:12
  103:2,2 104:1
**nader**  28:12,14
  94:13
**name**  5:4,23
  8:9,21 17:21
  28:12 29:4,5,6
  41:9 73:10
  89:6,9,19
  106:2,3

**names**  89:3
**national**  66:10
  87:24 88:2
**nature**  14:5,18
  26:2 37:7
**ncchc**  66:10
  87:21
**neck**  14:23,24
**need**  7:15,17
  11:4,13 56:13
  56:17 60:11
  66:21 79:25
  85:23 101:3,4
  101:5
**needed**  57:13
  81:15
**needs**  24:9 25:3
  25:21 42:20
  43:4 49:9,10
  49:15 51:23
  52:17 59:20
  60:7 69:9
  77:24 78:7
  79:13
**never**  16:12
  35:23 87:13,15
**new**  1:22 8:5
  103:3 105:5
  106:1
**nine**  81:18,23
**nods**  10:13
**north**  2:4
**northern**  1:3
  4:23

**notary**  1:21 8:4
  103:25 105:4
  106:25
**note**  4:7 17:5
  17:11,17,18
**noted**  102:22
**notes**  17:17
  90:14 100:20
**notice**  1:20
  98:7 99:19
  100:2
**noticing**  5:21
**november**
  75:19
**number**  4:24
  35:2,2 46:8
  64:14 81:23
  87:20 102:18
**numbered**  71:2
**numbering**
  21:22
**nurse**  37:6 49:7
  49:13 50:15,17
  50:19 52:12,23
  62:19 66:15
  69:14,18
**nurses**  37:5
  45:11 58:4,18
  58:20 66:25
  80:25 82:18
**nursing**  25:22
  26:9 39:11
  45:7 66:3,20
  72:23 73:2

  89:18

**o**

**o**  3:2 6:5 28:7
  28:13 72:8
  89:12 103:2
**oath**  3:9 5:11
  11:19 103:9,13
**object**  7:7
  79:24
**objection**  15:7
  16:2,11 34:19
  39:25 42:24
  43:22 45:21
  57:22 62:11,16
  66:7 78:13
  79:16,24 80:2
  80:4 93:11
  96:2 97:2,24
  98:4,10,16
  99:17 100:16
**objections**  3:6
  5:14 11:24
**occurs**  52:5
**october**  75:8
**offer**  54:5,7
  79:23 93:21
**offered**  54:5
**office**  6:7 83:11
  84:19,25 85:3
  94:25 95:10
**officer**  3:8
  67:23 72:13
  73:6 89:7

**officers** 36:24
59:3
**offices** 38:2
82:24 83:4,8
83:10
**official** 74:11
**oh** 59:10
**okay** 10:3,7,8
11:2,3 33:15
33:16 37:20
98:22 102:5
**once** 45:10
49:13 50:15,17
51:3
**ones** 18:15
19:11 64:5
**op** 25:3
**operating**
67:22 72:12
73:6 89:7
**ophthalmolo...**
27:4 46:17
**opportunity**
21:10 22:12
**option** 56:19,22
57:4,5,16 95:6
**optometrist**
27:5,9,13,16,18
27:22 28:11,19
29:13 44:11
45:20 46:9,13
46:14,16,24
57:9 83:7
94:10,17 95:9

97:4
**optometrist's**
94:25
**optometrists**
27:3 28:2
46:17,20
**optometry**
47:16,20,25
48:3,9 49:21
50:16,18
**order** 77:22
102:12
**ordered** 43:12
**orders** 95:14
**outcome** 5:13
16:12 105:17
**outs** 48:17
**outside** 13:16
13:18 16:4
98:6,18 99:2
100:4
**overall** 54:15
67:23 70:18
79:7,11
**oversee** 27:3
**oversight** 26:23
27:2
**own** 12:14
38:11,14,15
42:19 43:16
67:16,18
**oxygen** 54:2

**p**

**p** 2:2,2,5 3:2
**p.m.** 1:14 68:16
68:21 101:13
101:18 102:15
102:22
**page** 33:9,20
34:22,23 35:3
35:9 38:25
39:3,5 51:6
70:12 71:15
73:16 74:24
89:2 104:3,8
106:5
**paid** 30:22
**pair** 56:17,18
94:7 95:7,15
96:17
**pairs** 56:24
96:21
**pandemic** 44:6
**paper** 18:9,11
18:13 32:15
44:17 61:11,13
61:16
**paragraph**
36:13,22 42:6
**paraplegia**
26:2
**part** 53:5 55:5
55:23 71:18
79:6,10

**participants**
4:12
**particular**
14:19 99:10
**parties** 3:4 4:16
71:18,23 89:3
105:14
**parts** 17:4
**party** 5:11
**pass** 50:25
**past** 15:20
99:12
**patient** 14:11
14:14,15 17:6
17:7 25:23
26:22 37:6
50:23 58:8
64:7 79:2
80:21,23 81:10
82:18 85:12
**patient's** 52:16
79:12
**patients** 15:12
24:9,16 25:2,4
25:4,8,17,19,25
26:5 81:3 85:6
86:8
**paul** 5:23 8:21
**pause** 7:5
**pay** 43:11
**pending** 11:7
**people** 38:6
43:15 59:3,10

[percent - prior]                                                    Page 17

**percent** 50:12
**perfect** 68:7
　101:8
**performed**
　63:13
**period** 31:14
　40:2,18 41:8
**periodically**
　75:5
**periods** 66:24
**person** 50:9,13
　52:11 72:23
　81:21 93:25
**personal** 12:21
　13:15
**personnel**
　85:10
**pertaining**
　70:15
**pertains** 42:16
**pharmacy**
　39:11
**phone** 7:19
　10:19,21
**physical** 51:15
　51:19 59:20
**physically**
　84:25
**physician**
　23:21 26:20
　29:24 30:11
　37:5 52:18,19
**physician's**
　69:14

**physicians**
　26:20 37:4
**picking** 61:3
**place** 1:19 4:15
　18:3 54:18
　63:2
**placed** 50:2
**plaintiff** 1:7 2:4
　5:25 7:25 8:23
**plaintiff's**
　21:14,24 29:18
　33:2 70:7,8
　92:11,12 104:8
**plaintiffs** 32:25
**plastic** 86:10
　86:11,20
**platform** 53:9
**please** 4:7 5:15
　8:10,16 10:5
　12:7 33:5,13
　44:11 102:4
**point** 41:21
　44:9 54:11
　61:7 81:18
　87:4 88:14,20
　94:4
**policies** 12:17
　16:16,20,25
　19:8,12 38:10
　62:25 66:6
　71:11 75:4
　84:9,17 88:12
　90:3,4 92:7

**policy** 36:6
　38:12,12,18,20
　62:13,18 63:4
　70:9,15,17,18
　70:22,25 71:9
　71:16 73:2,24
　73:25 74:21
　75:7,12,13,16
　75:24 76:9,19
　77:5,6,19 82:5
　83:20,24 84:2
　85:2,5 88:18
　88:20,23 89:25
　90:7,8,11,16
　91:3,5,7,11,12
　91:20 104:11
**poor** 7:4
**population**
　26:5,12,22
**portions** 19:8
　34:5,10
**position** 22:13
　22:24 23:4,10
　23:15,19,20,21
　24:11 28:18
　29:3,23,25
**possible** 6:20
**post** 25:3
**postal** 42:4
**posted** 74:15
　74:18 76:9
　90:15
**postgraduate**
　30:10

**posting** 73:18
　74:4,8 76:15
　76:18 84:5
**potential** 78:9
**pregnancy** 54:5
**prepare** 16:14
　19:15 20:15
**preparing** 34:6
**prescription**
　36:18 39:16,23
　40:4,12 41:10
　42:3,6,13,20,22
　43:5 46:2
　56:21,24 57:7
　57:13 58:12
　69:10 93:20
　94:7 95:8
**present** 2:13
　5:17 20:4
　30:15 31:6
**presented**
　65:13
**presenting** 6:8
**pressure** 53:22
　53:25
**pretty** 52:13
　78:23
**primarily** 28:2
**primary** 27:23
　28:8 48:4
**prior** 23:20
　29:3 32:14
　34:13 44:6
　90:5 95:18

**prison** 41:15
**private** 55:21
**probably** 41:16
   47:12 64:13
   67:9 73:11
   80:9,11 100:21
**problem** 21:18
**problems** 36:16
   36:17 79:4
   80:10,18
**procedure** 36:6
   77:6,7,9,14
   78:8 87:3
**procedures**
   12:18 16:17,18
   63:2
**proceeding**
   5:15
**proceedings**
   7:12
**process** 16:22
   35:10,17,22,24
   36:7 38:10,20
   49:4 51:24
   52:3,5 54:9,25
   55:5,14 57:11
   57:19 59:13
   60:22,25 61:6
   65:3 69:22
   82:20
**processes** 31:11
   31:16
**processing**
   31:19 61:19

**produced** 76:2
   76:4
**professionals**
   80:25
**pronouncing**
   28:14
**property** 55:7,8
   85:7,20
**provide** 7:10
   39:23 40:4,7
   40:16 65:10,17
   86:23 87:5
**provided** 40:12
   53:15,19 87:15
   91:20
**providers** 58:2
   58:6
**provides** 39:19
**providing** 36:8
**provision** 15:5
   15:9,17 16:10
   26:24 97:20
**pry** 12:21
**psychological**
   36:17
**public** 1:21 8:4
   30:23 103:25
   105:4 106:25
**pull** 20:18
**pulse** 53:25
**purposes** 70:25
**pursuant** 1:19
**purview** 90:12

**put** 10:24 22:12
   38:13 50:24
   74:12,13 82:19
**puts** 48:22 64:7

**q**

**quality** 4:9,10
   63:6 64:9,12
   64:19,25 65:14
   65:16 66:17,20
   67:10,20,24
   73:14 84:19
**quarterly**
   65:15,17
**question** 3:6
   7:2 10:5,6 11:7
   11:8 12:3,4
   16:6 69:8,11
   69:13,20,25
   78:15 79:22
   80:5 81:2,14
   100:6
**questions** 11:25
   12:20 101:22
**quick** 29:17

**r**

**r** 2:2 6:5 8:2,12
   8:18 17:22,22
   17:24,24 28:7
   28:7,12,13
   67:22 89:12
   105:1
**radunsky** 2:8
   2:14,14 6:6,10

6:10 99:17,23
   100:24 101:8
   101:25 102:5
   102:11
**raise** 93:9
**raised** 57:11
**range** 25:16
**rate** 54:2
**ray** 54:4
**read** 72:5 73:10
   103:8
**ready** 7:13
**real** 29:17
**really** 7:8 100:9
**reason** 76:13
   106:5
**recall** 16:19,22
   19:13,24 34:15
   34:21 40:17
   43:19 44:7
   64:5,22 65:12
   68:25 72:25
   73:5 100:8
**receipt** 42:3
   63:19
**receive** 17:13
   35:15,17,21
   39:10 96:10,12
**receiving** 62:21
**recess** 68:18
   101:15
**recognize** 21:2
   33:10 70:11
   73:11 83:24

**[recognize - review]** Page 19

92:20,21
**recollection**
15:19 40:14
92:3
**record** 4:4,17
5:20 7:4,11
8:10,15 12:5
31:23 45:17
53:6,8 55:10
55:12 64:2
68:16,21 97:9
97:17 100:23
101:12,18
102:6,15
103:11,14
105:10
**recorded** 4:14
4:19 63:20
**recording** 4:9
4:15
**records** 18:17
18:18 31:20
32:15 67:18
97:5,16
**red** 76:23 77:2
**refer** 34:25
35:5 50:5
**reference** 42:15
51:10 87:19
**referencing**
15:12
**referral** 48:15
49:25 57:10

**referred** 33:18
52:18 57:9
71:19
**referring** 13:22
17:8 30:12
35:7 36:23
51:24 52:3
74:9
**refers** 50:17
**reflect** 22:24
102:6
**reflecting** 23:3
**regarding**
12:17 13:23
14:11 15:5,22
16:17 26:24
32:19 38:10
61:2,25 88:19
**registered**
52:12,23 69:14
80:24
**regular** 55:24
**regulatory**
87:19
**related** 5:11
36:16 88:11
97:7 105:14
**relevant** 87:18
**remains** 24:5
**remember** 29:4
29:5 43:14
69:5 98:2
**remote** 1:16

**remotely** 5:3,18
6:23 7:17
**repeat** 9:14
**rephrase** 43:2
**reporter** 1:21
5:7 6:17 8:9,14
9:11 10:11
28:5 68:4,10
105:4
**reporting**
106:1
**reports** 65:2,5
65:10,17,21
66:2 67:11
68:2
**represent** 8:23
**representing**
5:5 6:6
**request** 43:6
44:5,12,15,16
45:13 48:22
49:9,18,19,20
50:18,24 51:5
57:21,25 58:11
58:14,21 59:6
60:22 61:3,13
62:5,9 65:3
82:12,19,21
**requesting**
93:15
**requests** 44:4
62:20 63:3,8
66:16 67:2
83:18 95:21

**require** 25:5,22
26:8 44:10
77:25 85:8
**required** 14:12
25:24
**requires** 36:7
**requiring**
62:14
**reserve** 102:3
**reserved** 3:6
**residency**
30:11
**resident** 30:3,3
**residential**
54:20
**resolved** 50:11
**respective** 3:4
**respectively**
84:6
**respiratory**
53:25
**responsibilities**
26:16
**responsible**
46:24 84:16
**resume** 20:20
22:23 29:18
32:18
**retained**
102:19
**review** 16:25
19:9 52:14
63:2,12 65:20
65:23 71:10

**[review - seen]**                                                  Page 20

| | | | |
|---|---|---|---|
| 73:18,21,24 74:25 89:20 92:4 100:20 | **rules** 10:3 **run** 25:9 | 48:18 49:25 50:5,19 | **section** 22:17 22:23 23:5 |

73:18,21,24
74:25 89:20
92:4 100:20
**reviewed** 16:16
17:4,10 34:4,9
49:7 70:22
75:5 84:2
88:25 93:4
97:21 99:2
**reviewing**
16:24 20:12
51:12 66:15
67:2 78:21
**reviews** 62:20
**revise** 75:18
**revised** 75:19
90:15
**right** 19:13
29:21 30:17
32:15 48:10,23
55:14,25 58:18
89:11 94:3,14
96:16
**risk** 86:7
**rob** 5:4
**role** 29:11
75:15 76:18,21
**room** 6:21
10:16 55:17
**rooms** 55:19,22
**round** 26:18,21
**routine** 51:7
**rule** 60:11

**rules** 10:3
**run** 25:9

**s**

**s** 2:2,14 3:2,2
28:7 29:7
67:22 106:5
**safety** 86:7
**sanitation** 59:3
59:5
**saying** 61:20,22
**says** 33:21
35:15 39:5,19
43:20 44:9
46:8 51:21
59:17 62:19
71:4 75:7
77:20 81:19
84:4 85:6 87:5
88:14,18 89:21
90:19,25 99:19
99:19
**scanned** 45:16
49:5,12 55:6
62:6,10,15
**scanning** 49:16
61:24
**schedule** 48:13
**scheduled**
14:21 60:13,16
**scheduling**
24:15 47:2,3,5
47:8,10,17,22
47:25 48:7,12

48:18 49:25
50:5,19
**scope** 16:4 98:5
98:6,17 99:18
100:4,17
**screen** 4:13
20:19,24 33:6
33:15 77:20
92:16
**screened** 54:3
**screener** 69:17
**screening**
16:21 17:14
31:11 35:14
38:12,17 51:25
52:5,9,10,20,22
53:4,7,14,20
54:7,8,9,17
55:14,16,19,24
68:24 69:22
70:16 71:2
77:5,17 79:7
81:19
**screenings**
35:18
**scroll** 71:15
88:17 91:15
92:18
**scrolling** 33:14
**sealing** 3:4
**second** 14:10
20:22 34:18
59:12

**section** 22:17
22:23 23:5
38:9 42:9 51:8
51:11 60:21
85:5 87:3
**security** 55:6
**see** 17:5 20:23
20:25 22:16
30:9 33:22
35:11,18 36:3
36:19 39:6,12
39:20 42:6
44:12 46:10
51:7,10 56:8
59:22 60:12,22
62:23 63:23
65:22 71:6,23
73:18 74:5,23
74:25 75:9,20
76:9,23 77:6
78:2,10 80:19
81:22,24 82:8
82:25 83:22
84:4 87:6
88:12,15,19,21
89:2,3,22
90:16,20 91:18
92:16,17
**seem** 43:21
**seen** 4:12 35:23
58:10,10 59:18
60:6 93:3,7
99:9

**send** 21:20 22:8
**senior** 23:20
**sense** 11:17
**sensitive** 55:22
**sent** 42:4
**sentence** 35:13
  39:18 59:17
  78:2 85:6
**separate** 30:20
  55:20 97:12
**service** 30:24
  60:22 61:3
  62:5,9 65:3
  82:12 86:17
**services** 8:18
  15:6,10,13,17
  16:10 38:17
  39:6 51:7
  70:19 72:20
  77:20 87:4,10
  97:20
**set** 46:20 53:24
  60:11 88:4
  105:8
**sets** 77:6
**setting** 46:24
**settled** 15:24
  16:6,9
**severe** 25:5
**severely** 25:4
**sexually** 54:7
**shakes** 10:13
**shand** 1:20 5:8
  105:3,20

**sharing** 33:15
**sheet** 106:1
**sheriff's** 6:7
**short** 6:18
**shorthand** 1:21
  105:3
**show** 32:22
  70:4 82:4,6
  92:9
**showing** 33:8
**shown** 92:8
**side** 36:10
**signature** 72:5
  72:15 73:8
  102:3,3,7
  105:19
**signed** 3:8,9
  103:20
**significantly**
  61:9
**similar** 83:17
  89:24
**simultaneous**
  13:17 98:19
  99:21
**single** 52:9 79:2
  81:8
**site** 87:14 90:9
**situation** 42:11
  45:22 50:10
**situations**
  24:19
**six** 34:22,23
  35:9 39:5 44:9

46:8 47:23,24
  60:15
**slow** 33:14
**smith** 59:11
**smoothly** 6:19
**social** 37:14,17
  37:20 58:3
  85:17
**solutions** 5:5,9
  102:20
**soon** 68:5
**sooner** 14:21
**sorry** 18:21
  43:3 64:3
  72:16
**sort** 45:15
  55:25 66:17
**south** 8:18 19:2
**speak** 56:15
  79:25 80:15
**speaking** 6:25
  13:17 58:8
  59:8 79:24
  98:19 99:21
**special** 24:6,10
  24:22,23 25:13
  25:17
**specialty** 48:3
  83:16
**specific** 15:18
  32:11 51:16
  62:18 80:19
  90:2 93:5

**specifically**
  35:25 67:4
  80:16 88:24
  94:23 97:13
**specifics** 31:24
  90:5 98:2,11
  100:9,12
**specify** 27:2
  51:16
**spell** 89:11
**spoke** 50:9,25
**spreadsheet**
  65:10
**ss** 103:4
**staff** 27:5,8,12
  27:15,18,21
  28:10,18 29:13
  36:14,15,22,25
  37:2,3,25 38:3
  45:7 46:13,16
  49:14 50:17,20
**staffing** 24:15
**stamp** 76:7
**stamped** 21:17
  63:18,22
**standard** 4:5
  56:7 68:17,22
  93:8,13 101:6
  101:9,14,19
  102:23
**standards**
  87:21 88:4,7,8
**stands** 37:16
  87:23 88:9

**[started - thanks]**                                             Page 22

started  27:14
  28:24 30:2
  40:20 61:11
  77:16
starting  30:4
  31:2
state  1:22 5:15
  5:18 8:4,9,14
  103:3 105:5
stated  18:23
statement  6:18
  77:19
states  1:2 36:14
  39:9 41:22
  93:15
stationed  30:24
status  15:2
stay  38:7 59:19
step  49:4,6
  54:25
steps  82:20
stipulated  3:3,5
  3:7 7:24
stipulation
  7:15,17
stopped  40:23
  44:8 95:12
storage  31:19
store  67:17
stored  31:25
stroger  28:4,6
  46:18,20 47:6
subjects  99:8

submit  44:19
  44:21,25 66:12
submitted
  63:12,15,22
subscribed
  103:20 106:22
substances
  12:23
suite  2:9
supplies  87:6
  87:16
supporting
  24:13
supposed  69:23
sure  9:16 21:18
  21:23 24:4
  34:12 36:14
  41:3,16 47:12
  50:8 52:6
  64:24 65:7
  67:17 73:9
  78:20
surgery  14:12
  14:20,22,24
swapped  86:11
  86:20
swear  6:16
  7:14,16,18
sworn  3:8,10
  8:4 105:9
  106:22
system  9:6
  17:20,21 18:2
  18:8 19:6 24:8

28:3 31:23
  32:2,3,4,7
  41:15 55:10,11
  64:3 67:14,14
  67:16 70:21
  72:21 84:10,15
  97:12
systems  52:14

**t**

t  3:2,2 28:7
  29:7 67:22
  103:2 105:1,1
take  4:15 7:5
  10:12 11:6,15
  41:25 42:2
  46:3,7 53:21
  54:17 68:4,9
  68:10 81:7
  91:23 102:12
taken  1:20 4:20
  12:24 36:19
  55:8 68:18
  101:15 103:9
takes  45:19
  52:25
talk  32:3 99:7
talked  32:18
  69:3 82:2
  87:20
talking  43:5
  50:16 68:24
  95:3

task  51:4
team  26:19
  27:7
tech  52:13
  69:19
technically
  30:2,21
technology  5:4
tell  9:2 52:24
  56:8 72:14
  87:22
temperature
  54:2
terms  40:2 42:9
  61:19
testified  8:5
  15:14 23:9
  29:19 81:13
  84:12 86:22
  89:15 92:7
testify  12:10,16
  12:25 13:5
  99:20,25
testimony
  68:25 79:18,21
  102:16 103:9
  103:13 105:8
  105:11
tests  54:5
thank  101:23
  101:24 102:8
  102:10,21
thanks  9:13
  91:18

[thing - under]                                    Page 23

**thing** 11:12
  37:24 81:8
**things** 26:2
  27:25 31:25
  37:7 59:12
  61:11
**think** 13:4
  15:21 16:22
  17:3 29:6,6,19
  32:14 34:4
  37:8 44:2 45:2
  46:15 47:15,23
  51:3,14 54:15
  55:23 58:16
  61:10 62:12
  66:19 71:16
  77:15 79:6
  80:7 81:13
  84:11 85:11
  92:6 98:25
  99:7,9 100:10
  100:20
**third** 33:21
  34:10,24 51:21
**three** 25:14
  26:10,16,18
  41:21 64:13,19
  88:14,20 91:18
  98:21,22,23
  99:12 102:19
**tim** 2:15 6:3
**time** 1:19 3:7
  4:5 5:16 8:25
  11:4 14:2

  17:12 21:19
  31:9 35:15
  40:2,8,15,17
  41:5,7,8,8 43:8
  54:12 55:4
  60:5 63:18,19
  63:21 68:14,16
  68:17,19,21,22
  79:13 96:20
  99:16 100:10
  101:7,10,13,14
  101:16,18,19
  101:21,22
  102:8,22,23
**timed** 81:20
**times** 11:23
  13:10,13 15:16
**timestamp** 64:4
  64:6
**timing** 22:11
  45:24
**title** 9:7,9,14,20
  21:11,11 81:20
**titled** 16:20
  70:25 83:21
**today** 6:9 8:25
  11:23 12:11,25
  13:5 19:15
  20:9 35:6 40:4
  40:6 46:25
  96:16 101:21
  102:9
**today's** 7:11
  16:15 20:15

  102:16
**told** 93:18 96:6
**tom** 1:9 4:22
  106:2
**took** 22:8
**tool** 82:18
**top** 33:20 39:4
  71:4 77:4
  83:22 90:24
**topic** 98:21,22
  98:23 99:4
**topics** 98:6
  100:2
**total** 102:18
**touched** 32:4
**tracie** 1:20 5:7
  6:15 10:10
  102:11 105:3
  105:20
**track** 13:11
  20:3 63:5,14
**tracked** 63:9,11
**tracks** 63:7
  64:10 97:12
**training** 30:4
**transcript**
  103:8,10
  105:10
**transcription**
  10:12
**transmitted**
  54:8
**treatment**
  54:21

**triage** 45:11
  82:18
**trial** 1:17 3:7
**troy** 2:14 6:10
**true** 103:11,14
  105:10
**truthfully**
  12:25
**try** 81:8
**trying** 79:11
**tuberculosis**
  54:3
**turn** 34:22
**turning** 59:15
**two** 19:8 64:13
  64:18 87:4
**type** 14:22
**typically** 28:4,5
  43:14 45:19
  49:23 50:3,13
  50:22 52:21
  57:8 86:8
**typing** 85:2

|  u  |
|---|

**u** 3:2 6:13 8:2
  8:13 28:13
**ultimate** 61:23
**under** 11:19
  27:7 35:13
  37:8,11 39:8
  41:21,21 51:6
  51:15,19 60:21
  66:3 77:19

| | | | |
|---|---|---|---|
| 78:7,8 80:10 | **updates** 71:11 | **video** 4:14,19 | **waived** 3:5 |
| 84:18 85:5 | **updating** 31:19 | **videoconfere...** | **walk** 48:20 |
| 87:3 88:18 | **urgent** 46:6 | 7:20 | **wall** 56:8 |
| 90:12 98:3,8 | 77:23 | **videographer** | **want** 7:8 10:2 |
| 103:9,13 | **use** 11:14 | 4:2 5:6 6:15 | 32:11 35:7 |
| **understand** | **used** 18:8,9 | 68:15,20 | 43:11 65:13 |
| 7:10 10:4,14 | 24:24 31:22 | 100:22 101:11 | 68:9 85:13 |
| 11:10,21 12:4 | 41:10 102:19 | 101:17 102:14 | 100:23 102:2 |
| 12:6,7,12 | **using** 5:3 40:24 | **virtual** 1:12 5:3 | **wanted** 14:20 |
| 24:21 67:25 | 42:12 44:8 | 7:19 | 91:17 |
| 82:14 | **usually** 64:7 | **virtually** 4:9 | **way** 59:11 |
| **understanding** | **v** | **vision** 16:17,24 | 63:19 77:10 |
| 40:3,6 55:4 | | 19:7 26:24 | 105:16 |
| 59:24 75:3 | **v** 6:5 106:2 | 37:10 39:8,12 | **we've** 27:15 |
| 81:10 82:15 | **vacation** 27:25 | 39:15 41:22 | 90:3 99:9 |
| 95:13 | **vaccinations** | 51:11,16,18 | 100:2 |
| **understood** | 54:6 | 78:4,6 79:14 | **wear** 85:22 |
| 10:7 30:8 31:4 | **vary** 45:24 | 80:6,9,14 | **wearing** 85:13 |
| 48:6 80:3 | 59:25 | 83:18 97:7,13 | 85:22,25 |
| **uniform** 55:9 | **vendor** 40:15 | **visitation** 85:8 | **week** 14:4 |
| **unit** 4:18 24:7 | 40:24 41:10,19 | **visual** 88:19 | **weeks** 42:2 |
| 24:11,22,23,24 | 42:12,17,22 | **vitae** 21:6 | 43:21 44:3 |
| 24:25 25:13,18 | 43:14 44:8 | **vitals** 52:15 | 46:7 |
| 26:3 44:24 | 95:12 | 53:25 | **weinstein** 29:7 |
| 54:21 102:18 | **verbalize** 81:6 | **w** | 94:17 |
| **united** 1:2 | **verbally** 10:10 | **w** 2:9 8:2,12 | **went** 43:13 |
| **units** 24:8 | **verified** 7:21 | 29:7 89:12 | **whatnot** 43:12 |
| 25:12 38:6 | **veritext** 5:5,8 | 103:2 | **wish** 41:23 |
| 44:17 | 7:19 102:20 | **wacker** 2:4 | 42:10 |
| **unused** 94:3 | 106:1 | **wait** 41:24 | **witness** 1:18 |
| **update** 21:11 | **version** 33:25 | 42:10 43:15,17 | 4:13 6:8,12,16 |
| **updated** 21:20 | 75:24 76:5 | **waive** 102:3,4,7 | 7:5,14,16,18,21 |
| 22:9 34:3 | **versus** 4:22 | | 7:23 8:3,11,17 |
| 91:12,13 | | | 12:10,11 28:6 |

**[witness - zoom]**                                    Page 25

| | |
|---|---|
| 51:12 78:21 | **y** |
| 99:14 102:4 | |
| 104:3 105:7,12 | **y** 28:13 |
| **witnesses'** | **yeah** 20:3 |
| 106:3 | 32:10 41:7 |
| **women** 54:4 | 44:3,7 46:4 |
| **wonderful** | 50:7 58:19 |
| 10:10 | 62:17 64:5 |
| **words** 10:11 | 68:6,14 72:14 |
| 12:15 25:7 | 73:7 76:6 81:9 |
| 60:4 97:11 | 90:2 91:17 |
| **work** 22:22 | **year** 67:9 |
| 23:5 24:10 | **years** 9:21 |
| 26:21 28:2 | 15:20 18:4 |
| 30:6 31:2 | 23:16 27:17 |
| 37:17,21 46:19 | 28:22 29:21 |
| **worked** 29:20 | 54:13 71:12 |
| 30:15,18 31:6 | 91:18 95:18 |
| **worker** 59:2,6 | 97:25 98:12 |
| 85:17 | **yesterday** |
| **workers** 37:15 | 20:21 22:8 |
| 37:17,20 58:4 | **york** 1:22 8:5 |
| 59:4 | 103:3 105:5 |
| **working** 24:16 | 106:1 |
| 36:4 | **z** |
| **worse** 93:17 | |
| **write** 75:12 | **zoom** 1:16 2:6 |
| **written** 73:9 | 2:10 7:20 8:6 |
| 75:8,12 89:21 | |
| **x** | |
| **x** 1:5,11 54:4 | |
| 104:1 | |

Federal Rules of Civil Procedure

Rule 30

(e)  Review By the Witness; Changes.

(1)  Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A)  to review the transcript or recording; and

(B)  if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2)  Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.